**Exhibit A**

(Trustee's Complaint)

WHITE AND WILLIAMS LLP
Amy E. Vulpio, Esq.
James C. Vandermark, Esq.
7 Times Square, Suite 2900
New York, NY 10036
(212) 244-9500
vulpioa@whiteandwilliams.com
vandermarkj@whiteandwilliams.com

*Counsel to Heidi J. Sorvino, Esq.,*
 *as the Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>60 91st Street Corp.,<br>     Debtor. | Chapter 11<br><br>Case No. 20-10338 (SCC) |
| HEIDI J. SORVINO, as the duly appointed chapter 11 trustee for the estate of 60 91st Street Corp.,<br><br>     Plaintiff,<br><br>v.<br><br>2386 HEMPSTEAD, INC.,<br><br>     Defendant. | Adv. Proc. |

## COMPLAINT FOR A DECLARATORY JUDGMENT, TO AVOID AND RECOVER TRANSFERS, AND TO DISALLOW CLAIMS

Heidi J. Sorvino (the "**Chapter 11 Trustee**"), as the duly appointed chapter 11 trustee for

the estate of 60 91st Street Corp. (the "**Debtor**"), brings this complaint (the "**Complaint**") against

2386 Hempstead, Inc. (the "**Lender**") and alleges[1] as follows:

---

[1] The allegations in this Complaint are based upon the Chapter 11 Trustee's information and belief, obtained, without limitation, from a review of documentation and information obtained by the Chapter 11 Trustee and her professionals during the course of their investigatory work in the Debtor's chapter 11

## NATURE OF THE CASE

1.      By the instant adversary proceeding, the Chapter 11 Trustees seeks a declaratory judgment against the Lender declaring the Loan Documents (as defined below) and the Foreclosure Judgment (as defined below) are void under New York law, as they were impermissibly entered into by the Lender and Kim Mortimer, on behalf of the Debtor, after the Debtor was dissolved by the State of New York.

2.      The Chapter 11 Trustee further seeks to avoid and recover from the Lender, or from any other person or entity for whose benefit the transfers were made, all preferential transfers of property that occurred during the ninety (90) day period prior to the commencement of the bankruptcy case of the Debtor (the "**Preference Period**") pursuant to sections 547 and 550 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), including any judgement entered in favor of the Lender and against the Debtor during the Preference Period.

3.      Subject to proof, the Chapter 11 Trustee also seeks to avoid and recover from the Lender, or any other person or entity for whose benefit transfers were made, any transfers that may have been fraudulent conveyances, pursuant to sections 548 and 550 of the Bankruptcy Code as well as sections 273-279 of the New York Debtor & Creditor Law (the "**DCL**").

4.      In addition, the Chapter 11 Trustee seeks to disallow, pursuant to sections 502(a), (b), (d), and (j) of the Bankruptcy Code, any claim that the Lender has filed or asserted against the Debtor or that has been scheduled for the Lender.

## JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**"), has subject matter jurisdiction over this adversary proceeding, which arises under title

case, from a review of other publicly available documentation and information, and from information

11, arises in, and relates to a case under title 11, pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Debtor's chapter 11 case and this adversary proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6. This adversary proceeding is a core proceeding to be heard and determined by the Court under 28 U.S.C. § 157(b)(2). The Chapter 11 Trustee consents to entry of final orders and judgment by the Court.

7. The statutory and legal predicates for the relief sought herein are sections 502, 547, 548, and 550 of the Bankruptcy Code, Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), sections 273-279 of the DCL, sections 1005 and 1006 of NY Business Corporation Law, and section 203-1 of the New York Tax Law.

## II.     PARTIES

8. The Debtor is a New York domestic business corporation, incorporated under the laws of New York, and is the owner of the real property located at 60 West 91st Street, New York, NY 10024 (the "**Property**").

9. The Chapter 11 Trustee is the duly appointed chapter 11 trustee for the Debtor's bankruptcy estate and has standing to purse this action.

10. Upon information and belief, the Lender was, at all relevant times, a New York domestic business corporation, incorporated under the laws of New York. Upon further information and belief, at all relevant times, the Lender's principal place of business was located at 47 Glen Cove Rd., Greenvale, New York, 11548.

## FACTUAL BACKGROUND

## Pre-Petition Background

provided parties in interest in the Debtor's chapter 11 case.

11.     Prior to September 26, 1994, Arthur and Anne Sowell (who, upon information and belief, were Kim Mortimer's maternal grandparents) owned the Property as tenants in common.

12.     On or about August 29, 1994, the Debtor was organized as a New York domestic business corporation pursuant to a Certificate of Incorporation filed with the Department of State for the State of New York (the "**NY DOS**").

13.     After the Debtor was incorporated, the Debtor received ownership of the Property as the result of two transfers: (1) the first transfer occurred on or about September 26, 1994, when Anne Sowell transferred her one-half interest in the Property to the Debtor (the "**1994 Transfer**"), and (2) the second transfer occurred on or about February 18, 2011, when Arthur Sowell's one-half interest in the Property was transferred to the Debtor by Yvonne Sowell (a/k/a Yvonne Mortimer) as the sole heir-at-law of Arthur Sowell (the "**2011 Transfer**").

14.     On or about July 29, 2009 (the "**Dissolution Date**"), the Debtor was dissolved, pursuant to section 203-a of the New York Tax Laws, by the proclamation of the Secretary of State for the State of New York published on July 29, 2009.

15.     Upon information and belief, Kim Mortimer was, at all relevant times, operating the Debtor's business and managing the Debtor's affairs, which includes all times after the Dissolution Date and until the appointment of the Chapter 11 Trustee.

16.     Upon information and belief, in 2015, Kim Mortimer began to operate and manage the renting of apartment units at the Property through a new corporation, 60 91st Street Corporation (the "**New Corp**").  Upon further information and belief, Kim Mortimer caused a Certification of Incorporation to be filed with the NY DOS on or about August 24, 2015, which effectuated the formal creation of New Corp.

17. Upon further information and belief, following the creation of New Corp, Kim Mortimer operated the business of renting the apartment units at the Property through New Corp, including entering into leases in the name of New Corp, and also ceased filing tax returns for the Debtor and reported all income derived from the Property as income on the tax returns filed for New Corp.

18. After the Dissolution Date, and despite the fact that the Debtor was dissolved, the Lender and Kim Mortimer, purportedly on behalf of the Debtor, executed the following Loan Documents:

   a. upon information and belief, a promissory note dated August 13, 2015 (the "**First Note**"), which purports to obligate the Debtor to repay the Lender the sum of $1,400,000.00 (the "**First Loan**");

   b. a mortgage purporting to secure the obligations under the First Note, dated August 13, 2015, which was recorded with Office of the City Register of the City of New York at CRFN 2015000301919 (the "**First Mortgage**");

   c. upon information and belief, a promissory note dated October 3, 2016 (the "**Second Note**"), which purports to obligate the Debtor to repay the Lender the sum of $300,000 (the "**Second Loan**");

   d. a mortgage purporting to secure the obligations under the Second Note, dated October 3, 2016, which was recorded with Office of the City Register of the City of New York at CRFN 2016000435774 (the "**Second Mortgage**");

   e. an agreement entitled Consolidation, Extension and Modification Agreement dated October 3, 2016, (the "**CEMA**"), which purports to consolidate the obligations under the First and Second Loans;

   f. a consolidated note dated October 3, 2016, (the "**Consolidated Note**") purporting to consolidate the First and Second Notes into one note; and

   g. a mortgage dated October 3, 2016 and recorded in the Office of the City Register of the City of New York at CRFN 2016000435774 (the "**Last Mortgage**"), which purports to secure the obligations under a "note signed by the [Debtor] and dated September 2016", which is a note unknown to the Chapter 11 Trustee (the "**September 2016 Note**").

A true and correct copy of the Consolidated Note and Last Mortgage are attached hereto as **Exhibits A and B**, respectively, and incorporated herein as if set forth at length.

19.     Pursuant to the Consolidated Note, Kim Mortimer purportedly obligated the Debtor to pay the Lender $1,700,000, plus interest, on or before October 3, 2017 (the "**Maturity Date**").

20.     Upon information and belief, the Debtor failed to pay the Lender the amounts owed under the Consolidated Note by the Maturity Date (the "**Loan Default**").

21.     On November 16, 2017, approximately one (1) month after the Maturity Date and Loan Default, the Lender commenced a foreclosure action against the Debtor by causing a Verified Complaint Mortgage Foreclosure (the "**Foreclosure Complaint**") to be filed with the Supreme Court of the State of New York in the County of New York (the "**State Court**"), which was assigned index no. 850274/2017 (the "**Foreclosure Action**").  A true and correct copy of the Foreclosure Complaint is attached hereto as **Exhibit C** and incorporated herein as if set forth at length.

22.     On December 9, 2019, the State Court entered a Decision + Order on Motion, Judgment of Foreclosure and Sale (the "**Foreclosure Judgment**") which provided for a sale of the Property and payment of the following amounts to the Lender:

  a.  $2,691,415.40 with interest at the note rate from April 30, 2019 until entry of judgment, together with any advances as provided for in the note and mortgage which [the Lender] had made for taxes, insurance, principal, and interest and any other charges due to prior mortgages or to maintain the property pending consummation of the foreclosure sale, not included in the computation upon presentation of receipt for said expenditure to the Referee, and then with interest from the date of entry of this judgment at the statutory rate until the date the deed is transferred

  b.  $1,590.00 for costs and disbursements in this action with interest at the statutory judgment rate from the date of entry of this judgment; and

      c.    $20,000 for reasonable attorneys' fees with interest at the statutory judgment rate from the date of entry of this judgment.

A true and correct copy of the Foreclosure Judgment is attached hereto as **Exhibit D** and incorporated herein as if set forth at length.

23.     The Foreclosure Judgment does not reference either the Consolidated Note or the September 2016 Note or otherwise identify the applicable note for determining the amount of any additional interest or advances the Lender may be entitled to under the Foreclosure Judgement.

24.     On December 20, 2019, the Debtor filed a Notice of Appeal with the State Court challenging "each and every part" of the Foreclosure Judgment.  A true and correct copy of the Notice of Appeal is attached hereto as **Exhibit E** and incorporated herein as if set forth at length.

**Post-Petition Background**

25.     On February 4, 2020 (the "**Petition Date**"), Kim Mortimer, who alleges that she is the sole shareholder of the Debtor, filed a voluntary petition (the "**Petition**") on behalf of the Debtor for relief under chapter 11 of the Bankruptcy Code with the Court.

26.     On February 27, 2020, the Lender filed a proof of claim [Claim No. 2-1] (the "**Lender's POC**") to assert a secured claim of $3,016,316.05.  The Lender's POC includes a copy of the Foreclosure Judgment, the Consolidated Note, and the Last Mortgage; however, it does not include a copy of the September 2016 Note.

27.     On April 30, 2020, the Court entered the *Order Approving the Appointment of the Chapter 11 Trustee* [Doc. No. 28] approving the appointment of Ms. Sorvino as the Chapter 11 Trustee in the Debtor's bankruptcy case.

28.     On August 7, 2020, the Chapter 11 Trustee filed the *Motion of Heidi J. Sorvino, as the Chapter 11 Trustee for (I) an Order (A) Establishing Bidding Procedures, Terms and*

*Conditions for the Sale of Substantially All of the Debtor's Assets; (B) Approving Bid*

*Protections; (C) Approving the Form and Manner of the Sale; and (D) Scheduling an Auction*

*and Hearing to Consider the Approval of the Sale of Substantially All of the Debtor's Assets; (II)*

*an Order Approving the Sale of the Debtor's Assets Free and Clear of Liens, Claims and*

*Encumbrances; and (III) Granting Related Relief* [ECF No. 134] (the "**Bidding Procedures**

**Motion**").  The Bidding Procedures Motions proposed certain requirements, procedures, and

deadlines (the "**Sale Procedures**") for a potential auction and sale of substantially all of the

Debtor's assets, including the Property (the "**Sale**").

29.     In preparation for a hearing on the Bidding Procedures Motion, counsel to the

Chapter 11 Trustee engaged Riverside Abstract LLC (the "**Title Company**") to examine the title

to the Property and prepare a preliminary certificate of title (the "**Preliminary Report**"), which

reflects the dissolution of the Debtor as of the Dissolution Date.  A copy of the Preliminary

Report is attached hereto as **Exhibit F** and incorporated herein as if set forth at length.

30.     The Title Company advised the Chapter 11 Trustee that it would not be able to

issue title insurance for the conveyance of the Property, as a whole, due to the Dissolution of the

Debtor prior to the 2011 Transfer.

31.     On September 14, 2020, the Chapter 11 Trustee filed the *Motion of Heidi J.*

*Sorvino, as the Chapter 11 Trustee, Pursuant to 11 U.S.C. §§ 105, 363 and 541, for an Order (I)*

*Deeming Debtor a De Facto Corporation and (II) Finding Certain Real Property to be Property*

*of the Debtor's Estate* [ECF No. 154] (the "**Title Motion**") requesting the Court find the

Property to be part of the Debtor's estate.

32.     On September 29, 2020, the Court enter the *Order Granting Motion of Heidi J.*

*Sorvino, as the Chapter 11 Trustee, Pursuant to 11 U.S.C. §§ 105, 363, and 541, for an Order (I)*

*Deeming Debtor a De Facto Corporation and (II) Finding Certain Real Property to be Property of the Debtor's Estate* [ECF No. 171] (the "**Title Order**"), which held that the Debtor was vested with title to the Property and that the Property, in its entirety, was part of the Debtor's estate.

33.     The Title Order did not address the Loan Documents, the Foreclosure Judgment, or any other lien, claim or interest in the Property that is alleged by the Lender.

## CLAIMS AND CAUSES OF ACTIONS

### Count I
**(Declaratory Judgment Finding the Lender's Claims are Void)**

34.     The Chapter 11 Trustee repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

35.     Pursuant to section 203-a of the New York Tax Law, a corporation may be involuntarily dissolved by proclamation of the New York Secretary of State for failure to file reports or pay taxes.

36.     After a corporation is dissolved, it is prohibited from carrying on new business because the corporation's legal existence terminates, except for a limited *de jure* existences solely for the purpose of winding up its affairs.  *80-02 Leasehold, LLC v. CM Realty Holdings Corp.*, 123 A.D.3d 872, 874 (NY App. Div. 2d Dept. 2014); *Moran Enters., Inc. v. Hurst*, 66 A.D.3d 972, 975 (NY App. Div. 2d Dept. 2009) (*citing* Business Corporation Law § 1005(a)(1)).

37.     Pursuant to Section 1005(a)(2) of the NY Business Corporation Law,  "winding up" means "the performance of acts directed toward the liquidation of the corporation, including the collection and sale of corporate assets."  *172 E. 122 St. Tenants Ass'n v. Schwarz*, 73 N.Y.2d 340, 349 (1989) (citation omitted).

38.     Moreover, only the claims and remedies available prior to the dissolution of a corporation are preserved; therefore, claims arising after the company is dissolved, and any

judgment based on such a claim, are null and void.  *See* NY Business Corporation Law § 1006(b); *see also Bayer v. Sarot*, 51 A.D.2d 366, 368 (NY App. Div. 1st Dept. 1976) ("all persons who had contracted or done business with the dissolved corporation are charged with knowledge of the statutes governing the termination of its corporate existence upon dissolution, and of the statutes governing its liquidation, and are bound thereby.").

39.     The Debtor was dissolved and its legal existence terminated as of the Dissolution Date.

40.     Kim Mortimer's execution of the Loan Documents, on behalf of the Debtor, were not in the furtherance of the winding up of the Debtor and thus, constitutes impermissible new business.

41.     Actions taken by the Debtor in violation of Section 1005 of the NY Business Corporation Law are void, including the execution of the Loan Documents and entry of the Foreclosure Judgment.

42.     The Lender is a sophisticated party, charged with the knowledge of the Debtor's dissolution and the laws governing that dissolution, and had the means to determine the status of the Debtor's corporate existences prior to entering into the Loan Documents.

43.     Despite the foregoing, the Lender, in its business judgment, chose to proceed with the execution of the Loan Documents.

44.     As the Loan Documents and the Foreclosure Judgment are based on claims arising from after the Dissolution Date, they are void.   The Lender may have recourse against Kim Mortimer for claims arising from the Loan Documents, but not against the Debtor or the Debtor's estate.  *See 80-02 Leasehold, LLC*, 123 A.D.3d at 874 ("A person who purports to act on behalf

of a dissolved corporation is personally responsible for the obligations incurred") (citations omitted).

45.     Pursuant to sections 1005 and 1006 of the NY Business Corporation Law, the Lender impermissibly encumbered the Debtor's property by obtaining the Loan Documents and Foreclosure Judgment following the dissolution of the Debtor; therefore, the Chapter 11 Trustee is entitled to a judgment declaring: (a) the Loan Documents are void, (b) the Foreclosure Judgment is void, and (c) requiring the Lender to take such steps as necessary for the public records to reflect that the Loan Documents and Foreclosure Judgment are void.

## <u>Count II</u>
### (Avoidance of Preference Period Transfers - 11 U.S.C. § 547)

46.     The Chapter 11 Trustee repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

47.     During the Preference Period, the Lender received transfers (the "**Transfers**") from the Debtor that were to or for the benefit of the Lender, including the transfer effectuated by the Foreclosure Judgment.

48.     Each Transfer constituted transfers of an interest in the Debtor's property to or for the benefit of the Lender.

49.     The Lender was a creditor of the Debtor at the time of each Transfer by virtue of the Loan Documents and the Debtor's purported obligation to pay claims arising thereunder.

50.     Each Transfer was to or for the benefit of a creditor within the meaning of section 547(b)(1) of the Bankruptcy Code because each Transfer either reduced or fully satisfied a debt or debts then owed by the Debtor to the Lender.

51.     Each Transfer was made for, or on account of, an antecedent debt or debts owed by the Debtor to the Lender before such Transfers were made, as asserted by the Lender and memorialized in the Loan Documents, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of the Lender prior to the Transfers.

52.     Each Transfer was made while the Debtor was insolvent.  The Chapter 11 Trustee is entitled to the presumption of the Debtor's insolvency for each Transfer made during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

53.     Each Transfer was made during the Preference Period.

54.     As a result of each Transfer, the Lender received more than the Lender would have received if: (i) the Debtor's bankruptcy case was a case under chapter 7 of the Bankruptcy Code; (ii) the Transfers had not been made; and (iii) the Lender received payments of its debts under the provisions of the Bankruptcy Code.  As evidenced by the Debtor's schedules filed in the underlying bankruptcy case as well as the proofs of claims that have been received to date, the Debtor's liabilities exceed its assets such that the Debtor's unsecured creditors will not receive payment of their claims in full from the Debtor's bankruptcy estate.

55.     In accordance with the foregoing, each Transfer, including the Foreclosure Judgment, is avoidable pursuant to 547(b) of the Bankruptcy Code.

56.     Pursuant to sections 547(b) and 550 of the Bankruptcy Code, the Chapter 11 Trustee is entitled to a judgment: (a) avoiding the Transfers, (b) directing the Transfers be set

aside, and (c) requiring the Lender, as the recipient of the Transfers, to take such steps as necessary to set aside the Transfers.

## Count III
### (Avoidance of Constructive Fraudulent Conveyances - 11 U.S.C. § 548)

57.     The Chapter 11 Trustee repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

58.     During the two years prior to the Petition Date, the Lender received transfers (the "**Potentially Fraudulent Transfers**") from the Debtor that were to or for the benefit of the Lender, including the transfer effectuated by the Foreclosure Judgment, the Chapter 11 Trustee pleads that the Debtor did not receive reasonably equivalent value in exchange for the Potentially Fraudulent Transfers; and

   a.  the Debtor was insolvent as of the date of the Potentially Fraudulent Transfer(s), or became insolvent as a result of the Potentially Fraudulent Transfer(s); or

   b.  the Debtor was engaged, or about to engage, in business or a transaction for which any property remaining with the Debtor or for whose benefit the Potentially Fraudulent Transfer(s) was made was unreasonably small capital; or

   c.  the Debtor intended to incur, or believed it would incur, debts beyond its ability to pay upon maturity.

59.     Each of the Potentially Fraudulent Transfers constituted a transfer of an interest of the Debtor in property.

60.     At the time of each Potentially Fraudulent Transfer, the Lender knew or should have known that the Debtor was a dissolved corporation and incapable of entering into the Loan Documents.  Thus, the Lender received each of the Potentially Fraudulent Transfers without good

faith and with the knowledge of their avoidability. Accordingly, the Lender is not entitled to a replacement lien pursuant to section 548(c) of the Bankruptcy Code.

61.     Pursuant to sections 548(a)(1)(B) and 550 of the Bankruptcy Code, the Chapter 11 Trustee is entitled to a judgment: (a) avoiding the Potentially Fraudulent Transfers, (b) directing the Potentially Fraudulent Transfers be set aside, (c) requiring the Lender, as the recipient of the Potentially Fraudulent Transfers, to take such steps as necessary to set aside the Potentially Fraudulent Transfers, and (d) denying the Lender a replacement lien pursuant to section 548(c) of the Bankruptcy Code.

## Count IV
### (Avoidance of Actual Fraudulent Conveyances - 11 U.S.C. § 548)

62.     The Chapter 11 Trustee repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

63.     The Potentially Fraudulent Transfers received by the Lender constituted transfers of an interest of the Debtor's property.

64.     The Potentially Fraudulent Transfers were made within two (2) years of the Petition Date.

65.     The Potentially Fraudulent Transfers were made with the actual intent to hinder, delay, or defraud entities to which the Debtor was or became indebted to on or after the date of the Potentially Fraudulent Transfers.

66.     At the time of each Potentially Fraudulent Transfer, the Lender knew or should have known that the Debtor was dissolved and the Loan Documents and Foreclosure Action were legally impermissible. Thus, the Lender received the Potentially Fraudulent Transfers without good faith and with the knowledge of their avoidability. Accordingly, the Lender is not entitled to a replacement lien pursuant to section 548(c) of the Bankruptcy Code.

67.     Pursuant to sections 548(a)(1)(A) and 550, the Chapter 11 Trustee is entitled to a judgment: (a) avoiding the Potentially Fraudulent Transfers, (b) directing the Potentially Fraudulent Transfers be set aside, (c) requiring the Lender, as the recipient of the Potentially Fraudulent Transfers, to take such steps as necessary to set aside the Potentially Fraudulent Transfers, and (d) denying the Lender a replacement lien pursuant to section 548(c) of the Bankruptcy Code.

## Count V
**(Avoidance of Fraudulent Conveyances - New York Law, DCL §§ 276, 276-a, 278, 279)**

68.     The Chapter 11 Trustee repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

69.     The First, Second, and Last Mortgage constituted transfers (the "**Mortgage Transfers**") of an interest of the Debtor in property.

70.     Each of the Mortgage Transfers was made within six (6) years of the Petition Date.

71.     At all relevant times there have been one or more creditors who have held and still hold matured or un-matured unsecured claims against the Debtor that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

72.     The Mortgage Transfers were made with the actual intent to hinder, delay, or defraud entities to which the Debtor was or became indebted to after each Mortgage Transfer occurred.

73.      At the time of the Mortgage Transfers, the Lender was aware or should have been aware that the Debtor was dissolved and the Loan Documents and Foreclosure Action were

legally impermissible. Thus, the Lender received the Mortgage Transfers without good faith and with the knowledge of their avoidability.

74.     Pursuant to sections 276, 278, and 279 of the New York Debtor & Creditor Laws (the "**DCL**"), and section 544 and 550 of the Bankruptcy Code, the Chapter 11 Trustee is entitled to a judgment: (a) avoiding the Mortgage Transfers, (b) directing that the Mortgage Transfers be set aside, (c) requiring the Lender, as the recipient of the Mortgage Transfers, to take such steps as necessary to set aside the Mortgage Transfers, and (d) recovering attorneys' fees from the Lender.

### Count VI
### (Avoidance of Fraudulent Conveyances - New York Law, DCL §§ 273, 278, and 279)

75.     The Chapter 11 Trustee repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

76.     Each of the Mortgage Transfers constituted a transfer of an interest of the Debtor in property.

77.     At all relevant times there have been one or more creditors who have held and still hold matured or un-matured unsecured claims against the Debtor that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

78.     The Debtor did not receive fair consideration for the Mortgage Transfers.

79.     The Debtor was insolvent at the time Kim Mortimer and the Lender caused the Mortgage Transfers to occur, or, in the alternative, the Debtor became insolvent as a result of the Mortgage Transfers.

80.     At the time of the Mortgage Transfers, the Lender was aware or should have been aware that the Debtor was dissolved and the Loan Documents and Foreclosure Action were legally impermissible.  Thus, the Lender received the Mortgage Transfers without good faith and with the knowledge of their avoidability.

81.     Pursuant to sections 273, 278, and 279 of the DCL, and section 544 and 550 of the Bankruptcy Code, the Chapter 11 Trustee is entitled to a judgment: (a) avoiding the Mortgage Transfers, (b) directing that the Mortgage Transfers be set aside, and (c) requiring the Lender, as the recipient of the Mortgage Transfers, to take such steps as necessary to set aside the Mortgage Transfers.

## Count VII
### (Avoidance of Fraudulent Conveyances - New York Law, DCL §§ 274, 278, and 279)

82.     The Chapter 11 Trustee repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

83.     Each of the Mortgage Transfers constituted a transfer of an interest of the Debtor in property.

84.     At all relevant times there have been one or more creditors who have held and still hold matured or un-matured unsecured claims against the Debtor that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

85.     The Debtor did not receive fair consideration for the Mortgage Transfers.

86.     At the time Kim Mortimer and the Lender caused the Mortgage Transfers to occur, the Debtor was engaged in, or was about to engage in, a business or transaction for which

the property remaining in its hands after each of the transfers constituted unreasonably small capital.

87.     At the time of the Mortgage Transfers, the Lender was aware or should have been aware that the Debtor was dissolved and the Loan Documents and Foreclosure Action were legally impermissible.  Thus, the Lender received the Mortgage Transfers without good faith and with the knowledge of their avoidability.

88.     Pursuant to sections 274, 278, and 279 of the DCL, and section 544 and 550 of the Bankruptcy Code, the Chapter 11 Trustee is entitled to a judgment: (a) avoiding the Mortgage Transfers, (b) directing that the Mortgage Transfers be set aside, and (c) requiring the Lender, as the recipient of the Mortgage Transfers, to take such steps as necessary to set aside the Mortgage Transfers.

## <u>Count VIII</u>
**(Avoidance of Fraudulent Conveyances - New York Law, DCL §§ 275, 278, and 279)**

89.     The Chapter 11 Trustee repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

90.     Each of the Mortgage Transfers constituted a transfer of an interest of the Debtor in property.

91.     At all relevant times there have been one or more creditors who have held and still hold matured or un-matured unsecured claims against the Debtor that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

92.     The Debtor did not receive fair consideration for the Mortgage Transfers.

93.     At the time Kim Mortimer and the Lender caused the Mortgage Transfers to occur, the Debtor had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

94.     At the time of the Mortgage Transfers, the Lender was aware or should have been aware that the Debtor was dissolved and the Loan Documents and Foreclosure Action were legally impermissible.  Thus, the Lender received the Mortgage Transfers without good faith and with the knowledge of their avoidability.

95.     Pursuant to sections 275, 278, and 279 of the DCL, and section 544 and 550 of the Bankruptcy Code, the Chapter 11 Trustee is entitled to a judgment: (a) avoiding the Mortgage Transfers, (b) directing that the Mortgage Transfers be set aside, and (c) requiring the Lender, as the recipient of the Mortgage Transfers, to take such steps as necessary to set aside the Mortgage Transfers.

## Count IX
### (Disallowance of all Claims – 11 U.S.C. § 502(a), (b), (d), and (j))

96.     The Chapter 11 Trustee repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

97.     The Lender's POC and any other claims asserted by the Lender against the Debtor or the Debtor's estate (collectively, the "**Lender's Claims**") must be disallowed to the extent the Lender relies upon certain of the Loan Documents and the Foreclosure Judgment, which are void because they are based on claims against the Debtor that arose after the Dissolution Date.

98.     To the extent the Loan Documents are not void, the Lender's POC does not include the September 2016 Note and thus does not establish either (i) the Lender's entitlement to interest or advances beyond the amounts specified in the Foreclosure Judgment, to the extent

the Foreclosure Judgment is not void, or (ii) the amount of the obligation secured by the Last Mortgage.

99.     The Lender is also a transferee of avoidable transfers under sections 544, 547 and 548 of the Bankruptcy Code and sections 273-279 of the DCL, which are recoverable by the Chapter 11 Trustee under section 550 of the Bankruptcy Code.

100.    The Lender has not paid to the Chapter 11 Trustee the amount of the avoidable transfers, or turned over such property, for which the Lender is liable under section 550 of the Bankruptcy Code.

101.    Pursuant to section 502(a), the Chapter 11 Trustee may object to the Lender's claims in this chapter 11 case.

102.    Pursuant to section 502(b)(1), any and all claims of the Lender and/or its assignee, against the Debtor or the Debtor's chapter 11 estate must be disallowed as arising from transactions which are impermissible and void because they took place after the Dissolution Date.

103.    Pursuant to section 502(b)(1), the Lender's Claims must be disallowed to the extent  the Lender's POC fails to establish an entitlement to the amounts asserted or that such amount is  secured under any agreement or New York law.

104.    Pursuant to section 502(d) of the Bankruptcy Code, Lender's Claims as asserted against the Debtor or the Debtor's chapter 11 estate must be disallowed until such time as the Lender pays to the Chapter 11 Trustee an amount equal to the aggregate amount of the avoidable transfers, plus interest and costs.

105.    Pursuant to section 502(j), any and all claims of the Lender, and/or its assignee, against the Debtor or the Debtor's chapter 11 estate previously allowed by the Debtor or the

Chapter 11 Trustee, must be reconsidered and disallowed until such time as the Lender pays the Chapter 11 Trustee an amount equal to the aggregate amount of the avoidable transfers.

106.     Pursuant to sections 502(a), (b), (d), and (j) of the Bankruptcy Code, the Chapter 11 Trustee is entitled to a judgment disallowing any claims held or filed by the Lender against the Debtor or the Debtor's chapter 11 estate.

**Count X**
**(Reclassification of Claims and Determining Liens are Void**
**– 11 U.S.C. § 502(a), (b) and (j) and 506)**

107.     The Chapter 11 Trustee repeats and reasserts the allegations contained in all of the preceding paragraphs as if the same were set forth herein at length.

108.     To the extent the Lender's Claims are not disallowed, the Lender's Claims must be reclassified as general unsecured claims to the extent the Lender relies upon certain of the Loan Documents and the Foreclosure Judgment, which are void because they are based on claims against the Debtor that arose after the Dissolution Date.

109.     To the extent the Loan Documents are not void, the Lender's POC does not include the September 2016 Note and thus does not establish either (i) the Lender's entitlement to interest or advances beyond the amounts specified in the Foreclosure Judgment, to the extent the Foreclosure Judgment is not void, or (ii) the amount of the obligation secured by the Last Mortgage.

110.     Pursuant to section 502(a), the Chapter 11 Trustee may object to the Lender's claims in this chapter 11 case.

111.     Pursuant to section 506(a)(1), the Lender's Claims are not secured because the Lender does not have an interest in the estate's interest in property.

112.     Pursuant to section 506(d), the Lender's asserted liens allegedly secured claims against the Debtor are void to the extent the Lender's Claims are not allowed as secured claims by the Court.

113.     Pursuant to section 502(b)(1), any and all claims of the Lender and/or its assignee, against the Debtor or the Debtor's chapter 11 estate must be disallowed as arising from transactions which are impermissible and void because they took place after the Dissolution Date.

114.     Pursuant to section 502(b)(1), the Lender's POC must be disallowed as a secured claim to the extent  the Lender's POC fails to establish an entitlement to the amounts asserted or that such amount is  secured under any agreement or New York law.

115.     Pursuant to section 502(j), any and all claims of the Lender, and/or its assignee, against the Debtor or the Debtor's chapter 11 estate previously allowed as secured claims by the Debtor or the Chapter 11 Trustee, must be reconsidered and disallowed as secured claims.

116.     Pursuant to sections 502(a), (b), and (j) and 506(a)(1) and (d) of the Bankruptcy Code, the Chapter 11 Trustee is entitled to a judgment reclassifying the Lender's Claims as general unsecured claims and decreeing any liens asserted by the Lender against the Debtor or the Debtor's estate are void.

WHEREFORE, the Chapter 11 Trustee respectfully request that this Court enter judgment in favor of the Chapter 11 Trustee and against the Lender as follows:

a. On Count I: (a) declaring the Loan Documents are void, (b) declaring the Foreclosure Judgment is void, and (c) requiring the Lender to take such steps as necessary for the public records to reflect that the Loan Documents and Foreclosure Judgment are void.

b. On Count II: (a) avoiding the Transfers, (b) directing the Transfers be set aside, and (c) requiring the Lender, as the recipient of the Transfers, to take such steps as necessary to set aside the Transfers.

c. On Count III and IV: (a) avoiding the Potentially Fraudulent Transfers, (b) directing the Potentially Fraudulent Transfers be set aside, (c) requiring the Lender, as the recipient of the Potentially Fraudulent Transfers, to take such steps as necessary to set aside the Potentially Fraudulent Transfers, and (d) denying the Lender a replacement lien pursuant to section 548(c) of the Bankruptcy Code.

d. On Count V: (a) avoiding the Mortgage Transfers, (b) directing that the Mortgage Transfers be set aside, (c) requiring the Lender, as the recipient of the Mortgage Transfers, to take such steps as necessary to set aside the Mortgage Transfers, and (d) recovering attorneys' fees from the Lender.

e. On Counts VI, VII, and VII: (a) avoiding the Mortgage Transfers, (b) directing that the Mortgage Transfers be set aside, and (c) requiring the Lender, as the recipient of the Mortgage Transfers, to take such steps as necessary to set aside the Mortgage Transfers.

f. On Count IX: disallowing any claims held or filed by the Lender against the Debtor or the Debtor's chapter 11 estate.

g. On County X: reclassifying any claims held or filed by the Lender as general unsecured claims and decreeing any liens asserted by the Lender against the Debtor or the Debtor's estate are void.

and such other and further relief as this Court deems just and proper to grant the Chapter 11 Trustee, on behalf of the Debtor's estate, full relief in this case.

Dated:   New York, New York          WHITE AND WILLIAMS LLP
         November 23, 2020

                                     */s/ James C. Vandermark*
                                     Amy E. Vulpio
                                     James C. Vandermark
                                     7 Times Sq., Suite 2900
                                     New York, NY 100036
                                     vulpioa@whiteandwilliams.com
                                     vandermarkj@whiteandwilliams.com

                                     *Counsel to Heidi J. Sorvino, Esq., as the*
                                     *Chapter 11 Trustee*

## Exhibit A

(Consolidated Note)

# CONSOLIDATED
# INTEREST-ONLY PERIOD FIXED RATE NOTE

| October 3, 2016 | **Melville,** | New York |
|---|---|---|
| [Date] | [City] | [State] |

**60 West 91ˢᵗ St., New York, NY 10024**
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$1,700,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **2386 Hempstead Inc.** I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **3.000%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment every month. This payment will be for interest only for the first 12 months.

I will make my monthly payment on the first day of each month beginning on **November 3, 2016.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on October 3, 2017, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 45 Glen Cove Rd., Greenvale, NY 11548 or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$4,250.00** for the first 12 months of this Note. The Note Holder will notify me prior to the date of change in monthly payment. **The borrower shall have the option to pay only $3,500.00 per month for the first 12 months of this Note. If the borrower elects this reduced payment, the shortage of $750.00 per month shall be added to the payoff amount that will be due on October 3, 2017.**

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. However, if the partial Prepayment is made during the period when my monthly payments consist only interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest as well as during the time that my payments consist of principal and interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, the amount of my monthly payment will not decrease; however, the principal and the interest required under this Note will be paid prior to the Maturity Date.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **2.000%** of my overdue payment of interest and/or principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

7. **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail, return receipt requested, to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

8. **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

9. **WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

10. **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

11. **DEFAULT**

In the event of any acceleration of the due date of any amount or amounts due under this note by reason of the Maker's failure to comply with the terms, covenants and conditions of this note, or on and after the maturity date set forth herein, whichever occurs first, it is agreed by the parties that interest on such amounts shall be computed at the maximum legal rate from the date of acceleration or maturity until the entire debt evidenced hereby is satisfied whether or not, notice of acceleration is delivered to Maker; in the event an action is instituted to collect the debt herein or to foreclose under the terms of the Mortgage and Security Agreement, or to foreclose any mortgage or mortgages given now or hereafter as collateral security for this indebtedness, interest on the amounts due hereunder shall be computed at the maximum legal rate from the date of acceleration or maturity of the indebtedness evidenced hereby until the entire debt is paid in full. All such interest shall be secured by the Mortgage and Security Agreement. Maker agrees that the time of repayment of the debt when due as hereinabove stated is of unique and specific importance and financial necessity to the holder of this note and the Mortgage and Security Agreement, and time is hereby made of the essence. It is further understood that the foregoing provisions of this paragraph do not constitute a consent or agreement on the part of the holder of this note to extend or postpone the time of such payment beyond the present date of maturity hereof. If any action is instituted to collect the debt herein or to foreclose the Mortgage and Security Agreement, or to foreclose under the terms of the Mortgage and Security Agreement or any collateral mortgage collaterally securing the debt herein whether granted now or at any future time, the Maker, and any guarantor, endorser or surety hereby severally agree to pay the reasonable attorney's fee incurred by the holder of this note for each such action, together with all costs and disbursements incurred in connection therewith, which attorney's fees, costs and disbursements shall be added to the amount due hereunder.

In no event shall the undersigned be charged more than the highest rate of interest which may be lawfully charged by the holder hereof and paid by the undersigned on the indebtedness evidenced hereby. It is therefore, agreed that if at any time interest on the indebtedness evidenced hereby would otherwise exceeds the highest lawful rate, the rate shall be automatically reduced and only such highest lawful rate will be paid by the undersigned. Should any amount be paid by the undersigned in excess of such highest lawful amount, such excess shall be deemed to have been paid in reduction of the principal balance hereof.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.**

60 91st Street Corp.

_____(Seal)

By: Kimberly Mortimer

_____(Seal)

_____(Seal)

_____(Seal)

## BALLOON PAYMENT RIDER TO NOTE AND SECURITY INSTRUMENT

This BALLOON PAYMENT RIDER ("Rider") is made this **October 3, 2016,** and amends a Note in the amount of **$1,700,000.00** (the "Note" made by the person(s) who sign below ("Borrower") to **2386 Hempstead Inc.** and the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") dated and given by Borrower to secure repayment of the Note.

In addition to the agreements and provisions made in the Note and the Security Instrument, both Borrower and Lender further agree as follows:

**IF NOT PAID EARLIER, THIS LOAN IS PAYABLE IN FULL ON (THE "MATURITY DATE"). BORROWER MUST REPAY THE ENTIRE UNPAID PRINCIPAL BALANCE OF THE LOAN AND INTEREST THEN DUE. THIS IS CALLED A "BALLOON PAYMENT". THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME.**

_____
Witness

_____
Witness

60 91st Street Corp.

_____
By: Kimberly Mortimer

# PREPAYMENT ADDENDUM TO NOTE

Date:   October 3, 2016

Borrower(s):   60 91ˢᵗ Street Corp.

THIS PREPAYMENT ADDENDUM TO NOTE (the "Addendum") is made this **October 3, 2016** and is incorporated into and shall be deemed to amend and supplement that certain promissory note (the "Note") made by the undersigned ("Borrower") in favor of **2386 Hempstead Inc.** ("Lender") and dated the same date as this Addendum. Repayment of the Note is secured by a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") given by Borrower in favor of Lender and dated the same date as this Addendum. To the extent that the provisions of this Addendum are inconsistent with the provisions of the Note, the provisions of this Addendum shall supersede the inconsistent provisions of the Note.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Note, Borrower and Lender further covenant and agree as follows:

Section 4 of the Note is amended to read in its entirety as follows:

**4.    BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

The Note Holder will use my Prepayment to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes.

If the Note contains provisions for a variable interest rate, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase. If this Note provides for a variable interest rate or finance charge, and the interest rate or finance charge at any time exceeds the legal limit under which a Prepayment penalty is allowed, then the Note Holder's right to assess a Prepayment penalty will be determined under applicable law.

If within six (6) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to three (3 ) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Addendum.

Date:  October 3, 2016


60 91ˢᵗ Street Corp.


By: Kimberly Mortimer

*[Sign original only]*

STATE OF NEW YORK    )
                     )ss:
COUNTY OF SUFFOLK    )

On **October 3, 2016**, before me, the undersigned, personally appeared **Kimberly Mortimer**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacities and that by his/her/their signatures on the instrument, the individuals, or the person upon behalf of which the individuals acted, executed the instrument.

_____
Notary Public

JAMES KOCORIS
NOTARY PUBLIC - STATE OF NEW YORK
NO. 02KO6020525
QUALIFIED IN NASSAU COUNTY
Commission Expires March 1, 20__

PAY TO THE ORDER OF

WITHOUT RECOURSE
2386 Hempstead Inc.

_____

**Exhibit B**

(Last Mortgage)

Loan #:
After Recording Return To:
**MOBERG & KOCORIS PC**
**150 Broadhollow Rd., Suite 320**
**Melville, NY 11747**

[Space Above This Line For Recording Data]
# C O N S O L I D A T E D   M O R T G A G E

## WORDS USED OFTEN IN THIS DOCUMENT

**(A) "Security Instrument."** This document, which is dated **October 3, 2016**, together with all Riders to this document, will be called the "Security Instrument."

**(B) "Borrower."** 60 91st Street Corp., whose address is 60 West 91st St, New York, NY 10024 sometimes will be called "Borrower" and sometimes simply "I" or "me."

**(C) "Lender."** 2386 Hempstead Inc. will be called "Lender." Lender is a corporation or association which exists under the laws of the State of . Lender's address is 45 Glen Cove Rd, Greenvale, NY 11548.

**(D) "Note."** The note signed by Borrower and dated **September  2016** will be called the "Note." The Note shows that I owe Lender **One Million Seven Hundred Thousand and 00/100** Dollars (U.S. **$1,700,000.00** ) plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by **November 3, 2017.**

**(E) "Property."** The property that is described below in the section titled "Description of the Property," will be called the "Property."

**(F) "Loan."** The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

**(H) "Riders."** All riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [ ] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [X] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

**(I) "Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

**(J) "Community Association Dues, Fees and Assessments."** All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees and Assessments."

**(K) "Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."

**(M) "Miscellaneous Proceeds."** "Miscellaneous Proceeds" mean any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, and as defined in, paid under the coverage described, in Section 5): for (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

**(N) "Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note and (ii) any amounts under Section 3 will be called "Periodic Payment."

**(P) "RESPA."** "RESPA means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

## DESCRIPTION OF THE PROPERTY

I give Lender rights in the Property described in (A) through (G) below:

(A) The Property which is located at **60 West 91st St., New York, NY 10024.** This Property is in **New York County.** It has the following legal description:

)

AS DESCRIBED IN SCHEDULE A ATTACHED HERETO AND MADE A PART HEREOF.

District:
Section:
Block:     1204
Lot:       54

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;
(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"
(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;
(E) All fixtures that are now or in the future will be on the Property described in subsection (A) of this section;
(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and
(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.
I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:
   **1. Borrower's Promise To Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.
   Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
   Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.
   **2. Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:
First, to pay interest due under the Note;
Next, to pay principal due under the Note; and
Next, to pay the amounts due Lender under Section 3 of this Security Instrument.
Such payments will be applied to each Periodic Payment in the order in which it became due.
Any remaining amounts will be applied as follows:
First, to pay any late charges;
Next, to pay any other amounts due under this Security Instrument; and
Next, to reduce the principal balance of the Note.
   If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.
   Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.
   Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments For Taxes And Insurance.**

(a) **Borrower's Obligations.** I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents, and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, and flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

(b) **Lender's Obligations.** Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if the Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

(c) **Adjustments to the Escrow Funds.** Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

**4. Borrower's Obligation to Pay Charges, Assessments And Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either: (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to the Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance polices covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

**(a) Maintenance and Protection of the Property.** I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as described in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

**(b) Lender's Inspection of Property.** Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

**8. Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9. Lender's Right to Protect Its Rights In The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for: such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance in force from time to time. Mortgage insurers may enter into agreements with other parties that change or modify their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance". It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These amounts will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has -- if any -- regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the Sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date the Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lenders interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

**(a) Borrower's Obligations.** Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

**(b) Lender's Rights.** Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender.

If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement of this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does transferred without Lender's prior written permission. If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right I will meet the following conditions:

(a)  I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b)  I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c)  I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d)  I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice will also contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances". "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup. I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law: (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the

presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing is this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements.** Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under the Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:
(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument.
(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:
    (1) The promise or agreement that I failed to keep or the default that has occurred;
    (2) The action that I must take to correct that default;
    (3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;
    (4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;
    (5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and
    (6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have.
(C) I do not correct the default stated in the notice from Lender by the date stated in that notice.

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

**24. Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

**25. Borrower's Statement Regarding the Property [check box as applicable].**
[ ]    This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.
[ ]    This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.
[X]    This Security Instrument does not cover real property improved as described above.

## BALLOON PAYMENT RIDER TO NOTE AND SECURITY INSTRUMENT

This BALLOON PAYMENT RIDER ("Rider") is made this **October 3, 2016**, and amends a Note in the amount of **$1,700,000.00** (the "Note" made by the person(s) who sign below ("Borrower") to **2386 Hempstead Inc.** and the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") dated and given by Borrower to secure repayment of the Note.

In addition to the agreements and provisions made in the Note and the Security Instrument, both Borrower and Lender further agree as follows:

**IF NOT PAID EARLIER, THIS LOAN IS PAYABLE IN FULL ON (THE "MATURITY DATE"). BORROWER MUST REPAY THE ENTIRE UNPAID PRINCIPAL BALANCE OF THE LOAN AND INTEREST THEN DUE. THIS IS CALLED A "BALLOON PAYMENT". THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME.**

_____
Witness

_____
Witness

**60 91st Street Corp.**

_____
By: Kimberly Mortimer

# PREPAYMENT RIDER

Date:    **October 3, 2016**

Borrower(s):    **60 91st Street Corp.**

THIS PREPAYMENT RIDER (the "Rider") is made this **October 3, 2016**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure repayment of Borrower's promissory note (the "Note") in favor of **2386 Hempstead Inc.** ("Lender"). The Security Instrument encumbers the Property more specifically described in the Security Instrument and located at:

**60 West 91st St., New York, NY 10024**
[Property Address]

ADDITIONAL COVENANTS.   In addition to the covenants and agreements made in the Security Agreement, Borrower and Lender further covenant and agree as follows:

**A.    PREPAYMENT CHARGE**
The Note provides for the payment of a prepayment charge as follows:

**4.    BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE**
I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment".  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
The Note Holder will use my Prepayment to reduce the amount of Principal that I owe under the Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note.  If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes.
If the Note contains provisions for a variable interest rate, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment.  However, any reduction due to my partial Prepayment may be offset by an interest rate increase.  If this Note provides for a variable interest rate or finance charge, and the interest rate or finance charge at any time exceeds the legal limit under which a Prepayment penalty is allowed, then the Note Holder's right to assess a Prepayment penalty will be determined under applicable law.
If within six (6) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to three (3 ) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Addendum.

Date:  **October 3, 2016**

**60 91st Street Corp.**

_____

**By: Kimberly Mortimer**

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 9 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____

_____

60 91st Street Corp.

_____

By: Kimberly Mortimer

_____

_____

STATE OF New York)
                 )ss:
COUNTY OF Suffolk)

On October 3, 2016, before me, the undersigned, personally appeared **Kimberly Mortimer**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacities and that by his/her/their signatures on the instrument, the individuals, or the person upon behalf of which the individuals acted, executed the instrument.

_____
Notary Public

Maria Tarasco
Notary Public - State of New York
NO. 01TA6073704
Qualified in Suffolk County
My Commission Expires April 28, 20_ _

**Exhibit C**

(Foreclosure Complaint)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

**2386 HEMPSTEAD, INC.,**

Plaintiff

-against-

**60 91st STREET CORP., and JOHN DOE # 1-10
and MARY ROE # 1-10** said names being fictitious, being
and intended to be persons or entities claiming or having an
interest in the premises that are the subject of this foreclosure
action.

Defendants

Index No.

**SUMMONS WITH NOTICE**

Plaintiff designates NEW YORK
County as the place of trial.
Venue is based upon the County
in which the mortgaged premises
are situated.

**Block 1204 Lot 54**

**TO THE ABOVE NAMED DEFENDANTS:**

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to
serve a copy of your answer, or, if the complaint is not served with this summons, to serve a
notice of appearance on the attorney for the Plaintiff within 20 days after the service of this
summons, exclusive of the day of service (or within 30 days after service is complete if this
summons is not personally delivered to you within the State of New York). In case of your
failure to appear or answer, judgment will be taken against you by default for the relief demanded
in the complaint.

**NOTICE OF NATURE OF ACTION AND RELIEF SOUGHT**

THE OBJECT of the above captioned action is to foreclose a Consolidated Mortgage
to secure $1,700,000.00 and interest, recorded in the office of the Clerk/ Register of the County
of New York on December 9, 2016 in CFRN 2016000435775, covering premises in New York, ,
New York ( Block 1204 Lot 54).

The relief sought in the within action is a final judgment directing the sale of the
premises described above to satisfy the debt secured by the Mortgage described above. The

·1

Plaintiff also seeks a deficiency judgment against the Defendants for any debt secured by said Mortgage which is not satisfied by the proceeds of the sale of said premises.

**TO** the Defendants, John Roe 1-10 and Mary Roe 1-10
the Plaintiff makes no personal claim against you in this action. The claim for a deficiency judgment is made only against the Defendant **60-91st Street Corp.** , and not against any other Defendants.

## NOTICE

### YOU ARE IN DANGER OF LOSING YOUR HOME

**If you do not respond to this summons and complaint by serving a copy of the answer on the attorney for the mortgage company who filed this foreclosure proceeding against you and filing the answer with the court, a default judgment may be entered and you can lose your home.**

**Speak to an attorney or go to the court where your case is pending for further information on how to answer the summons and protect your property.**

**Sending a payment to your mortgage company will not stop this foreclosure action.**

**YOU MUST RESPOND BY SERVING A COPY OF THE ANSWER ON THE ATTORNEY FOR THE PLAINTIFF ( MORTGAGE COMPANY) AND FILING THE ANSWER WITH THE COURT.**

Dated: Ronkonkoma, New York
November 15, 2017

THE WOLINSKY LAW GROUP, P.C.,
*Attorney for Plaintiff*
160-2 Remington Boulevard
Ronkonkoma, NY 11779
(631)588-2900

C:\Users\alex\Documents\Grodsky\Foreclosures\Mortimer\pleadings\summons.wpd          2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

**2386 HEMPSTEAD, INC.,**

Plaintiff

-against-

**60 91st STREET CORP.,** and **JOHN DOE # 1-10** and
**MARY ROE # 1-10** said names being fictitious, being and
intended to be persons or entities claiming or having an interest in
the premises that are the subject of this foreclosure action.

Defendants

**VERIFIED COMPLAINT**
Mortgage Foreclosure

Index No.

Block 1204 Lot 54

Premises known as: 60 West 91st Street, New York, NY 10024

The Plaintiff(s), by its attorneys, **THE WOLINSKY LAW GROUP, P.C.** complaining
of the Defendant(s), alleges, upon information and belief:

## ALLEGATIONS RELATING TO ALL CAUSES OF ACTION

1.  Upon In formation and belief, and at all of the times hereinafter mentioned the defendant,60

    91st Street Corp.,was and still is a corporation doing business under and by virtue of the laws

    of the State of New York.

2.  60 91st Street Corp., for the purpose of securing the payment to 2386 Hempstead, Inc. , of

1

the principal sum of $ 1,400,000.00 , with interest thereon, on or about August 13, 2015, for valuable consideration, executed and delivered to said 2386 Hempstead, Inc. a Note dated on that day (the "Note"), whereby said 60 91st Street. Corp. undertook and promised to pay to said 2386 Hempstead, Inc. the principal sum and interest thereon at the rate provided therein.

3.      As collateral security for the payment of said indebtedness, said 60-91st Street Corp. duly executed, acknowledged and delivered to said 2386 Hempstead, Inc. a Mortgage, dated August 13, 2015 (the "Mortgage"), whereby said 60 91st Street. Corp. mortgaged to said 2386 Hempstead, Inc. premises in Manhattan, New York, described in said Mortgage together with the appurtenances thereto as is more fully set forth in said Mortgage.

4.      Said Mortgage was duly recorded in the office of the Clerk/Register of the County of New York on August 31, 2015 in CRFN2015000301919. The mortgage recording tax thereon was duly paid.

5.      60 91st Street Corp., for the purpose of securing the payment to 2386 Hempstead, Inc. , of the principal sum of $ 300,000.00, with interest thereon, on or about October 3, 2016 for valuable consideration, executed and delivered to said 2386 Hempstead, Inc. a Note dated on that day (the "Note"), whereby said 60 91st Street. Corp. undertook and promised to pay to said 2386 Hempstead, Inc. the principal sum and interest thereon at the rate provided therein.

6.      As collateral security for the payment of said indebtedness, said 60-91st Street Corp. duly executed, acknowledged and delivered to said 2386 Hempstead, Inc. a Mortgage, dated

2

October 3, 2016 (the "Mortgage"), whereby said 60 91st Street. Corp. mortgaged to said 2386

Hempstead, Inc. premises in Manhattan, New York, described in said Mortgage together with

the appurtenances thereto as is more fully set forth in said Mortgage.

7.     Said Mortgage was duly recorded in the office of the Clerk/Register of the County of New

York on December 9, 2016 in CRFN 2016000435774. The mortgage recording tax thereon

was duly paid.

8.     On October 3, 2016, the plaintiff, 2386 Hempstead, Inc., and the defendant, 60 91st Street

Corp. Entered into a consolidation, extension and modification agreement combining the two

afore said mortgages ans notes into one single obligation. A copy of this agreement is

annexed as *EXHIBIT "A"*

9.     On October 3, 2016, the defendant, 60 91st Street Corp., executed a consolidated note

consolidating both of the aforesaid notes into one note . A copy of said note is annexed as

*EXHIBIT "B".*

10.    On October 3, 2016 the defendant, 60 91st Street Corp. Executed and delivered a

consolidated mortgage, consolidating  the two afore said mortgages into one single

obligation. Said consolidated mortgage was recorded in the office of the Clerk/Register of

the County of New York on December 9, 2106  in CRFN 2016000435775. A copy of said

agreement is annexed as *EXHIBIT "C".*

11.    The plaintiff is the owner and holder of the subject mortgage and note.

12.    The owner and holder of the notes and mortgages as consolidated  is not a "lender" as that

term is defined New York State Banking Law §590 subd.1(f)or an "exempt organization"

3

as defined in New York State Banking Law §590 subd.1(e).

13. To the extent that the following are applicable to this mortgage, the mortgage originated in compliance with Banking Law §595-a and 6-l and 6-m and the plaintiff has complied with all of the provisions of Banking Law § 595-a and any rules and regulations promulgated thereunder, Banking Law §6-l and 6-m and Real Property Actions & Proceedings Law §1304.

14. Said Mortgages provided that in case of default in the payment of any principal or interest that might become due thereon, the holder of the Mortgages could declare the entire indebtedness secured by the Mortgages immediately due and payable, and the holder of the Mortgages was thereby empowered to sell the mortgaged premises according to law.

15. Said mortgages provided that in the event an interest payment was received more than fifteen days after its due date a late charge would be imposed.

16. Said mortgages provides in part that the Lender (plaintiff herein) has the right to protect the itself/himself/herself from possible losses that might result if the mortgagor ( defendant, 60 91st Street. Corp.) fail to pay with interest, any amount that the Lender spends under the mortgages to protect the value of the property and the Lenders rights in the property.

17. Said consolidated note (**Exhibit "B"**) provides in part that upon default interest will accrue on the unpaid balance at the maximum legal rate of interest per annum permitted by law which for corporate borrowers is 24.999%.

18. Said mortgages further provide that the mortgagor is required to pay all taxes and assessments that are imposed upon the property that are superior liens to the lien of the

4

mortgage.

19.    Said mortgages further provide that the mortgagor must keep the premises insured against loss by fire or other casualty naming the mortgagee or holder of the mortgage as an additional insured in a sum sufficient to satisfy the mortgage in the event of a total loss.

20.    Upon information and belief, defendants JOHN DOE #1-10 and MARY ROE #1-10 have some interest in or lien upon the mortgaged premises or some part thereof, which interest or lien, if any, has accrued subsequent to the lien of said Mortgage and is subject and subordinate thereto.

21.    Upon information and belief, defendants, John Doe 1-10 and Mary Roe 1-10 have an interest in or lien upon the mortgaged premises or some part thereof, which interest or lien accrued subsequent to the lien of said mortgage and is subject and subordinate thereto.

22.    The Mortgages provide that, in the case of foreclosure, the mortgaged premises may be sold in one parcel.

23.    The plaintiff has complied with all notice requirements contained in the mortgages prior to the commencement of this action.

24.    The mortgaged premises under foreclosure herein is to be sold subject to: any state of facts an accurate survey would show, the lien of any taxes which became or may become a lien on the premises prior to their sale at foreclosure, any assessments charged against the premises and unpaid at the time of the foreclosure sale, to covenants, restrictions and easements, if any, of record affecting said mortgaged premises and/or any violations thereof, and to zoning regulations and ordinances of the city, town or village in which said mortgaged

5

premises lies and/or any violations thereof.

25.    In order to protect his security, the Plaintiff may be compelled, during the pendency of this

action, to pay sums for premiums on insurance policies, real estate taxes, assessments, water

charges, and sewer rents which are or may become liens on the mortgage premises, and other

charges which may be necessary for the protection of the mortgaged premises, and the

Plaintiff prays that any sum or sums so paid, together with interest from the date of payment,

shall be added to the Plaintiff's claim and be deemed secured by said Notes and Mortgages

and adjudged a valid lien on the mortgaged premises, and that the Plaintiff be paid such

sums, together with interest thereon, out of the proceeds of the sale of the mortgaged

premises.


## AS AND FOR A FIRST CAUSE OF ACTION


26.    The Plaintiff repeats, reiterates and re-alleges each and every allegation contained in those

paragraphs of this complaint designated as 1-25 with the same force and effect as if fully set

forth hereinafter herein..

27.    The terms of the mortgage provides that the entire principal balance then owing together

with unpaid interest, late charges, un reimbursed advances, unpaid legal fees costs and

disbursements incurred by the holder of the mortgage to enforce the terms of the mortgage

were due and payable on October 3, 2017.

28.    The defendant, **60 91st  STREET CORP.,** has failed to satisfy the mortgage and pay the

6

foregoing sums due on October 3, 2017.

29.    The defendant, 60-91st Street, Corp., is in default under the terms of the notes and/or the mortgages and pursuant to the terms of the notes and/or mortgages, the plaintiff is entitled to the relief requested hereinafter herein.

## AS AND FOR A SECOND CAUSE OF ACTION

30.    The Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in those paragraphs of this complaint designated as 1-29 with the same force and effect as if fully set forth hereinafter herein..

31.    The Defendant, **60 91st STREET CORP.**, has failed to pay all of the real property taxes assessed against the premises, aa smae became due.

32.    By reason of the foregoing, the defendant, **60 91st STREET CORP.**, is in default under the terms of the note and/or the mortgage and pursuant to the terms of the note and/or mortgage, the plaintiff is entitled to the relief requested hereinafter herein.

## AS AND FOR A THIRD CAUSE OF ACTION

33.    The Plaintiff repeats, reiterates and re-alleges each and every allegation contained in those paragraphs of this complaint designated as 1-33 with the same force and effect as if fully set forth hereinafter herein.

7

34    In the Notes and/or Mortgages hereinbefore described the mortgagors , 60 91st Street. Corp.,agreed to pay the attorneys' fees of the holder of the Mortgage in the event of a default under the Note and Mortgage and the commencement of a suit to foreclose the same

35.    The mortgage is and has been in default and the plaintiff has incurred and will continue to incur legal fees, costs, and disbursement in the enforcement of the terms of the mortgage all to his/.her /its damages in a sum anticipated to be $100,000.00.

**WHEREFORE**, the Plaintiff demands judgment that the Defendants and all persons claiming under them or any of them, subsequent to the filing of the notice of pendency of this action, may be barred and foreclosed of all right, title, claim, lien and equity of redemption in the mortgaged premises; that said mortgaged premises may be decreed to be sold in one parcel according to law; that the money arising from the sale may be brought into court; that the Plaintiff may be paid the amount of principal and interest due on said Bonds and Mortgages as consolidated as hereinbefore set forth with interest to the time of such payment, and any sums paid by the Plaintiff for real estate taxes, assessments, water charges and sewer rents, insurance premium and other necessary charges or expenses to protect the lien of the Mortgages, and any sums expended for the protection or preservation of the property covered by said Mortgages, with interest thereon from the time of such payment, and attorneys' fees of $100,000.00 for legal services rendered in enforcing the terms of the note and mortgage as demanded in the Second cause of action, and the costs and disbursements of this action, and all other amounts due the Plaintiff under said Notes and Mortgages, so far as the

8

amount of such money properly applicable thereto will pay the same; and that the Defendants, 60

91st Street. Corp. may be adjudged to pay any deficiency which may remain, after applying all

moneys received from the sale of the mortgaged premises, of the indebtedness secured by the Note

and Mortgage or to be paid to the Plaintiff as costs or otherwise hereunder; and that the Plaintiff may

have such other and further relief in the mortgaged premises as may be just and equitable.

Dated: Ronkonkoma, NY
     November 13, 2017

               **The Wolinsky Law Group, P.C.**
               *Attorneys for Plaintiff*
               160-2 Remington Boulevard
               Ronkonkoma, NY 11779
               (516)588-2900

# EXHIBIT A

Loan #:

Record and return to:
MOBERG & KOCORIS PC
150 Broadhollow Rd., Suite 320
Melville, NY 11747

Dist.
Sect.
Blsk. *1204*
Lot(s) *54*
County New York

_____ Space Above This Line for Recording Data _____

## CONSOLIDATION, EXTENSION AND MODIFICATION AGREEMENT

**WORDS USED OFTEN IN THIS DOCUMENT**

(A) "Agreement." This document, which is dated October 3, 2016, and exhibits and riders attached to this document will be called the "Agreement."

(B) "Borrower." 60 91st Street Corp., will be called "Borrower" and sometimes "I" or "me." Borrower's address is: 60 West 91st St., New York, NY 10024.

(C) "Lender." 2386 Hempstead Inc. will be called "Lender" and sometimes "Note Holder." Lender is a corporation or association which exists under the laws of the State of . Lender's address is 45 Glen Cove Rd, Greenvale, NY 11548.

(D) "Mortgages." The mortgages, deeds of trust or other security instruments and any additional security instruments and related agreements (such as assignments, extensions, modification or consolidations of mortgages) identified in Exhibit A to this Agreement will be called the "Mortgages".

(E) "Note Holder." Lender or anyone who succeeds to Lender's rights under this Agreement and who is entitled to receive the payments I agree to make under this Agreement may be called the "Note Holder."

(F) "Notes." The Notes which are identified in Exhibit A to this Agreement, and which are secured by the Mortgages, will be called the "Notes".

(G) "Property." The property which is described in the Mortgage(s) and in Exhibit B to this Agreement (Legal Description), will be called the "Property." The Property is located at:

| 60 West 91st Street | New York, NY 10024 | New York |
|---|---|---|
| [street] | [city]    [state & zip code] | [county] |

I promise and I agree with Lender as follows:

**I.     BORROWER'S AGREEMENT ABOUT OBLIGATION UNDER THE NOTES AND MORTGAGES**

I agree to take over all of the obligations under the Notes and Mortgages as consolidated and modified by this Agreement as Borrower. This means that I will keep all of the promises and agreements made in the Notes and Mortgages even if some other person made those promises and agreements before me. The total unpaid principal balance of the Notes is U.S. $1,700,000.00. Of this amount, U.S. $300,000.00 was advanced to me (or for my account) immediately prior to this consolidation, solely for the purpose of extension and modification of this agreement.

**II.     AGREEMENT TO COMBINE NOTES AND MORTGAGES**

(A) By signing this Agreement, Lender and I are combining into one set of rights and obligations all of the promises and agreements stated in the Notes and Mortgages including any earlier agreements which combined, modified, or extended rights and obligations under any of the Notes and Mortgages. This means that all of Lender's rights in the Property are combined so that under the law Lender has one mortgage and I have one loan obligation which I will pay as provided in this Agreement. This combining of notes and mortgages is known as a "Consolidation".

(B) In the event that Exhibit A indicates that all of the Notes and Mortgages have already been combined by a previous agreement, then Lender and I agree to change the terms of Section II, paragraph (A) of this Agreement to the following:

Lender and I agree that all of the promises and agreements stated in the Notes and Mortgages - including any earlier agreements which combined, modified, or extended rights and obligations under any of the Notes and Mortgages - have been combined into one set of rights and obligations by an earlier agreement which is referred to in Exhibit A. This means that all of the Lender's rights in the Property have already been combined so that under the law Lender already has one mortgage and I have one obligation which I will pay as provided in this Agreement. The combining of notes and mortgages is known as a "Consolidation".

III.   **AGREEMENT TO CHANGE TERMS OF THE CONSOLIDATED NOTE**

Lender and I agree that the terms of the Notes are changed and restated to be the terms of the "Consolidated Note" which is attached to this Agreement as Exhibit C. The Consolidated Note contains the terms of payment for the amounts that I owe to Note Holder. I agree to pay the amounts due under the Notes in accordance with the terms of the Consolidated Note. The Consolidated Note will supersede all terms, covenants, and provisions of the Notes.

IV.   **AGREEMENT TO CHANGE TERMS OF THE CONSOLIDATED MORTGAGE**

Lender and I agree that the terms of the Mortgages are changed and restated to be the terms of the "Consolidated Mortgage" which is attached to this Agreement as Exhibit D. The Consolidated Mortgage secures the Consolidated Note and will constitute in law a single lien upon the Property. I agree to be bound by the terms set forth in the Consolidated Mortgage which will supersede all terms, covenants and provisions of the Mortgages.

V.   **NO SET-OFF, DEFENSES**

I agree that I have no right of set-off or counterclaim, or any defense to the obligations of the Consolidated Note or the Consolidated Mortgage.

VI.   **BORROWER'S INTEREST IN THE PROPERTY**

I promise that I am the lawful owner occupying the Property and that I have the right to consolidate, modify, and extend the Notes and Mortgages.

VII.   **WRITTEN TERMINATION OR CHANGE OF THIS AGREEMENT**

This Agreement may not be terminated, changed, or amended except by a written agreement signed by the party whose rights or obligations are being changed by that agreement.

VIII.   **OBLIGATIONS OF BORROWERS AND OF PERSONS TAKING OVER BORROWER'S OR LENDER'S RIGHTS OR OBLIGATIONS**

If more than one person signs this Agreement as Borrower, each of us is fully and personally obligated to keep all of Borrower's promises and obligations contained in this Agreement. The Note Holder may enforce its rights under this Agreement against each of us individually or against all of us together.

The terms of the Consolidated Note and the Consolidated Mortgage may not allow any person to take over my rights or obligations under this Agreement. Lender and I agree that if any person is permitted to take over my rights and obligations under this Agreement, that person will have all of my rights and will be obligated to keep all of my promises and agreements made in this Agreement. Similarly, any person who takes over Lender's rights or obligations under this Agreement will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Agreement.

IX.   **LIEN LAW**

I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (A) hold all amounts which I receive and which I have a right to receive from Lender under the Consolidated Note as a "trust fund;" and (B) use those amounts to pay for "cost of improvement" (as defined in the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a "trust fund" means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section IX.

X.   **TYPE OF PROPERTY**

Check box(es) as applicable.

[ ]   This Agreement covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six (6) residential dwelling units with each dwelling unit having its own separate cooking facilities.

[ ]   This Agreement covers real property improved, or to be improved, by a one (1) or two (2) family dwelling.

[X]   This Agreement does not cover real property improved as described above.

By signing this Agreement, Lender and I agree to all of the above.

60 91st Street Corp.

By: Kimberly Mortimer

Lender: 2386 Hempstead Inc.

X

_____Space Below This Line for Acknowledgments_____

STATE OF New York)
                 )ss:
COUNTY OF Suffolk)
On October 3, 2016, before me, the undersigned, personally appeared Kimberly Mortimer, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals whose names are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacities and that by his/her/their signatures on the instrument, the individuals, or the person upon behalf of which the individuals acted, executed the instrument.

Maria Terasco
Notary Public – State of New York
NO. 01TA6078704
Qualified in Suffolk County
My Commission Expires April 29, 20___

Notary Public

State of New York)
                 )ss:
County of Nassau )
On October 20, 2016, before me, the undersigned, personally appeared Scott Grodsky

personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

JAMES KOCORIS
Notary Public, State of New York
No. 02KO6020326
Qualified in Nassau County
Commission Expires March 1, 20___

Notary Public

TO BE USED ONLY WHEN THE ACKNOWLEDGEMENT IS MADE OUTSIDE NEW YORK STATE

State(or District of Columbia, Territory, of Foreign Country) of                                          ss:

On June 12, 2015 before me, the undersigned, personally appeared

Personally known to me or proved to me on the basis of satisfactory evidence to to the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, then individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in

the_____in_____
(insert the City or other political subdivision) (and insert the State or County or other place the acknowledgment was taken)

_____
(signature and office of individual taking acknowledgment)

EXHIBIT F

# EXHIBIT B

Loan #:

# CONSOLIDATED
## INTEREST-ONLY PERIOD FIXED RATE NOTE

October 3, 2016          Melville,          New York
[Date]          [City]          [State]
60 West 91ᵉ St., New York, NY 10024
[Property Address]

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $1,700,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is 2386 Hempstead Inc. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 3.000%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3.    PAYMENTS**

**(A)    Time and Place of Payments**

I will make a payment every month. This payment will be for interest only for the first 12 months.

I will make my monthly payment on the first day of each month beginning on November 3, 2016. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on October 3, 2017, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 45 Glen Cove Rd., Greenvale, NY 11548 or at a different place if required by the Note Holder.

**(B)    Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $4,250.00 for the first 12 months of this Note. The Note Holder will notify me prior to the date of change in monthly payment. The borrower shall have the option to pay only $3,500.00 per month for the first 12 months of this Note. If the borrower elects this reduced payment, the shortage of $750.00 per month shall be added to the payoff amount that will be due on October 3, 2017.

**4.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. However, if the partial Prepayment is made during the period when my monthly payments consist only interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest as well as during the time that my payments consist of principal and interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, the amount of my monthly payment will not decrease; however, the principal and the interest required under this Note will be paid prior to the Maturity Date.

**5.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.    BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)    Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 2.000% of my overdue payment of interest and/or principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)    Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)    Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)    No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)    Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

7.   **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail, return receipt requested, to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

8.   **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

9.   **WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid

10.  **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

11.  **DEFAULT**

In the event of any acceleration of the due date of any amount or amounts due under this note by reason of the Maker's failure to comply with the terms, covenants and conditions of this note, or on and after the maturity date set forth herein, whichever occurs first, it is agreed by the parties that interest on such amounts shall be computed at the maximum legal rate from the date of acceleration or maturity until the entire debt evidenced hereby is satisfied whether or not, notice of acceleration is delivered to Maker; in the event an action is instituted to collect the debt herein or to foreclose under the terms of the Mortgage and Security Agreement, or to foreclose any mortgage or mortgages given now or hereafter as collateral security for this indebtedness, interest on the amounts due hereunder shall be computed at the maximum legal rate from the date of acceleration or maturity of the indebtedness evidenced hereby until the entire debt is paid in full. All such interest shall be secured by the Mortgage and Security Agreement. Maker agrees that the time of repayment of the debt when due as hereinabove stated is of unique and specific importance and financial necessity to the holder of this note and the Mortgage and Security Agreement, and time is hereby made of the essence. It is further understood that the foregoing provisions of this paragraph do not constitute a consent or agreement on the part of the holder of this note to extend or postpone the time of such payment beyond the present date of maturity hereof. If any action is instituted to collect the debt herein or to foreclose the Mortgage and Security Agreement, or to foreclose under the terms of the Mortgage and Security Agreement or any collateral mortgage collaterally securing the debt herein whether granted now or at any future time, the Maker, and any guarantor, endorser or surety hereby severally agree to pay the reasonable attorney's fee incurred by the holder of this note for each such action, together with all costs and disbursements incurred in connection therewith, which attorney's fees, costs and disbursements shall be added to the amount due hereunder.

In no event shall the undersigned be charged more than the highest rate of interest which may be lawfully charged by the holder hereof and paid by the undersigned on the indebtedness evidenced hereby. It is therefore, agreed that if at any time interest on the indebtedness evidenced hereby would otherwise exceeds the highest lawful rate, the rate shall be automatically reduced and only such highest lawful rate will be paid by the undersigned. Should any amount be paid by the undersigned in excess of such highest lawful amount, such excess shall be deemed to have been paid in reduction of the principal balance hereof.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

60 91st Street Corp.

_____ (Seal)

By: Kimberly Mortimer

_____ (Seal)

_____ (Seal)

_____ (Seal)

Loan #:

## BALLOON PAYMENT RIDER TO NOTE AND SECURITY INSTRUMENT

This BALLOON PAYMENT RIDER ("Rider") is made this October 3, 2016, and amends a Note in the amount of $1,700,000.00 (the "Note" made by the person(s) who sign below ("Borrower") to 2386 Hempstead Inc. and the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") dated and given by Borrower to secure repayment of the Note.

In addition to the agreements and provisions made in the Note and the Security Instrument, both Borrower and Lender further agree as follows:

**IF NOT PAID EARLIER, THIS LOAN IS PAYABLE IN FULL ON (THE "MATURITY DATE"). BORROWER MUST REPAY THE ENTIRE UNPAID PRINCIPAL BALANCE OF THE LOAN AND INTEREST THEN DUE. THIS IS CALLED A "BALLOON PAYMENT". THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME.**

_____
Witness

_____
Witness

60 91st Street Corp.

_____
By: Kimberly Mortimer

Loan #:

## PREPAYMENT ADDENDUM TO NOTE

Date:   October 3, 2016

Borrower(s):   60 91st Street Corp.

THIS PREPAYMENT ADDENDUM TO NOTE (the "Addendum") is made this October 3, 2016 and is incorporated into and shall be deemed to amend and supplement that certain promissory note (the "Note") made by the undersigned ("Borrower") in favor of 2386 Hempstead Inc. ("Lender") and dated the same date as this Addendum. Repayment of the Note is secured by a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") given by Borrower in favor of Lender and dated the same date as this Addendum. To the extent that the provisions of this Addendum are inconsistent with the provisions of the Note, the provisions of this Addendum shall supersede the inconsistent provisions of the Note.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Note, Borrower and Lender further covenant and agree as follows:

Section 4 of the Note is amended to read in its entirety as follows:

**4.    BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

The Note Holder will use my Prepayment to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes.

If the Note contains provisions for a variable interest rate, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase. If this Note provides for a variable interest rate or finance charge, and the interest rate or finance charge at any time exceeds the legal limit under which a Prepayment penalty is allowed, then the Note Holder's right to assess a Prepayment penalty will be determined under applicable law.

If within six (6) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to three (3) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Addendum.

Date:   October 3, 2016

60 91st Street Corp.

By: Kimberly Mortimer

*[Sign original only]*

STATE OF NEW YORK    )
                      )ss:
COUNTY OF SUFFOLK    )

On October 3, 2016, before me, the undersigned, personally appeared **Kimberly Mortimer**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacities and that by his/her/their signatures on the instrument, the individuals, or the person upon behalf of which the individuals acted, executed the instrument.

Notary Public

JAMES KOCORIS
NOTARY PUBLIC - STATE OF NEW YORK
NO. 02KO6020025
QUALIFIED IN NASSAU COUNTY
Commission Expires March 1, 20__

PAY TO THE ORDER OF

WITHOUT RECOURSE
2386 Hempstead Inc.

# EXHIBIT C

Loan #:
After Recording Return To:
**MOBERG & KOCORIS PC**
**150 Broadhollow Rd., Suite 320**
**Melville, NY 11747**

[Space Above This Line For Recording Data]

# CONSOLIDATED MORTGAGE

**WORDS USED OFTEN IN THIS DOCUMENT**
**(A) "Security Instrument."** This document, which is dated October 3, 2016, together with all Riders to this document, will be called the "Security Instrument."
**(B) "Borrower."** 60 91st Street Corp., whose address is 60 West 91st St, New York, NY 10024 sometimes will be called "Borrower" and sometimes simply "I" or "me."
**(C) "Lender."** 2386 Hempstead Inc. will be called "Lender." Lender is a corporation or association which exists under the laws of the State of . Lender's address is 45 Glen Cove Rd, Greenvale, NY 11548.
**(D) "Note."** The note signed by Borrower and dated September 2016 will be called the "Note." The Note shows that I owe Lender One Million Seven Hundred Thousand and 00/100 Dollars (U.S. $1,700,000.00 ) plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by November 3, 2017.
**(E) "Property."** The property that is described below in the section titled "Description of the Property," will be called the "Property."
**(F) "Loan."** The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(G) "Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."
**(H) "Riders."** All riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

[ ] Adjustable Rate Rider     [ ] Condominium Rider     [ ] Second Home Rider
[X] Balloon Rider     [ ] Planned Unit Development Rider     [ ] Other(s) (specify)
[ ] 1-4 Family Rider     [ ] Biweekly Payment Rider

**(I) "Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."
**(J) "Community Association Dues, Fees and Assessments."** All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees and Assessments."
**(K) "Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."
**(M) "Miscellaneous Proceeds."** "Miscellaneous Proceeds" mean any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, and as defined in, paid under the coverage described, in Section 5): for (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."
**(N) "Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(O) "Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note and (ii) any amounts under Section 3 will be called "Periodic Payment."
**(P) "RESPA."** "RESPA means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY**
I mortgage, grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:
    (A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;
    (B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and
    (C) Keep all of my other promises and agreements under this Security Instrument and the Note.

**DESCRIPTION OF THE PROPERTY**
I give Lender rights in the Property described in (A) through (G) below:
    (A) The Property which is located at 60 West 91st St., New York, NY 10024. This Property is in New York County. It has the following legal description:

AS DESCRIBED IN SCHEDULE A ATTACHED HERETO AND MADE A PART HEREOF.

District:
Section:
Block:  1204
Lot:  54

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;
(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"
(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;
(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;
(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and
(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record. I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

1. **Borrower's Promise To Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment to be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

2. **Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;
Next, to pay principal due under the Note; and
Next, to pay the amounts due Lender under Section 3 of this Security Instrument.
Such payments will be applied to each Periodic Payment in the order in which it became due.
Any remaining amounts will be applied as follows:
First, to pay any late charges;
Next, to pay any other amounts due under this Security Instrument; and
Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments For Taxes And Insurance.**

(a) Borrower's Obligations. I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents, and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, and flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

(b) Lender's Obligations. Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if the Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

(c) Adjustments to the Escrow Funds. Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

**4. Borrower's Obligation to Pay Charges, Assessments And Claims.** I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either: (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to the Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance polices covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

**7. Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

(a) Maintenance and Protection of the Property. I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as described in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

(b) Lender's Inspection of Property. Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

**8. Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9. Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance in force from time to time. Mortgage insurers may enter into agreements with other parties that change or modify their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance". It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower will owe for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has -- if any -- regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

**11. Agreements About Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date the Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lenders interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

**12. Continuation of Borrower's Obligations And of Lender's Rights.**

(a) Borrower's Obligations. Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

(b) Lender's Rights. Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

**13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.** If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender.

If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement of this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup. I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the

presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS**

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements.** Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under the Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

   (a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument.

   (b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

   (1) The promise or agreement that I failed to keep or the default that has occurred;

   (2) The action that I must take to correct that default;

   (3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;

   (4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;

   (5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

   (6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have.

   (C) I do not correct the default stated in the notice from Lender by the date stated in that notice.

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

**24. Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

**25. Borrower's Statement Regarding the Property [check box as applicable].**

   [ ]   This Security Instrument covers real property improved, or to be improved, by one or two family dwelling only.

   [ ]   This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

   [X]   This Security Instrument does not cover real property improved as described above.

Loan #:

## BALLOON PAYMENT RIDER TO NOTE AND SECURITY INSTRUMENT

This BALLOON PAYMENT RIDER ("Rider") is made this October 3, 2016, and amends a Note in the amount of $1,700,000.00 (the "Note" made by the person(s) who sign below ("Borrower") to 2386 Hempstead Inc. and the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") dated and given by Borrower to secure repayment of the Note.

In addition to the agreements and provisions made in the Note and the Security Instrument, both Borrower and Lender further agree as follows:

IF NOT PAID EARLIER, THIS LOAN IS PAYABLE IN FULL ON (THE "MATURITY DATE"). BORROWER MUST REPAY THE ENTIRE UNPAID PRINCIPAL BALANCE OF THE LOAN AND INTEREST THEN DUE. THIS IS CALLED A "BALLOON PAYMENT". THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME.

_____
Witness

_____
Witness

60 91st Street Corp.

By: Kimberly Mortimer

Loan #:

# PREPAYMENT RIDER

Date: October 3, 2016

Borrower(s): 60 91st Street Corp.

THIS PREPAYMENT RIDER (the "Rider") is made this October 3, 2016, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure repayment of Borrower's promissory note (the "Note") in favor of 2386 Hempstead Inc. ("Lender"). The Security Instrument encumbers the Property more specifically described in the Security Instrument and located at:

60 West 91st St., New York, NY 10024
[Property Address]

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Agreement, Borrower and Lender further covenant and agree as follows:

A.    PREPAYMENT CHARGE
The Note provides for the payment of a prepayment charge as follows:

4.    BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

The Note Holder will use my Prepayment to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes.

If the Note contains provisions for a variable interest rate, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase. If this Note provides for a variable interest rate or finance charge, and the interest rate or finance charge at any time exceeds the legal limit under which a Prepayment penalty is allowed, then the Note Holder's right to assess a Prepayment penalty will be determined under applicable law.

If within six (6) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to three (3 ) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Addendum.

Date: October 3, 2016

60 91st Street Corp.

By: Kimberly Mortimer

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 9 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____

_____

60 91st Street Corp.

By: Kimberly Mortimer

_____

_____

STATE OF New York)
                 )ss:
COUNTY OF Suffolk)

On October 3, 2016, before me, the undersigned, personally appeared Kimberly Mortimer, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacities and that by his/her/their signatures on the instrument, the individuals, or the person upon behalf of which the individuals acted, executed the instrument.

_____
Notary Public

Maria Tarasco
Notary Public - State of New York
NO. 01TA6073704
Qualified in Suffolk County
My Commission Expires April 29, 20_1_

NEW YORK -Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3033 1/01    (page 9 of 9 pages)

**VERIFICATION**

STATE OF NEW YORK)
COUNTY OF SUFFOLK) SS:

**ALAN M. WOLINSKY**, being duly sworn, deposes and says:

I am a member of the firm of THE WOLINSKY LAW GROUP, P.C., attorneys of record for, 2386 Hempstead, Inc., a party in the within action. I have read the foregoing complaint and I know the contents thereof; and the same are true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief and as to those matters, I believe them to be true. This verification is made by me because the above party is not presently in a county where my firm maintains an office for the practice of law.

The grounds of my belief as the matters not stated on my own knowledge are based upon a review of all papers and documents maintained by and discussions had with Scott Grodsky, president of the corporation.

Sworn to before me this
13th day of November, 2017

_____
ALAN M. WOLINSKY

_____
NOTARY PUBLIC

MICHAEL H. FIER
Notary Public, State of New York
No. 02FI4830441
Qualified in Suffolk County
Commission Expires Oct. 31, 2021

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No.

---

2386 HEMPSTEAD, INC.,

Plaintiff

-against-

60 91st STREET CORP., and **JOHN DOE # 1-10** and **MARY ROE # 1-10** said names being fictitious, being and intended to be persons or entities claiming or having an interest in the premises that are the subject of this foreclosure action.

Defendants

---

## SUMMONS AND VERIFIED COMPLAINT
## FORECLOSURE

---

### THE WOLINSKY LAW GROUP., P.C.
*Attorneys for Petitioner*
*Office and Post Office Address, Telephone*
**160-02 Remington Boulevard**
**Ronkonkoma, New York 11779**
**(631) 588-2900**

ALAN M. WOLINSKY

Signed Pursuant to NYCRR§ 130-1.1-a

---

To:

Service of a copy of the within is hereby admitted.

Dated:_____19

**Exhibit D**

(Foreclosure Judgment)

## SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| | | |
|---|---|---|
| PRESENT: | HON. ARLENE P. BLUTH | PART | IAS MOTION 32 |
| | *Justice* | | |

-----------------------------------------------------------------X

2386 HEMPSTEAD, INC.

Plaintiff,

- v -

60 91ST STREET CORP.,

Defendant.

-----------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 850274/2017 |
| MOTION DATE | N/A |
| MOTION SEQ. NO. | 003 |

**DECISION + ORDER ON MOTION, JUDGMENT OF FORECLOSURE AND SALE**

The following e-filed documents, listed by NYSCEF document number (Motion 003) 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 102, 103

were read on this motion to/for                     JUDGMENT - FORECLOSURE & SALE            .

The motion by plaintiff for a judgment of foreclosure and sale is granted.  The cross-motion by defendant to vacate is denied.

**Background**

In this foreclosure action, plaintiff moves to confirm the report of Thomas Kleinberger, which found that plaintiff is due $2,691,415.40 as of April 30, 2019.

In opposition and in support of its motion to vacate, defendant claims that plaintiff has unclean hands because it purportedly paid itself monies from the proceeds of the loan to which it was not entitled.  Defendant also alleges that plaintiff changed the agreed-upon terms of the loan agreement at the closing.  Defendant's principal contends that although she was represented by counsel at the closing and that she signed the subject agreement, she was suffering from distress due to her mother's illness.  She claims she now knows the documents she signed do not represent the negotiations she previously had with the lender.

Defendant claims there is excusable default because the building had no mail carrier at

the time the Secretary of State mailed the summons and complaint and it has a meritorious

defense based on plaintiff's purported fraudulently inducing it to sign the loan.

In reply and in opposition to the cross-motion, plaintiff emphasizes that defendant was

represented by counsel throughout the loan agreement process and explains in detail why

defendant received approximately $87,000 from the loan. According to plaintiff, monies were

deducted for unpaid interest owed on the first mortgage, for closing costs, and another $10,000

was held in escrow because defendant did not come to the closing with a proper insurance

policy.

## Discussion

. The Court grants the motion and denies defendant's cross-motion. As an initial matter,

defendant did not establish a reasonable excuse for failing to appear. Defendant did not claim

that plaintiff failed to properly effectuate service with the Secretary of State. Rather, it blames

the post office for its mail carrier obligations. However, the Court cannot ignore the fact that

*defendant owns* the building— if the mail service was lacking, then defendant's principal should

have taken steps to fix the problem. The affidavit of defendant's principal is silent on what she

did to alleviate the problem, when she found out about it or how long this problem existed prior

to service through the Secretary of State. It is not the obligation of plaintiff or the Secretary of

State to ensure that the mail service at defendant's building is operating properly. Here, the

papers were served to the correct address and defendant merely complains she never got them.

That is not enough to establish a reasonable excuse for not appearing.

Even if defendant could establish a reasonable excuse, it did not show a meritorious

defense. The principal for defendant appears to claim that she does not like the agreement that

she signed. While the Court appreciates that she may have been preoccupied with her mother's illness, that is not a valid defense to this action, especially where it is undisputed that she was represented by counsel at the closing. Defendant cannot get out of an agreement because its principal chose to read the terms after signing it and decided she doesn't like them or that they might have been different from previous discussions with plaintiff. That is presumably why defendant had counsel at the closing.

And there is no basis to find that plaintiff fraudulently induced defendant's principal into signing the loan agreement. In her affidavit, she admits that she signed a previous promissory note for $1.4 million in 2015 and that when this loan neared maturity, she sought out new financing. In other words, defendant wanted additional money from plaintiff. There is no basis to find that defendant was coerced or fraudulently induced into signing the agreement. Rather, it appears she sought out additional financing and received it.

Accordingly, it is hereby

ORDERED and ADJUDGED that the motion by plaintiff for a judgment of foreclosure and sale and to confirm the referee's report is granted; and it is further

ORDERED that the cross-motion by defendant is denied; and it is further

ORDERED that the mortgaged property described in the complaint and as described in this judgment, or such part thereof as may be sufficient to discharge the mortgage debt, the expense of sale and the costs of this action as provided in the RPAPL be sold within 90 days of this judgment, in one parcel, at a public auction at the New York County Courthouse located at 60 Centre Street, New York, New York under the direction of **Thomas Kleinberger, Esq.,** who is appointed Referee for this purpose; and it is further

ORDERED that the Referee shall give public notice of the time and place of sale in accordance with RPAPL 231(2) in the *New York Law Journal*; and the referee need not conduct the sale unless plaintiff shall provide the referee with proof of publication of the notice of sale, and if the sale is adjourned due to plaintiff's failure to provide such proof, then said adjournment shall not be considered at the referee's request; and it is further

ORDERED that by accepting this appointment the Referee certifies that she/he is in compliance with Part 36 of the Rules of the Chief Judge (22 NYCRR Part 36), including, but not limited to §36.2 (c) ("Disqualifications from appointment"), and §36.2 (d) ("Limitations on appointments based upon compensation"), and, if the Referee is disqualified from receiving an appointment pursuant to the provisions of that Rule, the Referee shall immediately notify the Appointing Judge; and it is further

ORDERED that the Referee is prohibited from accepting or retaining any funds for herself/himself or paying funds to him/herself without compliance with Part 36 of the Rules of the Chief Administrative Judge; and it is further

ORDERED that the Referee shall conduct the foreclosure sale only if Plaintiff, its successors and/or assignees or its representatives is present at the sale or the Referee has received a written bid and Terms of Sale from Plaintiff, its successors and/or assigns, or its representatives; and it is further

ORDERED that if the Referee cannot conduct the sale within 90 days of the date of this judgment, plaintiff must make a motion to extend the time to sell the subject property explaining the reasons for the delay; and it is further

ORDERED that at the time of sale the Referee may accept a written bid from the Plaintiff

or the Plaintiff's attorney, just as though Plaintiff were physically present to submit said bid; and

it is further

ORDERED that the Referee shall accept the highest bid offered by a bidder who shall be

identified upon the court record, and shall require that the successful bidder immediately execute

Terms of Sale for the purchase of the property, and pay to the Referee in cash, certified check or

bank check, ten percent (10%) of the sum bid, unless the successful bidder is Plaintiff, in which

case no deposit against the purchase process shall be required and it is further

ORDERED that notwithstanding the previous paragraph, the Referee shall have the right

to refuse cash payments and require a bank or certified check from the successful bidder and the

Referee shall be entitled to qualify bidders and require bidders to show proof of funds before or

during the auction; and it is further

ORDERED that in the event the first successful bidder fails to execute the Terms of Sale

or fails to immediately pay the ten percent (10%) deposit as required, the property shall be

immediately reoffered at auction on the same day; and it is further

ORDERED the Referee shall deposit the down payment and proceeds of sale, as

necessary in an FDIC-insured bank where the Referee has an account for that purpose in

accordance with CPLR 2609; and it is further

ORDERED that after the balance of the purchase price is paid or credited and the

property is sold, the Referee shall execute a deed to the purchaser in accordance with RPAPL

1353 and the terms of sale (which shall be deemed a binding contract); and it is further

ORDERED that in the event a party other than Plaintiff becomes the purchaser at the sale, the closing of title shall be held no later than 30 days after the date of such sale; and it is further

ORDERED that, pursuant to RPAPL 1353(1), if Plaintiff (or its affiliate as defined in paragraph [a] of subdivision one of section six-1 of the banking law) is the purchaser, the property shall be placed back on the market for sale or other occupancy within 180 days of the execution of the deed of sale or within 90 days of construction, renovation, or rehabilitation of the property, provided that such construction, renovation or rehabilitation proceeded diligently to completion, whichever comes first, provided that this court grants an extension upon a showing of good cause; and it is further

ORDERED that the Referee, after receiving the proceeds of the sale, shall pay (from the proceeds) the taxes, assessments, sewer rents, or water rates, which are, or may become, liens on the property in accordance with their priority according to law with such interest or penalties which may have lawfully accrued thereon to the date of payment; and it is further

ORDERED that the Referee shall deposit the balance of the proceeds from the sale in his or her own name as Referee in an FDIC-insured bank where the Referee has an account for that purpose and shall make the following payments in accordance with RPAPL 1354:

1. The Referee's fees for conducting the sale, which are $1,100. Plaintiff shall also compensate the Referee in the sum of $350 for each adjournment or cancellation made on less than two business days' notice unless the Referee caused the delay.

2. All taxes, assessments and water rates that are liens upon the property and monies necessary to redeem the property from any sales for unpaid taxes, assessments or water rates and any other amounts due in accordance with RPAPL 1354(2). The

purchaser shall be responsible for interest and penalties accrued *after* the sale. The Referee shall not be responsible for the payment of penalties or fees pursuant to this appointment. The purchaser shall hold the Referee harmless from any such penalties or fees assessed;

3. The expenses of the sale and the advertising expenses as shown on the bills presented and certified by the Referee to be correct, copies of which shall be annexed to the report of sale.

4. The Referee shall also pay to the Plaintiff or its attorneys the following:

    a. Amount Due from the Referee's Report: $2,691,415.40 with interest at the note rate from April 30, 2019 until entry of judgment, together with any advances as provided for in the note and mortgage which Plaintiff had made for taxes, insurance, principal, and interest and any other charges due to prior mortgages or to maintain the property pending consummation of the foreclosure sale, not included in the computation upon presentation of receipts for said expenditures to the Referee, and then with interest from the date of entry of this judgment at the statutory rate until the date the deed is transferred

    b. Costs and Disbursements: _$1590.00_ (to be filled in by the Clerk) to Plaintiff for costs and disbursements in this action with interest at the statutory judgment rate from the date of entry of this judgment;

    c. The Court declines to award additional allowance.

    d. Attorneys' Fees: $20,000.00 is hereby awarded as reasonable attorneys' fees with interest at the statutory judgment rate from the date of entry of this judgment.

5. Surplus monies from the sale shall be paid into Court by the Referee within five days after receipt in accordance with RPAPL 1354(4); and it is further

ORDERED that if Plaintiff is the purchaser of the property, or in the event that the rights of the purchasers at the sale and the terms of sale under this judgment shall be assigned to or be acquired by Plaintiff, and a valid assignment is filed with the Referee, the Referee shall not require Plaintiff to pay in cash the entire amount bid at sale, but shall execute and deliver to Plaintiff or its assignee, a deed or deeds of the property sold upon the payment to said Referee of the amounts specified as 1, 2, and 3 above, and the Referee shall allow Plaintiff to pay the amounts specified in 2 and 3 above when it is recording the deed; that the balance of the bid, after deducting the amounts paid by Plaintiff, shall be applied to the amount due to Plaintiff as specified in 4 above; that Plaintiff shall pay any surplus after applying the balance of the bid to the Referee, who shall deposit it in accordance with 5 above; and it is further

ORDERED that all expenses of recording the Referee's deed, including real property transfer taxes, which is not a lien upon the property at the time of sale, shall be paid by the plaintiff from the sale proceeds; and it is further

ORDERED that Plaintiff may seek to recover a deficiency judgment in accordance with RPAPL 1371 if applicable;

ORDERED that if the property is sold in one parcel in "as is" physical order and condition, subject to any condition that an inspection of the property would disclose; any facts that an accurate survey of the property would show; any covenants, restrictions, declarations, reservations, easements, right of way, and public utility agreements of record, if any; any building and zoning ordinances of the municipality in which the mortgaged property is located and possible violations of same; any rights of tenants or persons in possession of the subject

property; prior liens of record, if any, except those liens addressed in RPAPL 1354, any equity of

redemption of the United States of America to redeem the property within 120 days from the

date of sale, any rights pursuant to CPLR 317, 2003 and 5015 or any appeal of the underlying

action or additional litigation brought by any defendant or its successor or assignee contesting

the validity of this foreclosure; and it is further

ORDERED that the purchaser be let into possession of the property upon production in

hand of the Referee's Deed or upon personal service of the Referee's deed in accordance with

CPLR 308; and it is further

ORDERED that defendants in this action and persons claiming through them and any

person possessing a junior interest in the property after the Notice of Pendency was filed are

barred and foreclosed of all right, claim, lien, title, and interest in the property after the sale of

the mortgaged property; and it is further

ORDERED that within **14 days** after completing the sale and executing the proper

conveyance to the purchaser, the Referee shall file with the clerk a report under oath of the

disposition of the proceeds of the sale and upload the report to NYSCEF if it is an e-filed case;

and it is further

ORDERED that if the purchaser or purchasers at said sale default upon the bid or terms

of sale, the Referee may place the property for resale without prior application to this Court

unless Plaintiff's attorney elects to make such an application; and it is further

ORDERED that Plaintiff shall serve a copy of this judgment with notice of entry upon

the owner of the equity of redemption, any tenants named in this action, and any other parties

entitled to service, including the Referee appointed herein; and it is further

850274/2017  2386 HEMPSTEAD, INC. vs. 60 91ST STREET CORP.                Page 9 of 10
Motion No. 003

ORDERED that nothing herein shall be deemed to relieve Plaintiff of any obligation imposed by RPAPL 1307 or 1308 to secure and maintain the property until ownership of the property has been transferred and the deed duly recorded; and it is further

ORDERED that when the Referee files a report of sale, she or he shall also file a Foreclosure Action Surplus Monies Form and also upload this document to NYSCEF if an e-filed case; and it is further

ORDERED that plaintiff shall upload the notice of sale to NYSCEF at least 21 days before the sale and the Referee and **plaintiff shall e-mail SFC-Foreclosures@nycourts.gov** at least 21 days before the auction date so the auction may be placed on the auction calendar; IF THE AUCTION IS NOT ON THE CALENDAR, then *the auction will not go forward*; and it is further

ORDERED that, without further order of the Court, the referee shall be entitled to an additional fee of $950 for conducting and attending a closing with a purchaser other than plaintiff, plus, if such a closing is scheduled for the referee's conference room, then the referee shall be entitled to a reasonable fee for use thereof, without further order of the Court.

The property is commonly known as 60 West 91st Street, New York, NY 10024. Plaintiff did not include a legal description in its proposed judgment (NYSCEF Doc. No. 61).

_11·21·19_
DATE

_ARLENE P. BLUTH, J.S.C._

| CHECK ONE: | X | CASE DISPOSED | | | | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|---|
| | X | GRANTED | | DENIED | | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | x | FIDUCIARY APPOINTMENT | | REFERENCE |

**FILED**

_Milton A. Tingling_
CLERK

850274/2017  2386 HEMPSTEAD, INC. vs. PP 91ST ST CORP.
Motion No. 003

DEC 9 2019

Page 10 of 10

COUNTY CLERK'S OFFICE
NEW YORK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------

**2386 HEMPSTEAD, INC.,**

Plaintiff

-against-

**60 91ˢᵗ STREET CORP.**

Defendants

Defendant(s).

--------------------------------------------------------

**BILL OF COSTS**

Index No. 850274/2017

Justice:
Hon. ARLENE P. BLUTH

**COSTS**

Costs before Note of Issue(CPLR 8201(1))                    $   200.00
Costs after proceedings after note of issue filed but before trial

Additional Allowance (CPLR§8302(a)1 on *(b)*
10%...............................$ 200.00 *20.00*
5%................................$ 800.00 *40.00*
2%................................$ 2,000.00 *40.00*
1%................................$ 5,000.00 *50.00*

*#150.00* $ 8,000.00

**TOTAL COSTS**                                             $ 8,200.00

*I HEREBY CERTIFY THAT I HAVE ADJUSTED THIS BILL OF COSTS AT $ 1590.00*

*DEC -9 2019*

CLERK

**DISBURSEMENTS**

| | |
|---|---|
| Fee for Index number(CPLR 8018(a) | *# 400.00* $ 235.00 |
| Referee's Fees(CPLR 8301(a)(1), 8003, 8001(d) and 4321) | $ 350.00 |
| Paid for Searches (CPLR 8301(a)(10) | *# 250.00* $ 489.94 |
| Serving copy summons & Complaint (CPLR 8301© ) and 8301(d) | *55.00* $ 95.00 |
| Request for Judicial Intervention | $ 95.00 |
| Motion Expenses(CPLR 8301(b) 2@ $45.00 | $ 90.00 |
| Referee fee to sell | $ pending |
| Fees for Publication(CPLR 8301(a)(3)) | $ pending |
| TOTAL DISBURSEMENTS | $1,354.94 *1590.00* |

C:\Users\awole\Desktop\00345-305687914\alan\Desktop\Documents\Grodsky\Foreclosures\Mortimer\Judgement\bill of costs.wpd

## SUMMARY

| | |
|---|---|
| Costs | $ 8,200.00 |
| Disbursements | $ 1,354.94 |
| TOTAL | $ 9,554.94 |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------

**2386 HEMPSTEAD, INC.,**

         Plaintiff

          -against-

**60 91ST STREET CORP.**

         Defendants

**AFFIRMATION**

Index No. 850274/2017
Justice:
Hon. ARLENE P. BLUTH

--------------------------------------------------------

     **ALAN M. WOLINSKY**, an attorney duly admitted to practice law in the courts of the State of New York, under penalty of perjury duly affirms and says:

1. That he is a shareholder of The Wolinsky Law Group, P.C. attorney of record for 2386 Hempstead, Inc., the mortgagee in this foreclosure proceeding.
2. The foregoing disbursements have been or will be necessarily incurred in this action and are reasonable in amount.
3. That each of the persons named as witnesses attended as a witness on the trial the number of days set opposite their names and each of these persons resided the number of miles set opposite their names, from the place of trial and each of these persons necessarily traveled the number of miles so set opposite their names in traveling to, and the same distance returning from the same place of trial.
4. That any copies of documents or papers as charged herein were actually and necessarily obtained for use.

DATED: May 13 , 2019  Ronkonkoma, New York

ALAN M. WOLINSKY
THE WOLINSKY LAW GROUP, P.C.
160-02 Remington Boulevard
Ronkonkoma, New York 11779
(631)588-2900

C:\Users\awole\Desktop\00345-305687914\alan\Desktop\Documents\Grodsky\Foreclosures\Mortimer\Judgement\bill of costs.wpd

Index No. 850274/2017

Order and Judgment

FILED

DEC 09 2019

AT     10:08   A.M.

N.Y., CO. CLK'S OFFICE

**Exhibit E**

(Notice of Appeal)

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

2386 HEMPSTEAD, INC.

Plaintiff,

-against-

60 91ST STREET CORP.

Defendant.

Index No: 850274/2017

**NOTICE OF
APPEAL**

**PLEASE TAKE NOTICE THAT** Defendant 60 91st Street Corp. appeals to the

Appellate Division, First Department, from each and every part of the Decision of the

Honorable Arlene P. Bluth, J.S.C., dated November 21, 2019 and entered on December 9, 2019, a

copy of which is attached hereto.

Dated: New York, New York
December 20, 2019

Respectfully submitted,
/s/ Julio E. Portilla
Julio E. Portilla, Esq.
LAW OFFICE OF JULIO E. PORTILLA, P.C
555 Fifth Avenue, 17th Floor
New York, NY 10017
(212) 365-0292
(212) 365-4417 fax
jp@julioportillalaw.com

To:
The Wolinsky Law Group, P.C.
*Attorneys for Plaintiff*
160-02 Remington Boulevard
Ronkonkoma, New York 11779
(631) 588-2900

# Supreme Court of the State of New York
# Appellate Division: First     Judicial Department
Informational Statement (Pursuant to 22 NYCRR 1250.3 [a]) - Civil

| Case Title: Set forth the title of the case as it appears on the summons, notice of petition or order to show cause by which the matter was or is to be commenced, or as amended. | For Court of Original Instance |
|---|---|
| 2386 HEMPSTEAD, INC. <br><br> - against - <br><br> 60 91ST STREET CORP. | Date Notice of Appeal Filed |
| | **For Appellate Division** |

| Case Type | | Filing Type | |
|---|---|---|---|
| ▣ Civil Action | ☐ CPLR article 78 Proceeding | ▣ Appeal | ☐ Transferred Proceeding |
| ☐ CPLR article 75 Arbitration | ☐ Special Proceeding Other | ☐ Original Proceedings | ☐ CPLR Article 78 |
| | ☐ Habeas Corpus Proceeding | ☐ CPLR Article 78 | ☐ Executive Law § 298 |
| | | ☐ Eminent Domain | ☐ CPLR 5704 Review |
| | | ☐ Labor Law 220 or 220-b | |
| | | ☐ Public Officers Law § 36 | |
| | | ☐ Real Property Tax Law § 1278 | |

**Nature of Suit:** Check up to three of the following categories which best reflect the nature of the case.

| | | | |
|---|---|---|---|
| ☐ Administrative Review | ☐ Business Relationships | ☐ Commercial | ☐ Contracts |
| ☐ Declaratory Judgment | ☐ Domestic Relations | ☐ Election Law | ☐ Estate Matters |
| ☐ Family Court | ▣ Mortgage Foreclosure | ☐ Miscellaneous | ☐ Prisoner Discipline & Parole |
| ☐ Real Property (other than foreclosure) | ☐ Statutory | ☐ Taxation | ☐ Torts |

Informational Statement - Civil

## Appeal

**Paper Appealed From (Check one only):**

If an appeal has been taken from more than one order or judgment by the filing of this notice of appeal, please indicate the below information for each such order or judgment appealed from on a separate sheet of paper.

☐ Amended Decree     ☐ Determination     ☐ Order     ☐ Resettled Order
☐ Amended Judgement     ☐ Finding     ☐ Order & Judgment     ☐ Ruling
☐ Amended Order     ☐ Interlocutory Decree     ☐ Partial Decree     ☐ Other (specify):
■ Decision     ☐ Interlocutory Judgment     ☐ Resettled Decree
☐ Decree     ☐ Judgment     ☐ Resettled Judgment

| Court: | Supreme Court | County: | New York |
|---|---|---|---|
| Dated: | 11/21/2019 | Entered: | 12/09/2019 |
| Judge (name in full): Honorable Arlene P. Bluth | | | |
| Index No.: 850274/2017 | | | |

Stage: ☐ Interlocutory ☐ Final ☐ Post-Final     Trial: ☐ Yes ■ No    If Yes: ☐ Jury ☐ Non-Jury

### Prior Unperfected Appeal and Related Case Information

Are any appeals arising in the same action or proceeding currently pending in the court?    ☐ Yes ■ No
If Yes, please set forth the Appellate Division Case Number assigned to each such appeal.

Where appropriate, indicate whether there is any related action or proceeding now in any court of this or any other jurisdiction, and if so, the status of the case:

### Original Proceeding

Commenced by: ☐ Order to Show Cause ☐ Notice of Petition ☐ Writ of Habeas Corpus    Date Filed:

Statute authorizing commencement of proceeding in the Appellate Division:

### Proceeding Transferred Pursuant to CPLR 7804(g)

| Court: | Choose Court | County: | Choose County |
|---|---|---|---|
| Judge (name in full): | | Order of Transfer Date: | |

### CPLR 5704 Review of Ex Parte Order

| Court: | Choose Court | County: | Choose County |
|---|---|---|---|
| Judge (name in full): | | Dated: | |

### Description of Appeal, Proceeding or Application and Statement of Issues

Description: If an appeal, briefly describe the paper appealed from. If the appeal is from an order, specify the relief requested and whether the motion was granted or denied. If an original proceeding commenced in this court or transferred pursuant to CPLR 7804(g), briefly describe the object of proceeding. If an application under CPLR 5704, briefly describe the nature of the ex parte order to be reviewed.

The Supreme Court made an erroneous ruling by granting Plaintiff's motion for a judgment of foreclosure and sale of the property commonly known as 60 West 91st Street, New York, NY 10023.

Informational Statement - Civil

Issues: Specify the issues proposed to be raised on the appeal, proceeding, or application for CPLR 5704 review, the grounds for reversal, or modification to be advanced and the specific relief sought on appeal.

## Party Information

Instructions: Fill in the name of each party to the action or proceeding, one name per line. If this form is to be filed for an appeal, indicate the status of the party in the court of original instance and his, her, or its status in this court, if any. If this form is to be filed for a proceeding commenced in this court, fill in only the party's name and his, her, or its status in this court.

| No. | Party Name | Original Status | Appellate Division Status |
|-----|------------|-----------------|---------------------------|
| 1 | 60 91ST STREET CORP. | Defendant | Appellant |
| 2 | 2386 HEMPSTEAD, INC. | Plaintiff | Respondent |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |

Informational Statement - Civil

## Attorney Information

Instructions: Fill in the names of the attorneys or firms for the respective parties. If this form is to be filed with the notice of petition or order to show cause by which a special proceeding is to be commenced in the Appellate Division, only the name of the attorney for the petitioner need be provided. In the event that a litigant represents herself or himself, the box marked "Pro Se" must be checked and the appropriate information for that litigant must be supplied in the spaces provided.

| | | | |
|---|---|---|---|
| **Attorney/Firm Name:** Julio E. Portilla, Esq./Law Office of Julio E. Portilla, P.C. | | | |
| Address: 555 Fifth Avenue, 17th Floor | | | |
| City: New York | State: New York | Zip: 10017 | Telephone No: 212-365-0292 |
| E-mail Address: jp@julioportillalaw.com | | | |
| Attorney Type: ■ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |
| **Attorney/Firm Name:** The Wolinsky Law Group, P.C. | | | |
| Address: 160-02 Remington Boulevard | | | |
| City: Ronkonkoma | State: New York | Zip: 11779 | Telephone No: 631-588-2900 |
| E-mail Address: | | | |
| Attorney Type: ■ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |
| **Attorney/Firm Name:** | | | |
| Address: | | | |
| City: | State: | Zip: | Telephone No: |
| E-mail Address: | | | |
| Attorney Type: ☐ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |
| **Attorney/Firm Name:** | | | |
| Address: | | | |
| City: | State: | Zip: | Telephone No: |
| E-mail Address: | | | |
| Attorney Type: ☐ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |
| **Attorney/Firm Name:** | | | |
| Address: | | | |
| City: | State: | Zip: | Telephone No: |
| E-mail Address: | | | |
| Attorney Type: ☐ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |
| **Attorney/Firm Name:** | | | |
| Address: | | | |
| City: | State: | Zip: | Telephone No: |
| E-mail Address: | | | |
| Attorney Type: ☐ Retained ☐ Assigned ☐ Government ☐ Pro Se ☐ Pro Hac Vice | | | |
| Party or Parties Represented (set forth party number(s) from table above): | | | |

Informational Statement - Civil

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

| PRESENT: | HON. ARLENE P. BLUTH | | PART | IAS MOTION 32 |
| | | *Justice* | | |

-----------------------------------------------------------------X

2386 HEMPSTEAD, INC.

Plaintiff,

- v -

60 91ST STREET CORP.,

Defendant.

-----------------------------------------------------------------X

| INDEX NO. | 850274/2017 |
| MOTION DATE | N/A |
| MOTION SEQ. NO. | 003 |

**DECISION + ORDER ON MOTION, JUDGMENT OF FORECLOSURE AND SALE**

The following e-filed documents, listed by NYSCEF document number (Motion 003) 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 102, 103

were read on this motion to/for               JUDGMENT - FORECLOSURE & SALE            .

The motion by plaintiff for a judgment of foreclosure and sale is granted. The cross-motion by defendant to vacate is denied.

**Background**

In this foreclosure action, plaintiff moves to confirm the report of Thomas Kleinberger, which found that plaintiff is due $2,691,415.40 as of April 30, 2019.

In opposition and in support of its motion to vacate, defendant claims that plaintiff has unclean hands because it purportedly paid itself monies from the proceeds of the loan to which it was not entitled. Defendant also alleges that plaintiff changed the agreed-upon terms of the loan agreement at the closing. Defendant's principal contends that although she was represented by counsel at the closing and that she signed the subject agreement, she was suffering from distress due to her mother's illness. She claims she now knows the documents she signed do not represent the negotiations she previously had with the lender.

Defendant claims there is excusable default because the building had no mail carrier at the time the Secretary of State mailed the summons and complaint and it has a meritorious defense based on plaintiff's purported fraudulently inducing it to sign the loan.

In reply and in opposition to the cross-motion, plaintiff emphasizes that defendant was represented by counsel throughout the loan agreement process and explains in detail why defendant received approximately $87,000 from the loan. According to plaintiff, monies were deducted for unpaid interest owed on the first mortgage, for closing costs, and another $10,000 was held in escrow because defendant did not come to the closing with a proper insurance policy.

**Discussion**

The Court grants the motion and denies defendant's cross-motion. As an initial matter, defendant did not establish a reasonable excuse for failing to appear. Defendant did not claim that plaintiff failed to properly effectuate service with the Secretary of State. Rather, it blames the post office for its mail carrier obligations. However, the Court cannot ignore the fact that *defendant owns* the building— if the mail service was lacking, then defendant's principal should have taken steps to fix the problem. The affidavit of defendant's principal is silent on what she did to alleviate the problem, when she found out about it or how long this problem existed prior to service through the Secretary of State. It is not the obligation of plaintiff or the Secretary of State to ensure that the mail service at defendant's building is operating properly. Here, the papers were served to the correct address and defendant merely complains she never got them. That is not enough to establish a reasonable excuse for not appearing.

Even if defendant could establish a reasonable excuse, it did not show a meritorious defense. The principal for defendant appears to claim that she does not like the agreement that

850274/2017 2386 HEMPSTEAD, INC. vs. 60 91ST STREET CORP.
Motion No. 003

Page 2 of 10

she signed. While the Court appreciates that she may have been preoccupied with her mother's illness, that is not a valid defense to this action, especially where it is undisputed that she was represented by counsel at the closing. Defendant cannot get out of an agreement because its principal chose to read the terms after signing it and decided she doesn't like them or that they might have been different from previous discussions with plaintiff. That is presumably why defendant had counsel at the closing.

And there is no basis to find that plaintiff fraudulently induced defendant's principal into signing the loan agreement. In her affidavit, she admits that she signed a previous promissory note for $1.4 million in 2015 and that when this loan neared maturity, she sought out new financing. In other words, defendant wanted additional money from plaintiff. There is no basis to find that defendant was coerced or fraudulently induced into signing the agreement. Rather, it appears she sought out additional financing and received it.

Accordingly, it is hereby

ORDERED and ADJUDGED that the motion by plaintiff for a judgment of foreclosure and sale and to confirm the referee's report is granted; and it is further

ORDERED that the cross-motion by defendant is denied; and it is further

ORDERED that the mortgaged property described in the complaint and as described in this judgment, or such part thereof as may be sufficient to discharge the mortgage debt, the expense of sale and the costs of this action as provided in the RPAPL be sold within 90 days of this judgment, in one parcel, at a public auction at the New York County Courthouse located at 60 Centre Street, New York, New York under the direction of **Thomas Kleinberger, Esq.,** who is appointed Referee for this purpose; and it is further

ORDERED that the Referee shall give public notice of the time and place of sale in accordance with RPAPL 231(2) in the *New York Law Journal*; and the referee need not conduct the sale unless plaintiff shall provide the referee with proof of publication of the notice of sale, and if the sale is adjourned due to plaintiff's failure to provide such proof, then said adjournment shall not be considered at the referee's request; and it is further

ORDERED that by accepting this appointment the Referee certifies that she/he is in compliance with Part 36 of the Rules of the Chief Judge (22 NYCRR Part 36), including, but not limited to §36.2 (c) ("Disqualifications from appointment"), and §36.2 (d) ("Limitations on appointments based upon compensation"), and, if the Referee is disqualified from receiving an appointment pursuant to the provisions of that Rule, the Referee shall immediately notify the Appointing Judge; and it is further

ORDERED that the Referee is prohibited from accepting or retaining any funds for herself/himself or paying funds to him/herself without compliance with Part 36 of the Rules of the Chief Administrative Judge; and it is further

ORDERED that the Referee shall conduct the foreclosure sale only if Plaintiff, its successors and/or assignees or its representatives is present at the sale or the Referee has received a written bid and Terms of Sale from Plaintiff, its successors and/or assigns, or its representatives; and it is further

ORDERED that if the Referee cannot conduct the sale within 90 days of the date of this judgment, plaintiff must make a motion to extend the time to sell the subject property explaining the reasons for the delay; and it is further

FILED: NEW YORK COUNTY CLERK 12/09/2019 10:13 AM    INDEX NO. 850274/2017
NYSCEF DOC. NO. 109    RECEIVED NYSCEF: 12/09/2019

ORDERED that at the time of sale the Referee may accept a written bid from the Plaintiff or the Plaintiff's attorney, just as though Plaintiff were physically present to submit said bid; and it is further

ORDERED that the Referee shall accept the highest bid offered by a bidder who shall be identified upon the court record, and shall require that the successful bidder immediately execute Terms of Sale for the purchase of the property, and pay to the Referee in cash, certified check or bank check, ten percent (10%) of the sum bid, unless the successful bidder is Plaintiff, in which case no deposit against the purchase process shall be required and it is further

ORDERED that notwithstanding the previous paragraph, the Referee shall have the right to refuse cash payments and require a bank or certified check from the successful bidder and the Referee shall be entitled to qualify bidders and require bidders to show proof of funds before or during the auction; and it is further

ORDERED that in the event the first successful bidder fails to execute the Terms of Sale or fails to immediately pay the ten percent (10%) deposit as required, the property shall be immediately reoffered at auction on the same day; and it is further

ORDERED the Referee shall deposit the down payment and proceeds of sale, as necessary in an FDIC-insured bank where the Referee has an account for that purpose in accordance with CPLR 2609; and it is further

ORDERED that after the balance of the purchase price is paid or credited and the property is sold, the Referee shall execute a deed to the purchaser in accordance with RPAPL 1353 and the terms of sale (which shall be deemed a binding contract); and it is further

FILED: NEW YORK COUNTY CLERK 12/09/2019 10:13 AM
NYSCEF DOC. NO. 109                                     RECEIVED NYSCEF: 12/09/2019

ORDERED that in the event a party other than Plaintiff becomes the purchaser at the sale, the closing of title shall be held no later than 30 days after the date of such sale; and it is further

ORDERED that, pursuant to RPAPL 1353(1), if Plaintiff (or its affiliate as defined in paragraph [a] of subdivision one of section six-1 of the banking law) is the purchaser, the property shall be placed back on the market for sale or other occupancy within 180 days of the execution of the deed of sale or within 90 days of construction, renovation, or rehabilitation of the property, provided that such construction, renovation or rehabilitation proceeded diligently to completion, whichever comes first, provided that this court grants an extension upon a showing of good cause; and it is further

ORDERED that the Referee, after receiving the proceeds of the sale, shall pay (from the proceeds) the taxes, assessments, sewer rents, or water rates, which are, or may become, liens on the property in accordance with their priority according to law with such interest or penalties which may have lawfully accrued thereon to the date of payment; and it is further

ORDERED that the Referee shall deposit the balance of the proceeds from the sale in his or her own name as Referee in an FDIC-insured bank where the Referee has an account for that purpose and shall make the following payments in accordance with RPAPL 1354:

1. The Referee's fees for conducting the sale, which are $1,100. Plaintiff shall also compensate the Referee in the sum of $350 for each adjournment or cancellation made on less than two business days' notice unless the Referee caused the delay.

2. All taxes, assessments and water rates that are liens upon the property and monies necessary to redeem the property from any sales for unpaid taxes, assessments or water rates and any other amounts due in accordance with RPAPL 1354(2). The

FILED: NEW YORK COUNTY CLERK 12/20/2019 08:43 PM
NYSCEF: NEW YORK COUNTY CLERK 12/09/2019 10:13 AM
NYSCEF DOC. NO. 109

INDEX NO. 850274/2017
INDEX NO. 850274/2017
RECEIVED NYSCEF: 12/23/2019
RECEIVED NYSCEF: 12/09/2019

purchaser shall be responsible for interest and penalties accrued *after* the sale. The Referee shall not be responsible for the payment of penalties or fees pursuant to this appointment. The purchaser shall hold the Referee harmless from any such penalties or fees assessed;

3. The expenses of the sale and the advertising expenses as shown on the bills presented and certified by the Referee to be correct, copies of which shall be annexed to the report of sale.

4. The Referee shall also pay to the Plaintiff or its attorneys the following:

   a. Amount Due from the Referee's Report: $2,691,415.40 with interest at the note rate from April 30, 2019 until entry of judgment, together with any advances as provided for in the note and mortgage which Plaintiff had made for taxes, insurance, principal, and interest and any other charges due to prior mortgages or to maintain the property pending consummation of the foreclosure sale, not included in the computation upon presentation of receipts for said expenditures to the Referee, and then with interest from the date of entry of this judgment at the statutory rate until the date the deed is transferred

   b. Costs and Disbursements: *$1590.00* (to be filled in by the Clerk) to Plaintiff for costs and disbursements in this action with interest at the statutory judgment rate from the date of entry of this judgment;

   c. The Court declines to award additional allowance.

   d. Attorneys' Fees: $20,000.00 is hereby awarded as reasonable attorneys' fees with interest at the statutory judgment rate from the date of entry of this judgment.

FILED: NEW YORK COUNTY CLERK 12/09/2019 10:13 AM    INDEX NO. 850274/2017
NYSCEF DOC. NO. 109                                  RECEIVED NYSCEF: 12/09/2019

5. Surplus monies from the sale shall be paid into Court by the Referee within five days after receipt in accordance with RPAPL 1354(4); and it is further

ORDERED that if Plaintiff is the purchaser of the property, or in the event that the rights of the purchasers at the sale and the terms of sale under this judgment shall be assigned to or be acquired by Plaintiff, and a valid assignment is filed with the Referee, the Referee shall not require Plaintiff to pay in cash the entire amount bid at sale, but shall execute and deliver to Plaintiff or its assignee, a deed or deeds of the property sold upon the payment to said Referee of the amounts specified as 1, 2, and 3 above, and the Referee shall allow Plaintiff to pay the amounts specified in 2 and 3 above when it is recording the deed; that the balance of the bid, after deducting the amounts paid by Plaintiff, shall be applied to the amount due to Plaintiff as specified in 4 above; that Plaintiff shall pay any surplus after applying the balance of the bid to the Referee, who shall deposit it in accordance with 5 above; and it is further

ORDERED that all expenses of recording the Referee's deed, including real property transfer taxes, which is not a lien upon the property at the time of sale, shall be paid by the plaintiff from the sale proceeds; and it is further

ORDERED that Plaintiff may seek to recover a deficiency judgment in accordance with RPAPL 1371 if applicable;

ORDERED that if the property is sold in one parcel in "as is" physical order and condition, subject to any condition that an inspection of the property would disclose; any facts that an accurate survey of the property would show; any covenants, restrictions, declarations, reservations, easements, right of way, and public utility agreements of record, if any; any building and zoning ordinances of the municipality in which the mortgaged property is located and possible violations of same; any rights of tenants or persons in possession of the subject

850274/2017  2386 HEMPSTEAD, INC. vs. 60 91ST STREET CORP.                Page 8 of 10
Motion No. 003

property; prior liens of record, if any, except those liens addressed in RPAPL 1354, any equity of redemption of the United States of America to redeem the property within 120 days from the date of sale, any rights pursuant to CPLR 317, 2003 and 5015 or any appeal of the underlying action or additional litigation brought by any defendant or its successor or assignee contesting the validity of this foreclosure; and it is further

ORDERED that the purchaser be let into possession of the property upon production in hand of the Referee's Deed or upon personal service of the Referee's deed in accordance with CPLR 308; and it is further

ORDERED that defendants in this action and persons claiming through them and any person possessing a junior interest in the property after the Notice of Pendency was filed are barred and foreclosed of all right, claim, lien, title, and interest in the property after the sale of the mortgaged property; and it is further

ORDERED that within **14 days** after completing the sale and executing the proper conveyance to the purchaser, the Referee shall file with the clerk a report under oath of the disposition of the proceeds of the sale and upload the report to NYSCEF if it is an e-filed case; and it is further

ORDERED that if the purchaser or purchasers at said sale default upon the bid or terms of sale, the Referee may place the property for resale without prior application to this Court unless Plaintiff's attorney elects to make such an application; and it is further

ORDERED that Plaintiff shall serve a copy of this judgment with notice of entry upon the owner of the equity of redemption, any tenants named in this action, and any other parties entitled to service, including the Referee appointed herein; and it is further

850274/2017  2386 HEMPSTEAD, INC. vs. 60 91ST STREET CORP.                Page 9 of 10
Motion No. 003

ORDERED that nothing herein shall be deemed to relieve Plaintiff of any obligation imposed by RPAPL 1307 or 1308 to secure and maintain the property until ownership of the property has been transferred and the deed duly recorded; and it is further

ORDERED that when the Referee files a report of sale, she or he shall also file a Foreclosure Action Surplus Monies Form and also upload this document to NYSCEF if an e-filed case; and it is further

ORDERED that plaintiff shall upload the notice of sale to NYSCEF at least 21 days before the sale and the Referee and **plaintiff shall e-mail SFC-Foreclosures@nycourts.gov** at least 21 days before the auction date so the auction may be placed on the auction calendar; IF THE AUCTION IS NOT ON THE CALENDAR, then *the auction will not go forward*; and it is further

ORDERED that, without further order of the Court, the referee shall be entitled to an additional fee of $950 for conducting and attending a closing with a purchaser other than plaintiff, plus, if such a closing is scheduled for the referee's conference room, then the referee shall be entitled to a reasonable fee for use thereof, without further order of the Court.

The property is commonly known as 60 West 91st Street, New York, NY 10024. Plaintiff did not include a legal description in its proposed judgment (NYSCEF Doc. No. 61).

_____11·21·19_____
DATE

_____
ARLENE P. BLUTH, J.S.C.

| CHECK ONE: | | | | | |
|---|---|---|---|---|---|
| | X | CASE DISPOSED | | NON-FINAL DISPOSITION | |
| | X | GRANTED | ☐ DENIED | GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ | SETTLE ORDER | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ | INCLUDES TRANSFER/REASSIGN | | x FIDUCIARY APPOINTMENT | ☐ REFERENCE |

# FILED

_Nilton Hingling_
CLERK

850274/2017  2386 HEMPSTEAD, INC. vs. 91ST SQR 2019 ORP.    DEC 3 2019    Page 10 of 10
Motion No. 003

COUNTY CLERK'S OFFICE
NEW YORK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

2386 HEMPSTEAD, INC.,

                    Plaintiff

-against-

60 91st STREET CORP.

                    Defendants

                    Defendant(s).

---

**BILL OF COSTS**

Index No. 850274/2017

Justice:
Hon. ARLENE P. BLUTH

---

**COSTS**

I HEREBY CERTIFY THAT I HAVE
ADJUSTED THIS BILL OF COSTS AT
$ _1590.00_

DEC - 9 2019

_[signature]_

CLERK

| | |
|---|---|
| Costs before Note of Issue(CPLR 8201(1)) | $ 200.00 |
| Costs after proceedings after note of issue filed but before trial | |

Additional Allowance (CPLR§8302(a)1 on (b)

| | |
|---|---|
| 10%..........................$ ~~200.00~~ 20.00 | |
| 5%...........................$ ~~800.00~~ 40.00 | |
| 2%...........................$ ~~2,000.00~~ 40.00 | |
| 1%...........................$ ~~5,000.00~~ 50.00 | |

                                      # 150.00 $ ~~8,000.00~~

TOTAL COSTS                            $ ~~8,200.00~~

---

**DISBURSEMENTS**

| | |
|---|---|
| Fee for Index number(CPLR 8018(a) | # 400.00 $ ~~235.00~~ |
| Referee's Fees(CPLR 8301(a)(1), 8003, 8001(d) and 4321) | $ 350.00 |
| Paid for Searches (CPLR 8301(a)(10) | # 250.00 $ ~~489.94~~ |
| Serving copy summons & Complaint (CPLR 8301© ) and 8301(d) | 55.00 $ ~~95.00~~ |
| Request for Judicial Intervention | $ 95.00 |
| Motion Expenses(CPLR 8301(b) 2@ $45.00 | $ 90.00 |
| Referee fee to sell | $ ~~pending~~ |
| Fees for Publication(CPLR 8301(a)(3)) | $ ~~pending~~ |
| TOTAL DISBURSEMENTS | $ ~~1,354.94~~ 1590.00 |

C:\Users\awole\Desktop\00345-305687914\alan\Desktop\Documents\Grodsky\Foreclosures\Mortimer\Judgement\bill of costs.wpd

FILED: NEW YORK COUNTY CLERK 12/20/2019 08:43 PM
NYSCEF Doc. NEW YORK COUNTY CLERK 12/09/2019 10:13 AM
NYSCEF DOC. NO. 109

INDEX NO. 850274/2017
RECEIVED NYSCEF: 12/23/2019
RECEIVED NYSCEF: 12/09/2019

### SUMMARY

Costs                              $ 8,200.00

Disbursements                      $ 1,354.94
TOTAL                              $ 9,554.94

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------

**2386 HEMPSTEAD, INC.,**

　　　　　　　　　Plaintiff

**AFFIRMATION**

-against-

Index No. 850274/2017
Justice:
Hon. ARLENE P. BLUTH

**60 91ˢᵗ STREET CORP.**

　　　　　　　　　Defendants

-------------------------------------------------------------------

　　　　**ALAN M. WOLINSKY,** an attorney duly admitted to practice law in the courts of the State of New York, under penalty of perjury duly affirms and says:

1.　　That he is a shareholder of The Wolinsky Law Group, P.C. attorney of record for 2386 Hempstead, Inc., the mortgagee in this foreclosure proceeding.

2.　　The foregoing disbursements have been or will be necessarily incurred in this action and are reasonable in amount.

3.　　That each of the persons named as witnesses attended as a witness on the trial the number of days set opposite their names and each of these persons resided the number of miles set opposite their names, from the place of trial and each of these persons necessarily traveled the number of miles so set opposite their names in traveling to, and the same distance returning from the same place of trial.

4.　　That any copies of documents or papers as charged herein were actually and necessarily obtained for use.

DATED: May 13 , 2019 Ronkonkoma, New York

　　　　　　　　　　　　　　ALAN M. WOLINSKY
　　　　　　　　　　　　　　THE WOLINSKY LAW GROUP, P.C.
　　　　　　　　　　　　　　160-02 Remington Boulevard
　　　　　　　　　　　　　　Ronkonkoma, New York 11779
　　　　　　　　　　　　　　(631)588-2900

C:\Users\awole\Desktop\00345-305687914\alan\Desktop\Documents\Grodsky\Foreclosures\Mortimer\Judgement\bill of costs.wpd

FILED: NEW YORK COUNTY CLERK 12/09/2019 10:13 AM

INDEX NO. 850274/2017
RECEIVED NYSCEF: 12/09/2019

Index No. 850274/2017

Order and Judgment

# FILED

DEC 09 2019

AT 10:08 A.M.

N.Y., CO. CLK'S OFFICE

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTUY

| | |
|---|---|
| 2386 HEMPSTEAD, INC. | Index No: 850274/2017 |
| Plaintiff, | **AFFIDAVIT OF SERVICE** |
| -against- | |
| 60 91SST STREET CORP. | |
| Defendants. | |

**STATE OF NEW YORK** )
                   ) ss.:
**COUNTY OF NEW YORK** )

DEYANITH SKRIP, being duly sworn, deposes and says:

1. I am not a party to the action, am over 18 years of age and reside in Richmond County, New York.

2. I certify that on the 20th day of December 2019, I served the Notice of Appeal, the Notice of Pre-Argument Statement and supporting documents, by depositing a true copy thereof in post-paid, properly addressed sealed envelope by first-class delivery, in the official depository within New York City and State under the exclusive care and custody of the United States Postal Service, addressed to the following persons at the last known address of the addressees as follows:

The Wolinsky Law Group, P.C.
*Attorneys for Plaintiff*
160-02 Remington Boulevard
Ronkonkoma, New York 11779
(631) 588-2900

_____
Deyanith Skrip

Subscribed and sworn to before me
on this _____ of December, 2019

_____
NOTARY

**Exhibit F**

(Preliminary Report)


September 3, 2020

Amy E. Vulpio, Esq.
White and Williams LLP
7 Times Square, Suite 2900
New York, NY 10036

Reference: Our File:      **RANY-40759**
          Seller(s):    **60 91St Street Corp.**
          Buyer(s):    **TBD**
          Lender:      **TBD**
          Premises:   **60 West 91st Street, New York, NY 10024**
                        **Block:  1204 Lot:  54**

Dear Amy,

Enclosed please find the most recently completed title report relative to the above referenced transaction for your review.

Please contact this office should you have any questions or require the method of disposition for any exception set forth herein.

**Your coordinator on this file is Yisroel Stamm who can be reached via phone at 718-215-5135 or via email at YStamm@rsabstract.com.**

Sincerely,

Chana Klingman
Riverside Abstract, LLC

Notice to Buyer(s)/Borrower(s) and/or their agent(s): Please be advised that Riverside Abstract, LLC has implemented a rate calculator for your convenience to enable you to calculate your title insurance premiums. This website can be accessed at **www.nyrates.fntg.com**.

## *AMTRUST TITLE INSURANCE COMPANY*

Agrees to issue its standard form of insurance policy after the closing of the transaction in conformance with procedures approved by the Company excepting (a) all loss or damage by reason of the estates, interests, defects, objections, liens, encumbrances and other matters set forth herein that are not disposed of to the satisfaction of the Company prior to such closing or issuance of the policy, and (b) any question or objection coming to the attention of the Company before the date of closing, or if there be no closing, before the issuance of said policy.

This Certificate shall be null and void (1) if the premium and related charges for the policy are not paid; (2) if the prospective insured, his attorney or agent makes any untrue statement with respect to any material fact or suppresses or fails to disclose any material fact or if any untrue answers are given to material inquiries by or on behalf of the Company; or (3) upon delivery of the policy. Any claim arising by reason of the issuance hereof shall be restricted to the terms and conditions of the standard form of title insurance policy. If the title, interest or lien to be insured was acquired by the prospective insured prior to delivery hereof, the Company assumes no liability except under its policy when issued.

**THIS CERTIFICATE IS INTENDED FOR LAWYERS ONLY. SUCH EXCEPTIONS AS MAY BE SET FORTH HEREIN MAY AFFECT MARKETABILITY OF TITLE. YOUR LAWYER SHOULD BE CONSULTED BEFORE TAKING ANY ACTION BASED UPON THE CONTENTS HEREOF. THE COMPANY'S REPRESENTATIVE AT THE CLOSING HEREUNDER MAY NOT ACT AS LEGAL ADVISOR TO ANY OF THE PARTIES OR DRAW LEGAL INSTRUMENTS FOR THEM. SUCH REPRESENTATIVE IS PERMITTED TO BE OF ASSISTANCE ONLY TO AN ATTORNEY. IT IS ADVISABLE TO HAVE YOUR ATTORNEY PRESENT AT THE CLOSING.**

**IF ANY OF THE CLOSING INSTRUMENTS WILL BE OTHER THAN COMMONLY USED FORMS OR CONTAIN UNUSUAL PROVISIONS, THE CLOSING CAN BE SIMPLIFIED AND EXPEDITED BY FURNISHING THE COMPANY WITH COPIES OF THE PROPOSED DOCUMENTS IN ADVANCE OF CLOSING.**

**Dated:** September 3, 2020

**Redated:**                                                          AMTrust Title Insurance Company

Riverside Abstract, LLC
3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234
TEL: (718) 252-4200
FAX: (718) 252-4226                         By: _____
                                                                Shaul Greenwald
                                                                Authorized Signature

Report Created by: Chana Klingman

# CERTIFICATE OF TITLE INSURANCE
## (Continued)

The following matters will be expressly excluded from the coverage of the policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
      i.   the occupancy, use, or enjoyment of the Land;
      ii.  the character, dimensions, or location of any improvement erected on the Land;
      iii. the subdivision of land; or:
      iv.  environmental protection;
      v.   or the effect of any violation of these laws, ordinances, or governmental regulations.
      This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   b. Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters
   a. created, suffered, assumed, or agreed to by the Insured Claimant;
   b. not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c. resulting in no loss or damage to the Insured Claimant;
   d. attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10 or loan policy 11 , 13 or 14) or
   e. resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   a. a fraudulent conveyance or fraudulent transfer; or
   b. a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5. Any lien on the Title for real estate taxes, assessments, water charges or sewer rents imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records.

*Loan Policy additional Exclusions:*
1. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

2. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

The policy will except from coverage any state of facts which an accurate survey might show, unless a survey is provided or survey coverage is available. When a survey is provided, this certificate will set forth the specific survey exceptions which we will include in the Policy. Whenever the word "trim" is used in any survey exceptions from coverage, it shall be deemed to include roof cornices, show window cornices, lintels, sills, window trim, entrance trim, bay window cornices, moldings, belt courses, water tables, keystones, pilasters, porticos, balconies all of which project beyond the street line.

# A RIVERSIDE
## A B S T R A C T

## CONSUMER NOTICES AND DISCLOSURES AS REQUIRED
## PURSUANT TO NEW YORK INSURANCE LAW

Date: **September 3, 2020**

File No.: **RANY-40759**

Property: **60 West 91st Street, New York, NY 10024**

To: **TBD**

These disclosure and Notices are for the purposes of compliance with New York Insurance Law and do not alter or change the coverage's, exceptions, exclusions, or conditions of the final policies issued in connection with the subject transaction. Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**THIS REPORT IS NOT A TITLE INSURANCE POLICY!**

**PLEASE REVIEW THIS REPORT WITH A REAL ESTATE PROFESSIONAL REPRESENTING YOUR INTEREST IN THIS TRANSACTION. PLEASE READ IT CAREFULLY.**

**THE REPORT MAY SET FORTH EXCLUSIONS UNDER THE TITLE INSURANCE POLICY AND MAY NOT LIST ALL LIENS, DEFECTS, AND ENCUMBRANCES AFFECTING TITLE TO THE PROPERTY. YOU SHOULD CONSIDER THIS INFORMATION CAREFULLY.**

Initial: _____

3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234

**A RIVERSIDE**
ABSTRACT

212 Second Street, Suite 502
Lakewood, NJ 08701

## NOTICE CONCERNING AVAILABILITY OF AN "OWNER'S" POLICY

Date:     September 3, 2020

To:       TBD

Title No:   RANY-40759

Please indicate if this transaction is a refinance _____ or a purchase _____.

Our records indicate that you are currently seeking a "Lender's" title insurance policy, not an "Owner's" title insurance policy.

You have the option of purchasing an Owner's insurance policy.  Please read the following disclosures concerning "Lender's" and "Owner's" title insurance policies, and *initial in the space provided to confirm that you have read and understand the disclosures.*

_____   I acknowledge that the Lender's title insurance policy issued in connection with this financing provides insurance to the ***lender only*** and does not insure my interest in the property as the owner of the property.

_____   I acknowledge that I understand that the Lenders' policy insures that the lender has a valid and enforceable encumbrance on the property that I own or that I am purchasing.  An Owner's Policy, if purchased by me, would insure me and provide me with a legal defense against claims made against the title to the property.  The Owner's policy would also protect my equity in the property and assure that marketability of the property when I sell it.  Without an Owner's policy I do not get those protections.

I may obtain an Owner's Policy of Title Insurance which provides title insurance to me and the total premium for both policies will be $**TBD.**

☐   I/We do request an Owner's Extended Protection Policy (TOEPP) of title insurance.

☐   I/We do request a Standard Owner's Policy of title insurance.

☐   I/We do not request an Owner's Policy of title insurance.

TO BE SIGNED BY BUYER/BORROWER


_____
Date


TBD

BY:_____

3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234

**A** RIVERSIDE
A B S T R A C T

212 Second Street, Suite 502
Lakewood, NJ 08701

## OPTIONAL MARKET VALUE POLICY RIDER AVAILABILITY

Title No.: RANY-40759

**NOTE:** THE FOLLOWING IS ONLY APPLICABLE TO THE PURCHASE OF A ONE TO FOUR FAMILY DWELLING, A RESIDENTIAL CONDOMINIUM OR COOPERATIVE UNIT. THE PURCHASER MUST BE A NATURAL PERSON AND MUST RESIDE AT THE PROPERTY WHICH MUST BE USED PREDOMINANTLY FOR RESIDENTIAL PURPOSES.

Section 6049, Subdivision "C" of the Insurance Law requires that title companies' offer at or prior to closing an optional policy rider to cover the homeowner for the <u>future market value</u> of his or her home. The Purchaser may, for an additional premium, obtain a title policy in excess of the Purchase Price.

**A. I choose to accept the Market Value Policy Rider.**

TBD

BY:_____

B. I do not wish to accept the Market Value Policy Rider for future increased market value and elect to waive the offer for such additional coverage.

TBD

BY:_____

**C. TO BE COMPLETED BY THE COMPANY CLOSER:**

The Optional Market Value Policy Rider is not applicable to this transaction.

REASON:
☐ Commercial Property                    ☐ Vacant Land
☐ Multiple Dwelling (consisting of 5 families or more)
☐ Purchaser is not a natural person (e.g. corporation, partnership, trust, etc.)
☐ Purchaser will not reside at dwelling

BY: _____
    Company Closer

# RIVERSIDE ABSTRACT, LLC
### As Agent for
### AMTRUST TITLE INSURANCE COMPANY
## SCHEDULE A

**Effective Date:**     July 28, 2020          Title No.:  **RANY-40759**

**Recertified Date:**    _____

**Recertified By:**     _____

Policy and/or Policies to be issued:

ALTA Owner's Policy with N.Y. Endorsement Modifications          **$TBD**
   Proposed Insured:   **TBD**

ALTA 2006 Loan Policy with N.Y. Endorsement Modifications         **$ TBD**
   Proposed Insured:   **TBD**

   Borrower:          **TBD**

The Estate or interest in the land described or referred to in this Certificate and covered herein is:

Fee Simple

**THIS COMPANY CERTIFIES** that a good and marketable title to the premises described in Schedule A, subject to the liens, encumbrances and other matters, if any, set forth in this certificate may be conveyed and/or mortgaged by:

**60 91St Street Corp.**

Title is Vested In:
**As to one half interest:**
60 91St Street Corp.* by deed from Anne Sowell, dated September 26, 1994 and recorded October 13, 1994 in the Office of the City Register of the City of New York at Reel 2145, Page 2249.

**As to one half interest:**
60 91St Street Corp.* by deed from Yvonne Sowell n/k/a Yvonne Mortimer "as sole heir-at-law of" Arthur Sowell, dated February 18, 2011 and recorded October 7, 2011  in the Office of the City Register of the City of New York in CRFN 2011000355788.

*See Excepton 24

**Title Recertified in:**

The land referred to in this certificate is described as follows:

SEE ATTACHED LEGAL DESCRIPTION

Premises described in Schedule A are known as:

Address: **60 West 91st Street**
**New York, NY 10024**
**County: New York**

**Block: 1204**       **Lot: 54**

**For any title clearance questions on this report please call: (718) 252-4200**

# RIVERSIDE ABSTRACT, LLC
## As Agent for
### AMTRUST TITLE INSURANCE COMPANY
# LEGAL DESCRIPTION

Title No.: **RANY-40759**

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly line of West Ninety-First Street opposite the center of a party wall which point is distant two hundred and forty-one feet easterly form the corner formed by the intersection of the southerly line of Ninety-First Street with the easterly line of Columbus (formerly Ninth) Avenue;

RUNNING THENCE southerly parallel with Columbus (formerly Ninth) Avenue and partly through said party wall, one hundred feet, eight and one-half inches to the center line of the block between West Nintieth and West Ninety-First Streets;

THENCE easterly along said center line of the block; twenty feet to the point opposite the center of another party wall;

THENCE northerly parallel with Columbus (formerly Ninth) Avenue and partly through the said last mentioned party wall, one hundred feet, eight and one-half inches to the southerly line of West Ninety-First Street;

THENCE westerly along the southerly side of West Ninety-First Street, twenty feet to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as Block 1204, Lot 54, New York County and also known as 60 West 91st Street, New York, NY 10024.

Title No.: **RANY-40759**

The following requirements must be met prior to issuance of any title policy:

1.  Closings should be scheduled at least two business days prior to the anticipated date of closing to provide ample time for the Company to provide continuation searches.

2.  All parties attending the closing will be required to furnish a photo driver's license or other photo-identification and social security numbers to the Company's representative at closing.

3.  This company does not accept personal checks for payment of any of its closing charges or fees. Only certified or bank checks, attorney escrow checks or wired funds will be accepted at closing. Under no circumstances will third party or seller's checks be accepted in any amount.

4.  The Company closer may not act as a legal adviser for any of the parties or draw any legal documents for any of the parties.

5.  Pay the agreed amounts for the interest in the land and/or according to the mortgage to be insured.

6.  Pay the Company the premium, fees and charges for and associated with the policy.

7.  Documents satisfactory to us creating the interest in the land and/or the mortgage to be insured must be signed, delivered and recorded.

8.  You must tell us in writing the name of any person or entity not referred to in this Commitment who will get an interest in the land or who will make a loan on the land. We may then make additional requirements or raise additional exceptions.

9.  Although the Company will use its best efforts to record instruments promptly, no liability is assumed for penalties and interest under section 1416 of the Tax Law due to the inability to file Transfer Tax Returns or to pay Transfer Taxes within the time required.

10. Policy excepts any consequences that may arise due to the fact that the instruments submitted for recording are rejected by the County Clerk or Register because the instruments are illegible.

11. If the conveyance and/or mortgage to be insured herein is to be made under Power of Attorney, Both the Power of Attorney AND a copy of the Principal's driver's license  or passport must be submitted to the Company for approval PRIOR to closing. Further, proof is required that same has not been revoked and is still in full force and effect and that the Principal is living at the time of execution and delivery of the instruments.

12. Borrower and lender must comply with the mortgage recording requirements of the New York State Department of Taxation and Finance. Every mortgage offered for recording must contain the following recital:
    "The real property [is or is not, whichever applies] principally improved or to be improved by one or more structures containing in the aggregate not more than six residential dwelling units, each dwelling unit having its own separate cooking facilities."
    NOTE: This recital may be stated on the mortgage instrument itself or it may be included by the attachment of a separate page to the mortgage signed by the person making the statement.

13. Applicable Mortgage Recording Tax (or Affidavit of Exemption) is due at closing.

# CLOSING REQUIREMENTS cont.

14. Deeds must contain the covenant required by Section 13 of the lien law and such covenant must be absolute and not conditional. These covenants are not required in deeds from referees or other duly appointed officials of the court for the sole purpose of selling the property.

15. If any of the closing documents to be used at the closing are documents that are not commonly used or contain unusual provisions, a copy of the documents must be presented to the company's legal department prior to closing.

16. If any part of the transaction consists of the conveyance or lease by a corporate grantor or lessor, compliance with Section 909 of the Business Corporation Law must be complied with. The written consent of the outstanding shareholders of the corporation will be required and the closing documents must recite same. In lieu thereof, the consent of two thirds of the outstanding shares entitled to vote must be obtained at a meeting duly noticed and called for in the manner provided for in Section 605 of the Business Corporation law and the closing document must recite same.

17. When the transaction is an assignment of a mortgage or other lien, an estoppel certificate executed by the owner of the fee and by the holders of all subsequent encumbrances must be obtained. When the transaction is a mortgage, the amount actually advanced should be reported to the Company.

18. If any part of the transaction consists of the making of a new mortgage by a corporate mortgagor, compliance with Section 911 of the Business Corporation Law must be established. A certified copy of the resolution of the Board of Directors authorized to make such mortgage will be required.

19. A mortgagee's title insurance policy does not provide title insurance coverage to the fee owner. If you wish to obtain owners title insurance, you must request it at or before the closing and pay the required premium.

Title No.:  **RANY-40759**

The following requirements must be met prior to the issuance of a policy.

a.     Pay the agreed amounts for the interest in the land and/or according to the mortgage to be insured.
b.     Pay the Company the premium, fees and charges for and associated with the policy.
c.     Documents satisfactory to us creating the interest in the land and/or the mortgage to be insured must be signed, delivered and recorded.

You must tell us in writing the name of any person or entity not referred to in this Commitment who will get an interest in the land or who will make a loan on the land.  We may then make additional requirements or raise additional exceptions.

Hereinafter set forth are additional matters which will appear in our policy as exceptions from coverage.  The Company will not pay costs, attorneys' fees or expenses which arise by reason of the following exceptions unless disposed of to the Company's satisfaction prior to the closing or delivery of the policy: Company reserves the right to raise additional exceptions.

**<u>DISPOSITION</u>**

1.     Taxes, tax liens, tax sales, water rates, sewer rents, and assessments set forth herein.

2.     Rights of tenants or persons in possession, if any.

3.     Mortgage(s) returned herein and set forth herein: **(ONE, as consolidated)** SEE ATTACHED MORTGAGE SCHEDULE

4.     Covenants, restrictions, easements, leases and agreements of record, etc., more fully set forth herein:

       **A) Covenants and Restrictions recorded in Liber 2208 Page 182**
       **B) Landmark Designation recorded in Reel 1696 Page 1872**

5.     Any encroachment, encumbrance, violation, variation or adverse circumstances affecting the title that would be disclosed by an accurate and complete land survey of the land or Survey exceptions as set forth herein.  In the absence of a survey Company will not certify as to the location or dimensions of within described premises on all sides, and will except any state of facts an accurate survey may show.

6.     FOR INFORMATION ONLY: Bankruptcy Searches run against the certified owner(s) and purchaser(s), if any.

7.     FOR INFORMATION ONLY: Patriot Searches run against the certified owner(s) and purchaser(s), if any.

8. Searches were run for judgments, federal tax liens, minor liens, etc. against the same/similar name as **60 91St Street Corp.** The following returns were found of record and must be satisfactorily disposed of:

   **A) 5 Judgments and 3 ECBs vs. 60 91St Street Corp.**

9. If any of the mortgages shown in the mortgage schedule herein is to be paid off at closing, then a written statement from the mortgagee indicating the balance and that the account is closed must be presented. Failure to provide this statement may cause the closing to be adjourned.

10. If any of the mortgages shown in the mortgage schedule herein have been paid off prior to closing, the certified owner must produce the original Satisfaction(s) of said mortgage(s), or in the alternative, the name of the title company who handled the payoff and their title number in connection therewith.

11. FOR NYC ONLY: Policy excepts Emergency Repair Liens and charges which may exist but are not filed. There may be work in progress or completed work and such items can not effectively be determined due to the delay in entering such items.

12. Satisfactory proof by affidavit must be furnished showing whether any work has been done upon the premises by The City of New York, or any demand has been made by The City of New York for any such work that may result in:
    A) Charges by the New York City Department of Rent and Housing Maintenance Emergency Services.
    B) Charges by the New York City Department of Health.
    C) Charges by the New York City Department of Environmental Protection.

13. Section 26-128 of the Administrative Code of The City of New York, creates tax liens for unpaid Inspection Fees and Permit Fees billed by the Building Department and Fire Department regardless of the fact that such fees may not be reflected in the City Collector's records. Policy excepts any loss, claim or damage for any unpaid fee or charge claimed by the Building Department or Fire Department and entered in the records of the City Collector after the date of closing.

14. FOR INFORMATION ONLY: The City of New York requires the owners of certain income producing properties to file a Real Property Income and Expense ("RPIE") form with the City's Department of Finance annually. If the property owner does not file the RPIE form or files the form late, then the Department of Finance may assess a penalty of 3 to 5 percent of the property's final assessed valuation. The penalty will appear on the owner's real property tax bill. Because there may be significant time lag between the due date for the RPIE form and the date on which the penalty and interest appear on the tax bill, the policy will except and not cover any and all RPIE charges, fees and penalties which may be assessed by the Department of Finance against the property or its owner after the date of the title policy.

15. All taxes, water, sewer rent charges and other miscellaneous assessments not entered prior to date of closing, which might include charges for use prior to the date of the policy.

16. If the subject premises are currently benefited by a tax exemption, discount, credit or abatement, no liability is assumed for the retroactive restoration of any taxes due to a loss or reversal, partial or total, of said exemption, discount, credit or abatement. Any tax which may be assessed, entered, re-opened, or restored after Date of Policy for periods prior to Date of Policy is not insured.

# EXCEPTIONS cont.

17. If the subject premises consists of 6 units or more and is rent stabilized, this policy excepts any rent stabilization fees not transferred to the NYC Department of Finance as of the date of closing. Any fee which may be assessed or entered subsequently by the City is not insured.

18. If subject property is used for both residential and commercial use, and the total purchase price is in excess of $1,000,000.00. New York State Department of Taxation and Finance may impose Mansion Tax on the residential portion of said property. This policy does not insure any such tax, nor any penalties related thereto, which may be assessed or entered subsequently by the State.

19. **NOTE:** For any closing exceeding two hours or that extends past 5:00pm a minimum charge of $250 will apply.

20. In the event that escrow is being held for taxes, water/sewer charges, the liability of this Company shall be limited to the sum deposited in escrow.

21. The proposed closing transaction may be subject to the reporting requirements set forth in the confidential Geographic Targeting Order issued pursuant to the Bank Secrecy Act, therefore the Company Reserves the rights to require additional information and documentation in order to comply with the order.

22. **Note to Seller / Seller Representative:** Please note that the title closer may charge up to $250 for each mortgage payoff "pickup fee" that they will be processing.

23. Department of State search shows that the entity **60 91St Street Corp.** was dissolved by proclamation on **July 29, 2009.** Said entity must be reinstated or a corporate wind down deed can be done. Pls contact legal dept to discuss.

24. Order from the Bankruptcy Court confirming that the **60 91st Street Corp.** [old entity] was dissolved and **60 91st Street Corp.** [new entity] is to be considered the old entity's successor. Certified copy of the Order must be filed on Acris.

25. Proof of the following as to 60 91St Street Corp.:

    A) Certificate of Incorporation;
    B) Production of Certificate of Good Standing;
    C) Production of Corporate Resolution authorizing the conveyance or mortgage
    D) Certificate of Secretary certifying that the Certificate of Incorporation does not require stockholders consent

26. Proof by affidavit must be provided to company at the time of closing that there are currently no New York State Franchise Taxes due and owing against 60 91St Street Corp.

27. Proof of payment of New York City General Corporation Tax on 60 91St Street Corp. is required. Said proof must cover the period from date of incorporation to date of closing.

28. Proof is required that the person executing the instruments on behalf of said corporation has the power to bind said corporation in this transaction. A Directors Resolution or Shareholders Resolution should be provided.

29. If the present transaction consists in whole or in part of the making of a new mortgage, the mortgage should contain a recital showing that it was made and executed pursuant to the resolution of the board of directors of the mortgagor.

30. If the present transaction consists in whole or in part of a conveyance or lease by a corporate grantor or lessor, the instrument on closing should recite that the lease/conveyance was made with consent thereto by all of the holders of the outstanding shares of the said corporation; or, in the ordinary course of the corporations business.

31. **Sidewalk violation filed on February 25, 2010 at Index Number 82194.**

    NOTE (FOR MORTGAGE POLICIES ONLY): Although this item is provided for information only and will not appear in our mortgage policy, failure to repair sidewalk (or remove violation) may result in a future lien against which the policy does not protect. (See chapter 28-A, Title A, Section 693-6.0, Administrative Code of the City of New York.)

32. **Bankruptcy report shows open Case Number 1:2020bk10338.** Approval of trustee must be obtained prior to sale or the Court must grant an order approving the sale of the property to the purchaser with no liens. If such order is obtained, the deed delivered at closing must state that the conveyance is free and clear of all liens as set forth in the Bankruptcy Court.
    NOTE: Upon receipt of final order of the court additional exceptions may be raised.

33. **Proof of death and heirship of Arthur Sowell to be obtained and considered.**

34. **The last deed of record recorded in CRFN 2011000355788 was a transfer for no consideration**. In connection therewith, the following documentation must be reviewed by this Company prior to closing. (NOTE: Upon receipt and review, additional exceptions to title may be raised):

    A)  Affidavit from the attorney who supervised the execution and delivery of the deed and/or;
    B)  Affidavit from the grantor(s) confirming the conveyance and a copy of photo identification of said grantor(s).

35. Proof is required that the delivery of the deed dated February 18, 2011 and recorded on October 7, 2011 in CRFN 2011000355788 was during the lifetime of Yvonne Sowell n/k/a Yvone Mortimer "as sole heir-at-law of" Arthur Sowell, grantor.

36. **The consolidated mortgage recorded December 9, 2016 in CRFN 2016000435775 is a non-institutional mortgage.** If said mortgage is to be satisfied in the transaction to be insured herein the following must be surrendered to the Company at or prior to closing.
    a) original note and bond marked "paid";
    b) original mortgage marked "paid";
    c) original Satisfaction of Mortgage in recordable form.

37. **A UCC-1 Financing Statement** vs. 60 91st Street Corp. in favor of Approved Oil Co. recorded on March 6, 2019 in CRFN 2019000074584.

## SURVEY READING

Title No.:  RANY-40759

**See Schedule B Exceptions**

# MORTGAGE SCHEDULE

**1.** **MORTGAGE**

| | |
|---|---|
| Mortgagor: | 60 91St Street Corp. |
| Mortgagee: | 2386 Hempstead Inc. |
| Amount: | $1,400,000.00 |
| Dated: | August 13, 2015 |
| Recorded: | August 31, 2015 |
| CRFN: | 2015000301919 |
| Tax Paid: | $39,200.00 |

Notes:
Together with a Collateral Assignment of Leases and Rents recorded in CRFN 2015000301920.

**2.** **GAP MORTGAGE**

| | |
|---|---|
| Mortgagor: | 60 91St Street Corp. |
| Mortgagee: | 2386 Hempstead Inc. |
| Amount: | $300,000.00 |
| Dated: | October 3, 2016 |
| Recorded: | December 9, 2016 |
| CRFN: | 2016000435774 |
| Tax Paid: | $6,150.00 |

**2A.** **CONSOLIDATION, EXTENSION, AND MODIFICATION AGREEMENT**

| | |
|---|---|
| From: | 60 91St Street Corp. |
| To: | 2386 Hempstead Inc. |
| Dated: | October 3, 2016 |
| Recorded: | December 9, 2016 |
| CRFN: | 2016000435775 |

Notes:
This Agreement consolidates Mortgages 1 and 2 above to form a single lien in the amount of $1,700,000.00.

This title report does not show all the terms and provisions of the mortgage(s) set forth herein. Interested parties should contact the holder(s) thereof to ascertain the terms, covenants and conditions contained therein, and to determine if there are any unrecorded amendments or modifications thereto.

If the mortgage(s) shown herein is (are) held by an institutional lender, a payoff letter MUST be produced and said letter MUST be verified by the title closer via telephone at the time of closing

**MDSNY** The unpaid taxes, water rates, assessments and other matters relating to taxes which are liens at the date of this certificate are set forth below.

CODE: BETTER    TITLE: RANY-40759    DATE: 08/11/2020

CNTY: NEW YORK    COMPANY: BETTER RESEARCH

SEC: 4    VOL: 8

BLOCK: 1204    LOT: 54

TAX MAP ATTACHED

TAX                       2020/2021 FINAL

CLASS: 2B   RATE: 12.473

| | | |
|---|---|---|
| BLDG | TRANSITIONAL LAND ................ | $114,202.00 |
| CLASS: C5 | TRANSITIONAL TOTAL ............... | $658,815.00 |
| CONVERTED | EXEMPT TOTAL ..................... | $0.00 |
| DWELLINGS OR | ACTUAL LAND ...................... | $364,050.00 |
| ROOMING HOUSE | ACTUAL TOTAL ..................... | $2,100,150.00 |
| SWIS CODE:  620100 | ACTUAL EXEMPT TOTAL .............. | $0.00 |

EXEMPTIONS:  NO EXEMPTIONS

ASSESSED OWNER:  60 91ST STREET CORP.

60 WEST 91 STREET

---

*Taxes 2020/2021   1ST HALF   Due Date   07/01/2020   REAL ESTATE*

| Transaction Date | | Charges/Adjustments | Payments/Adjustments |
|---|---|---|---|
| 06/06/2020 | TAX ORG | $41,087.00 | $0.00 |
| | AMOUNT DUE: | $41,087.00 OPEN | |

Taxes 2020/2021   2ND HALF   *Due Date*   *01/01/2021*   *REAL ESTATE*

| Transaction Date | | Charges/Adjustments | Payments/Adjustments |
|---|---|---|---|
| 06/06/2020 | TAX ORG | $41,087.00 | $0.00 |
| | AMOUNT DUE: | $41,087.00 OPEN | |

HPD MULTI DWELLING REGISTRATIO Due Date   07/01/2020

| | | | |
|---|---|---|---|
| 06/06/2020 | SAF ORG | $13.00 | $0.00 |
| | AMOUNT DUE: | $13.00 OPEN | |

Taxes *2019/2020*   *1ST HALF*   *Due Date*   *07/01/2019*   *REAL ESTATE*

| Transaction Date | | Charges/Adjustments | Payments/Adjustments |
|---|---|---|---|
| 06/01/2019 | TAX ORG | $40,257.14 | $0.00 |
| | AMOUNT DUE: | $40,257.14 OPEN | |

Taxes 2019/2020   2ND HALF   *Due Date*   01/01/2020   REAL ESTATE

| Transaction Date | | Charges/Adjustments | Payments/Adjustments |
|---|---|---|---|
| 06/01/2019 | TAX ORG | $40,257.14 | $0.00 |
| 01/01/2020 | TAX ADJ MID YEAR TAX CHG | $0.00 | $887.40 |
| | AMOUNT DUE: | $39,369.74 OPEN | |

HPD MULTI DWELLING REGISTRATIO Due Date   07/01/2019

| | | | |
|---|---|---|---|
| 06/01/2019 | SAF ORG | $13.00 | $0.00 |
| | AMOUNT DUE: | $13.00 OPEN | |

Taxes 2018/2019   1ST HALF   Due Date   07/01/2018   REAL ESTATE

| Transaction Date | | Charges/Adjustments | Payments/Adjustments |
|---|---|---|---|
| 06/01/2018 | TAX ORG INIT CHG | $37,591.44 | $0.00 |
| 11/28/2018 | INT ADJ | $1.13 | $0.00 |

NOTE: SECOND HALF TAXES SUBJECT TO CHANGE DUE TO TAX RATE ADJUSTMENT. RESPONSIBILITY LIMITED TO THOSE ITEMS AND INSTALLMENTS THAT ARE LIENS AS OF DATE OF THIS REPORT AND REFLECT ON THE PUBLIC RECORDS. TAX SEARCH DOES NOT COVER ANY PART OF THE STREETS ON WHICH THE PREMISIS TO BE INSURED ABUT. RECENT PAYMENTS MAY BE SUBJECT TO COLLECTION. TAX EXEMPTIONS NOTED ABOVE WERE RESTORED ON THE DATE OF CONVEYANCE OR UPON DEATH OF RECORD OWNER. TAX SEARCH DOES NOT GUARANTEE AGAINST ANY CLAIMS RESULTING FROM LEVIES OF RESTORED TAXES. ACCURATE WATER METER READING REQUIRED FOR THOSE REPORTED AS MINIMUM, ACTUAL, ESTIMATED OR MULTIPLE READINGS TO AVOID ADDITIONAL CHARGES. TAX SEARCH DOES NOT GUARANTEE AGAINTS NEW METERS OR UNFIXED FRONTAGE CHARGES NOT ON RECORD IN THE DEPARTMENT OF ENVIRONMENTAL PROTECTION. THE RETURNS ARE GURANTEED TO BLOCK AND LOT.
* PLEASE REQUEST THE SELLER OR BORROWER TO HAVE RECEIPTED BILLS AT THE CLOSING *

The unpaid taxes, water rates, assessments and other matters relating to taxes which are liens at the date of this certificate are set forth below.

CODE: BETTER          TITLE: RANY-40759          DATE: 08/11/2020

CNTY: NEW YORK        COMPANY: BETTER RESEARCH

SEC: 4    VOL: 8

BLOCK: 1204   LOT: 54

| | | | |
|---|---|---|---|
| 11/20/2018 | INT ADJ | $1,300.86 | $0.00 |
| 11/20/2018 | CHG PAY | $0.00 | $13,699.14 |
| 11/28/2018 | CHG PAY | $0.00 | $11.87 |
| 11/28/2018 | INT PAY | $0.00 | $1.13 |
| 11/20/2018 | INT PAY | $0.00 | $1,300.86 |
| | AMOUNT DUE: | $23,880.43 OPEN | |

Taxes 2018/2019    2ND HALF    Due Date    01/01/2019    REAL ESTATE

| Transaction Date | | Charges/Adjustments | Payments/Adjustments |
|---|---|---|---|
| 06/01/2018 | TAX ORG INIT CHG | $37,591.44 | $0.00 |
| 11/16/2018 | TAX ADJ TAXRATEDEC | $0.00 | $632.48 |
| | AMOUNT DUE: | $36,958.96 OPEN | |

DEPT OF HEALTH EXTERMINATION    Due Date    10/01/2018

| | | | |
|---|---|---|---|
| 06/30/2018 | SAC ORG INIT CHG | $93.75 | $0.00 |
| 06/30/2018 | SAT ORG SALES TAX | $8.32 | $0.00 |
| | AMOUNT DUE: | $102.07 OPEN | |

DEPT OF HEALTH EXTERMINATION    Due Date    10/01/2018

| | | | |
|---|---|---|---|
| 07/31/2018 | SAC ORG INIT CHG | $93.75 | $0.00 |
| 07/31/2018 | SAT ORG SALES TAX | $8.32 | $0.00 |
| | AMOUNT DUE: | $102.07 OPEN | |

DEPT OF HEALTH EXTERMINATION    Due Date    10/01/2018

| | | | |
|---|---|---|---|
| 07/31/2018 | SAC ORG INIT CHG | $62.50 | $0.00 |
| 07/31/2018 | SAT ORG SALES TAX | $5.55 | $0.00 |
| | AMOUNT DUE: | $68.05 OPEN | |

DEPT OF HEALTH EXTERMINATION    Due Date    10/01/2018

| | | | |
|---|---|---|---|
| 08/15/2018 | SAC ORG INIT CHG | $93.75 | $0.00 |
| 08/15/2018 | SAT ORG SALES TAX | $8.32 | $0.00 |
| | AMOUNT DUE: | $102.07 OPEN | |

R5    Due Date    10/01/2018

| | | | |
|---|---|---|---|
| 06/15/2018 | SAC ORG INIT CHG | $85.50 | $0.00 |
| 06/15/2018 | SAT ORG SALES TAX | $7.59 | $0.00 |
| | AMOUNT DUE: | $93.09 OPEN | |

**\* ALL PAYMENTS SUBSEQUENT TO 7/10/2020 ARE SUBJECT TO COLLECTION.**

**\*\*PLEASE NOTE PROPERTY SHOWS ON 2020 TAX LIEN SALE LIST. DUE TO COVID-19 THE LIEN SALE SET TO TAKE PLACE ON MAY 15TH HAS BEEN DELAYED. THE 2020 LIEN SALE IS NOW SET TO TAKE PLACE SEPTEMBER 4TH 2020. PLEASE HAVE ALL PAYMENTS MADE TO DOF/DEP NO LATER THAN AUGUST 31ST 2020. \*\***

**\*\*DEPARTMENT OF FINANCE RECORDS SHOW TAX LIEN(S) SOLD IN 2009 & 2010 WERE REDEEMED.\*\***

NOTE: SECOND HALF TAXES SUBJECT TO CHANGE DUE TO TAX RATE ADJUSTMENT. RESPONSIBILITY LIMITED TO THOSE ITEMS AND INSTALLMENTS THAT ARE LIENS AS OF DATE OF THIS REPORT AND REFLECT ON THE PUBLIC RECORDS. TAX SEARCH DOES NOT COVER ANY PART OF THE STREETS ON WHICH THE PREMISIS TO BE INSURED ABUT. RECENT PAYMENTS MAY BE SUBJECT TO COLLECTION. TAX EXEMPTIONS NOTED ABOVE MAYBE RESTORED ON THE DATE OF CONVEYANCE OR UPON DEATH OF RECORD OWNER. TAX SEARCH DOES NOT GUARANTEE AGAINST ANY CLAIMS RESULTING FROM LEVIES OF RESTORED TAXES. ACCURATE WATER METER READING REQUIRED FOR THOSE REPORTED AS MINIMUM, ACTUAL, ESTIMATED AND MULTIPLE READINGS TO AVOID ADDITIONAL CHARGES. TAX SEARCH DOES NOT GUARANTEE AGAINTS NEW METERS OR UNFIXED FRONTAGE CHARGES NOT ON RECORD IN THE DEPARTMENT OF ENVIRONMENTAL PROTECTION. THE RETURNS ARE GURANTEED TO BLOCK AND LOT.
\* PLEASE REQUEST THE SELLER OR BORROWER TO HAVE RECEIPTED BILLS AT THE CLOSING \*

**MDSNY**  The unpaid taxes, water rates, assessments and other matters relating to taxes
which are liens at the date of this certificate are set forth below.

CODE: BETTER          TITLE: RANY-40759          DATE: 08/11/2020

CNTY: NEW YORK        COMPANY: BETTER RESEARCH

SEC: 4    VOL: 8

BLOCK: 1204   LOT: 54


**\*\*DUE TO NEW YORK STATE SUPREME COURT RULING, ACCESS TO DEP RECORDS IS
CURRENTLY UNAVAILABLE TO ALL RESEARCH COMPANIES.
THE FOLLOWING INFORMATION HAS BEEN ABSTRACTED FROM AVAILABLE ONLINE RECORDS,
FURTHER INFORMATION AND/OR ACCOUNT DETAILS CANNOT BE PROVIDED AT THIS TIME.
PLEASE CONTACT DEP AT 718-595-7000 FOR ADDITIONAL INFORMATION.**


**\*\*MUNICIPAL DATA CAN STILL ASSIST IN SCHEDULING FINAL METER READINGS. PLEASE
CONTACT US AT 718-815-0707 OR CONTACT DEP DIRECTLY AT 718-595-7000 ALL
READINGS SHOULD BE SCHEDULED 30 DAYS PRIOR TO CLOSING\*\***


**PLEASE PRODUCE BILLS/RECEIPTS AT CLOSING\*\*\***


**D.E.P. ACCOUNT #5000125648001**


**TOTAL DUE ON DEP ACCOUNT $7,174.15 OPEN**


**NOTE: ALL PROPERTIES ARE SUBJECT TO REBILLING BY DEP UNLESS A TITLE READ IS ORDERED THIRTY
DAYS PRIOR TO CLOSING.**

**PAYMENT INFORMATION**
**-------------------**
**MAIL PAYMENT TO:**
**NYC DEPARTMENT OF FINANCE (DOF)**
**P.O. BOX 680**
**NEWARK, NJ 07101-0680**
**MAKE CHECKS PAYABLE TO: NYC DEPARTMENT OF FINANCE**

**MAIL PAYMENT TO**
**NYC WATER BOARD (DEP)**
**P.O. BOX 11863**
**NEWARK, NJ 07101-8163**
**MAKE CHECKS PAYABLE TO: NYC WATER BOARD**


**NOTE: A SPECIAL METER READING SHOULD BE OBTAINED ON ALL ACCOUNTS TO AVOID ADDITIONAL CHARGES.**

**SUBJECT TO CONTINUATION PRIOR TO CLOSING.**
**NOTHING ELSE FOUND 08/11/2020**

NOTE: SECOND HALF TAXES SUBJECT TO CHANGE DUE TO TAX RATE ADJUSTMENT. RESPONSIBILITY LIMITED TO THOSE ITEMS AND INSTALLMENTS THAT ARE LIENS AS OF DATE OF THIS
REPORT AND REFLECT ON THE PUBLIC RECORDS. TAX SEARCH DOES NOT COVER ANY PART OF THE STREETS ON WHICH THE PREMISIS TO BE INSURED ABUT. RECENT PAYMENTS MAY BE SUBJECT
TO COLLECTION. TAX EXEMPTIONS NOTED ABOVE MAYBE RESTORED ON THE DATE OF CONVEYANCE OR UPON DEATH OF RECORD OWNER. TAX SEARCH DOES NOT GUARANTEE AGAINST ANY CLAIMS
RESULTING FROM LEVIES OF RESTORED TAXES. ACCURATE WATER METER READING REQUIRED FOR THOSE REPORTED AS MINIMUM, ACTUAL, ESTIMATED AND MULTIPLE READINGS TO AVOID
ADDITIONAL CHARGES. TAX SEARCH DOES NOT GUARANTEE AGAINTS NEW METERS OR UNFIXED FRONTAGE CHARGES NOT ON RECORD IN THE DEPARTMENT OF ENVIRONMENTAL PROTECTION. THE
RETURNS ARE GURANTEED TO BLOCK AND LOT.
* PLEASE REQUEST THE SELLER OR BORROWER TO HAVE RECEIPTED BILLS AT THE CLOSING *

# MDSNY

CODE: BETTER      TITLE: RANY-40759      DATE: 08/11/2020

CNTY: NEW YORK      COMPANY: BETTER RESEARCH

SEC: 4    VOL: 8

BLOCK: 1204   LOT: 54

MUNICIPAL DATA SERVICES SHALL BEAR NO LIABILITY For ERRONEOUS Or INACCURATE
INFORMATION PROVIDED BY THE DEPARTMENT Of FINANCE INCLUDING BUT Not LIMITED To ERRORS
DUE To LOADING, KEY ENTRY, PROCESSING, DATA COMMUNICATION,HARDWARE And SOFTWARE PROBLEMS
Or THE BACKDATING OF ANY INFORMATION.

NOTE: SECOND HALF TAXES SUBJECT TO CHANGE DUE TO TAX RATE ADJUSTMENT. RESPONSIBILITY LIMITED TO THOSE ITEMS AND INSTALLMENTS THAT ARE LIENS AS OF DATE OF THIS
REPORT AND REFLECT ON THE PUBLIC RECORDS. TAX SEARCH DOES NOT COVER ANY PART OF THE STREETS ON WHICH THE PREMISIS TO BE INSURED ABUT. RECENT PAYMENTS MAY BE SUBJECT
TO COLLECTION. TAX EXEMPTIONS NOTED ABOVE MAYBE RESTORED ON THE DATE OF CONVEYANCE OR UPON DEATH OF RECORD OWNER. TAX SEARCH DOES NOT GUARANTEE AGAINST ANY CLAIMS
RESULTING FROM LEVIES OF RESTORED TAXES. ACCURATE WATER METER READING REQUIRED FOR THOSE REPORTED AS MINIMUM, ACTUAL, ESTIMATED AND MULTIPLE READINGS TO AVOID
ADDITIONAL CHARGES. TAX SEARCH DOES NOT GUARANTEE AGAINTS NEW METERS OR UNFIXED FRONTAGE CHARGES NOT ON RECORD IN THE DEPARTMENT OF ENVIRONMENTAL PROTECTION. THE
RETURNS ARE GURANTEED TO BLOCK AND LOT.
* PLEASE REQUEST THE SELLER OR BORROWER TO HAVE RECEIPTED BILLS AT THE CLOSING *

Property Information | Apply for Exemptions | Get Help

Property Address Search | BBL Search | REUC Search

**Property Info**
**Account Balance**
Account History
Payment History
Refund History
Notices of Property Value
Property Tax Bills
Benefits - Prop. Owners
Benefits - Business & Construction
Benefits - Gov & Non-Prof
Market Values & Assessments
2020-2021 Final
2020-2021 Tentative
2019-2020 Final
Prior Years

**60 WEST 91 STREET** | **Borough: MANHATTAN**
| **Block: 1204 Lot: 54**

08/10/2020 📅 Update Values

**Actions**
🖨 Printable Summary
🖨 Printable Version

**More Info**
FAQ

🖨 Printable Version

**Account Balance Summary**

| Year | Charge Amt. | Discount | Interest | Other/Fees | Total |
|------|------------|----------|----------|------------|-------|
| 2019 | 61,268.64 | 0.00 | 23,619.41 | 38.10 | 84,926.15 |
| 2020 | 79,626.88 | 0.00 | 13,475.17 | 13.00 | 93,115.05 |
| 2021 | 82,174.00 | 0.00 | 818.33 | 13.00 | 83,005.33 |
| Total: | 223,069.52 | 0.00 | 37,912.91 | 64.10 | 261,046.53 |

**Account Balance Details**

| Year | Period | Charge Type | Account ID | Due Date | Charge Amt. | Discount | Interest | Other/Fees | Total |
|------|--------|-------------|------------|----------|-------------|----------|----------|------------|-------|
| 2019 | 1 | TAX | | 07/01/2018 | 23,880.43 | 0.00 | 11,043.94 | 0.00 | 34,924.37 |
| 2019 | 2 | DOH | | 10/01/2018 | 93.75 | 0.00 | 37.28 | 8.32 | 139.35 |
| 2019 | 2 | DOH | | 10/01/2018 | 93.75 | 0.00 | 37.28 | 8.32 | 139.35 |
| 2019 | 2 | DOH | | 10/01/2018 | 62.50 | 0.00 | 24.85 | 5.55 | 92.90 |
| 2019 | 2 | DOH | | 10/01/2018 | 93.75 | 0.00 | 37.28 | 8.32 | 139.35 |
| 2019 | 2 | | | 10/01/2018 | 85.50 | 0.00 | 34.00 | 7.59 | 127.09 |
| 2019 | 3 | TAX | | 01/01/2019 | 36,958.96 | 0.00 | 12,404.78 | 0.00 | 49,363.74 |
| 2020 | 1 | REG FEE | 123538 | 07/01/2019 | 0.00 | 0.00 | 0.00 | 13.00 | 13.00 |
| 2020 | 1 | TAX | | 07/01/2019 | 40,257.14 | 0.00 | 8,921.39 | 0.00 | 49,178.53 |
| 2020 | 3 | TAX | | 01/01/2020 | 39,369.74 | 0.00 | 4,553.78 | 0.00 | 43,923.52 |
| 2021 | 1 | REG FEE | 123538 | 07/01/2020 | 0.00 | 0.00 | 0.00 | 13.00 | 13.00 |
| 2021 | 1 | TAX | | 07/01/2020 | 41,087.00 | 0.00 | 818.33 | 0.00 | 41,905.33 |
| 2021 | 3 | TAX | | 01/01/2021 | 41,087.00 | 0.00 | 0.00 | 0.00 | 41,087.00 |
| Total: | | | | | 223,069.52 | 0.00 | 37,912.91 | 64.10 | 261,046.53 |

**Notes**

To make a payment, visit www.nyc.gov/payonline.

Payments made today are not reflected in the balances above.

Directory of City Agencies | Contact NYC Government | City Employees

Notify NYC | CityStore | Stay Connected

NYC Mobile Apps | Maps | Resident Toolkit

City of New York. 2019
All Rights Reserved.
NYC is a trademark and service mark of
the City of New York



FINANCE
NEW ★ YORK
MARTHA E. STARK
COMMISSIONER

NYC Digital Tax Map

Effective Date    : 12-09-2008 10:19:26
End Date          : Current
Manhattan Block : 1204

Legend

- Streets
- • Miscellaneous Text
- ↓ Possession Hooks
- Boundary Lines
- Regular
- Lot Face Possession Hooks
- ········ Underwater
- Tax Lot Polygon
- Condo Number
- Tax Block Polygon



# RIVERSIDE ABSTRACT, LLC
## as Agent for
### AMTRUST TITLE INSURANCE COMPANY

## MUNICIPAL DEPARTMENT SEARCHES AND STREET REPORT

Title No.: **RANY-40759**

Any searches or returns reported herein are furnished **FOR INFORMATION ONLY**.  They will not be insured and the Company assumes no liability for the accuracy thereof.  They **WILL NOT BE CONTINUED** to date of closing.

| | |
|---|---|
| **Patriot Search** | HEREIN |
| **Bankruptcy Search** | HEREIN |
| **Certificate of Occupancy** | HEREIN |
| **Housing & Building** | HEREIN |
| **Fire Dept. Search** | HEREIN |
| **Emergency Repairs** | HEREIN |
| **Street Report** | HEREIN |
| **Air Resources** | HEREIN |

## STREET VAULTS

In New York City, if there is a STREET VAULT, it is suggested that the applicant investigate possible unpaid license fees by the City of New York for the use of such vault, because the right to maintain it **IS NOT INSURED**, nor does the Company insure that the vault charges have been paid.

3839 Flatlands Avenue, Suite 208
Brooklyn, NY 11234

**RIVERSIDE**
A B S T R A C T

212 Second Street, Suite 502
Lakewood, NJ 08701

# UNITED STATES PATRIOT NAME SEARCH

**Date:** September 3, 2020        **Title No.:** RANY-40759

NAME(S) OF INDIVIDUAL(S), CORPORATION(S) OR BUSINESS(ES)

**60 91St Street Corp.**

This information is as of 08/18/2020

WE HAVE SEARCHED THE SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS LIST, MAINTAINED BY THE OFFICE OF FOREIGN ASSETS CONTROL OF THE U.S DEPARTMENT OF TREASURY, AND REPORT THE FOLLOWING FINDINGS WITH RESPECT TO THE PERSON OR ENTITY LISTED ABOVE:

☒ **There is no record found for the above mentioned individual, corporation or business.**

☐ **A record was found against someone of same or similar name as the above mentioned individual, corporation or business.**

### IMPORTANT NOTICE ABOUT THE ABOVE SEARCH INFORMATION

The Special Designated Nationals (SDN) List is frequently updated. There is no predetermined timetable, but rather names are added and removed as necessary and appropriate.

RIVERSIDE ABSTRACT, LLC does hereby certify that the records of the above Governmental agency were examined and that the information recorded above is a true and accurate abstract of the information contained therein.

This report is submitted for information purposes only. Liability is limited to errors and omissions of information properly indexed, filed and recorded with the above governmental agency. The liability under this search will not exceed $1,000 and shall be confined to the applicant for whom the search was made.


# BANKRUPTCY SEARCH

**Date:** September 3, 2020      **Title No.:** RANY-40759

NAME(S) OF INDIVIDUAL(S), CORPORATION(S) OR BUSINESS(ES)

**60 91St Street Corp.**

This information is as of 08/18/2020

LAST KNOWN ADDRESS:

COUNTY: New York

SOCIAL SECURITY OR FEDERAL IDENTIFICATION NO.:

---

A search of the records of the United States Bankruptcy Court, for the above County, has been made in all districts of New York with the following results:

☐ There is no record of a bankruptcy filing for the above referenced individual, corporation or business.

☒ See attached for active and/or closed cases found on file.

☐ Due to multiple listings and/or variations of the above referenced name a Social Security or EIN No. is required.

IMPORTANT NOTICE ABOUT THE ABOVE SEARCH INFORMATION

Riverside Abstract, LLC does hereby certify that the records of the above Governmental agency were examined and that the information recorded above is a true and accurate abstract of the information contained therein.

This report is submitted for information purposes only. Liability is limited to errors and omissions of information properly indexed, filed and recorded with the above governmental agency. The liabilities under this search shall not exceed $1,000 and shall be confined to the applicant for whom the search was made.

This search does not include filings other than the microfiche or index Sections of the United States Bankruptcy Clerk's Office.

**20-10338-scc** 60 91st Street Corp.
**Case type:** bk **Chapter:** 11 **Asset:** Yes **Vol:** v **Judge:** Shelley C. Chapman
**Date filed:** 02/04/2020 **Date of last filing:** 08/17/2020

# Case Summary

**Office:** Manhattan              **Filed:** 02/04/2020

**County:** NEW          **Terminated:**
YORK-NY
**Fee:** Paid          **Debtor discharged:**
**Origin:** 0              **Reopened:**
**Previous
term:**                **Converted:**

                **Debtor dismissed:**
**Joint:** n           **Confirmation
                 hearing:**
**Original
chapter:** 11
**Current
chapter:** 11

**Nature of debt:** business
**Pending status:** Appeal Filed
**Flags:** APPEAL

**Trustee:** Heidi J.     **City:**     **Phone:**
Sorvino, Chapter
11 Trustee,            **City:** New York
**Trustee:** United   **Phone:** (212) 510-   **Fax:** (212) 668-2255       **Email:** USTPRegion02.NYECF@USDOJ.GOV
States Trustee        0500

**Party 1:** 60 91st Street Corp.   (Debtor)
        Tax ID / EIN: 13-3786454

**Atty:** Charles A   **Represents party**   **Phone:** 917-673-3768
Higgs            **1:** Debtor         **Email:** Charles@Freshstartesq.com
**Location of case
files:**
        **Volume:** CS1
The case file may be available.


| | | | |
|---|---|---|---|
| **County:** | MANHATTAN | **Search Date:** | 08/11/2020 |
| **Title/CoNo.:** | BETTER RANY-40759 | | |
| **Address:** | 60 WEST 91 STREET | | |
| **Block:** | 1204 | | |
| **Lot:** | 54 | | |

# CERTIFICATE OF OCCUPANCY SEARCH

A SEARCH OF THE RECORDS OF THE NEW YORK CITY DEPARTMENT OF BUILDINGS WAS PERFORMED SUBSEQUENT TO SEPTEMBER 11, 2001. DUE TO RESTRICTIONS ON ACCESS, CERTAIN INFORMATION WAS RESEARCHED AND PROVIDED BY DOB PERSONNEL.

Attached find a copy of Certificate of Occupancy # 69738
issued on 11/12/1970 FOR A CELLAR, BASEMENT AND FOUR STORY
NON-FIREPROOF BUILDING; NINE APARTMENTS.

According to the Building Department Index/Computer records,
there are no alteration plans approved subsequent to the
Certificate of Occupancy that either change or propose to
change the legal occupancy of these premises.

## IMPORTANT NOTICE REGARDING CERTIFICATE OF OCCUPANCY SEARCHES

THE PURPOSE OF THIS REPORT IS TO PROVIDE THE LATEST CERTIFICATE OF OCCUPANCY AND ANY SUBSEQUENT ALTERATIONS THAT PROPOSE TO CHANGE THE USE OR OCCUPANCY. IT MAY NOT INCLUDE MINOR NON-STRUCTURAL ALTERATIONS OR FILINGS NEVER APPROVED.

Municipal Data Services Inc. certifies that the records of the above municipal agency were examined on behalf of BETTER RESEARCH. The information reported above is a true and accurate abstract of the information on file therein. This report is submitted for information purposes only. There are no intended third party beneficiaries. No liability is assumed.



# DEPARTMENT OF BUILDINGS

BOROUGH OF  MANHATTAN , THE CITY OF NEW YORK

Date  November 12, 1970  No.  69738

# CERTIFICATE OF OCCUPANCY

**NO CHANGES OF USE OR OCCUPANCY NOT CONSISTENT WITH THIS CERTIFICATE SHALL BE MADE UNLESS FIRST APPROVED BY THE BOROUGH SUPERINTENDENT**

This certificate supersedes C. O. No.  69319 Temp.

THIS CERTIFIES that the ~~new~~—altered—~~existing~~—building—premises located at

60 West 91st Street  Block 1204  Lot  54

That the zoning lot and premises above referred to are situated, bounded and described as follows:

BEGINNING at a point on the  south  side of  West 91st Street

distant  241  feet  east  from the corner formed by the intersection of

Columbus Avenue  and  West 91st Street

running thence  east 20  feet; thence  south 100.8½  feet;

thence  west 20  feet; thence  north 100.8½  feet;

running thence  feet; thence  feet;

to the point or place of beginning, conforms substantially to the approved plans and specifications, and to the requirements of the Building Code, the Zoning Resolution and all other laws and ordinances, and of the rules of the Board of Standards and Appeals, applicable to a building of its class and kind at the time the permit was issued; and

CERTIFIES FURTHER that, any provisions of Section 646F of the New York City Charter have been complied with as certified by report of the Fire Commissioner to the Borough Superintendent.  **Class 3**

N.B. or Alt. No.—  Heretofore Converted  Construction classification—  Nonfireproof

Occupancy classification—Class "A" Mult. Dwell. Height Bsmt. & 4  stories, 60  feet.

Date of completion— August 5, 1970 . Located in  R 7-2  Zoning District.

at time of issuance of permit. 2706-1970

This certificate is issued subject to the limitations hereinafter specified and to the following resolutions of the Board of Standards and Appeals: and The City Planning Commission:

(Calendar numbers to be inserted here)

## PERMISSIBLE USE AND OCCUPANCY

Off-Street Parking Spaces ..........................................................................................................

Off-Street Loading Berths ..........................................................................................................

| STORY | LIVE LOADS Lbs. per Sq. Ft. | PERSONS ACCOMMODATED | USE |
|---|---|---|---|
| Clr. On Ground | | | Boiler room, storage room, tenants laundry room. |
| Bsmt. | 40 | | One (1) apartment. |
| 1st to 4th Incl. | 40 each | | Two (2) apartments on each story. |

THIS CERTIFICATE SHALL ALSO BE CONSIDERED A CERTIFICATE OF COMPLIANCE OR OCCUPANCY UNDER SECTION 301 OF THE MULTIPLE DWELLING LAW.

*Warren? ....* Borough Superintendent

OFFICE COPY—DEPARTMENT OF BUILDINGS
THIS CERTIFICATE OF OCCUPANCY MUST BE POSTED WITHIN THE BUILDING IN ACCORDANCE WITH THE RULES OF THE DEPARTMENT PROMULGATED MARCH 31ST, 1967.



25 Hyatt Street – Suite 301
Staten Island, NY 10301
Phone – (718) 815-0707
Fax – (718) 815-9101
www.munidata.com

**Search Date:** 08/11/2020

**County:** MANHATTAN

**Title/CoNo.:** BETTER RANY-40759

**Address:** 60 WEST 91 STREET

**Block:** 1204
**Lot:** 54

## HOUSING AND BUILDING DEPARTMENT SEARCH

A search of the records of the Department of Buildings and the Rent and Housing Maintenance Department of the City of New York was made on **08/10/2020** . The following violations were reported pending:

## BUILDING DEPARTMENT:

(8) VIOLATIONS

## RENT AND HOUSING MAINTENANCE DEPARTMENT:

VIOLATIONS ATTACHED

Last Date of Posting: 07/11/2020

Municipal Data Services Inc. certifies that the records of the above municipal agency were examined on behalf of BETTER RESEARCH. The information reported above is a true and accurate abstract of the information on file therein. This report is submitted for information purposes only. There are no intended third party beneficiaries. No liability is assumed.

3597214          11858811

# HEATING PLANT INSPECTIONS
## NEW REQUIREMENTS FOR LOCAL LAW 62/91

In accordance with Local Law 62/91 owners of commercial buildings or buildings with six or more units (apartments) are required to have their boilers inspected annually and submit an inspection report to the Department of Buildings with a filing fee of $30.00 per boiler. The reports must be filed on forms supplied by the Department of Buildings within 30 days of the inspection date and prior to December 31 of each calendar year starting with 1992. Failure to file may subject the owner to a civil penalty of $1500.00 in accordance with Section 26-125 of the Administrative Code.

The following NYC licenses are qualified to perform the inspection regardless of the fuel type:

1. HIGH PRESSURE BOILER OPERATORS
2. OIL BURNER EQUIPMENT INSTALLERS
3. NYC AUTHORIZED INSURANCE COMPANIES
4. NYC LICENSED MASTER PLUMBERS

This filing with the Department of Buildings supercedes and replaces the Heating Plant Self-Inspection Certification formerly required by the Department of Housing Preservation and Development, Division of Code Enforcement.

### Boiler Division: (212) 393-2661 / Email: BoilersInfo@buildings.nyc.gov

**The following violations for Boiler Inspections are on file for premises.**

| | |
|---|---|
| V  031893LL629117178 | |
| V  031894LL629117178 | |
| V  082995LL629112492 | |
| V  021097LL629105043 | |
| V  020700LL629103643 | |
| V  032602LL629103630 | |
| V  121311LBLVIO01917 | |
| V  100115LBLVIO03184 | |
| | |
| | |
| | |
| | |
| | |
| | |

Please note: This is a computer generated violation, no copies available. Contact the above number for any penalties and or fines due. Contact a licensed professional for proper filings.

HPD Building    Maton's Violation    Services [--- Select --- ▼]    Home

---

**The selected address: 60 WEST 91 STREET, Manhattan 10024**

**This building has filed records with the <u>New York State Division of Housing and Community Renewal</u> at least one time from 1993 to the present year and may contain one or more regulated apartments.**

| HPD# | Range | Block | Lot | CD | CensusTract | Stories | A Units | B Units | Ownership | Registration# | Class |
|------|-------|-------|-----|-----|-------------|---------|---------|---------|-----------|---------------|-------|
| 36927 Active | 60-60 | 01204 | 0054 | 7 | 17700 | 4 | 9 | 0 | PVT | 123538 | G |

Other Units

Property Owner Registration Information

Charges

Complaint Status

Complaint History

Litigation/Case Status

Tenant Harassment Report

**All Open Violations**

prior year Open Viol.'s

Ecertification

Overdue Lead Paint Viol. Correction

Vacate Orders

Violations By Date

Images

I-Card Images

PROS Online

Bed Bugs

HPD Map

Map

### THIS PROPERTY IS NOT CURRENTLY VALIDLY REGISTERED WITH HPD.

Residential properties are required to register with HPD every year. If you are the owner or agent for this property, go to our <u>Property Registration page</u> to find out more about registration requirements or to use our Property Registration Online System, which allows you to begin the registration process. If you just wish to view the existing registration information for the property, click on the Property Owner Registration Information link on the left hand tool bar on this page.

### Building Registration Summary Report

Find Apartment#        [ Clear ]    [ Search ]

| Owner | Last Reg Dt Reg Expire Dt | Organization | Last Nm | First Nm | House No | Street Nm | Apt | City | State | Zip |
|-------|---------------------------|--------------|---------|----------|----------|-----------|-----|------|-------|-----|
| Head Officer | 11/27/2018 **09/01/2019** | | MORTIMER | KIM | 60 | WEST 91ST STREET | | New York | NY | 10024 |
| Corporation | 11/27/2018 **09/01/2019** | 6091ST STREET CORPORATION | | | 60 | WEST 91ST STREET | | New York | NY | 10024 |
| Managing Agent | 11/27/2018 **09/01/2019** | | MORTIMER | KIM | 60 | WEST 91ST STREET | | NEW YORK Y | NY | 10024 |

### Open Violations - ALL DATES
**There are 29 Violations. Arranged by category:  A class: 5   B class: 18    C class: 5   I class: 1**

**For Definitions of the columns indicated below, select glossary under the Services option (located at the upper right).**

**To sort the columns, click on their underlined headers below in the blue area.**

| Apt Story | Reported Date, nov ISSUED Date | Hzrd Class | Order no | Violation ID, NOV ID, NOV Type | Violation Description | Status Status Date | Certify By Date Actual Cert. Date |
|-----------|-------------------------------|------------|----------|-------------------------------|----------------------|--------------------|-----------------------------------|
| F 3 | 2014/10/07 2014/10/09 | B | 579 | 10410826 4930902 Original | § 27-2026 adm code repair the leaky and/or defective faucets at sink in the kitchen located at apt f, 3rd story, 1st apartment from south at west | NOV SENT 2014/10/09 | 2014/11/27 |
| F 3 | 2014/10/07 2014/10/09 | B | 501 | 10410833 4930902 Original | § 27-2005 adm code properly repair the broken or defective bell and return buzzer from the vestibule at public hall to in the entrance located at apt f, 3rd story, 1st apartment from south at west | NOV SENT 2014/10/09 | 2014/11/27 |
| F 3 | 2014/10/07 2014/10/09 | B | 579 | 10410838 4930902 Original | § 27-2026 adm code repair the leaky and/or defective faucets at washbasin in the bathroom located at apt f, 3rd story, 1st apartment from south at west | NOV SENT 2014/10/09 | 2014/11/27 |
| F 3 | 2014/10/07 2014/10/09 | B | 593 * | 10410844 4930902 | § 27-2026 adm code repair the flushing apparatus and maintain same so as to flush effectively the | NOV SENT 2014/10/09 | 2014/11/27 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Original | water closet .. in the bathroom located at apt f, 3rd story, 1st apartment from south at west | | |
| A Basement | 2010/09/25 C 2010/09/27 | 508 | 8619911 4023586 Original | § 27-2005 adm code repair the broken or defective plastered surfaces and paint in a uniform color ceiling ceiling in the 5th room from north located at apt a, 1st apartment from east at south | NOV SENT 2010/09/27 | 2010/10/08 |
| A Basement | 2010/09/25 B 2010/09/27 | 510 | 8619912 4023585 Original | § 27-2005 adm code & 309 m/d law abate the nuisance consisting of evidence of water penetration at east wall in the 5th room from north located at apt a, 1st apartment from east at south | NOV LATE 2011/06/07 | 2011/11/15 2011/06/07 |
| A Basement | 2010/09/25 C 2010/09/27 | 550 | 8619913 4023586 Original | § 27-2005 hmc:trace and repair the source and abate the nuisance consisting of mold ... at east wall in the 5th room from north located at apt a, 1st apartment from east at south | NOV SENT 2010/09/27 | 2010/10/08 |
| A Basement | 2010/09/25 C 2010/09/27 | 508 | 8619914 4023586 Original | § 27-2005 adm code repair the broken or defective plastered surfaces and paint in a uniform color : east wall in the 5th room from north located at apt a, 1st apartment from east at south | NOV SENT 2010/09/27 | 2010/10/08 |
| A Basement | 2010/09/25 B 2010/09/27 | 502 | 8619915 4023585 Original | § 27-2005 adm code properly repair with similar material the broken or defective wood floor in the 5th room from north located at apt a, 1st apartment from east at south | NOV LATE 2011/06/07 | 2011/11/15 2011/06/07 |
| A Basement | 2010/09/25 A 2010/09/27 | 501 | 8619916 4023584 Original | § 27-2005 adm code properly repair the broken or defective bell-buzzer/intercom system in the entire apartment located at apt a, 1st apartment from east at south | NOV LATE 2011/06/07 | 2011/01/14 2011/06/07 |
| A Basement | 2010/09/25 B 2010/09/27 | 702 | 8619917 4023585 Original | § 27-2045 adm code repair or replace the smoke detector defective at entire apartment, apartment | NOV LATE 2011/06/07 | 2010/11/15 2011/06/07 |
| Basement | 2010/09/25 C 2010/09/27 | 502 | 8620483 4023586 Original | § 27-2005 adm code properly repair with similar material the broken or defective second concrete tread from bottom at rear yard | NOV SENT 2010/09/27 | 2010/10/08 |
| A Basement | 2010/02/12 A 2010/02/16 | 556 | 8282576 3869252 Original | § 27-2013 adm code paint with light colored paint to the satisfaction of this department all peeling paint surfaces in the 5th room from north located at apt a, 1st apartment from east at south | NOV LATE 2011/06/07 | 2010/06/05 2011/06/07 |
| A Basement | 2010/02/12 B 2010/02/16 | 508 | 8280806 3869253 Original | § 27-2005 adm code repair the broken or defective plastered surfaces and paint in a uniform color the east wall in the 5th room from north located at apt a, 1st apartment from east at south | NOV LATE 2011/06/07 | 2010/04/06 2011/06/07 |
| A Basement | 2010/02/12 B 2010/02/16 | 1503 | 8280807 3869253 Original | § 27-2046.1 hmc: repair or replace the carbon monoxide detecting device(s). defective in the entire apartment located at apt a, 1st apartment from east at south | NOV LATE 2010/04/19 | 2010/04/06 2010/04/19 |
| A Basement | 2010/02/12 B 2010/02/16 | 702 | 8280808 3869253 Original | § 27-2045 adm code repair or replace the smoke detector dfective in the entire apartment located at apt a, 1st apartment from east at south | NOV LATE 2010/04/19 | 2010/04/06 2010/04/19 |
| Yards / Courts | 1987/06/08 B 2008/08/18 | 686 | 2985185 3430262 Reissued | d26-19.07 adm code provide adequate lighting at or near the outside of the front entranceway of the building and keep same burning from sunset every day to sunrise on the day following night inspection lights not on. | NOV SENT 2008/08/18 | 2008/10/06 |
| I 4 | 2007/04/12 A 2007/04/16 | 501 | 6696492 2945770 Original | § 27-2005 adm code properly repair the broken or defective door in the 1st bedroom from north at east located at apt i, 4th story, apartment at north | NOT COMPLIED 2007/06/25 | 2007/08/08 |
| I 4 | 2007/04/12 A 2007/04/16 | 529 | 6696493 2945770 Original | § 27-2005 adm code refit door in the entrance located at apt i, 4th story, apartment at north | NOT COMPLIED 2007/06/25 | 2007/08/08 |
| I 4 | 2007/04/12 B 2007/04/16 | 702 | 6696511 2945771 Original | § 27-2045 adm code repair or replace the smoke detector wall mounted not installed within 4 to 12 inches of ceiling in the entire apartment located at apt i, 4th story, apartment at north | NOV LATE 2007/07/12 | 2007/06/09 2007/07/12 |
| I 4 | 2007/04/12 B 2007/04/16 | 508 | 6696597 2945771 Original | § 27-2005 adm code repair the broken or defective plastered surfaces and paint in a uniform color walls and ceiling in the 1st room from north at west located at apt i, 4th story, apartment at north | NOV LATE 2007/07/12 | 2007/06/09 2007/07/12 |
| B 1 | 2006/08/18 B 2006/08/22 | 501 | 6325274 2797267 Original | § 27-2005 adm code properly repair the broken or defective bell, buzzer in the entire apartment located at apt b, 1st story, 1st apartment from east at south | NOT COMPLIED 2007/06/25 | 2006/10/15 |
| F 3 | 2006/08/18 B 2006/08/22 | 501 | 6325298 2797270 Original | § 27-2005 adm code properly repair the broken or defective bell buzzar in the entire apartment located at apt f, 3rd story, 1st apartment from south at west | NOT COMPLIED 2007/06/25 | 2006/10/15 2007/06/01 |
| H 4 | 2006/08/17 A 2006/08/21 | 529 | 6321231 2796239 Original | § 27-2005 adm code refit apt door in the entrance located at apt h, 4th story, 1st apartment from north at east | NOT COMPLIED 2007/06/25 | 2006/12/13 |
| H 4 | 2006/07/17 B 2006/07/28 | 501 | 6265652 2766144 | § 27-2005 adm code properly repair the broken or defective intercom in the entire apartment located | NOT COMPLIED | 2006/09/20 2007/04/11 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Original | at apt h, 4th story, apartment at west | 2007/06/25 |
| H 5 | 2006/05/12 B 2006/05/16 | 530 | 6154690 2672089 Original | § 27-2005, 2007 adm code arrange and make self-closing the doors located at apt h, 5th story, apartment at south | NOT COMPLIED 2007/06/25 | 2006/07/09 |
| Cellar | 2006/04/12 C 2006/04/14 | 672 | 6103262 2652017 Original | § 27-2033 adm code provide ready access to buildings heating system boiler room at cellar | NOT COMPLIED 2007/06/25 | 2006/04/30 |
| A Basement | 2005/09/22 B 2005/09/28 | 501 | 5732537 2500548 Original | § 27-2005 adm code properly repair the broken or defective intercom-buzzer at vestibule to apt. a located at bsmt-apt a | NOT COMPLIED 2007/06/25 | 2005/11/21 |
| | 2019/10/25 I - | 780 | 13357691 | §27-2107 adm code owner failed to file a valid registration statement with the department as required by adm code §27-2097 and is therefore subject to civil penalties, prohibited from certifying violations, and denied the right to recover possession of premises for nonpayment of rent until a valid registration statement is filed. | INFO NOV SENT 2019/10/25 | - |

**MUNICIPAL DATA**
SERVICES

25 Hyatt Street – Suite 301
Staten Island, NY 10301
Phone – (718) 815-0707
Fax – (718) 815-9101
www.munidata.com

**Search Date:** 8/12/2020

**County:** NEW YORK

**Title/CoNo.:** BETTER  RANY-40759

**Address:** 60 WEST 91 STREET

**Block:** 1204
**Lot:** 54

## FIRE DEPARTMENT VIOLATION SEARCH

In reply to your request concerning the above mentioned premises, please be advised that as of **9 A.M. on 6/1/2020**, the records show the following:

**NO VIOLATIONS**

**Violations recorded above are of record in headquarters of the Division of Fire Prevention only, and may not include violations issued by local units.**

Municipal Data services Inc. certifies that the records of the above municipal agency were examined on behalf of BETTER RESEARCH. The information reported above is true and accurate abstract of the information on file therein.  This report is submitted for information purposes only.  There are no intended third party beneficiaries.  No liability is assumed.

3597214          11858809



25 Hyatt Street – Suite 301
Staten Island, NY 10301
Phone – (718) 815-0707
Fax – (718) 815-9101
www.munidata.com

**Search Date:** 8/10/2020

**County:** NEW YORK

**Title/CoNo.:** BETTER  RANY-40759

**Address:** 60 WEST 91 STREET

**Block:** 1204
**Lot:** 54

## EMERGENCY REPAIRS

A search of the records of the Department of Housing Maintenance Emergency Repairs Unit shows the following:

**Amount due HPD:** $0.00          **Last Printed Lien Book:** 7/24/2020

The following Emergency Repair charges were found as of    8/10/2020

(3) BUILDING CHARGE(S)

*** SEE ATTACHED ***

Municipal Data services Inc. certifies that the records of the above municipal agency were examined on behalf of BETTER RESEARCH. The information reported above is true and accurate abstract of the information on file therein.  This report is submitted for information purposes only.  There are no intended third party beneficiaries.  No liability is assumed.

3597214          11858807

**The selected address: 60 WEST 91 STREET, Manhattan 10024**

**This building has filed records with the <u>New York State Division of Housing and Community Renewal</u> at least one time from 1993 to the present year and may contain one or more regulated apartments.**

| HPD# | | Range | Block | Lot | CD | CensusTract | Stories | A Units | B Units | Ownership | Registration# | Class |
|------|---|-------|-------|-----|----|-----------|---------|---------|---------|-----------|---------------|-------|
| 36927 | Active | 60-60 | 01204 | 0054 | 7 | 17700 | 4 | 9 | 0 | PVT | 123538 | G |

<u>**PLEASE REVIEW THIS REPORT IN ITS ENTIRETY, INCLUDING ALL NOTES AT THE END.**</u>

**THIS BUILDING CHARGE REPORT PROVIDES NOTICE, AS REQUIRED BY NEW YORK CITY ADMINISTRATIVE CODE §27-2144(a), OF OPEN WORK ORDERS AND FEES REPRESENTING CHARGES THAT MAY BE BILLED TO THIS PROPERTY AND THE DATES THAT THEY WERE ENTERED ON THE RECORDS OF THE DEPARTMENT.**

The <u>Department of Finance website</u> (DOF) provides the current status of any charge listed on this report **after** that charge has been transferred to DOF (see the column furthest to the right on the below charts for the transfer date), including interest accumulation, payments and adjustments. Charges are transferred to DOF for collection once HPD has paid the vendor who completed the work or after an invoice for work done by HPD staff has been completed.

Please be aware that this report does **NOT** include:

- most demolition charges incurred prior to January 1, 2000.

- most non-demolition charges incurred by HPD prior to July 1, 1999.

- Civil penalties imposed by the Housing Court for failure to comply with HPD issued violations.

For information on amounts owed for demolition charges incurred prior to January 1, 2000 and for all non-demolition charges incurred by HPD prior to July 1, 1999, contact HPD's ERP Accounting Unit at (212) 863-6810 to verify the amount owed for those charges. For information on whether there are pending civil penalties, see the Litigation/Case Status link on the left hand toolbar for this building.

**The Charge Report will include information on the following building(s).**

| HPD Bldg ID | Status | House No | Street name | Life Cycle |
|-------------|--------|----------|-------------|------------|
| 36927 | Active | 60 | WEST 91 STREET | BLDG |

### Charges for this Building

Work Orders: **3**                    Fees: **0**

### Building Charge Report as of 8/9/2020
### Work Orders

| WO TYPE/ WO# | Job General | Total Work Cost | Award Amt Chg Orders (WOs) | Create Dt/ Award Dt/ Invc Dt/ | WO Close Reason | Invoice Approved Amount/ Svc Chg(Y/N) | Admin Fee/ Sales Tax/ | Total Charge | Date Charges Transferred to DOF |
|---|---|---|---|---|---|---|---|---|---|
| **AOR** E637806 | MISC | | 0.00 | 06/23/2006 | No Access | 0.00 | 0.00 0.00 | 0.00 | |
| **Work Order Description:** apt a) at living room remove illegal double cylinder key operated lock at the fire exit door | | | | | | | | | |
| **OMO** E710789 | GC | 884.75 | 884.75 0.00 | 10/13/2006 10/17/2006 | OMO Completed | 884.75 | 75.00 76.31 | 1036.06 | 03/20/07 |

| | | | | 11/29/2006 | | | | | |
|---|---|---|---|---|---|---|---|---|---|

**Work Order Description:** apt b) at bedroom, trace and repair source of concealed water leak from above affecting walls and walls and once source is abated restore damaged wa

| OMO E716167 | DELEAD | 12.00 | 12.00 0.00 | 12/13/2006 12/18/2006 12/29/2006 | OMO Completed | 12.00 | 15.00 1.04 | 28.04 | 04/20/07 |
|---|---|---|---|---|---|---|---|---|---|

**Work Order Description:** as per rc # 20070012184 (enviro-probe inc), perform total lead analysis of 04 dust wipe sample(s) via environmental protection agency (epa) sw845-3050

| Totals for 60 WEST 91 STREET Life Cycle: BLDG |
|---|
| Charge Amount: $896.75    Admin Fee: $90.00    Sales Tax: $77.35    Total: $1,064.10 |

| Total for all Work Order & AOR charges on all building(s) on this report: | | | |
|---|---|---|---|
| Charge Amount | Admin Fee | Sales Tax | Total |
| $896.75 | $90.00 | $77.35 | $1,064.10 |

### Repair, AEP Fees, Heat/Hot Water Inspection Fees, Inspection Fees Grand Totals

| Invoiced Approved & Fee Amount | Admin Fee | Sales Tax | Total |
|---|---|---|---|
| $896.75 | $90.00 | $77.35 | $1,064.10 |

| Charge Status | | | |
|---|---|---|---|
| Invoiced - Not Yet Paid by HPD | Paid by HPD - Not Yet Transferred to DOF | Invoiced and Transferred | Grand Totals |
| $0.00 | $0.00 | $1,064.10 | $1,064.10 |

## Definitions:

### Work Order Section

**Work Type**: There are two work types:

- OMO: (Open Market Order): Private vendors perform Open Market Order (OMO) work, making repairs in response to HPD solicitations to complete the work described.

- AOR: (Area Office Repair): Repair work performed by HPD personnel.

**Work Order #**: Distinct identifier assigned to the work order.

**Job General**: Indicates the general category of the type of work performed. There are some special notes related to specific categories of job general:

- 7A Financial Assistance (7AFA) repair charges are Court/Agency authorized charges for buildings in the 7A Management Program. For more information about whether a 7AFA funded repair is ongoing or completed, or if partial liens have been filed, or will be filed, call the 7AFA Program at (212) 863-7356.

- Utilities: If a property is going to be sold or transferred, it is the responsibility of the parties involved to make sure that all utility bills for service provided by HPD are paid and that service provided by HPD is terminated. Utility Providers can take three or more months to invoice HPD; therefore all charges owed may not be posted on this Building Charge Report at the time of transfer. To terminate service provided by HPD, please contact the Utility Unit at (212)863-7704 for account termination and final invoice estimates.

**Total Work Cost**: This is the current total cost of the work itself, including the award amount and any change orders. This will not be the amount owed, which will include an administrative fee and sales tax and which may be reduced if the work is not performed and only a service charge is billed.

**Estimated Cost**: For Elevator work conducted in order to address Department of Buildings violations, an estimated cost of the work will be provided (not including an administrative fee and sales tax that will be owed after billing is finalized). This cost is subject to change until the work is completed and invoiced.

**Award Amt**: Once the agency and vendor agree on the price for an OMO based on the initial scope of work, this amount is defined as the award amount of the contract, which is listed in the 'Award Amt' column of this report. Since there is no award to an outside vendor when the work is completed by HPD, award amounts for AORs are blank. **Award amounts may not be final and are subject to change order increases or decreases.**

- **Award Amount Note for Utility Charges**: The Award Amount on Utility OMOs is $1.00 because billing by the Utility Company occurs after the utility account is initially set up. There can be multiple invoices for each Utility OMO. Charges that will be owed for utility services may not appear on this report until after the exact amount owed has been determined, which can take numerous months to occur. One charge being listed on this report for a Utility OMO indicates that other charges may be forthcoming for the same Utility OMO later on. In order to find out if there will be future charges due for a Utility OMO in addition to the charges already listed, please call HPD's Utilities Unit at 212-863-7704. Utility charges will continue to accrue until the property owner opens an appropriate account for the service. Multiple Utility OMOs may exist for the same Utility account.
- **Award amount note for Fireguard charges**: The award amount on a Fireguard OMO is initially listed as $1.00 because the amount that the Fireguard provider will be awarded for the work order by HPD is determined only after a Fireguard(s) has been initially posted, and the final amount to be charged depends upon how long the Fireguard is in place at the building. Each hour that a Fireguard is in place results in an additional payment to the Fireguard provider and additional billing to the building owner. There can be multiple OMOS for each Fireguard and/or multiple invoices for each Fireguard OMO. Charges that will be owed for Fireguard services may not appear on this report until after the exact amount owed has been determined. This may take several months. One charge listed on this report for a Fireguard OMO indicates that other charges may be forthcoming for the same Fireguard OMO and/or another Fireguard OMO later on. If you have any questions about the hazardous conditions that are resulting in a fireguard that is currently in place at the building, please call HPD's Special Enforcement Unit at 212-863-8611. Charges for Fireguard services will continue to accrue until the building owner cures the hazardous violating condition(s) that has resulted in the need for a Fireguard to HPD's satisfaction or provides its own licensed Fireguard service that is approved by HPD. All expenses incurred by HPD for the Fireguard service will be charged against the building, and may become a tax lien pursuant to NYC Administrative Code §27-2144 if they remain unpaid.

**Chg Order**: Change orders indicate modifications made to the original scope of work and may result in either an increase or decrease to the initial award amount and to the amount owed. **Change order information will be available only for OMOs awarded on or after August 1, 2011**.

**Svc Chg**: The 'Svc Chg' column, located immediately below the 'Invoice Approved Amount' figure, indicates whether a service charge is owed to a vendor. A service charge is owed when a vendor makes an attempt to visit a property to address a condition pursuant to a work order and the work order is subsequently cancelled (for example, a service charge can be owed when there is no access to make a repair). If 'Y' appears in the Service Charge column and an amount is not present, then the amount that will be owed for the service charge has not yet been determined.

**Total Charge**: Amount to be transferred to DOF for collection by DOF.

## Description of fees types:

- **AEP Fees**: If this building is in the Alternative Enforcement Program (AEP), then fees may be assessed pursuant to New York City Administrative Code Section 27-2153 and Section 36-03 of Chapter 36 of Title 28 of the Rules of the City of New York. These fees become a tax lien against the property if not timely paid. If you have questions about AEP charges and fees, please call the Alternative Enforcement Program at (212)863-8262.

- **Heat and Hot Water Inspection Fees**: For a third or any subsequent inspection that results in a heat violation within the same heat season (October through May) or for a third or any subsequent inspection which results in a hot water violation within a calendar year, HPD will charge a fee of $200 for such inspections, pursuant to New York City Administrative Code Section 27-2115. Such fees become a tax lien against the property if not timely paid.

- **Inspection Fees**: Pursuant to section 27-2115 of the New York City Administrative Code, HPD is authorized to impose a fee for the third and each subsequent complaint-based housing inspection it performs in a particular dwelling unit where certain conditions are met, including HPD having already inspected the unit twice in the same twelve-month period, HPD having issued hazardous (class B) or immediately hazardous (class C) violations, and the owner having failed to repair and timely certify that those violations have been corrected. The fee, if not timely paid, becomes a tax lien against the

property.

**Copies of documents may be requested pursuant to the Freedom of Information Law (FOIL) by writing to: FOIL Officer, HPD, 100 Gold Street, Room 5-U9, New York New York 10038. A FOIL request may also be submitted via the HPD website.**

Print Page



25 Hyatt Street – Suite 301
Staten Island, NY 10301
Phone – (718) 815-0707
Fax – (718) 815-9101
www.munidata.com

**Search Date:** 8/10/2020

**County:** NEW YORK

**Title/CoNo.:** BETTER  RANY-40759

**Address:** 60 WEST 91 STREET

**Block:** 1204
**Lot:** 54

## STREET REPORT

A search of the Topographical Department shows the following results:

Street Width: WEST 91 STREET - MAPPED AT 30' CEDED 04/17/1860 NORTHERLY
OPEN 05/11/1880 SOUTHERLY.

Cross Streets: CENTRAL PARK WEST - MAPPED AT 63' OPEN 1811
TO THE FULL WIDTH
COLUMBUS AVENUE - MAPPED AT 60' OPEN 12/23/1854
TO THE FULL WIDTH

Municipal Data services Inc. certifies that the records of the above municipal agency were examined on behalf of BETTER RESEARCH. The information reported above is true and accurate abstract of the information on file therein.  This report is submitted for information purposes only.  There are no intended third party beneficiaries.  No liability is assumed.

3597214          11858805



25 Hyatt Street – Suite 301
Staten Island, NY 10301
Phone – (718) 815-0707
Fax – (718) 815-9101
www.munidata.com

**County:** NEW YORK  **Search Date:** 8/10/2020

**Title/CoNo.:** BETTER  RANY-40759

**Address:** 60 WEST 91 STREET

**Block:** 1204
**Lot:** 54

## AIR RESOURCES SEARCH

A search of the records of the City of New York, Department of Environmental Protection, against the above captioned premises shows the following:

**Please see attached information.**

Municipal Data services Inc. certifies that the records of the above municipal agency were examined on behalf of BETTER RESEARCH.The information reported above is true and accurate abstract of the information on file therein.  This report is submitted for information purposes only.  There are no intended third party beneficiaries.  No liability is assumed.
00030.00

3597214    11858808



8/10/2020

Municipal Data Services
25Hyatt Street
Suite 301
Staten Island, NY 10301

*Vincent, Sapienza P.E.*
*Commissioner*

RE: Title Search Inquiry       Letter Dated: 8/10/2020

**Michael Gilsenan**
**Assistant Commissioner**
**Environmental Compliance**

Dear Applicant:

Please be advised, it is a violation of the New York City Administrative Code, Title 24, Air Pollution Control Code, to operate fuel-burning or process equipment as specified in the Code without a valid Registration or Certificate of Operation. If such equipment, although unknown to us exist, it is automatically in violation of the law. This applies regardless to the information provided here in.

**59-17 Junction Boulevard**
**Records – 9th Floor**
**Flushing, NY 11373**

For the requested locations:   60 WEST 91 STREET      **MANHATTAN**

The Bureau of Environmental Compliance Division of Air Engineering has searched its files regarding the above referenced premise(s) and has found that:

**Records are available, but there are no outstanding violations.**

If there are any existing records or violations for the requested location, please see the attached documents.

For questions related to this finding, please contact us at catsfeedback@dep.nyc.gov or (718) 595-3855



Register with CATS
Login into CATS



**NYC DEP CATS Information**

| | | | |
|---|---|---|---|
| **PREMISES: 60 WEST 91 STREET   MANHATTAN   BIN: 031614  BLOCK: 01204  LOT: 0054** | | | |
| **Owner:** 60 91ST STREET CORP. - ATTN: KIM MORTIMER | **Application #:** CA460485 | **Type:** REGISTRATION - BOILER | **Expiration Date:** 7/1/2015 |
| **Business Type:** NA | **Request Type:** Renewal - Boiler | **Status:** EXPIRED | **Submitted Date:** NA | **Decision Date:** 10/21/1985 |
| **Boiler Make / Model:** NATIONAL RADIATOR HEAT EXTRACTOR / NATIONAL RADIATOR HEAT EXTRACTOR | **Fuel Type 1:** NO2FUEL | **Fuel Type 2:** NONE | Heat Input (BTU/Hr.): 840000 |
| **Burner Make / Model:** AUTO HEAT DX2F / AUTO HEAT DX2F | **Number of Identical Units:** 1 | | |
| | | | |

Standard N.Y.B.T.U. Form 8001   —Bargain and Sale Deed, without Covenant against Grantor's Acts—Individual or Corporation (Single Sheet)

**CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT—THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.**

AINC 2682B

**THIS INDENTURE,** made the 26 day of September, nineteen hundred and 84

**BETWEEN** ANNE SOWELL
60 West 91st Street
New York, NY 10024

party of the first part, and

60 91ST STREET CORP., with offices at 60 West 91st
Street, New York, New York

party of the second part,

**WITNESSETH,** that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly line of Ninety-First
Street opposite the center of a party wall which point is distant
two hundred and forty-one feet easterly from the corner formed by
the intersection of the southerly line of Ninety-First Street
with the easterly line of Columbus (formerly Ninth) Avenue; running
thence southerly parallel with Columbus (formerly Ninth) Avenue
and partly through said party wall, one hundred feet, eight and
one-half inches to the center line of the block between Ninetieth
and Ninety-First Streets; thence easterly along said center line
of the block, twenty feet to the point opposite the center of
another party wall; thence northerly parallel with Columbus
(formerly Ninth) Avenue and partly through the said last mentioned
party wall, one hundred feet, eight and one-half inches to the
southerly line of Ninety-First Street and thence westerly along
the southerly side of Ninety-First Street, twenty feet to the
point or place of beginning.

Said premises being known as and by the street number 60
West 91st Street.

½ INT

BK 71204
Got 54

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

**IN WITNESS WHEREOF,** the party of the first part has duly executed this deed the day and year first above written.

IN PRESENCE OF:

ANNE SOWELL BY SEDGWICK
MORTIMER AS ATTORNEY
IN FACT
ANNE SOWELL
Anne Sowell by SEDGWICK
MORTIMER AS ATTORNEY IN
FACT.

STATE OF NEW YORK, COUNTY OF _New York_ ss:
On the _26_ day of _Sept_ 19_94_, before me
personally came _Sedgwick Mirtven as_
_attorney in fact for Anne Sowell_
to me known to be the individual   described in and who
executed the foregoing instrument, and acknowledged that
executed the same.

_F A Mello_
_02ME5032573_
_Exp 8/29/96_
_15_
_27835_

STATE OF NEW YORK, COUNTY OF _New York_ ss:
On the _26_ day of _Sept_ 19_94_, before me
personally came _Sedgwick Mirtven_
to me known, who, being by me duly sworn, did depose and
say that   he resides at No. _22 West 64th St_
that   he is the _Vice President_
of _60 91st Street Corp_, the corporation described
in and which executed the foregoing instrument; that   he
knows the seal of said corporation; that the seal affixed
to said instrument is such corporate seal; that it was so
affixed by order of the board of directors of said corpora-
tion, and that   he signed h   name thereto by like order.

_F A Mello_
_02ME5032573_
_Exp. 8/28/96_

STATE OF NEW YORK, COUNTY OF            ss:
On the        day of        19   , before me
personally came
to me known to be the individual   described in and who
executed the foregoing instrument, and acknowledged that
executed the same.

STATE OF NEW YORK, COUNTY OF            ss:
On the        day of        19   , before me
personally came
the subscribing witness to the foregoing instrument, with
whom I am personally acquainted, who, being by me duly
sworn, did depose and say that   he resides at No.

that   he knows

to be the individual
described in and who executed the foregoing instrument;
that   he, said subscribing witness, was present and saw
execute the same; and that   he, said witness,
at the same time subscribed h   name as witness thereto.

**Bargain and Sale Deed**
WITHOUT COVENANT AGAINST GRANTOR'S ACTS

TITLE NO. _AINC-21692B_

_Sowell, Anne_

TO

_60 91st Street Corp._

STANDARD FORM OF NEW YORK BOARD OF TITLE UNDERWRITERS
Distributed by
SECURITY TITLE AND GUARANTY COMPANY
CHARTERED 1926  ST  IN NEW YORK

SECTION
BLOCK _1204_
LOT _54_
COUNTY OR TOWN _New York_

RETURN BY MAIL TO:

_Alan Weiner, Esq._
_220 5th Avenue_
_New York, NY_  Zip No. _10001_

RESERVE THIS SPACE FOR USE OF RECORDING OFFICE

# CITY REGISTER RECORDING AND ENDORSEMENT PAGE
## - NEW YORK COUNTY -
### (This page forms part of the Instrument)

Block(s) **1204**
Lot(s) **54**
**60 a 91 st Street**

Record & Return to: **ALAN WEINER, Esq**
**220 5th AVENUE** **New York NY 10001**

Title/Agent Company name: **ABSTRACTS, INCORPORATED**
Title Company number: **AEINC 2682 B**

**OFFICE USE ONLY - DO NOT WRITE BELOW THIS LINE**

## THE FOREGOING INSTRUMENT WAS ENDORSED FOR THE RECORD AS FOLLOWS:

**27836**

Examined by (A):

Mtge Tax Serial No.

Mtge Amount ........ $

Taxable Amount .... $

Exemption (✓)    YES ☐    NO ☐

City Register Serial Number ➤

Indexed By (A):    Verified By (A): **IN**

Block(s) and Lot(s) verified by (A): **RC**
Address ☐    Tax Map ☐
Extra Block(s) _____ Lot(s) _____

Type: *(ONLY USE IF)*    [339EE]    [2E8]    [OTHER ___]

Dwelling Type: *(ONLY USE IF)*    [1 to 2]    [3]    [4 to 6]    [OVER 6]

## TAX RECEIVED ON ABOVE MORTGAGE ▼

| | |
|---|---|
| County (basic) | $ |
| City (Add'l) | $ |
| Spec Add'l | $ |
| TASF | $ |
| MTA | $ |
| NYCTA | $ |
| **TOTAL TAX** | $ |

Apportionment Mortgage (✓)  YES ☐  NO ☐

Recording Fee _____ $ **21**
Affidavit Fee .....(O)... $
TP-584/582 Fee .(Y).... $
RPTT Fee _____ (R) $ **R 20**
HPD-A ☐    HPD-C ☐

New York State Real Estate Transfer Tax ▼
$
Serial Number ➤ **95 S 1360**

New York City Real Property Transfer Tax
Serial Number ➤ **R 6257**

New York State Gains Tax
Serial Number ➤

Joy A. Bobrow, City Register

$1.00
GRBF 655543
DEED 655542



## RECORDED IN NEW YORK COUNTY
## OFFICE OF THE CITY REGISTER
1994 OCT 13 AT _____

1994 OCT 13 A 9824

Witness My Hand and Official Seal

City Register

CR0FPM92M BPO 1/93


## NYC DEPARTMENT OF FINANCE
## OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 4 |
|---|---|

Document ID: ~~2011033101255001~~  Document Date: 02-18-2011   Preparation Date: 03-31-2011
Document Type: DEED
Document Page Count: 3.

| PRESENTER: | RETURN TO: |
|---|---|
| MAIN STREET TITLE AGENCY, INC. | MAIN STREET TITLE AGENCY, INC. |
| 190 MAIN STREET | 190 MAIN STREET |
| SUITE 306 | SUITE 306 |
| HACKENSACK, NJ 07601 | HACKENSACK, NJ 07601 |
| 201-457-3460 | 201-457-3460 |
| jcallirgos@mainsttitle.com MSN22695 (PICK UP RSR) | jcallirgos@mainsttitle.com MSN22695 (PICK UP RSR) |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1204 | 54 | Entire Lot | 60 WEST 91ST STREET |

Property Type:  COMMERCIAL REAL ESTATE

### CROSS REFERENCE DATA

CRFN_____  or Document ID_____  or _____ Year____ Reel ___ Page _____ or File Number_____

### PARTIES

| GRANTOR/SELLER: | GRANTEE/BUYER: |
|---|---|
| YVONNE SOWELL | 60 91ST STREET CORP. |
| 60 WEST 91ST STREET | 60 WEST 91ST STREET |
| NEW YORK, NY 10024 | NEW YORK, NY 10024 |

### FEES AND TAXES

| Mortgage | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | $ | 250.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | |
| MTA: | $ | 0.00 | |
| NYCTA: | $ | 0.00 | |
| Additional MRT: | $ | 0.00 | |
| TOTAL: | $ | 0.00 | |
| Recording Fee: | $ | 52.00 | |
| Affidavit Fee: | $ | 0.00 | |

**RECORDED OR FILED IN THE OFFICE
OF THE CITY REGISTER OF THE
CITY OF NEW YORK**

Recorded/Filed        10-07-2011 12:17
City Register File No.(CRFN):

**2011000355788**

*Annette M. Hill*

***City Register Official Signature***

— Quitclaim Deed – Individual or Corporation (single sheet)

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT—THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.

THIS INDENTURE, made the 18 day of ~~December~~ February in the year 2010

BETWEEN NKA Yvonne Mortimer

Yvonne Sowell "as sole heir-at-law of" Arthur Sowell, having an address at 60 West 91st Street, New York, NY 10024

party of the first part, and 60 91st Street Corp., having an address at 60 West 91st Street, New York, NY 10024

party of the second part,

WITNESSETH, that the party of the first part, in consideration of Ten Dollars and other valuable consideration paid by the party of the second part, does hereby remise, release and quitclaim unto the party of the part, the heirs or successors and assigns of the party of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the
See Schedule A attached.

TOGETHER with all right, title and interest, if any, of the party of the first part of, in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

IN PRESENCE OF

_____
K. Mortimer

_____
Yvonne Mortimer
Yvonne Sowell "as sole heir-at-law of" Arthur Sowell
Now Known As Yvonne Mortimer

_____
Yvonne Mortimer
Yvonne Mortimer

**SEAL**

1/2 WT

Margaretta Mendez
Margaretta Mendez
Notary Public State of New York
No. 02BA5003099
Qualified in Bronx County
Commission Expires January 31, 20__

-ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate lying and being in the Borough of Manhattan, City, County of New York, in the State of New York, bounded and described as follows:

BEGINNING at a point on the southerly line of Ninety-First Street Opposite of the center of a party wall which point is distant two hundred and forty-one feet easterly from the corner formed by the intersection of the southerly line of Ninety-First Street with the easterly line of Columbus (formerly Ninth) Avenue;

RUNNING THENCE southerly parallel with Columbus (formerly Ninth) Avenue and partly through said party wall, one hundred feet, eight and one-half inches to the center line of the block between Ninetieth and Ninety-First Streets;

THENCE easterly along said center line of the block; twenty feet to the point opposite the center of another party wall;

THENCE northerly parallel with Columbus (formerly Ninth) Avenue and partly through the said last mentioned partly wall, one hundred feet, eight and one-half inches to the southerly line of Ninety-First Street and thence westerly along the southerly side of Ninety-First Street, twenty feet to the point or place of beginning.

Said premises being known being known as and by street number 60 West 91st Street.

ACKNOWLEDGEMENT TAKEN IN NEW YORK STATE

State of New York, County of _N_ ss:

On the _16_ day of _May_ in the year _2011_, before me, the undersigned, personally appeared _Yvonne Mortimer_

, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

01G06 070850

ACKNOWLEDGEMENT BY SUBSCRIBING WITNESS
TAKEN IN NEW YORK STATE _7/23/2011_

State of New York, County of , ss:
On the day of in the year , before me, the undersigned, a Notary Public in and for said State, personally appeared , the
subscribing witness to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that he/she/they reside(s) in

(if the place of residence is in a city, include the street and street number if any, thereof).
that he/she/they know(s)

to be the individual described in and who executed the foregoing instrument; that said subscribing witness was present and saw said

execute the same; and that said witness at the same time subscribed his/her/their name(s) as a witness thereto

Efrain J. Gonzalez
Notary Public, State of NY
No. 01G06170850
Qualified in Kings County
Comm Exp 7/23/11

ACKNOWLEDGEMENT TAKEN IN NEW YORK STATE

State of New York, County of , ss:

On the day of in the year , before me, the undersigned, personally appeared

, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

ACKNOWLEDGEMENT TAKEN OUTSIDE NEW YORK STATE

*State of , County of , ss:
*(Or insert District of Columbia, Territory, Possession or Foreign County)

On the day of in the year , before me the undersigned personally appeared

Personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual make such appearance before the undersigned in the

(add the city or political subdivision and the state or country or other place the acknowledgement was taken).

**Quitclaim Deed** SEAL

SECTION:
BLOCK: _1204_
Title No. _MSN 22695_     LOT _54_
_Yvonne Mortimer_     COUNTY OR TOWN: _New York_

_60 91st street Corporation_     MAIN STREET TITLE AGENCY
RETURN BY MAIL TO:
NEW YORK DEPARTMENT
190 MAIN STREET, SUITE 306
HACKENSACK, NJ 07601

DISTRIBUTED BY
YOUR TITLE EXPERTS
The Judicial Title Insurance Agency LLC
800-281-TITLE (8485)  FAX: 800-FAX-9396

[CR]

1 2208 of 182

To all to whom these Presents, may come, Send Greeting

We the undersigned owners of the lots on the north and south side of 91st (Ninety first) Street and south side of 92nd (Ninety second) Street between the 8th (Eighth) and 9th (Ninth) Avenues in the City of New York in consideration of the mutual covenants hereinafter contained and of the sum of One Dollar by each to the other in hand paid the receipt whereof is hereby acknowledged do for ourselves our heirs executors administrators successors and assigns mutually covenant and agree that whenever the said lots owned by us respectively or any of them shall be improved the first buildings to be erected thereon shall be for private residences only X In Witness Whereof we have hereunto set our hands and seals this twelfth day of May 1888. Estate of Max Weil. A.M. Weil Ex © Bernard Cohen © Geo. F. Johnson © Dore Lyon © Patrick Farley © Eli Martin © Sealed and delivered in the presence of, Geo. W. Stake. for Max Weil & Bernard Cohen — Notary Public: Richmond Co. Cert. filed NY Co. and Goode taken as to Geo. F. Johnson. Notary Public. N.Y.Co. Sealed and signed & witnessed in presence of, Moses Barnett as to Dore Lyon Notary Public. No 96. N.Y.Co. In presence of LeRoy Porter as to Eli Martin State of New York, City and County of New York ss: On this 12 day of May 1888 before me personally came A. M. Weil Ex of the estate of Max Weil and Bernard Cohen personally to me known and known to me to be the individuals described in and who executed the foregoing instrument and who thereupon acknowledged that they severally executed the same. Geo. Wm Stake. Notary Public Richmond Co. Cert. filed NY State of New York City and County of New York ss. On this day of March 1889 before me personally came Eli Martin personally to me known and known to me to be one of the individuals described in and who executed the foregoing instrument and thereupon acknowledged that he executed the same. LeRoy Porter Commr of Deeds. NY City & NY

Recorded preceding at request of J. Hathaway March, 9th 1889 at 1 oclock & 28 minutes P.M.

Witness my hand,

James J. Slevin

REEL 1696 PG 1872

NOTICE OF DESIGNATION
PURSUANT TO CHAPTER 21 SECTION 534
OF THE NEW YORK CITY CHARTER
AND
CHAPTER 3 OF TITLE 25 OF THE ADMINISTRATIVE CODE
OF THE CITY OF NEW YORK

TAKE NOTICE that pursuant to the provisions of Chapter 21 Section 534 of the New York City Charter and Chapter 3 of Title 25 of the Administrative Code of the City of New York, the Landmarks Preservation Commission of the City of New York has designated as an Historic District the blocks and lots hereafter enumerated and set forth.

UPPER WEST SIDE/CENTRAL PARK WEST HISTORIC DISTRICT, MANHATTAN

The Upper West Side/Central Park West Historic District consists of the property bounded by a line beginning at the southwest corner of the intersection of Central Park West and West 96th Street, extending southerly along the western curb line of Central Park West, westerly along the northern curb line of West 62nd Street, northerly along the western property line of 25 Central Park West, northerly across West 63rd Street, westerly along the northern curb line of West 63rd Street, northerly and easterly along the western and northern property lines of 13-15 West 63rd Street, northerly along part of the western property line of 3-11 West 63rd Street, easterly along the southern curb line of West 64th Street, northerly across West 64th Street, northerly and easterly along the western and part of the northern property lines of 41 Central Park West, northerly along the western property line of 50 Central Park West, easterly along the southern curb line of West 65th Street, northerly across West 65th Street, northerly along the western property line of 51-53 Central Park West, westerly and northerly along part of the southern and the western property lines of 55 Central Park West, northerly across West 66th Street, westerly along the northern curb line of West 66th Street, northerly along part of the western building line of 8 West 67th Street, westerly along the southern property line of 26-50 West 67th Street, northerly along the western property line of 42-50 West 67th Street, northerly across West 67th Street, westerly along the northern curb line of West 67th Street, northerly along the western property line of 39-41 West 67th Street, westerly along part of the southern property line of 60-66 West 68th Street, westerly along the southern property lines of 68-76 West 68th Street and 171-179 Columbus Avenue, northerly along the eastern curb line of Columbus Avenue, northerly across West 68th Street to the northeast corner of Columbus Avenue, westerly across Columbus Avenue, westerly along the northern curb line of West 68th Street, northerly along the western property lines of 180-188 Columbus Avenue, westerly along the southern property lines of 108-120 West 69th Street and the irregular southern property lines of 122-128 West 69th Street and 2014-2018 Broadway (as determined by the City Surveyor's Map), northwesterly and northerly along the eastern curb line of Broadway, northerly across West 72nd Street, northerly along the eastern curb line of Amsterdam Avenue, easterly along the southern curb line of West 77th Street, northerly across West 77th Street, northerly and easterly along the western and part of the northern property lines of 137 West 78th Street, northerly along part of the western property lines of 156, 146 and 136 West 78th Street, northerly across West 78th Street, westerly along the northern curb line of West 78th Street, southerly across West 78th Street, southerly along the eastern property lines of 371-375 Amsterdam Avenue, westerly along the southern property line of 371 Amsterdam Avenue, northerly along the eastern curb line of Amsterdam Avenue to the southeast corner of West 79th Street, westerly across Amsterdam Avenue, westerly along the southern curb line of West 79th Street, southerly along the eastern property line of 206 West 79th Street, westerly along the southern property lines of 206-226 West 79th Street, northerly along the western property line of 226 West 79th Street, northerly across West

1696 PG 1877

## Upper West Side/Central Park West Historic District

Block 1200:  1, 2, 4, 5, 8, 9, 10, 11, 15, 19
Block 1200:  23, 25, 31, 37, 38, 39, 40, 41, 42, 43
Block 1200:  45, 46, 47, 48, 49, 50, 51, 52, 53, 54
Block 1200:  55, 56, 57, 59, 60, 61, 62, 63, 64, 142
Block 1200:  146, 150, 151, 152, 161, 1001-1006

Block 1201:  1, 2, 3, 4, 5, 6, 8, 9, 10, 11
Block 1201:  12, 13, 14, 15, 16, 17, 18, 19, 20, 21
Block 1201:  22, 23, 27, 29, 34, 39, 40, 41, 42, 43
Block 1201:  44, 45, 46, 47, 48, 49, 50, 51, 52, 53
Block 1201:  54, 55, 56, 57, 58, 63, 110, 113, 117, 122
Block 1201:  126, 140, 147, 153, 156

Block 1202:  8, 9, 10, 11, 12, 13, 14, 15, 16, 17
Block 1202:  18, 19, 20, 21, 22, 23, 24, 25, 26, 29
Block 1202:  36, 40, 41, 42, 43, 44, 45, 46, 47, 48
Block 1202:  49, 50, 51, 52, 53, 54, 55, 56, 57, 58
Block 1202:  108, 112, 116, 121, 141, 145, 149, 153, 157, 1001-1039

Block 1203:  5, 6, 7, 8, 9, 10, 11, 12, 13, 15
Block 1203:  16, 17, 18, 19, 20, 21, 22, 23, 24, 25
Block 1203:  26, 27, 28, 29, 31, 33, 37, 38, 39, 40
Block 1203:  41, 42, 43, 44, 45, 46, 47, 48, 54, 55
Block 1203:  107, 109, 117, 121, 124, 127, 138, 142, 146, 150
Block 1203:  154

Block 1204:  7, 8, 9, 10, 11, 12, 13, 14, 15, 16
Block 1204:  20, 21, 29, 48, 49, 50, 51, 52, 53, 54
Block 1204:  55, 56, 106, 109, 111, 120, 150, 153

Block 1205:  29, 34

Block 1206:  15, 16, 17, 20, 29, 32, 34

Block 1207:  29, 34, 40, 41, 42, 43, 44, 45, 46, 47   clone
Block 1207:  48, 49, 50, 141, 142, 146, 149

Block 1208:  11, 12, 13, 14, 15, 16, 17, 18, 19, 20
Block 1208:  21, 22, 23, 24, 25, 26, 27, 29, 38, 39
Block 1208:  40, 41, 42, 43, 44, 45, 46, 47, 48, 49
Block 1208:  50, 51, 52, 114, 116, 117, 121, 124, 127, 137
Block 1208:  139, 142, 145, 148

Block 1209:  13, 14, 15, 16, 17, 18, 19, 20, 21, 22
Block 1209:  23, 24, 25, 26, 27, 28, 29, 30, 31, 32
Block 1209:  33, 37, 41, 42, 43, 44, 45, 46, 47, 48
Block 1209:  49, 51, 113, 116, 118, 120, 123, 126, 129, 142
Block 1209:  146, 148

Block 1210:  1, 4, 5, 9, 12, 15, 17, 19, 23, 24
Block 1210:  25, 26, 33, 37, 38, 39, 40, 41, 42, 43
Block 1210:  44, 45, 46, 47, 48, 49, 50, 51, 52, 53
Block 1210:  54, 55, 58, 108, 138, 142, 145, 149, 152, 1001-1150
Block 1210:  1201-1297

Block 1211:  1, 2, 3, 4, 5, 6, 7, 8, 9, 10
Block 1211:  11, 12, 13, 14, 15, 16, 17, 18, 19, 20
Block 1211:  21, 22, 23, 24, 25, 26, 27, 28, 29, 31
Block 1211:  32, 33, 34, 37, 38, 39, 40, 41, 42, 43
Block 1211:  44, 45, 46, 47, 48, 49, 50, 52, 55, 56
Block 1211:  59, 61, 62, 63, 104, 116, 121, 135, 137, 142
Block 1211:  145, 148, 155

REEL 1696 PG 1879

TAKE FURTHER NOTICE that such designation was made at a duly constituted meeting of the Landmarks Preservation Commission held on:

April 24, 1990 [Designation List # 224, item 3 (LP-1647)]

DATED: New York,

LANDMARKS PRESERVATION COMMISSION

BY: *Joan Olshansky*
Joan R. Olshansky, Acting Executive Director

STATE OF NEW YORK)

COUNTY OF NEW YORK)

On the 14th Day of May, 1990 before me personally came, Joan R. Olshansky to me known, who, being by me duly sworn, did depose and say that she resides at 510 East 86th Street, New York, New York, that she is the Acting Executive Director of the Landmarks Preservation Commission of The City of New York, described in and which executed the foregoing instrument and that she signed her name thereto at the direction of the said Commission.

FRED W. DeLEON, JR.
Notary Public, State of New York
No. 24-4660 10
Qualified in Kings County
Certificate filed in New York County
Commission Expires May 27, 1990

| Key | Source | Index | Filed Date | Perfected Date | Block | Lot | Amount |
|---|---|---|---|---|---|---|---|
| 3100348514701 160608 | CT | 310000000019 | 06/14/16 | 02/05/16 | | | $1,755.31 |

**Debtor**    60 91ST STREET CORP 211 W 91 ST STE 55 NEW YORK NY

**Creditor**    NYC DEPARTMENT OF FINANCE 59 MAIDEN LANE NEW YORK NY 10038

**Attorney**    NYC DIRECTOR OF 59 MAIDEN LANE 28 FL. NEW YORK NY 100

**Comments**    061416-WARRANT # 00000000193856

| Key | Source | Index | Filed Date | Perfected Date | Block | Lot | Amount |
|---|---|---|---|---|---|---|---|
| 3100348585401 160608 | CT | 310000000019 | 06/14/16 | 02/05/16 | | | $2,273.42 |

**Debtor**    60 91ST STREET CORP 211 W 91 ST STE 55 NEW YORK NY

**Creditor**    NYC DEPARTMENT OF FINANCE 59 MAIDEN LANE NEW YORK NY 10038

**Attorney**    NYC DIRECTOR OF 59 MAIDEN LANE 28 FL. NEW YORK NY 100

Comments   061416-WARRANT # 00000000196959

| Key | Source | Index | Filed Date | Perfected Date | Block | Lot | Amount |
|---|---|---|---|---|---|---|---|
| 3100348604501 160608 | CT | 310000000019 | 06/14/16 | 02/05/16 | | | $1,865.47 |



**Debtor**     60 91ST STREET CORP 211 W 91 ST STE 55 NEW YORK NY
**Creditor**     NYC DEPARTMENT OF FINANCE 59 MAIDEN LANE NEW YORK NY 10038
**Attorney**     NYC DIRECTOR OF 59 MAIDEN LANE 28 FL. NEW YORK NY 100
Comments   061416-WARRANT # 00000000198084

| Key | Source | Index | Filed Date | Perfected Date | Block | Lot | Amount |
|---|---|---|---|---|---|---|---|
| 3100366376301 171025 | ST | 31E012445712 | 10/26/17 | 10/24/17 | | | $181.60 |



**Debtor**     60 91ST STREET CORP 60 W 91ST ST NEW YORK NY 10024
**Creditor**   NY STATE DEP'T OF TAXATION AND FINANCE 00000

| Key | Source | Index | Filed Date | Perfected Date | Block | Lot | Amount |
|---|---|---|---|---|---|---|---|
| 3100373817901 180606 | CT | 310000000024 | 06/12/18 | 05/24/18 | | | $55.73 |



**Debtor**     6091ST STREET CORPORATION 60 W 91ST ST NEW YORK NY 10024
                 6091 STREET CORP 60 W 91ST ST NEW YORK NY 10024
                 60 91 STREET CORP 60 W 91ST ST NEW YORK NY 10024
**Creditor**     NYC DEPARTMENT OF FINANCE 59 MAIDEN LANE NEW YORK NY 10038
**Attorney**     NYC DIRECTOR OF 59 MAIDEN LANE 28 FL. NEW YORK NY 100
Comments   061218-WARRANT # 00000000245611

**CC Environmental Control Board (4)** BOOK DATE 06/30/20



| Key | Docket | Debtor | Amount | Sat |
|---|---|---|---|---|
| 0203778181 | 11/18 | 60 91ST STREET CORP 60 WEST 91 STREET NEW YORK NY 10024 | $300.00 | |
| 0209118407 | 05/20 | 60 91ST STREET CORP 60 WEST 91 STREET NEW YORK NY 10024 | $300.00 | |
| 0210224659 | 06/20 | 60 91ST STREET CORP 60 WEST 91 STREET NEW YORK NY 10024 | $300.00 | |

| SEC/BLK/LOT | Type | Start | End | County | Returns | Run Date |
|---|---|---|---|---|---|---|
| **1204-54** | **SIDEWALK LIENS** | **6/1/1987** | **8/14/2020** | **MANHATTAN** | **1** | **8/18/2020** |

## 06 - SIDEWALK LIEN BOOK INQUIRY
### Request Judgment Copy

**CTRL NO:** 002664123 - 01                      **DEBTORS:** 01

**Docket Date:** 02/25/2010                      **TYPE:** SL - SIDEWALK LIEN
**EFFECTIVE DATE:** 02/25/2010  **ENDING:**       **COUNTY:** 31  NEW YORK (MANHATTAN)
**CLERK / SEQ #  :** STIMMONS   001               **COURT:**  NONE
**BLOCK:** 01204 **LOT:** 00054                   **INDEX NUMBER:** 82194

**DEBTOR**                                        **CREDITOR**

60 91St Street Corp                               Nyc Department Of Transportation
60 WEST 91ST STREET                               55 WATER STREET FL 4
NEW YORK NY                                        NY NY 10041

**AMOUNT:** .00 Judgment Status OPEN

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2019022800464001001E8034

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 5 |
|---|---|

**Document ID:** 2019022800464001    Document Date: 02-28-2019    Preparation Date: 02-28-2019
Document Type: INITIAL UCC1                                 FIXTURE FILING
Document Page Count: 4

**PRESENTER:**
LIEN SOLUTIONS
330 N. BRAND BLVD STE 700
68732129AVH
GLENDALE, CA 91203
818-662-4100
UCCFILINGRETURN@WOLTERSKLUWER.COM

**RETURN TO:**
LIEN SOLUTIONS
330 N. BRAND BLVD STE 700
68732129AVH
GLENDALE, CA 91203
818-662-4100
UCCFILINGRETURN@WOLTERSKLUWER.COM

## PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1204 | 54 | Partial Lot | 60 WEST 91ST STREET |

**Property Type:** APARTMENT BUILDING

## CROSS REFERENCE DATA

CRFN_____ *or* DocumentID_____ *or* _____ Year____ Reel____ Page_____ *or* File Number_____

## PARTIES

**DEBTOR:**
60 WEST 91ST STREET
60 WEST 91ST STREET
NEW YORK, NY 10024

**SECURED PARTY:**
APPROVED OIL CO
6717 4TH AVENUE
BROOKLYN, NY 11220

## FEES AND TAXES

| Mortgage : | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |
| Recording Fee: | $ | 40.00 | | |
| Affidavit Fee: | $ | 0.00 | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**
Recorded/Filed      03-06-2019 15:08
City Register File No.(CRFN):
          **2019000074584**

*Annette M Hill*

*City Register Official Signature*

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY.

A. NAME & PHONE OF CONTACT AT FILER [optional]
Phone: (800) 331-3282 Fax: (818) 662-4141

B. SEND ACKNOWLEDGMENT TO: (Name and Address)    18984 - APPROVED OIL

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

68732129

NYNY
FIXTURE

File with: New York, NY

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| 60 91ST STREET CORP. | | | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 60 WEST 91st STREET | NEW YORK | NY | 10024 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | CORPORATION | NY | ☒ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| APPROVED OIL CO | | | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 6717 4th AVENUE | BROOKLYN | NY | 11220 | USA |

4. This FINANCING STATEMENT covers the following collateral:

Fixtures: All Equipment now owned, or the ownership of which is hereafter acquired, by the Debtor, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating plumbing, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment and all other utilities whether or not situated in casements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof Notwithstanding the foregoing. Fixtures: All Equipment now owned, or the ownership of which is hereafter acquired, by the Debtor, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating plumbing, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment and all other utilities whether or not situated in casements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof Notwithstanding the foregoing.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☒ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA
68732129          CF60W91

FILING OFFICE COPY - NATIONAL UCC FINANCING STATEMENT (FORM UCC1)   (REV. 05/22/02)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

| | 9a. ORGANIZATION'S NAME |
|---|---|
| | **60 91ST STREET CORP.** |
| OR | 9b. INDIVIDUAL'S LAST NAME     FIRST NAME     MIDDLE NAME,SUFFIX |

| 10. MISCELLANEOUS: | 68732129-NY-61    18984 - APPROVED OIL |
|---|---|
| | APPROVED OIL CO |

File with: New York, NY    CF60W91            THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names

| | 11a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|

| 12. | ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b) | | | | |
|---|---|---|---|---|---|
| | 12a. ORGANIZATION'S NAME | | | | |
| OR | 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

13. THIS FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☒ fixture filing.

16. Additional Collateral description:

14. Description of real estate:

**Section: .**
**Block: 1204**
**Lot: 54**
**Property Type: APARTMENT BUILDING**

**BEGINNING at a point on the southerly line of Ninety-First Street opposite of the center of a party wall which point is distant two hundred and forty-one feet easterly from the corner formed by the intersection of the southerly line of Ninety First Street with the**

15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

17. Check only if applicable and check only one box.

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decendent's Estate

18. Check only if applicable and check only one box.

☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction
☐ Filed in connection with a Public-Finance Transaction

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

9a. ORGANIZATION'S NAME

**60 91ST STREET CORP.**

OR

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
|---|---|---|
| | | |

10. MISCELLANEOUS:  68732129-NY-61   18984 - APPROVED OIL
APPROVED OIL CO

File with: New York, NY    CF60W91                              THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 11d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

12. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)

12a. ORGANIZATION'S NAME

OR

| 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☒ fixture filing.

16. Additional Collateral description:

14. Description of real estate:

**easterly line of Columbus (formerly Ninth) avenue;**

**RUNNING THENCE southerly parallel with Columbus (formerly Ninth) Avenue and partly through said party wall, one hundred feet, eight and one half inches to the center line of the block between Ninetieth and Ninety-First Streets;**

**THENCE easterly along said center line of**

15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

17. Check only if applicable and check only one box.

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decendent's Estate

18. Check only if applicable and check only one box.

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction

☐ Filed in connection with a Public-Finance Transaction

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| 9a. ORGANIZATION'S NAME |
|---|
| 60 91ST STREET CORP. |

OR

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |
|---|---|---|
| | | |

| 10. MISCELLANEOUS: | 68732129-NY-61    18984 - APPROVED OIL |
|---|---|
| | APPROVED OIL CO |

File with: New York, NY     CF60W91

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names**

| 11a. ORGANIZATION'S NAME |
|---|
| |

OR

| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 11d. SEE INSTRUCTIONS | ADDL INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

**12. ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)**

| 12a. ORGANIZATION'S NAME |
|---|
| |

OR

| 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☒ fixture filing.**

**16. Additional Collateral description:**

**14. Description of real estate:**

the block; twenty feet to the point opposite the center of another party wall;

THENCE northerly parallel with Columbus (formerly Ninth) Avenue and partly through the said last mentioned party wall, one hundred feet, eight and one-half inches to the southerly line of Ninety-First Street and thence westerly along the southerly side of Ninety-First Street, twenty feet to the point or place of BEGINNING.

**15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):**

**17. Check only if applicable and check only one box.**

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decendent's Estate

**18. Check only if applicable and check only one box.**

☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction
☐ Filed in connection with a Public-Finance Transaction

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

FILING OFFICE COPY - NATIONAL UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/21/09)

## CLEARANCE INFORMATION

Title No.: **RANY-40759**

THE FOLLOWING IS A LIST OF PLACES AND PHONE NUMBERS WHICH WILL FACILITATE CLEARING SOME OBJECTIONS RAISED IN THIS REPORT. FOR ADDITIONAL INFORMATION CALL:

PARKING VIOLATIONS - A Satisfaction of Judgment must be obtained from the parking Violations Bureau located at any of the below addresses. Said Satisfaction is then to be filed with the New York County Clerk's Office located at 60 Centre Street, New York, NY and upon paying an $8.00 fee they will issue a Certificate of Disposition. In the alternative you can go to nyc.gov/finance and pay the amount due. Please forward to our company a receipt of your payment in order for us to omit any PVB Objection.

**PVB HELP CENTERS: (718)422-7800** - OPEN MONDAY THROUGH FRIDAY - 8:30 AM TO 7:00 PM
    MANHATTAN HELP CENTER - 1 Centre Street (1st Floor)
    BRONX HELP CENTER - 1400 Williamsbridge Road
    BROOKLYN HELP CENTER - 210 Joralemon Road
    QUEENS HELP CENTER - 89-61 162nd Street
    STATEN ISLAND HELP CENTER - 300 St. Marks Place

**NEW YORK STATE TAX COMMISSION LIENS -** For information regarding disposition and payments, please write: Tax Compliance Division, PO Box 5149, Albany, NY 12205, or call (800)835-3554 or (800)452-0455.
WEB SITE: www.tax.state.ny.us

**FEDERAL TAX LIENS** -For information regarding disposition and payments, please write: The Internal Revenue Service, 290 Broadway, New York, NY or at 210 East Post Road, White Plains, NY 10601 or call (800)829-1040. In Brooklyn, call (718)488-2818. Upstate call (716)961-5305. In New York City call (212)719-8276.
WEB SITE: www.irs.gov

**CITY OF NEW YORK LIENS** - For information regarding disposition and payments, please write: The Department of Finance, Bureau of Tax Collection, 345 Adams Street, 5th Floor, Brooklyn, NY 11201.
WEB SITE: www.nyc.gov/finance

**HIGHWAY DEPARTMENT (sidewalk violations)** - For information regarding disposition and payments, please write: The Highway Department, 51 Chambers Street, New York NY 10007 or call (718)222-7233.

**ENVIRONMENTAL CONTROL LIENS** - For information regarding disposition and payments, please write: The Environmental Control Board, 66 John Street, 10th Floor, New York, NY 10001 or call (212)361-1400.

**TRANSIT ADJUDICATION LIENS** - For information regarding disposition and payments, please write: 505 Fulton Street, 6th Floor, Brooklyn, NY 10201 or call (347)643-5800 or (718)330-3000 (Law Department).

**NEW YORK STATE COMMISSIONER:** For information regarding dispositions and payments, please write: NYS Department of Labor, Building 12, State Campus, Room 500, Albany, New York 12240 or call (518)457-2746. WEB SITE: www.labor.state.ny.us

**INTEREST CLERK** - For interest on all outstanding taxes in the City of New York or questions regarding In-Rem, please write: The City of New York, Department of Finance, 345 Adams Street, 5th Floor, Brooklyn, NY 11201, or call (718)935-6533.

**NEW YORK STATE DEPARTMENT OF TAX AND FINANCE:** For the State of New York, From TP-584 must be completed along with the appropriate tax check (made payable to the NYS Department of Finance, and forwarded to : NYS Department of Taxation and Finance, PO Box 5045, Albany, NY 12205-5045 or call (518)485-6800 - WEB SITE: www.tax.state.ny.us

For Filing TP-584 for Co-Ops, forward to Department of Taxation and Finance, Miscellaneous Tax Insourcing Unit, W.A. Harrison Campus, Building 8, Room 600, Albany, NY 11228.

When the property is in the City of New York, The RPT must be completed along with the appropriate tax and made payable to NYC Department of Finance along with an additional check for $25.00 (made payable to the City Register) and forwarded to: Department of Finance, 345 Adams Street, 5th Floor, Brooklyn, NY 11201.

# PRIVACY NOTICE 2
## Independent Agencies and Unaffiliated Escrow Agents

**WHAT DOES RIVERSIDE ABSTRACT, LLC and AMTRUST TITLE INSURANCE COMPANY DO WITH YOUR PERSONAL INFORMATION?**

Federal and applicable state law and regulations give consumers the right to limit some but not all sharing. Federal and applicable state law regulations also require us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand how we use your personal information. This privacy notice is distributed on behalf of Riverside Abstract, LLC and AMTrust Title Insurance Company, pursuant to Title V of the Gramm-Leach-Bliley Act (GLBA).

The types of personal information we collect and share depend on the project or service that you have sought through us. This information can include social security numbers and driver's license number.

All financial companies, such as companies engaged in banking, consumer finance, securities and insurance, need to share customer's personal information to run their everyday business – to process transactions and maintain customer accounts. In the section below, we list the reasons that we can share customers' personal information; the reasons that we choose to share; and whether you can limit this sharing.

| Reasons we can share your personal information | Do we share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes** – to process your transactions and maintain your account. This may include running the business and managing customer accounts, such as processing transactions, mailing, and auditing services, and responding to court orders and legal investigations. | Yes | No |
| **For our marketing purposes** – to offer our products and services to you. | Yes | No |
| **For joint marketing with other financial companies** | No | We don't share |
| **For our affiliates' everyday business purposes** – information about your transactions and experiences. Affiliates are companies related by common ownership or control. They can be financial and nonfinancial companies. | Yes | No |
| **For our affiliates' everyday business purposes** – information about your creditworthiness. | No | We don't share |
| **For our affiliates to market you** | Yes | No |
| **For nonaffiliates to market you.** Nonaffiliates are companies not related by common ownership or control. They can be financial or nonfinancial companies | No | We don't share |

We may disclose your personal information to our affiliates or to nonaffiliates as permitted by law. If you request a transaction with a nonaffiliated, such as a third party insurance company, we will disclose your personal information to that nonaffiliated. [We do not control their subsequent use of information, and suggest you refer to their privacy notices.]

| Sharing practices | |
|---|---|
| **How often does Riverside Abstract, LLC notify me about their practices?** | We must notify you about our sharing practices when you request a transaction. |
| **How does Riverside Abstract, LLC protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal and state law. These measures include computer, file, and building safeguards. |
| **How does Riverside Abstract, LLC collect my personal information?** | We collect your personal information, for example, when you<br>• Request insurance-related services<br>• Provide such information to us<br>We also collect your personal information from others, such as the real estate agent or lender involved in your transaction, credit reporting agencies, affiliates or other companies. |
| **What sharing can I limit?** | Although federal and state law give you the right to limit sharing (e.g., opt out) in certain instances, we do not share your personal information in those instances. |
| **Contact Us** | If you have any questions about this privacy notice, please contact us at (718) 252-4200. |