**Exhibit B**

(The PSA)

**PURCHASE AND SALE AGREEMENT**

**by and between**

**Heidi J. Sorvino, solely in her capacity as the duly appointed Chapter 11 Trustee for the bankruptcy estate of 60 91st Street Corp., a New York corporation**

**as Seller**

**and**

**Pinetree Group Inc, a New York corporation
as Purchaser**

**December 4, 2020**

**THIS PURCHASE AND SALE AGREEMENT** ("**Agreement**") is made as of the 4th day of December, 2020 (the "**Effective Date**"), by and between **HEIDI J. SORVINO** ("**Seller**"), solely in her capacity as the duly appointed chapter 11 Trustee for the bankruptcy estate of **60 91st STREET CORP.** (the "**Debtor**"), a New York corporation, and Pinetree Group, Inc**.,** a New York corporation, ("**Purchaser**") (Seller and Purchaser are also collectively referred to in this Agreement as the "**Parties**" and individually referred to in this Agreement as a "**Party**")**.**

RECITALS:

A.      **WHEREAS**, on February 4, 2020, the Debtor filed a voluntary petition for relief, commencing a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

B.      **WHEREAS**, on April 28, 2020, the Bankruptcy Court entered the *Order Directing Appointment of a Chapter 11 Trustee*, pursuant to which the United States Trustee was directed to appoint a chapter 11 trustee, with all rights, powers and duties authorized under 11 U.S.C. §§ 1104 and 1106 in the Chapter 11 bankruptcy case of In re 60 91st Street Corp., Case No. 20-10338 (SCC) (the "**Bankruptcy Case**");

C.      **WHEREAS**, on April 30, 2020, the Bankruptcy Court entered the *Order Approving the Appointment of the Chapter 11 Trustee* [Bankruptcy Case ECF No. 28], pursuant to which the Seller was appointed as the chapter 11 trustee for the Debtor's bankruptcy estate;

D.      **WHEREAS**, on September 18, 2020, the Bankruptcy Court entered the *Order Under Bankruptcy Code §§ 105, 363, 365 and 1146 and Bankruptcy Rules 6004 and 6006; (1) Authorizing and Approving Terms and Conditions of Sale of Debtor's Assets Subject to Higher or Better Offers, Free and Clear of All Liens, Claims and Encumbrances; (2) Establishing Procedures to Confirm Highest or Best Offer Received at Sale; (3) Approving Form, Time and Scope of Notice of Sale; and (4) Granting Related Relief* [Bankruptcy Case ECF No. 162] (the "**Bidding Procedures Order**"), the terms and provisions of which are incorporated herein by reference, and a copy of which is attached hereto as **Exhibit "A"**, for the marketing and sale of substantially all of the Debtor's assets (the "**Assets**"), which primarily consists of the Real Property (as defined herein) and Improvements (as defined herein), and approving, among other things, the proposed bidding procedures pursuant to which the Seller will sell the Assets;

E.      **WHEREAS**, the Seller seeks to sell the Assets and the Purchaser desires to purchase the Assets, pursuant to an interlocutory sale, upon the terms and conditions set forth in this Agreement;

F.      **WHEREAS**, Seller has determined that Purchaser is the Stalking Horse Bidder (as defined in the Bidding Procedures Order);

G.      WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the sale of the Assets are subject to, among other things, the entry of the Approval Order (as hereinafter defined);

H.     **WHEREAS**, upon acceptance of a Successful Bid (as defined in the Bidding Procedures Order), and as part of the closing process, Seller shall petition the Bankruptcy Court for an Approval Order (hereinafter defined);

I.     **NOW THEREFORE,** for and in consideration of representations, warranties, agreements, covenants, and conditions contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

## 1.     PURCHASE AND SALE

The Debtor is the owner of that certain parcel of land described on **Exhibit "B"** attached hereto and made a part hereof, including any interests of the Debtor in adjacent streets, alleys, easements, rights-of-way, strip and gores, including all easements for utilities and common roadway purposes (collectively, the "**Real Property**"), together with (i) all improvements, structures and fixtures located on the Real Property, and all rights and appurtenances pertaining to the Real Property (collectively, the "**Improvements**"), (ii) all of the equipment, machinery, and other items of tangible personal property, now owned or hereafter acquired by the Debtor and associated with the ownership, operation or maintenance of the Real Property and Improvements, if any, and situated on or at the Real Property and Improvements on the Closing Date set forth in Section 7 of this Agreement (collectively, the "**Personal Property**"), (iii) to the extent the Debtor has any rights, title or interest in and to the following (the "**Leases**"): (a) all lease agreements, rental agreements and other occupancy agreements with tenants or occupants for any portion of any space in any building or improvement located on the Real Property, and (b) including all rental income and rental payments payable under said leases together with all lease agreements, security deposits in connection with any and all said leases, and (iv) all of the following to the extent transferable by Seller or the Debtor: reports, approvals, licenses, permits, certificates, special permits, site plan approvals and variances benefiting, which are owned by the Debtor with respect to the Real Property. The Real Property and all items referred to in clauses (i)-(iv) are collectively referred to as the "**Property**" herein. Subject to the terms and conditions set forth in this Agreement, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Property at the Purchase Price set forth in Section 2 of this Agreement.

## 2.     PURCHASE PRICE

(a)     Subject to the adjustments and prorations as provided in this Agreement, the Purchase Price of the Property shall be Three Million One Hundred Thousand and 00/100 Dollars ($3,100,000.00) (the "**Purchase Price**") and payable by Purchaser in United States currency in good and certifiable funds at Closing.

(b)     Purchaser tenders to Seller and Seller acknowledges receipt of the sum of One Hundred and 00/100 Dollars ($100.00) as independent and non-refundable contract consideration for any options granted in this Agreement. This independent consideration is in addition to any other deposits made under this Agreement, is earned by Seller upon its execution of this Agreement, and will not be credited against the Purchase Price.

## 3.     **EARNEST MONEY DEPOSIT**

Within three (3) business days of the Effective Date, Purchaser shall deposit with the Seller in an attorney escrow account designated by the Seller, the sum of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) in United States currency (together with any interest thereon, the "**Earnest Money Deposit**") by means of a wire transfer, to be held by the Seller in accordance with the terms of the Bidding Procedures Order incorporated into this Agreement by this reference and also the terms and conditions of this Agreement. Except as otherwise provided elsewhere in this Agreement, the Earnest Money Deposit shall be credited against the Purchase Price at the time of Closing, and Purchaser agrees to pay or satisfy the balance of the Purchase Price, plus or minus prorations, at the time of Closing by wire transfer of immediately available funds. If Purchaser shall fail to deposit the Earnest Money Deposit within the time period provided for above, Seller may at any time prior to the deposit of the Earnest Money Deposit, terminate this Agreement, in which case this Agreement shall be null and void ab initio and neither Party shall have any further rights or obligations to the other hereunder, except as otherwise expressly set forth in this Agreement.

## 4.     **TITLE AND SURVEY REVIEW**

Purchaser has received and reviewed the title commitments for an ALTA Standard Form of Owner Policy of Title Insurance for the Real Property and the Improvements (collectively, the "**Title Commitment**"). At Closing, Seller shall convey good and marketable title to the Real Property and the Improvements, free and clear of all liens, claims, encumbrances, interests, mortgages, deeds of trust, leases, ground leases, judgments, mechanics' liens or other monetary encumbrances (collectively, "**Liens and Encumbrances**") pursuant to Section 363(f) of the Bankruptcy Code, except for those Liens and Encumbrances set forth on **Schedule 1** attached hereto, which Schedule 1 will be modified to include any Liens and Encumbrances which first encumber the Real Property and Improvements after the Effective Date and before Closing which are approved by Purchaser pursuant to **Section 38** of this Agreement (collectively, the "**Permitted Exceptions**", and the condition of title subject only to the Permitted Exceptions is hereinafter referred to as "**Acceptable Title**"). Notwithstanding anything to the contrary contained in this Agreement, and except for Seller's efforts to obtain the Approval Order (as hereinafter defined), Seller shall have no affirmative obligation hereunder to expend any funds or incur any liabilities in order to cause any title exceptions to be removed from any Title Commitment or insured over by Riverside Abstract, LLC, as agent for Old Republic National Title Insurance Company (the "**Title Insurer**"). From time-to-time prior to the Closing Date during normal hours and upon reasonable prior written notice to Seller, Seller agrees to grant Purchaser's surveyors access to inspect, survey and obtain a current or updated ALTA/NSPS land title survey for the Real Property and the Improvements (collectively, "**Purchaser Surveys**"). Purchaser, at its sole cost, shall pay for all Purchaser Surveys. At no time will any contractors, surveyors or consultants with access to the Real Property and Improvements unreasonably disturb any occupants of the Real Property and Improvements. Before any such entry, Purchaser shall provide Seller with a certificate of insurance naming Seller as an additional insured and with an insurer and insurance limits and coverage reasonably satisfactory to Seller. Inspections by Purchaser shall not unreasonably interfere with Seller's operation of the Real Property and Improvements. If any inspection or test damages the Real Property and Improvements, Purchaser will restore the Real Property and Improvements to substantially the same condition as existed before the inspection or test. Purchaser shall defend,

indemnify Seller and hold Seller, the Debtor, and the Debtor's officers, tenants, agents, contractors and employees (collectively, the "**Seller Parties**") and the Real Property and Improvements harmless from and against any and all losses, costs, damages, claims, or liabilities, including but not limited to, mechanics' and materialmens' liens and Seller's reasonable attorneys' fees, arising out of or in connection with Purchaser's, or its agents', contractors', employees', or invitees' entry upon or inspection of the Real Property and Improvements (but expressly excluding any such loss, cost, damages, claim, or liability arising from (i) the mere discovery of pre-existing conditions, (ii) the negligence or willful misconduct of Seller or the Seller Parties) or (iii) any disclosure which is required by law; provided, however, that prior to making any disclosure which Purchaser reasonably believes is legally required, Purchaser shall provide Seller written notice thereof so that Seller may elect to seek an appropriate protective order or such other waiver as Seller may elect to pursue. The license to access the Real Property and Improvements shall be deemed revoked upon termination of this Agreement. The provisions of this Section 4 shall survive the Closing or the earlier termination of this Agreement.

5. **PRORATIONS AND EXPENSES**

(a)     The following prorations, except as specifically set forth in this Agreement to the contrary, shall be made as of 12:01 a.m. on the Closing Date ("**Proration Date**"), it being agreed between the Parties that the Closing Date shall be an income and expense day for Purchaser, and shall be applied to reduce or increase the balance of the Purchase Price, as applicable:

(i)     **Taxes.** All general real estate taxes and other similar items (including, without limitation, special and other assessments) with respect to the Real Property and the Improvements not due and payable as of the Closing Date, shall be prorated as of the Closing Date based on the most recent ascertainable tax information for tax parcel numbers that are attributable to the Property. All prorations shall be final. Any general real estate taxes and other similar items and any installments of special or other assessments affecting the Real Property and the Improvements which are due and payable for the period prior to the Closing Date shall be paid by Seller at Closing, and any general real estate taxes and other similar items and any installments of special or other assessments affecting the Property which are due and payable for the period subsequent to the Closing Date shall be paid by Purchaser. The term "general real estate taxes" as used in this **Section 5(a)(i)** includes general assessments, including, without limitation, any payments in lieu of taxes in connection with the Real Property and the Improvements pursuant to any governmental abatement or exemption program, and any regular annual assessments payable to any property owners association.

**Miscellaneous.** All of the following: (A) utility charges (but excluding any utility deposits), provided that, to the extent reasonably practicable, though, in lieu of prorating the charges for any metered utility service, Purchaser and Seller shall endeavor to have the utility provider read the meter as early as possible on the Closing Date, render a final bill to Seller based on such

reading, and bill all subsequent service to Purchaser. Seller shall receive a credit for each deposit, if any, made by Seller or the Debtor as security under any such utility contracts if the same is transferable and provided such deposit remains on deposit for the benefit of Purchaser; (B) water and sewer charges; (C) rents, profits and other payments on account of financial obligations (collectively, "**Rents**") of any persons or entities leasing or occupying any portion of any of the Real Property and the Improvements for the month in which the Closing Date occurs, which have been actually received by Seller as of the Closing Date and any other items, the credit or proration of which are necessary to fairly allocate the benefits and burdens of ownership of the Real Property and the Improvements, shall be prorated at the Closing. All prorations shall be final.

(b)     At Closing, Seller shall pay one-half (1/2) of the cost of the Closing Escrow (as defined in **Section 8** of this Agreement).  At Closing, Purchaser shall pay: (i) one half (1/2) of the cost of the Closing Escrow; (ii) the cost of obtaining Purchaser Surveys, if any; (iii) the cost of any updated Title Commitment and any related title searches and exam fees, investigations and tests (excluding the cost of any Title Commitments that Seller obtained prior to February 4, 2020); (iv) owner's title policies and the cost of any endorsements to such title policies; and (v) all recording charges for the Deed and all documents pertaining to any purchase money financing. Seller and Purchaser shall pay the following in accordance with customary practice in the jurisdiction in which the Real Property and Improvements is located: the amount of any documentary stamps, recordation taxes, or transfer tax imposed by the city in which the Real Property is located (the **"City"**) and any county ordinance, and the state in which the Real Property is located (the "**State**") and shall meet any other requirements as established by any City ordinance with regard to the City transfer tax and the amount of any stamp or transfer tax imposed by county ordinance or State statute on the transfer of title; all financing related fees. All closing costs other than as specified above, or as may be specifically allocated elsewhere in this Agreement, will be payable equally by the Parties at Closing. Except as otherwise provided for in this Agreement, the Parties shall each be solely responsible for the fees and disbursements of their respective counsel and other professional advisors.

(c)     Purchaser is not purchasing and Seller shall retain at the Closing all amounts owing and all accounts receivable attributable to the period prior to the Closing, including, without limitation, all amounts owed or determined to be owed to the Debtor or the Debtor's estate from Kim Mortimer, the Debtor's chief executive officer.  If any accounts receivable are paid to Purchaser after the Closing, Purchaser shall pay to Seller the amounts received by Purchaser within fifteen (15) days after receipt of such amounts without any commission or deduction for Purchaser.

6.     **CONDITIONS TO CLOSING**

(a)     In addition to any other conditions and/or contingencies set forth in this Agreement, Seller's obligation to close on Purchaser's purchase of the Property is subject to each and all of the following conditions precedent:

(i)     All of Purchaser's representations and warranties contained in this Agreement shall be true and correct as of the Closing in all material respects; provided however Seller shall, promptly upon becoming aware of same, advise Purchaser if it believes that any of the Purchaser's representations and warranties contained in this Agreement are not true and correct as of the Closing in all material respects, and Purchaser shall thereupon have a reasonable period to cure any purported breach of its representations and warranties;

(ii)    All obligations of Purchaser that were to have been performed on or before the Closing Date have been timely and duly performed. If any condition precedent to Closing of Purchaser as set forth in this Agreement has not been fulfilled and satisfied on or before the Closing Date, Seller may, after notice to Purchaser and Purchaser's failure to cure within the time period(s) set forth in this Agreement, elect at any time thereafter, to terminate this Agreement, provided that Seller is not itself in default beyond any applicable notice and cure period, and exercise such remedies as provided in **Section 11** of this Agreement; and

(iii)   Entry by the Bankruptcy Court in the Bankruptcy Case of an order approving this Agreement and authorizing Seller to carry out this Agreement, substantially in the form attached hereto as **Exhibit "C"** (the "**Approval Order**"), which Approval Order has not been stayed at the time of the Closing.

(b)     In addition to any other conditions and/or contingencies set forth in this Agreement, Purchaser's obligation to close the purchase of the Property is subject to each and all of the following conditions precedent:

(i)     All of Seller's representations contained in this Agreement shall be true and correct as of the Closing in all material respects; provided however Purchaser shall, promptly upon becoming aware of same, advise Seller if it believes that any of Seller's representations and warranties contained in this Agreement are not true and correct as of the Closing in all material respects, and Seller shall thereupon have a reasonable period to cure any purported breach of its representations and warranties;

(ii)    All obligations of Seller that were to have been performed on or before the Closing Date have been timely and duly performed. If any condition precedent to Closing of Seller as set forth in this Agreement has not been fulfilled and satisfied on or before the Closing Date, Purchaser may, after notice to Seller and Seller's failure to cure within the time period(s) set forth in this Agreement, provided that Purchaser is not itself in default beyond

any applicable notice and cure period, elect at any time thereafter, to terminate this Agreement and exercise such remedies as provided in **Section 12** of this Agreement;

(iii)    Entry by the Bankruptcy Court of the Approval Order in the Bankruptcy Case which Approval Order has not been stayed at the time of the Closing; and

(iv)    At the Closing, Title Insurer delivers to Purchaser a signed commitment to insure under an ALTA Standard Form of Owner Policy of Title Insurance Purchaser's title to the Real Property and the Improvements, without exception for any Liens and Encumbrances excluding the Permitted Exceptions (collectively, **"Required Title Insurance"**).

(c)    In the event that (i) the Bankruptcy Court does not grant the Approval Order on or before December 31, 2020, (ii) the Approval Order is entered on or before December 31, 2020, but stayed before the time of the Closing or (iii) the Approval Order is entered on the docket in the Bankruptcy Case but the Title Insurer does not provide the Required Title Insurance on or before January 11, 2021, as a result of any appeal, motion for reconsideration or other motion to set aside, vacate or otherwise challenge the Approval Order, either Party will have the right to terminate this Agreement by written notice to the other Party, in which event (i) this Agreement shall immediately terminate, (ii) the Seller shall return the Earnest Money Deposit to Purchaser, and (iii) the Parties shall have no further obligations other than those that by their terms specifically survive termination of this Agreement.

## 7.    <u>CLOSING</u>

(a)    Provided all conditions and/or contingencies to Closing described in this Agreement have been fulfilled or waived, the Closing (the "**Closing**") shall take place in escrow at the offices of the Seller, as soon after the Bankruptcy Court enters the Approval Order as commercially practicable, but no later than January 11, 2021 (the "**Closing Date**"), provided, however, that the Closing may be conducted remotely as set forth in Section 8 of this Agreement.

(b)    On or before the Closing Date, Seller shall deliver or cause to be delivered to the Title Insurer the following Closing documents:

(i)    A certified copy of the Approval Order;

(ii)    An original Bargain and Sale Deed Without Covenant Against Grantor's Acts, in the form attached hereto and made a part hereof as **Exhibit "D"**, or the local law equivalent, executed by Seller for the Real Property and the Improvements, in proper form for recording under applicable state or local law so as to convey Acceptable Title to Purchaser and as reasonably requested by the Title Insurer to issue the Required Title Insurance (the "**Deed**");

(iii)      A settlement statement executed by Seller;

(iv)      An original FIRPTA Affidavit in accordance with the Foreign Investment in Real Property Tax Act, 26 U.S.C. § 1445, duly executed by Seller and in a form reasonably acceptable to Seller and Purchaser;

(v)      an original Bill of Sale executed by Seller, in form and substance reasonably acceptable to the Parties, conveying and transferring to Purchaser all of the Debtor's right, title and interest in the Personal Property ("**Bill of Sale**");

(vi)      An original general assignment executed by Seller, in form and substance reasonably acceptable to the Parties, assigning and transferring to Purchaser all of the Debtor's right, title and interest in all certificates, licenses, approvals, permits, warranties and other rights relating to the Real Property and the Improvements, to the extent the same are assignable ("**General Assignment**");

(vii)      An original assignment and assumption of lease executed by Seller, in form and substance reasonably acceptable to the Parties ("**Assignment and Assumption of Lease**"), assigning and transferring to Purchaser all of Seller's right, title and interest in each Lease;

(viii)      Copies of each Lease, to the extent such copies are in the possession or control of Seller;

(ix)      Copies of any certificates, licenses, approvals, permits and warranties relating to the Real Property and the Improvements, to the extent the same are assignable and are in the possession or control of Seller;

(x)      All keys, access, security, and alarm codes for the Property;

(xi)      a Combined Real Estate Transfer Tax Return, Credit Line Mortgage Certificate, and Certification of Exemption from the Payment of Estimated Personal Income Tax for the Conveyance of Real Property Located in New York City (the "**Form TP-584-NYC-I**")

(xii)      Such other instruments, certificates, affidavits, transfer tax returns and other documents as are required to effect the transfer of the Property under applicable state or local law, or as reasonably requested by the Title Insurer to issue the Required Title Insurance; provided, however, that Seller will not be required to execute a customary seller's title affidavit in favor of the Title Insurer.

(c)      On the Closing Date, Purchaser shall deliver or cause to be delivered to the Title Insurer the following for Closing:

(i)      Balance of the Purchase Price, plus or minus prorations;

(ii)     An original counterpart to the Bill of Sale executed by Purchaser;

(iii)    An original counterpart to the General Assignment executed by Purchaser;

(iv)     An original counterpart to the Assignment and Assumption of Lease executed by Purchaser; and

(v)      Such other documents, certificates, instruments, affidavits, transfer tax returns and other documents as are required to effect the transfer of the Property under applicable state or local law, or as reasonably requested by the Title Insurer to issue the Required Title Insurance.

(d)      On or before the Closing Date, Seller and Purchaser shall jointly execute and deliver or cause to be executed and delivered an agreed closing proration statement and state, county and municipal transfer tax declarations and all other documents required by the Title Insurer in order to consummate the Closing as contemplated in this Agreement.

## 8.     CLOSING ESCROW

The Closing shall take place through a deed and money escrow at the Title Insurer in accordance with the standard deed and money escrow agreement utilized by the Title Insurer ("**Closing Escrow**") to be opened with the Title Insurer on or before the Closing Date, with such special provisions inserted in the Closing Escrow as may be required to conform to this Agreement; provided, however, in the event of a conflict between the terms of this Agreement and the Closing Escrow, the terms of this Agreement shall control. All documents required to be provided by Purchaser and Seller pursuant to this Agreement and otherwise appropriate to consummate the sale and purchase transaction contemplated by this Agreement shall be delivered to the Title Insurer, as closing agent, on or before Closing. Notwithstanding the foregoing, the Parties agree that the Closing may be set up remotely and/or in a manner so that the Parties and their respective attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Purchase Price, for Closing are in place by the scheduled time for the Closing.

## 9.     REPRESENTATIONS AND WARRANTIES

(a)      Seller represents to Purchaser that as of the date hereof and as of the Closing Date:

(i)      Provided that the Approval Order is entered and has become final and non-appealable, Seller will have by the Closing Date, full capacity, right, power and authority to execute, deliver and perform this Agreement and all documents to be executed by Seller pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. The individuals signing this Agreement and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on Seller's behalf and to bind Seller thereto, subject to entry of the Approval Order.

(ii) To Seller's actual knowledge, there are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Property, other than those disclosed on the Title Commitment or as set forth on Schedule 1 attached hereto.

(iii) The Debtor has title to the Real Property and the Improvements.

(iv) As used in this Agreement, "to the knowledge of Seller", "Seller's knowledge" or "Seller's actual knowledge" shall mean the current actual knowledge of the Seller on behalf of the Debtor and shall not be construed to refer to the knowledge of any other officers, directors, employees, agents, representatives, beneficiaries, attorneys, subsidiaries, affiliates, contractors and/or subcontractors of the Seller or the Debtor, and Seller shall have no duty to conduct any further inquiry in making any such representations and warranties.

(b) Purchaser represents and warrants to Seller that as of the date hereof and as of the Closing Date:

(i) Purchaser has full capacity, right, power and authority to execute, deliver and perform this Agreement and all documents to be executed by Purchaser pursuant hereto, and all required action and approvals therefor have been duly taken and obtained. Neither the execution of this Agreement nor the performance of Purchaser's obligations hereunder will conflict with, or with or without notice or the passage of time or both, result in a breach of, violate any term or provision of, or constitute a default under any of Purchaser's organizational documents. The individuals signing this Agreement and all other documents executed or to be executed pursuant hereto on behalf of Purchaser are and shall be duly authorized to sign the same on Purchaser's behalf and to bind Purchaser thereto.

(ii) Purchaser is not in default under any agreement or instrument where the liability thereunder might adversely affect Purchaser's ability to perform its obligations under this Agreement.

(iii) This Agreement and all documents required hereby to be executed by Purchaser hereunder are and shall be valid, legally binding obligations of and enforceable against Purchaser in accordance with their terms.

(iv) The execution and delivery of this Agreement and the closing documents to be executed in connection herewith by Purchaser and the consummation of the transactions contemplated hereby and thereby, except as otherwise provided herein, do not, to Purchaser's knowledge, require the consent or approval of any governmental or quasi-governmental authority, nor shall such execution, delivery, and consummation, to Purchaser's knowledge, result in a breach or violation of any laws, including Environmental Laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions,

-10-

rules, regulations, permits, licenses, authorizations, directions, and requirements of all governments and governmental authorities having jurisdiction over the Property.

(v)     As of the Closing Date, Purchaser shall not have commenced, within the meaning of the Bankruptcy Code, or any similar state law for the relief of debtors ("**Bankruptcy Law**") a voluntary case, nor shall there have been commenced against Purchaser an involuntary case, nor shall Purchaser have consented to the appointment of a receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law (a "**Custodian**") of it or for all or any part of its property, nor shall a court of competent jurisdiction have entered an order or decree under any Bankruptcy Law that is for relief against Purchaser in an involuntary case or appoints a Custodian of Purchaser for all or any part of its property.

(vi)    Prior to the Closing Date, Purchaser will not create any easements, liens, mortgages or other encumbrances with respect to the Real Property and the Improvements.

The continued validity in all material respects of all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Agreement shall be conditions precedent to the performance of Seller's and Purchaser's respective obligations hereunder. All representations and warranties of Seller and all representations and warranties of Purchaser set forth in this Agreement shall be continuing and shall be true and correct on and as of the Closing Date with the same force and effect as if made at that time. Further, all representations and warranties of Seller and all representations and warranties of Purchaser set forth in this **Section 9** shall merge with the transfer of title and shall not survive Closing. Upon consummation of Closing, Seller and Purchaser shall have no further liability with respect to any claim that Purchaser or Seller may have against the other party for a breach of any such representation or warranty, whether such breach is known or unknown.

## 10.     AS IS/NO WARRANTIES

(a)     Purchaser expressly acknowledges that Purchaser is buying the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" with regard to the physical condition of the Property without warranty or representation of any kind by Seller, the Debtor, or any of Seller's or the Debtor's employees, agents or contractors (the "**Seller's Related Parties**"), including specifically and without limitation, any warranty or representation as to the presence or absence of any Hazardous Material. As used in this Agreement, the term **"Hazardous Material"** shall mean asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., and any amendments thereto and regulations thereunder, (b) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (c) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C.

§1321), and (d) any other federal, state or local environmental statute or regulation. Purchaser, hereby agrees to hold harmless Seller and Seller's Related Parties and indemnify Seller and her employees, agents or contractors (collectively, the "**Indemnitees**"), from and against any demand, claim, liability, loss or damage, including reasonable attorneys' fees and costs, but excluding any punitive, exemplary, consequential or incidental damages, (collectively, "**Losses**") incurred in connection with any claim, proceeding or judgment, with respect to the Real Property and the Improvements, up to a maximum of thirty-five percent (35%) of the Purchase Price (the "**Cap**"), net of any recovery actually received by the Indemnitees from any third party including without limitation any insurer, for Losses incurred by any Indemnitee from (x) any Hazardous Materials currently located or which come to be located upon the Real Property and the Improvements or the release of any Hazardous Materials into, from or through the Property (except to the extent the presence or release thereof was caused by Seller, the Debtor, or the Seller's or the Debtor's current or former affiliates, officers, employees, agents and contractors) or (y) any Hazardous Materials that have migrated, leached, or traveled onto or off of the Real Property and the Improvements, from any source (except to the extent any such migration, leach or travel thereof was caused by Seller, the Debtor, or the Seller's or the Debtor's current or former affiliates, officers, employees, agents and contractors). If any claim, action or proceeding is made or brought against any Indemnitee that may result in any Losses (an "**Asserted Claim**"), then such Indemnitee shall provide written notice thereof to Purchaser. Purchaser, in its sole discretion, may, but will not be required to, defend such Asserted Claim by attorneys selected by Purchaser. If Purchaser elects to defend an Asserted Claim, Purchaser shall control the defense thereof and may settle or compromise such Asserted Claim without the consent of Indemnitee only if, as part of such settlement or compromise, (i) the Indemnitee shall receive a full and unconditional release from such Asserted Claim, (ii) any payments to be made on behalf of the Indemnitee pursuant to such settlement or compromise shall be paid by Indemnitor up to the Cap, and (iii) such settlement or compromise shall not require the Indemnitee to admit any liability or wrongdoing.

(b)     Purchaser warrants, acknowledges to, and agrees with Seller that Purchaser is purchasing the Property in "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION", and specifically and expressly without any warranties, representations or guarantees, either express or implied, of any kind, nature, or type whatsoever from, or on behalf of, Seller, except as otherwise provided for in the representations and warranties in **Section 9** of this Agreement. Purchaser acknowledges that Purchaser's agreement hereunder to purchase the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" was bargained for in the Purchase Price. Without in any way limiting the generality of the immediately preceding sentences, Purchaser and Seller further acknowledge and agree that in entering into this Agreement and closing the transactions hereunder, except as otherwise provided for in the representations and warranties in **Section 9** of this Agreement:

(i)     Seller expressly disclaims, has not made, will not, and does not, make, any warranties or representations, express or implied, with respect to the Property, the physical condition, existence or repair or disrepair thereof, the value, profitability or marketability thereof, or of any of the appurtenances, facilities or equipment thereon;

(ii)    Seller expressly disclaims, has not made, will not, and does not, make, any warranties, express or implied, of merchantability, habitability or fitness for a particular use;

(iii)   Upon the Closing, Purchaser shall be deemed to have made such legal, factual and other inquiries and investigations as Purchaser deems necessary, desirable or appropriate with respect to the Property, the value and marketability thereof, and of the appurtenances, facilities and equipment thereof Such inquiries and investigations of Purchaser shall be deemed to include, but shall not be limited to, the physical components of all portions of the Property, the environmental condition of the Property, the condition of repair of the Property, such state of facts as an accurate survey would show, and the present and future zoning, ordinances, resolutions and regulations of the City, County, and State where the Property is located; and

(iv)    Purchaser shall acquire the Property in an "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION."

(c)    WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE PRECEDING **SUBSECTIONS 10(A) AND 10(B),** PURCHASER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT HEREBY WAIVES, RELEASES AND DISCHARGES ANY CLAIM IT HAS, MIGHT HAVE HAD, OR MAY HAVE, AGAINST THE SELLER AND SELLER'S RELATED PARTIES RELATING TO, ARISING OUT OF OR WITH RESPECT TO (i) THE CONDITION OF THE PROPERTY, EITHER PATENT OR LATENT, (ii) PURCHASER'S ABILITY, OR INABILITY, TO OBTAIN OR MAINTAIN TEMPORARY OR FINAL CERTIFICATES OF OCCUPANCY, PERMITS OR OTHER LICENSES FOR THE USE OR OPERATION OF THE PROPERTY, AND/OR CERTIFICATES OF COMPLIANCE FOR THE PROPERTY, (iii) THE ACTUAL OR POTENTIAL INCOME, OR PROFITS, TO BE DERIVED FROM THE PROPERTY, (iv) THE REAL ESTATE, OR OTHER, TAXES OR SPECIAL ASSESSMENTS, NOW OR HEREAFTER PAYABLE ON ACCOUNT OF, OR WITH RESPECT TO, THE PROPERTY, OR (v) PURCHASER'S ABILITY OR INABILITY TO DEMOLISH THE IMPROVEMENTS OR OTHERWISE DEVELOP THE PROPERTY, OR (vi) ANY OTHER MATTER RELATING TO THE PROPERTY.

(d)    Except as expressly set forth in this Agreement, no representations or warranties have been made or are made and no responsibility has been or is assumed by Seller or Seller's Related Parties as to the condition or repair of the Property or the value, expense of operation, or income potential thereof or as to any other fact or condition

which has or might affect the Property or the condition, repair, value, expense of operation or income potential of the Property or any portion thereof. The Parties agree that all understandings and contracts heretofore made between them or their respective agents or representatives are merged in this Agreement and the Exhibits hereto annexed, which alone fully and completely express their Agreement, and that this Agreement has been entered into after full investigation, or with the Parties satisfied with the opportunity afforded for investigation, neither Party relying upon any statement or representation by the other unless such statement or representation is specifically embodied in this Agreement or the Exhibits annexed hereto. Purchaser acknowledges that Seller has requested that Purchaser inspect the Property fully and carefully and investigate all matters relevant thereto and that Purchaser rely solely upon the results of Purchaser's own inspections or other information obtained or otherwise available to Purchaser, rather than any information that may have been provided by Seller to Purchaser.

## 11.   **NON-FOREIGN SELLER CERTIFICATION**

Seller represents that neither the Seller nor the Debtor is a foreign person as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and the regulations promulgated thereunder, and is therefore exempt from the withholding requirements of said Section. At Closing, Seller will deliver to Purchaser the certification set forth in Section 1445 of the Code and regulations.

## 12.   **DEFAULT AND REMEDIES**

If Seller fails or refuses to comply with the terms of this Agreement within fifteen (15) days of receipt by Seller of notice of such default (the "**Seller Cure Period**"), for any reason other than Purchaser's default hereunder and failure to diligently complete or cure Purchaser shall have as its sole and exclusive remedies the right to terminate the Agreement, in which event Purchaser shall be entitled to the prompt return of the Earnest Money Deposit and all accrued interest thereon in full satisfaction of all damages suffered by Purchaser by reason of Seller's default and the Agreement shall be terminated and of no further force or effect except as provided for in this Agreement or (b) in the event that the Approval Order has been entered and not stayed, the right to specific performance of this Agreement by the Bankruptcy Court; provided, however, Purchaser will seek this right of specific performance if at all within no more than thirty (30) days from the expiration of the Seller Cure Period. If Purchaser fails or refuses to comply with the terms of this Agreement within fifteen (15) days of receipt by Purchaser of notice of such default, for any reason other than Seller's default hereunder, Seller's sole remedy shall be to terminate this Agreement, in which event Seller shall be entitled to receive the Earnest Money Deposit as liquidated damages in lieu of all other remedies available to Seller and this Agreement shall become null and void with neither Party having any further rights or liabilities hereunder, except as provided for in this Agreement. Seller and Purchaser acknowledge and agree that: (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default hereunder; (ii) the Earnest Money Deposit is a fair and reasonable amount to be retained by Seller as agreed and liquidated damages for Purchaser's default under this Agreement; and (iii) retention

by Seller of the Earnest Money Deposit upon Purchaser's default hereunder shall not constitute a penalty or forfeiture.

13.     **SALE PROCESS; SELLER CONTINGENCIES**

(a) The sale of the Property shall proceed in accordance with the Bidding Procedures Order. Where the terms of this Agreement and the Bidding Procedures Order conflict, the terms of the Bidding Procedures Order will prevail.

(b) This Agreement is subject to consideration by Seller of higher or better competing bids from Qualified Bidders (as defined in the Bidding Procedures Order) for the Property, in accordance with the Bidding Procedures Order.

(c) From and after the Effective Date, Seller is authorized to disclose the material terms of this Agreement in any manner it deems appropriate to attract higher and better bids.

(d) Seller may, at any time prior to the Closing Date, accept another offer from a buyer other than Purchaser to purchase the Property ("**Competing Offer**"). Seller shall not consider any Competing Offer unless it is in an amount at least One Hundred Twenty-Five Thousand and No/100 Dollars ($125,000.00) greater than the Purchase Price or, in Seller's discretion constitutes an otherwise better bid than as set forth herein. In the event a Competing Offer is received by the Seller, Seller shall conduct an auction sale for the Property scheduled on or before December 9, 2020 at 12:00 p.m. (prevailing Eastern Time), or on such later date as determined by the Seller (the "**Auction**"). The Auction will be conducted in accordance with the Bidding Procedures Order. At the Auction, the initial bid will be the Purchase Price plus the Reimbursable Expenses, and all subsequent bids will be in increments as set by the Brokers (as defined in the Bidding Procedures Order) and/or the Seller. Purchaser may participate at the Auction. Purchaser acknowledges the Property will be sold to the highest or otherwise best bidder the Auction. Purchaser further acknowledges that the sale of the Property to Purchaser is contingent upon Purchaser being the Successful Bidder (as defined in the Bidding Procedures Order) at the Auction. In the event Purchaser is not the Successful Bidder at the Auction, Seller shall pay Purchaser, subject to Seller closing on the sale of the Property with the Successful Bidder, an amount equal to Ninety-Three Thousand and 00/100 Dollars ($93,000.00) ("**Break-Up Fee**"), plus reimbursement of reasonable and documented out-of-pocket fees not to exceed Twenty-Five Thousand and 00/100 Dollars ($25,000.00) ("**Reimbursable Expenses**"), which Break-Up Fee and Reimbursable Expenses shall be paid to Purchaser from the sale proceeds as soon as practicable after the Closing Date. If Seller accepts a Competing Offer and Purchaser is not the Successful Bidder at the Auction, then this Agreement shall immediately become null and void, the Earnest Money Deposit shall be returned to Purchaser, and neither Seller nor Purchaser shall have any obligations to one another (except for any of Purchaser's obligations that survive the termination of this Agreement and Seller's obligation to pay the Break-Up Fee and Reimbursable Expenses subject to the terms and conditions hereof). Purchaser hereby

-15-

acknowledges and agrees that Seller shall not factor in the Break-Up Fee in connection with Seller's evaluation of any Competing Offer.

(e) The Parties' obligations set forth in this Agreement are expressly subject to approval by the Court pursuant to the Approval Order.

## 14.  <u>NOTICES</u>

Any notice which either Party desires or is required to give hereunder shall be in writing and effective and deemed properly served when hand delivered, provided that the addressee of such notices signs an acknowledgement of receipt of such notice, or if deposited with the United States Postal Service, as registered or certified mail, return receipt requested, bearing adequate postage or being deposited with a reputable overnight courier service for guaranteed next day delivery with required signature acknowledgement of receipt to the Parties at the following addresses:

|  |  |
|---|---|
| To Seller: | Heidi J. Sorvino, Esq. |
|  | Chapter 11 Trustee for the estate of |
|  | 60 91st Street Corp. |
|  | White and Williams LLP |
|  | 7 Times Square, Suite 2900 |
|  | New York, NY 10024 |
|  | Telephone: (212) 244-9500 |
|  | Email: sorvinoh@whiteandwilliams.com |

with copies thereof to:

WHITE AND WILLIAMS LLP
7 Times Square
Suite 2900
New York, NY 10036
Attention: James C. Vandermark, Esq.
Telephone: (212) 244-9500
Email: vandermarkj@whiteandwilliams.com

To Purchaser:     Pinetree Group, Inc.
548 West 28th Street, Suite 645
New York, New York 10001
Attn: Jim Pastreich
Telephone: (212) 279-5600
Email: jim@pinetreegroup.com

with copies thereof to:

Scott R. Lippert, Esq.
Pashman Stein Walder Hayden, P.C.
Court Plaza South

-16-

21 Main Street, Suite 200
Hackensack, NJ 07601
Telephone: (201) 488-8200
Email: srlippert@pashmanstein.com

Notice of change of address for receipt of notices shall be sent in the manner set forth in this **Section 14.**

## 15.    **ENTIRE CONTRACT, AMENDMENTS AND WAIVERS**

This Agreement contains the entire agreement and understanding of the Parties with respect to the subject matter hereof, and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the Party to be bound thereby.

## 16.    **FURTHER ASSURANCES**

The Parties each agree to do, execute, acknowledge and deliver all such further acts, instruments and assurances and to take all such further action before or after the Closing as shall be necessary or desirable to fully carry out this Agreement and to fully consummate and effect the transaction contemplated hereby.

## 17.    **SURVIVAL AND BENEFIT**

Except to the extent specifically stated to the contrary elsewhere in this Agreement, all representations, warranties, agreements and obligations of the Parties contained in this Agreement shall be merged with the Deed at Closing. Wherever in this Agreement there is a reference to termination of this Agreement, such termination shall not be construed to terminate the obligations of the Parties with respect to any representations, warranties and obligations of the Parties contained in this Agreement which by their terms to the extent specifically stated in this Agreement shall survive termination of this Agreement.

## 18.    **CONFIDENTIALITY**

Purchaser agrees that all terms of this Agreement as well as any information provided to Purchaser pertaining to Seller and the Debtor (the **"Confidential Information"**) will remain confidential and will not be divulged by Purchaser without the written consent of Seller, except that Purchaser may disclose the Confidential Information without Seller's consent to the Title Insurer and Purchaser's respective directors, officers, employees, affiliates, and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors) and to any agency (governmental or public) in connection with Purchaser's pursuit of any entitlements and/or approvals deemed by Purchaser to be necessary for construction of the Property, so long as the confidentiality obligations of Purchaser are binding upon all of the foregoing and Purchaser informs the receiving parties of the confidential nature of the Confidential Information and directs the receiving parties to treat the Confidential Information confidentially in accordance with this **Section 18.** Notwithstanding anything contained in this Agreement to the contrary, the obligation of confidentiality does not apply to (a) Confidential Information which is now, or in the future becomes, part of the public domain, other than by breach of the terms of this **Section 18** or breach

26202440v.6

of confidentiality by anyone bound under like terms of confidentiality to the Party making such public disclosure, (b) Confidential Information lawfully obtained from independent sources, and (c) disclosure specifically authorized by Seller in writing. If Purchaser seeks Seller's consent to the disclosure of the Confidential Information, the Seller shall not unreasonably withhold her consent. Without limiting the foregoing, Purchaser agrees and acknowledges that no copies, summaries, abstracts or other reproductions of this Agreement or its terms will be provided to any third party not subject to the same confidentiality obligation as Purchaser. In the event Purchaser breaches the terms of this Section, Purchaser acknowledges and agrees that Seller will be irreparably harmed, but that Seller's damages are difficult to calculate and, therefore, Seller shall be entitled to pursue an action for equitable relief, including, but not limited to, temporary or permanent injunctions, against any actual or threatened breach of this **Section 18,** in addition to all other rights and remedies available at law or in equity. Notwithstanding anything in this Agreement to the contrary, Purchaser may divulge Confidential Information without Seller's consent to any existing lenders or proposed lenders in connection with any financing by Purchaser of the Property (who, in turn, may disclose the Confidential Information to their officers, advisors, attorneys, appraisers and other consultants in connection with the approval and documentation of such financing).

## 19.  **BROKERAGE**

Purchaser hereby indemnifies, protects and defends and holds Seller harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, attorneys' fees of counsel selected by the indemnified party) resulting from the claims of any broker (other than any broker representing Seller), finder, or other such party claiming by, through or under the acts or agreements of the Purchaser. Purchaser further agrees to be responsible for any commission, fee or other compensation due any broker representing Seller, as such commission, fee or other compensation are to be paid as set forth in Section 25 of Exhibit A of the Bidding Procedures Order, and any broker representing Seller shall be paid at the Closing in accordance with separate agreements between such broker and Seller.

## 20.  **ASSIGNMENT**

Purchaser may not assign or transfer its rights or obligations under this Agreement without Seller's prior written consent, the granting or denial of which consent shall be in the sole discretion of Seller; provided, however, that Purchaser shall have the right to assign this Agreement without Seller's consent in connection with a tax-deferred exchange or to shareholders of Purchaser or to an entity in which Purchaser or Purchaser's shareholders have a majority ownership interest or has at least co-control over provided that written notice of such assignment is delivered to Seller at least ten (10) business days prior to Closing. Notwithstanding such assignment, Purchaser shall remain obligated for the performance of all its obligations under this Agreement. No transfer or assignment by Purchaser in violation of the provisions hereof shall be valid or enforceable.

## 21.  **NO THIRD PARTY BENEFITS**

This Agreement is for the sole and exclusive benefit of the Parties hereto and their respective successors and permitted assigns, and no third party is intended to or shall have any

rights hereunder. This Agreement is binding upon and inures to the benefit of the successors and assigns of the Parties.

## 22. LITIGATION COSTS

In the event of any legal action or other proceeding between the Parties regarding this Agreement (an "**Action**"), the prevailing party shall be entitled to the payment by the losing party of its reasonable attorneys' fees, court costs and litigation expenses, as determined by the court. The term "prevailing party" as used in this **Section 22** includes, without limitation, a party: (i) who agrees to dismiss an Action on the other party's performance of the covenants allegedly breached, (ii) who obtains substantially the relief it has sought (which includes, without limitation, a party who has an Action voluntarily dismissed against it); or (iii) against whom an Action is dismissed (with or without prejudice) and cannot be refiled. In addition, the prevailing party in any Action shall be entitled, in addition to and separately from the amounts recoverable under this Section, to the payment by the losing party of the prevailing party's reasonable attorneys' fees, court costs and litigation expenses incurred in connection with: (y) any appellate review of the judgment rendered in such Action or of any other ruling in such Action; and (z) any proceeding to enforce a judgment in such Action. It is the intent of the Parties that the provisions of this Section be distinct and severable from the other rights of the Parties under this Agreement, shall survive Closing, shall survive the entry of judgment in any Action and shall not be merged into such judgment.

## 23. SEVERABILITY

In the event that any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision in this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained in the Agreement.

## 24. GOVERNING LAW

This Agreement shall be construed and governed in accordance with the laws of the State of New York without regard to its conflicts of laws principles.

## 25. COUNTERPARTS

This Agreement may be signed in several counterparts, each of which shall be deemed an original, and all such counterparts shall constitute one and the same instrument. Any counterpart to which is attached the signatures of all Parties shall constitute an original of this Agreement. The parties agree that the Purchaser shall be the first to execute this Agreement. Any counterpart of this Agreement executed by a Party may be delivered via facsimile, email or other electronic transmission, and shall be legally binding upon the Parties to the same extent as delivery of an original counterpart of this Agreement executed by a Party.

## 26. SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the Parties to this Agreement; provided, however, that Purchaser may only assign this Agreement in accordance with the provisions of **Section 20** of this Agreement.

27.    **NO RECORDING**

Purchaser agrees not to record this Agreement or any memorandum or short form of this Agreement. Any such recording by Purchaser shall be a default under this Agreement and shall entitle Seller to terminate this Agreement and retain the Earnest Money Deposit.

28.    **TIME FOR PERFORMANCE**

All references in this Agreement to "days" shall mean calendar days unless specifically stated. Notwithstanding the foregoing, whenever any expiration of a time limit or specific date provided in this Agreement falls on a Saturday, Sunday, or other day on which national banks in the State of New York are authorized or required to be closed, then that date is extended to the next day that is not a Saturday, Sunday, or other day on which national banks in the State of New York are authorized or required to be closed. The term "business day" as used in this Agreement means any day that is not a Saturday, Sunday, or other day on which national banks in the State of New York are authorized or required to be closed.

29.    **TIME OF THE ESSENCE**

Time is of the essence of this Agreement.

30.    **CONDEMNATION AND CASUALTY**

In the event of any taking, or notice is given of the intention to take any of the Real Property and the Improvements by the exercise of the power of eminent domain of all or a substantial portion of any Real Property and the Improvements prior to the Closing Date, such portion as would materially impair or otherwise materially affect Purchaser's intended use of any such Real Property and the Improvements will be deemed "substantial," Purchaser shall have the right to terminate this Agreement by giving written notice to Seller within five (5) business days after receipt by Purchaser of written notification of any such condemnation. If Purchaser elects to terminate this Agreement, all awards and compensation arising out of said condemnation shall be the property of Seller and the Earnest Money Deposit, plus any interest accrued thereon, shall be promptly returned to Purchaser. If Purchaser elects not to terminate this Agreement or fails to give Seller notice of termination within said five (5) business day period, said right to terminate shall be deemed waived and Purchaser shall be assigned all of Seller's right, title, and interest to all awards and compensation arising out of said condemnation, and Purchaser shall remain obligated to purchase the Property with no reduction in the Purchase Price.

If the Property suffers damage as a result of any casualty prior to the Closing Date, Seller shall give Purchaser prompt written notice thereof. If the cost to repair such damage to the Property is greater than Five Hundred Thousand and No/100 Dollars ($500,000.00), Purchaser may elect, by written notice delivered to Seller prior to the scheduled Closing Date, to:

(a) Terminate this Agreement, in which case this Agreement shall be null and void ab initio and neither Party shall have any further rights or obligations to the other hereunder, except those rights and obligations that expressly survive the termination of this Agreement and Seller shall immediately return the Earnest Money Deposit to Purchaser; or

(b) Notify Seller that it desires to take title to the Property in its damaged condition, without abatement of the Purchase Price, in which event Purchaser shall be entitled to the proceeds of any insurance carried by Seller with respect to the Property and Seller shall assign such insurance proceeds and related insurance claim to Purchaser at the Closing. All risks of loss to the Property are borne by Seller prior to Closing.

## 31. <u>SECTION HEADINGS</u>

The section headings contained in this Agreement are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof

## 32. <u>INTERPRETATION</u>

Whenever used in this Agreement, the singular number shall include the plural, the plural the singular, and the use of any gender shall include all genders.

## 33. <u>JURY TRIAL</u>

SELLER AND PURCHASER HEREBY RESPECTIVELY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE PROPERTY, THIS CONTRACT, AND/OR THE OBLIGATIONS AND CONTRACTS CONTAINED IN THIS CONTRACT.

## 34. <u>AMENDMENTS</u>

No agreement, amendment, modification, understanding or waiver of or with respect to this Agreement or any term, provision, covenant or condition hereof; nor any approval or consent given under or with respect to this Agreement, shall be effective for any purpose unless contained in writing and executed by each Party hereto. However, such amendments and/or supplements may be executed in counterparts, all of which shall be deemed to constitute one document.

## 35. <u>ENTIRE AGREEMENT</u>

The Parties acknowledge and agree that at all times they have intended that none of the preliminary negotiations concerning this transaction would be binding on either Party, and that they would be bound to each other only by a single, formal, comprehensive document containing this Section and all of the agreements of the Parties, in final form, which has been executed and delivered by Purchaser and Seller. The Parties acknowledge that none of the prior oral agreements between them (and none of the representations on which either of them has relied) relating to the subject matter of this Agreement shall have any force or effect whatever, except as and to the extent that such agreements and representations have been incorporated in this Agreement.

## 36. PATRIOT ACT

Seller certifies that the Debtor's name is **60 91ST STREET CORP.,** a New York corporation, and to Seller's knowledge, neither the Debtor nor its parent, subsidiary or affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control. Purchaser certifies that its name is Pinetree Group, Inc., and to Purchaser's knowledge, neither Purchaser nor affiliated entities are (i) in violation of any laws relating to terrorism or money laundering, or (ii) among the individuals or entities identified on any list compiled pursuant to Executive Order 13224 for the purpose of identifying suspected terrorists or on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

## 37. EXCULPATION; LIMITATION OF LIABILITY

Notwithstanding anything to the contrary contained in this Agreement, no officer, director, shareholder, employee, agent, manager, member or partner of Debtor, including, without limitation, the Seller, or Purchaser shall have any personal liability with respect to any of the obligations contained in this Agreement. Under no circumstances shall Seller or Purchaser be responsible for consequential, special or punitive damages, and Seller and Purchaser hereby waive any and all such claims against the other for such consequential, special or punitive damages. The provisions of this **Section 37** shall survive the expiration of the term or any earlier termination of this Agreement.

## 38. GENERAL COVENANTS

Except as Purchaser may otherwise consent in writing, such consent to be in Purchaser's sole discretion, until the Closing Date, unless this Agreement is sooner terminated, Seller shall (a) use commercially reasonable efforts to maintain the Real Property and the Improvements substantially in their present condition and repair, ordinary wear and tear excepted and subject to the terms of **Section 30** hereof; (b) maintain the existing insurance policies (or reasonably equivalent policies) for the Real Property and Improvements (and any replacements thereof) in full force and effect; (c) not sell, transfer, encumber, mortgage or place any monetary lien upon the Real Property and the Improvements, except for any debtor- in-possession liens in connection with the Bankruptcy Case that will be discharged as liens against the Real Property and the Improvements at Closing; (d) not enter into any new service contracts relating to the Real Property that would be binding on Purchaser unless they are terminable upon Closing or cancelable upon thirty (30) days or less notice; (e) not enter into any new license, lease or occupancy agreement or concession that will survive Closing; (f) file a motion in the Bankruptcy Case requesting entry of the Approval Order and serve such motion on all parties required by the Bidding Procedures Order entered by the Bankruptcy Court, and on all parties that hold any Liens and Encumbrances against the Property; (g) not accept payment of rent more than one (1) month in advance from any tenant or occupant or grant any free rent, concession, rebate, allowance or other consideration to any

tenant or occupant under any Lease; and (h) not make any material changes, improvements or alterations to any portion of the Real Property and the Improvements.

### 39. RENTS

With respect to any Rents received by any Seller or Purchaser after the Closing, within fifteen (15) days after such receipt: (a) the Party receiving such Rents shall provide written notice to the other Party of the receipt of such Rents, together with copies of any checks, electronic transfers or other documents related to such Rents; (b) such Rents received by Seller, to the extent that they are due and payable for periods after the Closing Date, shall be paid by Seller to Purchaser; and (c) such rents received by Purchaser, to the extent that they were due and payable for periods prior to the Closing Date, shall be paid by Purchaser to Seller. The terms of this **Section 39** shall survive the Closing for one hundred twenty (120) days after the Closing Date.

### 40. TAX APPEALS

In the event that Seller has, prior to the Closing Date, protested or appealed any general real estate taxes or assessments with respect to the Real Property and the Improvements for any tax years on or before 2020 (collectively, the "**Tax Appeals**"), from and after the Effective Date Seller shall maintain and control the Tax Appeals; provided, however, Seller agrees that no settlement or resolution of the Tax Appeals shall occur or be made without the prior written approval of Purchaser, such approval not to be unreasonably withheld, conditioned or delayed. Any refunds or savings in the payment of taxes resulting from such Tax Appeals applicable to taxes payable during the period prior to the date of the Closing shall belong to and be the sole property/obligation of Seller and any refunds or savings in the payment of taxes applicable to taxes payable from and after the date of the Closing shall, to the extent such refunds or savings apply to taxes paid by Seller or the Debtor, belong to and be the property of the Debtor, and otherwise shall belong to and be the property of Purchaser. All attorneys' fees and other expenses incurred in obtaining such refunds or savings shall be apportioned between Seller and Purchaser in proportion to the gross amount of such refunds or savings payable to Seller and Purchaser, respectively. The terms of this **Section 40** shall survive the Closing for one hundred twenty (120) days after the Closing Date.

### 41. LOCAL LAW PROVISIONS

The parties agree to amend this Agreement after the Effective Date but prior to Closing to provide any applicable local law provisions and/or requirements.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

**IN WITNESS WHEREOF,** the Parties have executed this Purchase and Sale Agreement as of the date first above written.

**SELLER:**

**Heidi J. Sorvino, as the duly appointed chapter 11 trustee for the bankruptcy estate of 60 91ST STREET CORP., a New York corporation**

By: _____
        Name: Heidi J. Sorvino, Esq.
        Title: Chapter 11 Trustee


**PURCHASER:**

**Pinetree Group Inc,**
**a New York corporation**


By: _____
        Name:
        Title:


**EXHIBITS**
Exhibit "A" Bidding Procedures Order
Exhibit "B" Legal Description
Exhibit "C" Approval Order
Exhibit "D" Bargain and Sale Deed Without Covenant Against Grantor's Acts
Schedule 1 Permitted Exceptions

**IN WITNESS WHEREOF,** the Parties have executed this Purchase and Sale Agreement as of the date first above written.

SELLER:

**Heidi J. Sorvino, as the duly appointed chapter 11 trustee for the bankruptcy estate of 60 91ST STREET CORP., a New York corporation**

By: _____
     Name: Heidi J. Sorvino, Esq.
     Title: Chapter 11 Trustee

PURCHASER:

**Pinetree Group Inc,**
**a New York corporation**

By: _____
     Name: December 4, 2020
     Title: President

**<u>EXHIBITS</u>**
Exhibit "A" Bidding Procedures Order
Exhibit "B" Legal Description
Exhibit "C" Approval Order
Exhibit "D" Bargain and Sale Deed Without Covenant Against Grantor's Acts
Schedule 1 Permitted Exceptions

# EXHIBIT "A"

## BIDDING PROCEDURES ORDER

(see attached)

WHITE AND WILLIAMS LLP
Amy E. Vulpio, Esq.
James C. Vandermark, Esq.
7 Times Square, Suite 2900
New York, NY 10036
(212) 244-9500
vulpioa@whiteandwilliams.com
vandermarkj@whiteandwilliams.com

*Counsel to Heidi J. Sorvino, Esq.,*
 *as the Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| 60 91st Street Corp., <br>                 Debtor. | Case No. 20-10338 (SCC) |

**ORDER UNDER BANKRUPTCY CODE §§ 105, 363, 365 AND 1146 AND
BANKRUPTCY RULES 6004 AND 6006; (1) AUTHORIZING AND APPROVING
TERMS AND CONDITIONS OF SALE OF DEBTOR'S ASSETS SUBJECT TO
HIGHER OR BETTER OFFERS, FREE AND CLEAR OF ALL LIENS, CLAIMS
AND ENCUMBRANCES; (2) ESTABLISHING PROCEDURES TO CONFIRM
HIGHEST OR BEST OFFER RECEIVED AT SALE; (3) APPROVING FORM, TIME
<u>AND SCOPE OF NOTICE OF SALE; AND (4) GRANTING RELATED RELIEF</u>**

Upon the motion (the "**Motion**")[1] of Heidi J. Sorvino, Esq., as Chapter 11 Trustee (the

"**Chapter 11 Trustee**") of 60 91st Street Corp. (the "**Debtor**"), the debtor in the above-captioned

Chapter 11 bankruptcy case, seeking the entry of an order in accordance with §§ 105, 363, 365

and 1146 of Title 11, United States Code, Federal Rules of Bankruptcy Procedure 2002, 6004, and

6006, Local Rule 6004-1, and the *Amended Guidelines for the Conduct of Asset Sales established*

*pursuant to General Order M-383* (the "**Sale Guidelines**"): (a) authorizing and approving the

---

[1] All capitalized terms used but not otherwise defined herein shall have the same meanings given to them in the Motion.

procedures, terms and conditions (the **"Sale Terms"**) for a public auction (the "**Auction**") and the sale (the "**Sale**") of substantially all of the Debtor's assets (the "**Assets**"), consisting primarily of the real property known as and located at 60 West 91st Street, New York, New York (the "**Real Property**"), free and clear of all liens, claims, and encumbrances, including without limitation, to the maximum extent permitted by applicable law, any unexpired leases not expressly assumed by the Debtor and any other possessory rights to occupy the Real Property or any portion thereof (collectively, **"Liens"**), with such Liens attaching to the proceeds of the Sale, to the bidder tendering the highest or best offer; (b) establishing a procedure to confirm the highest or best offer received for the Assets; (c) approving the form, time and scope of notice of the Sale; and (d) granting related relief; and after due deliberation and consideration of all the facts and circumstances herein; and upon the record of the hearing on the Motion (the "**Procedures Hearing**"); and this Court having reviewed the Motion; and this Court being satisfied with the representations made in the Motion; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it further appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and upon the record herein; and after due deliberation thereon; and sufficient cause appearing therefor; and the relief sought being determined to be in the best interests of the Debtor's estate and creditors, and appropriate notice having been given and no further notice being necessary or required; it is hereby ORDERED THAT

1.      The Motion is GRANTED as set forth herein.

2.      The bidding procedures and terms and conditions of sale (collectively, the **"Sale Terms"**), annexed hereto as **Exhibit A**, are approved in all respects.  All objections to the Sale

Terms that have not been withdrawn, waived, or settled as announced to the Court at the Procedures Hearing or by stipulation filed with the Court, are overruled.

3.    The Chapter 11 Trustee is authorized under 11 U.S.C. § 363 to sell all of the Debtor's right, title, and interest in and to the Assets pursuant to the Sale Terms, free and clear of all Liens, with such Liens to attach to the proceeds of the Sale, to the bidder tendering the highest or otherwise best offer through and by the Auction; provided, however, that the Sale of the Assets shall remain subject to final approval by this Court at the hearing to be held on **November 5, 2020 at 10:00 a.m.** (or as soon thereafter as the Bankruptcy Court may accommodate) (the **"Sale Hearing"**).  All relief sought in the Motion not granted by this Order shall be considered at the Sale Hearing.

4.    The Notice of Sale in substantially the form annexed hereto as **Exhibit B** is approved in all respects.  Within three (3) business days after entry of this Order, the Chapter 11 Trustee shall serve a copy of the Notice of Sale by first class mail or e-mail, upon the following notice parties (each a **"Notice Party"** and collectively, the "**Notice Parties**"): (i) the Office of the United States Trustee; (ii) counsel to the Lender; (iii) the Debtor's sole shareholder; (iv) each of the Debtor's creditors and tenants; (v) all other parties having requested notices in the Debtor's bankruptcy case; and (vi) the Secured Government Creditors.

5.    The Auction, if held, shall be conducted telephonically or by videoconference **October 29, 2020 at 12:00 p.m.** (prevailing Eastern Time), or at such later time as may be determined in the Trustee's discretion.  The Trustee shall provide all Qualified Bidders with written instructions for participating in the Auction no later than one business day prior to the Auction.

6.    Within forty-eight (48) hours after the close of the Auction, the Chapter 11 Trustee shall file with the Court and serve on the Notice Parties by first class mail or e-mail a Sale

Declaration in further support of the Sale that will include the actual marketing efforts undertaken leading up to the Sale and a detailed report of the Sale, together with a proposed order approving the Sale to the successful purchaser(s).

7.      The Chapter 11 Trustee and the Brokers may show the Property to prospective bidders as reasonably necessary to market the Assets in accordance with this Order and the Sale Terms.  The Shareholder shall not impede the efforts by the Chapter 11 Trustee and the Brokers to market the Assets and shall fully cooperate with their reasonable requests relating to the marketing of the Assets and Sale Terms.  This includes providing the Chapter 11 Trustee, the Brokers, and any party accompanying either the Chapter 11 Trustee or the Brokers, access to her apartment ("**Apartment A**"), the cellar and the mechanicals for the Property (collectively, the "**Cellar**"), and the patio connected to Apartment A (the "**Patio**" and together with Apartment A and the Cellar, collectively the "**Required Notice Space**") at any time requested by the Chapter 11 Trustee or the Brokers, so long as the Chapter 11 Trustee or the Brokers provide the Shareholder with at least twenty-four (24) hours notice.  The Chapter 11 Trustee or the Brokers may provide such notice to the Shareholder by email, which shall be deemed received by the Shareholder on the date and time the email is sent.  The Chapter 11 Trustee and the Brokers shall have access to any part of the Property, other than the Required Notice Space, without any notice to the Shareholder.

8.      Objections, if any, to any part of the relief sought in the Motion not otherwise approved by this Order, including the Sale of the Assets, shall be filed with the Bankruptcy Court and served upon the following parties so as to be actually received on or before **November 2, 2020 at 4:00 p.m.** (prevailing Eastern Time)(the **"Sale Objection Deadline"**):

    a.   Heidi J. Sorvino, the Chapter 11 Trustee, c/o White and Williams LLP, Attn: James C. Vandermark, Esq., 7 Times Square, Suite 2900, New York, NY 10036-6524;

    b.   Office of the United States Trustee, Attn: Brian Masumoto, Esq., U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York, 10014; and

    c.   2386 Hempstead, Inc., c/o Terenzi & Confusione, P.C., Attn: Ronald M. Terenzi, Esq., 401 Franklin Avenue, Suite 300, Garden City, New York 11530.

The failure of any Notice Party to file an objection prior to the Sale Objection Deadline contemplated by the Motion shall forever bar, preclude and disqualify such Notice Party from asserting an objection to the Motion at the Sale Hearing or to the Bankruptcy Court's entry of findings and rulings sought therein.

9.    The failure to include or reference a particular provision of the Sale Terms specifically in this Order shall not diminish or impair the effectiveness or enforceability of such a provision.

10.    In the event of any inconsistencies between this Order and the Motion and/or the Sale Terms, this Order shall govern in all respects.

11.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

12.    To the extent the dates and deadlines herein are modified pursuant to the Sale Terms and such modification is inconsistent with the requirements of Local Rule 9006-1(b), such requirements shall be deemed satisfied.

13.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

14.     The Chapter 11 Trustee is authorized to do such things, expend such funds, and execute such documents as necessary to effectuate the terms and conditions of this Order.

15.     This Court retains exclusive jurisdiction over the Sale and with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.  This Court has the authority to fashion appropriate relief, on an emergency basis or otherwise, for any violations of this Order or the Sale Terms.

Dated: September 18, 2020
         New York, New York

                                        /S/ Shelley C. Chapman
                                        HONORABLE SHELLEY C. CHAPMAN
                                        UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

## SALE TERMS

Set forth below are the bidding procedures and terms and conditions (collectively, the "**Sale Terms**") to be employed with respect to the sale (the "**Sale**") of substantially all of the assets of 60 91st Street Corp. (the "**Debtor**"), free and clear of all liens, claims, and encumbrances, including without limitation, to the maximum extent permitted by applicable law, any unexpired leases not expressly assumed by the Debtor and any other possessory rights to occupy the Real Property or any portion thereof (collectively, **"Liens"**), with such Liens attaching to the proceeds of the Sale, to the bidder tendering the highest or best offer at a public auction (the "**Auction**"), more fully described below.

### The Assets

1.      These Sale Terms are promulgated in connection with the Auction of the Debtor's assets (the "**Assets**"), which consist primarily of the real property located at and commonly known as 60 West 91st Street, New York, New York (the "**Real Property**"),[2] also known as:

| Block & Lot |
| --- |
| Block 01294, Lot 0054, as more particularly described on Schedule A annexed hereto |

as well as all executory contracts and leases, to the extent assumable and assignable by the Debtor, and the Debtor's books and records held by either the Chapter 11 Trustee or the Shareholder.  The Assets may also include certain building materials and other personal property of *de minimis* value that belongs to the Debtor

---

[2]  The Real Property is an apartment building consisting of nine (9) units.  Based on the records obtained by the Chapter 11 Trustee, two (2) of the units are leased to tenants and one (1) of the units is occupied by the Debtor's sole shareholder (the "**Shareholder**").  The remaining units are vacant but, upon information and belief, may contain building materials and other personal property of *de minimis* value that belongs to the Debtor.

2.       The Real Property is encumbered by a mortgage held by 2386 Hempstead, Inc.
(the **"Lender"**).  The Lender is represented by Ronald M. Terenzi, Esq., of Terenzi & Confusione,
P.C., 401 Franklin Avenue, Suite 300, Garden City, New York 11530.

<u>Bidding Procedures</u>

3.       The Auction shall be conducted by Maltz Auctions, Inc. ("**Maltz**") and Rosewood
Realty Group ("**Rosewood**" and together with Maltz, collectively, the "**Brokers**") on October 29,
2020 at 12:00 p.m. (prevailing Eastern Time) telephonically, online, and/or by videoconference,
provided, however, that the Chapter 11 Trustee shall be the sole authorized party to execute any
and all such documents as are necessary for the sale and transfer of the Assets following the
Auction.

4.       Parties interested in bidding must pre-register to bid at the Auction by contacting
Greg Corbin ("**Corbin**") of Rosewood at (212) 359-9904.  Upon execution of a confidentiality
agreement (the "**Confidentiality Agreement**"), each prospective Bidder (as hereinafter defined)
will be furnished, upon request to Corbin, and with such information relating to the Assets as may
be in possession of the Chapter 11 Trustee, without representation or warranty.  The Assets shall
be offered for inspection by appointment at reasonable times, and subject to compliance with state
and local orders as to physical distancing, face coverings, and similar COVID-19-related
precautions, on request by the interested party to the Brokers, which will make such arrangements.

<u>Qualified Bidder and Stalking Horse</u>

5.       Any person or entity that is interested in bidding on the Assets, including, without
limitation, each direct or indirect equity holder of such prospective purchaser or holder and each
trustee and beneficiary of any trust included therein (each a "**Bidder**"), shall provide the Chapter
11 Trustee with an executed Confidentiality Agreement.  A Bidder who has executed a

Confidentiality Agreement shall be given access to (i) the same evaluation materials and information provided by the Chapter 11 Trustee and Brokers to each other Bidder, and (ii) such other financial information and other data related to the Debtor as the Bidder may reasonably request, which requests may include reasonable access to the Chapter 11 Trustee and her professional advisors.

6.      In order to be permitted to submit a bid (each a "**Bid**") on the Assets, prior to the commencement of the Auction, each Bidder must deliver an executed copy of these Sale Terms and the Qualification Documents (hereinafter defined) to (a) the Brokers, (b) White and Williams LLP, counsel to the Chapter 11 Trustee, and (c) Terenzi & Confusione, P.C., counsel to the Lender. For purposes herein, the following documents are, collectively, the **"Qualification Documents"**:

    (i)     A written and signed binding offer for the purchase of the Assets without any contingencies as to financing and/or additional due diligences of any kind;

    (ii)    A written and signed statement fully disclosing the identify of each person or entity that is bidding for the Assets and include each Bidder's address, email address, and telephone number;

    (iii)   A signed acknowledgement that the bidder will be bound by its bid, which is not contingent upon the Bidder obtaining financing, until seven (7) days after the Closing Deadline or until such bid is rejected in writing by the Chapter 11 Trustee.  For purposes of the foregoing, the "**Closing Deadline**" shall be as soon after the Bankruptcy Court enters the Sale Order as commercially practicable, but no later than December 3, 2020;

(iv)    Financial information which fairly and reasonably demonstrate the source of the

Bidder's ability to close on the Sale in the amount of its bid in the event that the

Bidder is accepted by the Chapter 11 Trustee as the Successful Bidder, subject to

approval of the Bankruptcy Court; and

(v)    Other information reasonably requested by the Chapter 11 Trustee.

7.    The Qualification Documents must be accompanied by a good faith deposit in the

amount of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000) in immediately available

funds (the "**Deposit**"), which Deposit shall be made by wire transfer to an attorney escrow account

designated by the Chapter 11 Trustee.

8.    Any Bidder who submits a Bid that conforms to the requirements of Paragraphs

10 and 11 above on or prior to **October 27, 2020 at 12:00 p.m.** (prevailing Eastern Time) (the

"**Bid Deadline**") (each a "**Qualified Bid**"), shall be considered a **"Qualified Bidder"** with respect

to only such Assets as is identified in its Bid.

9.    Upon receipt of the Qualified Bid and payment of the Deposit, the Brokers will

provide the Qualified Bidder with a bidder number and the information needed to participate in

the Auction.

10.    At any time prior to the Auction, the Chapter 11 Trustee, with reasonable consent

of the Lender, may select a Bidder to act as a stalking horse bidder in connection with the Auction

(the "**Stalking Horse Bidder**") and enter into a purchase agreement with such Stalking Horse

Bidder (the "**Stalking Horse Agreement**"), which shall be subject to higher and better offers at

the Auction, to establish the minimum bid for the Assets at the Auction. The Chapter 11 Trustee

also reserves the right, with reasonable consent of the Lender, and subject to its rights under 11

U.S.C. § 363(f), to (i) provide a breakup fee (the "**Breakup Fee**") of a maximum amount of three

percent (3%) of the proposed purchase price under such Stalking Horse Agreement payable to the Stalking Horse Bidder from the proceeds of the Sale, and (ii) agree to reimburse reasonable and documented out-of-pocket fees and expenses not to exceed $25,000 (the "**Expense Reimbursement**" and with the Breakup Fee, collectively, the "**Bid Protections**") to the extent the Chapter 11 Trustee determines, in her sole discretion and as a matter of her reasonable business judgment, that provision of such Bid Protections is likely to maximize the value of the Assets.

11.     If the Chapter 11 Trustee selects a Stalking Horse Bidder, the opening bid for the Assets at the Auction (the "**Initial Bid**") shall be equal to the purchase price agreed to by the Stalking Horse Bidder plus the amount of any Bid Protections as set forth in the Stalking Horse Agreement (collectively, the "**Initial Bid Amount**").

12.     If the Auction is conducted without a Stalking Horse Bidder, the Initial Bid Amount will be set by the Chapter 11 Trustee, in consultation with the Brokers and the Lender, and the Chapter 11 Trustee shall notify the Qualified Bidders of the Initial Bid Amount at least three (3) business days prior to the Auction.

13.     The Initial Bid Amount will subsequently continue in minimum increments set by the Brokers so as to avoid being so high that they chill further bidding or so low that they provide insubstantial consideration to the Estate.

14.     Only Qualified Bidders shall be permitted to participate in the Auction. If no competing bids are received by the Bid Deadline, the Auction will be cancelled and the Stalking Horse Bidder will be deemed the successful bidder.

15.     Notwithstanding anything to the contrary set forth herein, the Lender shall be: (a) deemed a Qualified Bidder; (b) excused from providing a Deposit; and (c) permitted to credit bid the full amount of its claims at the Auction.

16.    For the avoidance of doubt, and notwithstanding the foregoing, any overbid submitted by a Qualified Bidder at the Auction on substantially the same terms as its initial offer (apart from any increase in price) shall be a "**Qualified Competing Bid**."

<u>Selection of Successful Bid</u>

17.    Prior to the conclusion of the Auction, the Chapter 11 Trustee will, in consultation with the Brokers and the Lender, (a) review and evaluate each Qualified Bid, and (b) determine the highest or otherwise best offer for the Assets received at the Auction (such bid, the "**Successful Bid**" and the bidder making such bid, the "**Successful Bidder**"),.  In determining the selection of the Successful Bid, the Chapter 11 Trustee shall consider (a) the total expected consideration to be received, (b) the likelihood of the Qualified Bidder(s) to close on the Sale by the Closing Deadline, (c) the expected net benefit to the Debtor's estate, and (d) any other criteria as may be considered by the Chapter 11 Trustee in her reasonable, good-faith business judgment and in consultation with the Brokers and the Lender.  The determination of the Successful Bid or Successful Bids by the Chapter 11 Trustee shall be final, subject to approval by the Bankruptcy Court.  After the Chapter 11 Trustee determines the Successful Bid, the Auction will be closed.  The Chapter 11 Trustee will then determine and announce which bid has been determined to be the second highest or otherwise best bid (the "**Backup Bid**" and such bidder being the "**Backup Bidder**").

18.    Notwithstanding anything herein to the contrary, the Chapter 11 Trustee, in her reasonable discretion, reserves the right to reject at any time prior to entry of a Court order approving a sale, without liability, any offer that she deems to be: (a) inadequate or insufficient, (b) contrary to the best interests of the Debtor or its Estate, or (c) with the advice of counsel, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures set forth therein or herein.

19.     The presentation of a particular Bid to the Bankruptcy Court for approval shall not constitute the Chapter 11 Trustee's acceptance of the Bid.  The Chapter 11 Trustee will be deemed to have accepted the Successful Bid only when it has been approved by the Bankruptcy Court at the Sale Hearing.

20.     The Chapter 11 Trustee will sell the Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of the Successful Bid by the Bankruptcy Court at the Sale Hearing.

21.     For the avoidance of doubt, the Chapter 11 Trustee shall not consider or support any bid (whether or not such bid is a Qualified Competing Bid) for the Assets received after the close of the Auction.

22.     As soon as commercially practicable following the Auction, the Successful Bidder and the Backup Bidder will, sign all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made, including, but not limited to, a memorandum of sale (the "**Memorandum of Sale**"), substantially in the form annexed hereto as <u>Schedule B</u>, in accordance with these Sale Terms.

<div align="center">Deposit, Sale and Closing</div>

23.     Within forty-eight (48) hours following the completion of the Auction, the Successful Bidder shall wire transfer in immediately available federal funds to an attorney escrow account designated by the Chapter 11 Trustee, an amount equal to ten percent (10%) percent of the cash consideration of its such Successful Bid minus the Deposit (together with the Deposit, collectively, the "**Additional Deposit**") plus the Buyer's Premium (hereinafter defined).  The failure of the Successful Bidder to tender the Additional Deposit and the Buyer's Premium within forty-eight (48) hours after conclusion of the Auction shall result in an immediate default under

these Sale Terms and the Memorandum of Sale and shall result in the forfeiture of all earnest monies paid, including the Buyer's Premium.

24.     The Chapter 11 Trustee shall return the Deposit to every bidder, except the Successful Bidder and the Backup Bidder, within five (5) business days from the date of the Auction; provided, however, that the Backup Bidder will not receive its Deposit unless the Successful Bidder closes on the Sale by the Closing Deadline (or within the Extension (as hereinafter defined, if exercised), at which time Chapter 11 Trustee shall return the Deposit to the Backup Bidder within five (5) business days of the Closing.

25.     As set forth in more detail in the order of the Bankruptcy Court setting forth the terms of the Brokers' retention, the Successful Bidder, and the Backup Bidder in the event of a Successful Bidder's Default (as hereinafter defined), are solely responsible to pay the Chapter 11 Trustee an amount equal to (i) one percent (1%) in the aggregate of the Successful Bid, in the event that the Lender is the Successful Bidder; or (b) four and one-half percent (4.5%) of the Successful Bid, in the event the Assets are sold to a third-party other than the Lender (the "**Buyer's Premium**").  The Buyer's Premium shall be deemed to have been earned immediately upon the fall of the hammer.  The sum of the Successful Bid and related Buyer's Premium is defined herein as the "**Purchase Price**."  In the event that the sale is not consummated, the Buyer's Premium shall be property of the Debtor's estate.

26.     The Successful Bidder must pay the balance of the Purchase Price for the Assets to the Chapter 11 Trustee by wire transfer to an attorney escrow account designated by the Chapter 11 Trustee in immediately available federal funds.  The Successful Bidder must close title to the Assets at a date that is no later than the Closing Deadline, **TIME BEING OF THE ESSENCE** as to the Successful Bidder, although such date may be extended solely by the

Chapter 11 Trustee in consultation with Lender. Notwithstanding the foregoing, the Chapter 11

Trustee shall grant the Successful Bidder a single fifteen (15-day) extension (the "**Extension**"),

at the request of the Successful Bidder, provided the Successful Bidder posts an additional, non-

refundable deposit equal to ten percent (10%) of the Purchase Price (the "**Extension Deposit**"),

for an aggregate non-refundable deposit equal to twenty percent (20%) of the Purchase Price,

prior to the Closing Deadline (the "**Total Deposit**"). The Extension Deposit shall be made by

wire transfer to an attorney escrow account designated by the Chapter 11 Trustee in immediately

available federal funds, and together with the Additional Deposit, shall be deemed, collectively,

the "**Deposit**." If the Successful Bidder elects to exercise the Extension, the Closing shall take place

on or before the fifteenth (15th) day following the Closing Deadline, **TIME BEING OF THE**

**ESSENCE** as to the Successful Bidder, although such date may be further extended solely by the

Chapter 11 Trustee in consultation with Lender for any reason. If the Successful Bidder elects to

exercise the Extension, the Successful Bidder shall be responsible for all real estate taxes, costs,

fees, and expenses incurred by the Estate after the original Closing Deadline through the date of the

actual Closing. The Successful Bidder shall also be responsible for any additional interest, fees,

and other amounts incurred by the Lender and any other party asserting a lien against the Real

Property from the day after the Closing Deadline through the date of the actual Closing.

27.    If the Successful Bidder fails to close on the Sale by the Closing Deadline (the

"**Successful Bidder's Default**"), the Chapter 11 Trustee, in her sole and absolute discretion, may

deem the Backup Bidder to hold all benefits and obligations under the Sale Terms and the

Memorandum of Sale, as a new Successful Bidder (the "**New Successful Bidder**"). The New

Successful Bidder shall not receive credit for any Deposit and/or Buyer's Premium forfeited by

the initial Successful Bidder. The New Successful Bidder must close within thirty (30) days of

receiving notice that the Successful Bidder failed to close on the Sale by the Closing Deadline (the "**New Closing Deadline**"), **TIME BEING OF THE ESSENCE** as to such New Successful Bidder, although such date may be extended solely by the Chapter 11 Trustee in consultation with Lender.  Notwithstanding the foregoing, the Chapter 11 Trustee shall grant the New Successful Bidder a single fifteen (15) day extension (the "**New Successful Bidder's Extension**"), at the request of the New Successful Bidder, provided the New Successful Bidder posts an additional, non-refundable deposit of ten percent (10%) of the Purchase Price, so that the New Successful Bidder's aggregate non-refundable deposit is equal to twenty percent (20%) of the Purchase Price prior to the New Closing Deadline (the "**New Successful Bidder's Additional Deposit**").  The New Successful Bidder's Additional Deposit shall be paid to the Chapter 11 Trustee by wire transfer to an attorney escrow account designated by the Chapter 11 Trustee in immediately available federal funds.  If the Successful Bidder elects to exercise the New Successful Bidder's Extension, the Closing shall take place on or before the fifteenth (15th) day following the New Closing Deadline, **TIME BEING OF THE ESSENCE** as to the New Successful Bidder, although such date may be further extended solely by the Chapter 11 Trustee  in consultation with lender for any reason.  If the New Successful Bidder elects to exercise the New Successful Bidder's Extension, the New Successful Bidder shall be responsible for all real estate taxes, costs, fees, and expenses incurred by the Estate after the original New Closing Deadline through the date of the actual Closing.  The New Successful Bidder shall also be responsible for any additional interest, fees, and other amounts incurred by the Lender and any other party asserting a lien against the Real Property from the day after the New Closing Deadline through the date of the actual Closing.

28.    The closing (the "**Closing**") shall take place at the offices of White and Williams LLP, 7 Times Square, Suite 2900, New York, NY, 10036, or such other location as the Chapter 11 Trustee may direct.

29.    The Successful Bidder, or the New Successful Bidder, as the case may be, shall pay any and all costs and expenses in connection with the Closing related to obtaining a survey; fee title or mortgage insurance; title company endorsement, search and escrow charges (subject to ¶ 31 of these Sale Terms); environmental, engineering or other property inspections; appraisals, reports and other costs of property due diligence; and New York state, local, or other real property transfer, deed or documentary tax, or other taxes imposed upon a sale due in connection with the transfer of the Real Property from the Chapter 11 Trustee at Closing; provided, however, that the Chapter 11 Trustee shall seek a determination that the Sale and distribution of the net proceeds through Debtor's Chapter 11 Plan fall within the scope of the exemption provided for under section 1146(a) of the Bankruptcy Code and thus that the Sale should be exempt from the imposition of any such taxes.  The Successful Bidder and New Successful Bidder, as the case may be, acknowledges that it will be responsible for the completion of any ACRIS forms, if required.  The Chapter 11 Trustee shall not be required to execute any form of title affidavit (but may in her sole and absolute discretion) and all title exceptions customarily omitted from a title policy on account of such title affidavit shall be deemed permitted exceptions.  The Successful Bidder, or the New Successful Bidder, as the case may be, acknowledges that it will be responsible for the preparation of all Closing documents required including, but not limited to, any transfer tax forms (if required).  In connection with the Closing, the Successful Bidder or the New Successful Bidder, as the case may be, is hereby given notice that **TIME IS OF THE ESSENCE against the Successful Bidder or the New Successful Bidder, as the case may be,**

**and the failure of the Successful Bidder or the New Successful Bidder, as the case may be, to close for any reason whatsoever (except as otherwise provided herein) including its failure to pay the balance of the Purchase Price by the Closing Deadline (or within the Extension, if exercised) or the New Closing Deadline (or the New Successful Bidder's Extension, if exercised), as the case may be, will result in an immediate forfeiture of the Deposit, the New Successful Bidder's Deposit, the Buyer's Premium, and any Additional Deposit, and the termination of the Successful Bidder's or the New Successful Bidder's, as the case may be, right to acquire the Assets under these Sale Terms and the Memorandum of Sale.**

30.     The Successful Bidder or the New Successful Bidder, as the case may be, shall be obligated to close title to the Assets and, except as expressly set forth herein, there is no contingency of any kind or nature, including among others, on obtaining (a) financing, (b) approval from equity holder(s), board of directors or board of managers, investment committee or other approval, or (c) the outcome or completion of a due diligence review by the Successful Bidder, or the New Successful Bidder, as the case may be, that will permit the Successful Bidder, or the New Successful Bidder, as the case may be, to cancel or avoid its obligation under these Terms of and Conditions of Sale and the Memorandum of Sale other than the Chapter 11 Trustee's inability to deliver insurable title to the Assets.  Further, the Successful Bidder or the New Successful Bidder, as the case may be, shall have demonstrated, to the satisfaction of the Chapter 11 Trustee, evidence of its ability to conclude the transaction upon these Sale Terms and the Memorandum of Sale, without delay.  The Chapter 11 Trustee reserves the right to reject any Bidder who the Chapter 11 Trustee believes, in her sole discretion, is not financially capable of consummating the purchase of the Assets.  Expenses incurred by the Successful Bidder, or any

other Bidder, concerning any due diligence shall be the sole responsibility of such Bidder and, under no circumstances shall the Chapter 11 Trustee, the Debtor, or their professionals be responsible for, or pay, such expenses.

31.    The Successful Bidder, or the New Successful Bidder, as the case may be, acknowledge and agree (i) to retain and engage Riverside Abstract LLC (or such other title company as may be be designated by the Brokers) (the "**Title Company**") to provide an owner's title insurance policy for the Real Property; (ii) that the Title Company has examined title and issued a Certificate of Title (hereinafter either the "**Certificate of Title**" or the "**Title Report**"); and (iii) to utilize such Title Report for purposes of obtaining an owner's title insurance policy from the Title Company for the Real Property, provided however, notwithstanding the foregoing or anything to the contrary, the Lender may use its own title company, and shall not be required to purchase a title policy from the above described Title Company, provided that such election to use an alternative title company or purchase an alternative title policy shall not be any justification for the Senior Lienholder to raise any title issues that are not contained in the above described Title Report.

<u>Free and Clear, No Representations</u>

32.    All of the right, title, and interest of the Debtor in and to the Assets, or any portion thereof, will be sold, conveyed, transferred, and assigned free and clear of all Liens pursuant to Sections 363 and 365 of the Bankruptcy Code, with such Liens attaching to the proceeds of the Sale, except to the extent otherwise set forth in the Memorandum of Sale.

33.    The Chapter 11 Trustee, the Brokers, and the Debtor, and their respective professionals, have not made and do not make any representations or warranties as to the physical condition, expenses, operations, value of the land or buildings thereon, or any other matter or thing affecting or relating to the Assets or the Auction, which might be pertinent to the purchase of the

Assets, or any portion thereof, including, without limitation, (i) the current or future real estate tax liability, assessment or valuation of the Assets; (ii) the potential qualification of the Assets for any and all benefits conferred by or available under federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated; (iii) the compliance or non-compliance of the Assets, in its current or any future state, with applicable present or future zoning ordinances or other land use law or regulation, or the ability to obtain a change in the zoning or use, or a variance in respect to the Assets; (iv) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Assets from any source, including, but not limited to, any state, city or federal government or institutional lender; (v) the current or future use of the Assets; (vi) the current or future rents, other operating income or expenses; (vii) the presence or absence of any laws, ordinances, rules or regulations issued by any governmental authority, agency or board and any violations thereof; and (viii) the compliance or non-compliance with environmental laws and the presence or absence of underground fuel storage tanks, any asbestos, any lead paint or other hazardous materials anywhere on the Assets, or notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued by any governmental department, agency or bureau having authority as to but not limited to lands, housing, buildings, fire, health, environment and labor conditions affecting the Assets.  Each Bidder hereby expressly agrees and acknowledges that no such representations or warranties have been made.  The Chapter 11 Trustee, the Brokers, the Debtor, and their respective professionals shall not be liable or bound in any manner by expressed or implied warranties, guarantees, promises, statements, representations or information pertaining to the Assets, made or furnished by the Chapter 11 Trustee, the Brokers, or the Debtor, or any real estate broker, agent, employee, servant or other person or professional representing or

purporting to represent the Chapter 11 Trustee, the Brokers, or the Debtor unless such warranties, guaranties, promises, statements, representations or information are expressly and specifically set forth in writing within these Sale Terms and the Memorandum of Sale.

34.     The Assets are being sold **"AS IS" "WHERE IS", "WITH ALL FAULTS"**, without any representations, covenants, guarantees or warranties of any kind or nature, and free and clear of any Liens of whatever kind or nature, with such Liens, if any, to attach to the proceeds of sale in such order and priority as they existed immediately prior to the Closing.  The Sale of the Assets is subject to, among other things (a) any state of facts that an accurate survey may show; (b) any covenants, restrictions and easements of record; (c) any state of facts a physical inspection may show; (d) any building or zoning ordinances or other applicable municipal regulations and violations thereof; (e) rent-stabilized and rent-controlled leases, if any; and (f) environmental conditions; **provided, however, the Assets shall be delivered free and clear of any and all monetary liens**.  By delivering their respective Deposits, all Bidders acknowledge that they have had the opportunity to review and inspect the Assets, the state of title thereof and laws, rules and regulations applicable thereto, and will rely solely thereon and on their own independent investigations and inspections of the Assets in making their bids. Neither the Brokers, the Chapter 11 Trustee, the Debtor nor any of their collective representatives make any representations or warranties with respect to the permissible uses of the Assets including, but not limited to, the zoning of the Assets.  All Bidders acknowledge that they have conducted their own due diligence in connection with the Assets and are not relying on any information provided by the Chapter 11 Trustee, the Brokers, the Debtor, or their respective professionals.  The Assets will be sold subject to any and all violations requiring corrective action.

35.     The Chapter 11 Trustee shall convey the Assets by delivery of a quitclaim or Chapter 11 Trustee deed.  The quality of title shall be that which any reputable title insurance company authorized to do business in the State of New York is willing to approve and insure. If the Successful Bidder or the New Successful Bidder, as the case may be, is unable to obtain title insurance, subject to the permissible exceptions contained herein, the Chapter 11 Trustee may, at its option, arrange for the issuance of a title insurance policy by such a company at the sole cost and expense of the Successful Bidder, or the New Successful Bidder, as the case may be

36.     Nothing contained in these Sale Terms is intended to supersede or alter any provisions of the Bankruptcy Code or any orders entered in the Debtor's Chapter 11 case, or otherwise interfere with the jurisdiction of the Bankruptcy Court.  All of the terms and conditions set forth in these Sale Terms are subject to modification as may be directed by the Chapter 11 Trustee or the Bankruptcy Court.  The Chapter 11 Trustee reserves the right, in consultation with Lender, to modify these Sale Terms at the Auction or thereafter to maintain consistency with the provisions of the Bankruptcy Code and/or prior orders of the Bankruptcy Court.

37.     These Sale Terms will be read into the record, or specifically incorporated by reference, at the Auction of the Assets.  By making a bid for the Assets all Bidders will be deemed to have acknowledged having read and understood these Sale Terms and have agreed to be bound by them.

38.     If the Chapter 11 Trustee is unable to deliver the Assets, in accordance with these Sale Terms for any reason whatsoever, the Chapter 11 Trustee's and the Broker's only obligation will be to refund the Deposit (including any Additional Deposit) and Buyer's Premium, without interest, to the Successful Bidder or the New Successful Bidder, as the case may be, and upon such refund, the Successful Bidder or the New Successful Bidder, as the case may be, will have

no claim or recourse against the Chapter 11 Trustee, the Brokers, the Debtor, or any of their respective professionals and shall have no further rights under these Sale Terms or the Memorandum of Sale.

<u>Sale Hearing</u>

39.     The Sale of the Assets is subject to the entry of the Sale Order by the Bankruptcy Court.  The presentation of a particular Bid to the Bankruptcy Court for approval shall not constitute the Chapter 11 Trustee's acceptance of such Bid.  The Chapter 11 Trustee will be deemed to have accepted the Bid only when the Bid has been approved by the Bankruptcy Court at the Sale Hearing pursuant to a further order of the Bankruptcy Court confirming the Auction.

40.     A hearing to approve the sale of the Assets to the Successful Bidder will be held on November 5, 2020 at 10:00 a.m. (or as soon thereafter as the Bankruptcy Court may accommodate) before the Bankruptcy Court.  The hearing may be conducted telephonically pursuant to the Bankruptcy Court's COVID-19 related operating procedures, if any, then in effect.

41.     The Chapter 11 Trustee shall notify the Successful Bidder or the New Successful Bidder, as the case may be, whether the Auction is confirmed.

42.     Neither the Chapter 11 Trustee, the Chapter 11 Trustee's professionals, the Brokers, the Lender, nor the Debtor's Estate is liable or responsible to the Successful Bidder or the New Successful Bidder, as the case may be, for the payment of fees, including but not limited to any broker fees that have not previously been approved by an order of the Bankruptcy Court.

43.     Pursuant to section 506(c) of the Bankruptcy Code, the Chapter 11 Trustee shall be entitled to recover from the proceeds of the Sale all reasonable, necessary costs and expenses of preserving the Assets, conducting the Auction, and closing the Sale transaction (the "**506(c) Carve-Out**").  The 506(c) Carve-Out includes the Chapter 11 Trustee's fees and the reasonable

fees and expenses of the professionals employed by the Chapter 11 Trustee in this Chapter 11 case, including her attorneys, accountants, property consultants, and the Brokers (collectively, the "**Professionals**"), to the extent the fees and expenses are approved by the Bankruptcy Court pursuant to the terms of the respective Orders approving the Chapter 11 Trustee's employment of the Professionals.  The Lender has consented to the 506(c) Carve-Out.

44.    The Bankruptcy Court shall retain jurisdiction to determine any disputes concerning the Auction of the Assets.  By participating in the Auction, all Bidders consent to the jurisdiction of the Bankruptcy Court to determine such disputes under the Debtor's pending case.

I have read these Sale Terms and agree to be bound by them.

By: _____ Date: _____

Print Name: _____

## Schedule A

### Description of the Real Property

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate lying and being in the Borough of Manhattan, City, County of New York, in the State of New York, bounded and described as follows:

BEGINNING at a point on the southerly line of Ninety-First Street Opposite of the center of a party wall which point is distant two hundred and forty-one feet easterly from the corner formed by the intersection of the southerly line of Ninety-First Street with the easterly line of Columbus (formerly Ninth) Avenue;

RUNNING THENCE southerly parallel with Columbus (formerly Ninth) Avenue and partly through said party wall, one hundred feet, eight and one-half inches to the center line of the block between Ninetieth and Ninety-First Streets;

THENCE easterly along said center line of the block; twenty feet to the point opposite the center of another party wall;

THENCE northerly parallel with Columbus (formerly Ninth) Avenue and partly through the said last mentioned partly wall, one hundred feet, eight and one-half inches to the southerly line of Ninety-First Street and thence westerly along the southerly side of Ninety-First. Street, twenty feet to the point or place of beginning.

Said Assets being known being known as and by street number 60 West 91st Street.

## Schedule B

## MEMORANDUM OF SALE – SUCCESSFUL BIDDER

High Bid Realized at Auction: _____

Buyer's Premium: _____

Purchase Price: _____

The undersigned has this [_____] day of [_____], 2020, agreed to purchase the Assets (as defined in the annexed Sale Terms) and sold by Heidi J. Sorvino, Esq., as the Chapter 11 Trustee, pursuant to the Order Approving the Appointment of the Chapter 11 Trustee of the United States Bankruptcy Court for the Southern District of New York, entered on April 30, 2020, for the sum of [$_____], and hereby promises and agrees to comply with the annexed Sale Terms and this Memorandum of Sale.

_____
SUCCESSFUL BIDDER (Signature)

_____
PRINT NAME

_____
ADDRESS

_____
ADDRESS (City, State, Zip)

_____
TELEPHONE NUMBER

_____
EMAIL ADDRESS

Received from [_____] the sum of [$_____], as a non-refundable deposit for the purchase of the Assets pursuant to the Sale Terms.

This is to verify that the final Purchase Price in the above sale was for the sum of [$_____].

_____
BROKER

25000291v.5

## <u>SUCCESSFUL BIDDER ATTORNEY INFORMATION</u>

_____
NAME

_____
ADDRESS

_____
ADDRESS (City, State, Zip)

_____
TELEPHONE NUMBER

_____
EMAIL ADDRESS

## <u>MEMORANDUM OF SALE – BACKUP BIDDER</u>

High Bid Realized at Auction: _____

Buyer's Premium: _____

Purchase Price: _____

The undersigned has this [_____] day of [_____], 2020, agreed to purchase the Assets (as defined in the annexed Sale Terms) and sold by Heidi J. Sorvino, the Chapter 11 Trustee pursuant to the Order Approving the Appointment of the Chapter 11 Trustee of the United States Bankruptcy Court for the Southern District of New York, entered on April 30, 2020, for the sum of [$_____], in the event of the Successful Bidder's Default and if deemed by the Chapter 11 Trustee, in her sole and absolute discretion, and to hold all benefits and obligations of a Successful Bidder under the Sale Terms and this Memorandum of Sale and hereby promises and agrees to comply with the annexed Sale Terms and this Memorandum of Sale.

_____
BACKUP BIDDER (Signature)

_____
PRINT NAME

_____
ADDRESS

_____
ADDRESS (City, State, Zip)

_____
TELEPHONE NUMBER

_____
EMAIL ADDRESS

Received from [_____] the sum of [$_____], as a non-refundable deposit for the purchase of the Assets pursuant to the Sale Terms.

[Remainder of Page Intentionally Left Blank]

25000291v.5

This is to verify that the final Purchase Price in the above sale was for the sum of [$_____].

_____

_____
BROKER

## **BACKUP BIDDER ATTORNEY INFORMATION**

_____
NAME

_____
ADDRESS

_____
ADDRESS (City, State, Zip)

_____
TELEPHONE NUMBER

_____
EMAIL ADDRESS

**EXHIBIT B**

**NOTICE OF SALE**

WHITE AND WILLIAMS LLP
Amy E. Vulpio, Esq.
James C. Vandermark, Esq.
7 Times Square, Suite 2900
New York, NY 10036
(212) 244-9500
vulpioa@whiteandwilliams.com
vandermarkj@whiteandwilliams.com

*Counsel to Heidi J. Sorvino, Esq.,*
 *as the Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| 60 91st Street Corp.,<br><br>                          Debtor. | Case No. 20-10338 (SCC) |

**NOTICE TO CREDITORS AND OTHER PARTIES IN INTEREST
OF PUBLIC AUCTION SALE OF THE DEBTOR'S ASSETS**

**PLEASE TAKE NOTICE** that, on February 4, 2020 ("**Petition Date**"), 60 91st Street Corp. (the "**Debtor**") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE** that, on April 30, 2020, the Bankruptcy Court entered an Order Approving the Appointment of the Chapter 11 Trustee, appointing Heidi J. Sorvino as the Chapter 11 Trustee ("**Trustee**") of the Debtor's estate.

**PLEASE TAKE FURTHER NOTICE** that, by Order entered on August __, 2020, the Bankruptcy Court approved the retention of Maltz Auctions, Inc. d/b/a Maltz Auctions and Rosewood Realty Group as co-real estate brokers (the "**Brokers**") to sell the Debtor's Assets (defined below).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to an Order entered on September __,_2020 ("**Sale Procedure Order**"), the Bankruptcy Court authorized the Trustee to sell substantially all of the Debtor's assets (the "**Assets**"), which consist primarily of the real property

located at and commonly known as 60 West 91st Street, New York, New York (the "**Real Property**"),[3] also known as:

| Block & Lot |
|---|
| Block 01294, Lot 0054, as more particularly described on <u>Schedule A</u> annexed hereto |

as well as all executory contracts and leases, to the extent assumable and assignable by the Debtor, and the Debtor's books and records held by either the Chapter 11 Trustee or the Shareholder.

PLEASE TAKE FURTHER NOTICE that the Auction shall be conducted telephonically or by videoconference **October 29, 2020 at 12:00 p.m.** (prevailing Eastern Time), or at such later time as may be determined in the Trustee's discretion.

PLEASE TAKE FURTHER NOTICE that on or prior to **October 27, 2020 at 12:00 p.m**, each bidder must submit executed copies of the bidding procedures and terms and conditions of sale (collectively, the "**Sale Terms**") and must deliver certain qualification documents identified in the Sale Terms together with a good faith deposit in the amount of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000) in immediately available funds (the "**Deposit**"), which Deposit shall be made by wire transfer to an attorney escrow account designated by the Chapter 11 Trustee. The Deposit shall serve as a partial good faith deposit against payment of the purchase price by such competing bidder as Trustee determines to have made the highest or best bid (the **"Successful Bid"**) for the Assets ("**Successful Bidder**"). At the Auction, the Assets shall be auctioned for sale with the bidding remaining open until there are no higher bids tendered on the Assets. Upon the conclusion of bidding, the Trustee, in her sole discretion, shall identify the Successful Bidder and the competing Bidder who Trustee determines to have made the second highest or best bid for the Assets ("**Backup Bidder**").

PLEASE TAKE FURTHER NOTICE that as soon as commercially practicable following the Auction, the Successful Bidder and the Backup Bidder will be required to execute, and agree to be bound by all agreements, contracts, instruments or other documents evidencing and containing the terms upon which such Successful Bid was made, including, but not limited to, a memorandum of sale (the "**Memorandum of Sale**").

PLEASE TAKE FURTHER NOTICE that, pursuant to an Order of the Bankruptcy Court, the Successful Bidder, and the Backup Bidder, in the event of Successful Bidder's Default (as defined in the Sale Terms), are solely responsible to pay the Brokers four and one-half percent (4.5%) of the high bid at the Sale ("**Buyer's Premium**"). The sum of the high bid at the Sale and the Buyer's Premium is defined as "**Purchase Price**" herein.

---

[3]  The Real Property is an apartment building consisting of nine (9) units. Based on the records obtained by the Chapter 11 Trustee, four (4) of the units are leased to tenants and one (1) of the units is occupied by the Debtor's sole shareholder (the "**Shareholder**"). The remaining units are vacant but, upon information and belief, may contain building materials and other personal property of de minimis value that belongs to the Debtor.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Bankruptcy Code §§ 363(b) and (f), Bankruptcy Rule 6004, Local Bankruptcy Rule 6004-1 and the Sale Procedure Order, the Assets will be sold free and clear of all liens, claims and encumbrances, with such liens, claims and encumbrances to attach to the net proceeds of sale payable to the Debtor's estate pursuant to the Sale Procedure Order.

**PLEASE TAKE FURTHER NOTICE** that the Assets are being sold "as is", "where is", without any representations of any kind or nature whatsoever, including as to merchantability or fitness for a particular purpose, and without warranty or agreement as to the condition of such Real Property.

**PLEASE TAKE FURTHER NOTICE** that the Sale of the Assets shall remain subject to final approval by this Court at the hearing to be held on **November 5, 2020 at 10:00 a.m.** (or as soon thereafter as the Bankruptcy Court may accommodate) (the **"Sale Hearing"**).

**PLEASE TAKE FURTHER NOTICE** that objections, if any, that part of the relief sought in the Motion not otherwise approved by the Sale Procedure Order, including the Sale of the Assets and the potential assumption and assignment of executory contracts and unexpired leases to the Successful Bidder, shall be filed with the Bankruptcy Court and served upon the following parties so as to be actually received on or before **November 2, 2020 at 4:00 p.m.** (prevailing Eastern Time)(the **"Sale Objection Deadline"**):

    a.    Heidi J. Sorvino, the Chapter 11 Trustee, c/o White and Williams LLP, Attn: James C. Vandermark, Esq., 7 Times Square, Suite 2900, New York, NY 10036-6524;

    b.    Office of the United States Trustee, Attn: Brian Masumoto, Esq., U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York, 10014; and

    c.    2386 Hempstead, Inc., c/o Terenzi & Confusione, P.C., Attn: Ronald M. Terenzi, Esq., 401 Franklin Avenue, Suite 300, Garden City, New York 11530.

**PLEASE TAKE FURTHER NOTICE** that the failure to file an objection prior to the Sale Objection Deadline shall forever bar, preclude and disqualify you from asserting an objection to the Motion at the Sale Hearing or to the Bankruptcy Court's entry of findings and rulings sought therein.

**PLEASE TAKE FURTHER NOTICE** that requests for information about the Assets, including a copy of the Terms and Conditions of Sale, can be obtained by contacting counsel to the Trustee, White and Williams LLP, James C. Vandermark, Esq., at vandermarkj@whiteandwilliams.com or 212.244.9500, Maltz Auctions at 516.349.7022 or Rosewood Realty Group at 212.359.9900.

Dated: September [__], 2020

|  |  |
|---|---|
| **MALTZ AUCTIONS, INC.** | **ROSEWOOD REALTY GROUP** |
| 39 Windsor Place | 38 E 29th Street, 5th Floor |
| Central Islip, New York 11722 | New York, New York 10016 |
| Telephone: 516.349.7022 | Telephone: 212.359.9900 |
| Fax: 516.349.0105 | www.rosewoodrealtygroup.com |
| www.MaltzAuctions.com |  |

**EXHIBIT "B"**

**LEGAL DESCRIPTION**

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, Cite and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly line of West Ninety-First Street opposite the center of a party wall which point is distant two hundred and forty-one feet easterly form the corner formed by the intersection of the southerly line of Ninety-First Street with the easterly line of Columbus (formerly Ninth) Avenue;

RUNNING THENCE southerly parallel with Columbus (formerly Ninth) Avenue and partly through said party wall, one hundred feet, eight and one-half inches to the center line of the block between West Ninetieth and West Ninety-First Streets;

THENCE easterly along said center line of the block; twenty feet to the point opposite the center of another party wall;

THENCE northerly parallel with Columbus (formerly Ninth) Avenue and partly through the said last mentioned party wall, one hundred feet, eight and one-half inches to the southerly line of West Ninety-First Street;

THENCE westerly along the southerly side of West Ninety-First Street, twenty feet to the point or place of BEGINNING.

**EXHIBIT "C"**

**APPROVAL ORDER**

(see attached)

WHITE AND WILLIAMS LLP
Amy E. Vulpio, Esq.
James C. Vandermark, Esq.
7 Times Square, Suite 2900
New York, NY 10036
(212) 244-9500
vulpioa@whiteandwilliams.com
vandermarkj@whiteandwilliams.com

*Counsel to Heidi J. Sorvino, Esq.,*
 *as the Chapter 11 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| 60 91st Street Corp.,<br>                              Debtor. | Case No. 20-10338 (SCC) |

**ORDER AUTHORIZING SALE OF SUBSTANTIALLY ALL ASSETS OF THE
DEBTOR, INCLUDING REAL PROPERTY, PURSUANT TO BANKRUPTCY CODE
§§ 105, 363, 365 AND 1146 AND BANKRUPTCY RULES 6004 AND 6006**

Upon the motion (the "**Motion**")[1] of Heidi J. Sorvino, Esq., as Chapter 11 Trustee (the "**Chapter
11 Trustee**") of 60 91st Street Corp. (the "**Debtor**"), the debtor in the above-captioned Chapter 11
bankruptcy case, seeking the entry of an order in accordance with §§ 105, 363, 365 and 1146 of
Title 11, United States Code, Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006, Local
Rule 6004-1, and the *Amended Guidelines for the Conduct of Asset Sales established pursuant to
General Order M-383* (the "**Sale Guidelines**"): (a) authorizing and approving the procedures,
terms and conditions (the "**Sale Terms**") for a public auction (the "**Auction**") and the sale (the
"**Sale**") of substantially all of the Debtor's assets (the "**Assets**"), consisting primarily of the real

---

[1] All capitalized terms used but not otherwise defined herein shall have the same meanings given to them in the
Motion.

property known as and located at 60 West 91st Street, New York, New York (the "**Real Property**"), free and clear of all liens, claims, and encumbrances, including without limitation, to the maximum extent permitted by applicable law, any unexpired leases not expressly assumed by the Debtor and any other possessory rights to occupy the Real Property or any portion thereof (collectively, **"Liens"**), with such Liens attaching to the proceeds of the Sale, to the bidder tendering the highest or best offer; (b) authorizing and approving the assumption and assignment of a certain unexpired lease of residential real property of which the Debtor is a party in connection therewith (the "**Assumed Lease**") (c) establishing a procedure to confirm the highest or best offer received for the Assets; (d) approving the form, time and scope of notice of the Sale; and (e) granting related relief; and after due deliberation and consideration of all the facts and circumstances herein; and upon the record of the hearing on the Motion (the "**Procedures Hearing**"); and upon the Sale Procedure Order, which approved the Sale Terms; and upon the Declaration of Richard B. Maltz (the "**Maltz Declaration**") on behalf of Maltz Auctions, Inc. ("**Maltz**") and the Declaration of Greg Corbin (the "**Corbin Declaration**" and collectively with the Maltz Declaration the "**Broker Declarations**") on Behalf of Rosewood Realty Group ("**Rosewood**" and together with Maltz, collectively, the "**Brokers**"), in further support of the Motion and the Sale of the Assets to the Successful Bidder for a purchase price of [$_____], and upon the Sale Terms and the Memorandum of Sale annexed to the thereto; and upon the affidavits of service of the Motion, the Sale Procedure Order, the Notice of Sale, and the Notice of Presentment of Final Order, all on file with the Clerk of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and appropriate notice having been given and no further notice being necessary or required; and after due deliberation and sufficient cause appearing therefor; and the

relief sought being determined to be in the best interests of the Debtor's estate and creditors, it is hereby FOUND THAT

1.      The Bankruptcy Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and this matter is a core proceeding under 28 U.S.C. 157(b)(2)(A), (N).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      Proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, and the transactions contemplated thereby has been provided in accordance with Bankruptcy Code §§ 102(1), 363, 365 and 1146 and Bankruptcy Rules 2002 and 6004, 9006, 9007, and 9014, which notice adequately described the nature of the Sale Hearing and the relief requested in the Motion and which notice was good and sufficient, and appropriate under the particular circumstances and no other or further notice of the Motion, the Sale Hearing and the transactions contemplated thereby, or of the entry of this Order is required.

4.      The marketing efforts undertaken by the Chapter 11 Trustee and the Brokers as described in the Broker Declarations, the Notice of Sale, and all other notices given in connection with the relief sought in the Motion, that was provided by the Chapter 11 Trustee, is and shall be, deemed good and sufficient service and no further notice of the relief provided for herein is necessary or required.

5.      The Chapter 11 Trustee has full power and authority to consummate the transactions contemplated by this Order, including executing all necessary documents to consummate the sale of the Assets, and assigning the Assumed Lease.

6.      The Chapter 11 Trustee has advanced sound business justifications for seeking to sell the Assets under the Sale Terms as demonstrated at the Sale Hearing, and the Sale under those Sale Terms is a reasonable exercise of the Chapter 11 Trustee's business judgment.

7.     The Memorandum of Sale was negotiated, proposed and entered into by the Chapter 11 Trustee and the Successful Bidder without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Chapter 11 Trustee nor the Successful Bidder has engaged in any conduct that would cause or permit the Memorandum of Sale to be voided under Section 363(n) of the Bankruptcy Code.

8.     The Successful Bidder is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. The Successful Bidder will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing the Sale of the Assets (the "**Closing**") as in the Memorandum of Sale.

9.     The Sale Terms, including the total consideration realized by the Debtor's estate pursuant to the Sale: (i) are fair and reasonable; (ii) represent the highest and best offer for the Assets; (iii) provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative; and (iv) constitute fair consideration.

10.     The transfer of the Assets upon the Closing will: (i) be a legal, valid, and effective transfer of the Assets of the Debtor's estate to the Successful Bidder; and (ii) vest the Successful Bidder with good, marketable and insurable title to the Assets free and clear of any Liens and security interests of whatever kind or nature.

11.     Subject to and conditioned upon the occurrence of the Closing, the Debtor is hereby authorized in accordance with Sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assumed Lease to the Successful Bidder free and clear of all claims, and to execute and deliver to the Successful Bidder such documents or other instruments as may be necessary to assign and transfer the Assumed Lease to the Successful Bidder as provided in the

Memorandum of Sale. Upon the Closing, Purchaser shall be fully and irrevocably vested with all right, title and interest of the Debtor under the Assumed Lease and, pursuant to Section 365(k) of the Bankruptcy Code, except as expressly set forth in the Memorandum of Sale, the Debtor shall be relieved from any further liability with respect to the Assumed Lease. Upon the Closing, the Successful Bidder shall have no liability or obligation with respect to any claim or matter accruing or arising under the Assumed Lease before the Closing. The Successful Bidder acknowledges and agrees that from and after the Closing, subject to and in accordance with the Memorandum of Sale, it shall comply with the obligations as the landlord under the Assumed Lease accruing and arising from and after the Closing under the Assumed Lease in its entirety, including any indemnification obligations expressly contained in such Assumed Lease that could arise as a result of events or omissions that occur from and after the Closing, unless any such provisions are not enforceable pursuant to the terms of this Order.

12.     Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other persons and entity who may be required by operation of law, the duties of its office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Assets, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale contemplated by the Memorandum of Sale and approved by this Order.

13.     The sale of the Assets as a going concern is necessary and integral to, and conditioned upon, the confirmation of Debtor's Chapter 11 Plan, which will provide for the disbursement of the Sale proceeds to creditors.  The funding for the Chapter 11 Plan can only be accomplished through the sale of the Assets of the Debtor.

14.     All of the provisions of this Order and the Memorandum of Sale are nonseverable and mutually dependent.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

1.      The Motion is granted in its entirety.

2.      All objections to the Motion or the relief requested therein, if any, that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled.

3.      The Chapter 11 Trustee is authorized and empowered, under 11 U.S.C. §§ 105(a) and 363 to enter into and perform under the Memorandum of Sale in order to close the Sale of the Assets to the Successful Bidder for the sum of [$_____] (the "**Sale Proceeds**"), free and clear of all Liens, with such Liens, if any, to attach to the Sale Proceeds in the priority and validity as they presently exist pending further order of this Court, except as otherwise provided for in this Order.

4.      The Chapter 11 Trustee is authorized, under 11 U.S.C. § 365, to assume and assign all executory contracts and unexpired leases relating to the Assets to the Successful Bidder, at the Chapter 11 Trustee's discretion.

5.      All persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding claims of any kind and nature arising prior to the Closing or relating to acts occurring prior to the Closing, and whether imposed by agreement, understanding, law, equity or otherwise against the Debtor or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising on or before the Closing, or out of, under, in connection with, or in any way relating to, events occurring prior to the Closing, with respect to the Assets, hereby are forever barred, estopped, and permanently

enjoined from asserting such claims of any kind and nature against the Successful Bidder, its successors or assigns, their property, or the Assets.

6.      The terms and provisions of the Memorandum of Sale, together with the terms and provisions of this Order, shall be binding in all respects upon, and shall inure to the benefit of the Chapter 11 Trustee, the Debtor's estate, and the Successful Bidder, and their respective affiliates, successors and assigns, and shall be binding in all respects upon any affected third parties, and all persons asserting a claim against or interest in the Debtor's estate or the Assets.

7.      The Bankruptcy Court retains exclusive jurisdiction to interpret, construe and enforce the provisions of the Memorandum of Sale and this Order, provided, however, that, in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

8.      The Chapter 11 Trustee is authorized to do such things, and execute such documents and expend such funds necessary to transfer title to the Assets and to effectuate the terms and conditions of this Order.

9.      The Sale and distribution of the net proceeds through the Chapter 11 Plan fall within the scope of the exemption provided for under section 1146(a) of the Bankruptcy Code and thus are exempt from the imposition of any New York state, local, or other real property transfer, deed recording or documentary tax, or other similar taxes that would otherwise be imposed upon a sale or due in connection with the transfer of the Real Property at Closing.

10.     The 506(c) Carve-Out is approved, and the Chapter 11 Trustee shall be entitled to recover from the proceeds of the Sale all reasonable, necessary costs and expenses of preserving

the Assets, conducting the Auction, and closing the Sale transaction, including the Chapter 11 Trustee's fees and the reasonable fees and expenses of her Professionals, to the extent the fees and expenses are approved by the Bankruptcy Court pursuant to the terms of the respective Orders approving the Chapter 11 Trustee's employment of the Professionals.

11.     The Successful Bidder has acted in good faith and will acquire the Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code.

12.     If the Successful Bidder fully performs under the Sale Terms at any time on or after the entry of this Order, then, with respect to the sale of the Assets, the Successful Bidder shall be entitled to the protection of 11 U.S.C. § 363(m) as set forth in this Order or any authorization contained herein, and the purchase by the Successful Bidder constitutes a purchase in good faith for fair value within the meaning of 11 U.S.C. § 363(m).

13.     This Court hereby orders that the fourteen (14) day stay provided for in Bankruptcy Rule 6006(d), to the extent applicable, shall not be in effect with respect to the Sale.

Dated: _____, 2020
      New York, New York

                                   _____
                                   HONORABLE SHELLEY C. CHAPMAN
                                   UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT "D"

## FORM OF BARGAIN AND SALE DEED WITHOUT COVENANT AGAINST GRANTOR'S ACTS

(see attached)

## BARGAIN AND SALE DEED WITHOUT COVENANT AGAINST GRANTOR'S ACTS

**THIS INDENTURE**, made the __ day of _____, 2020

**BETWEEN** Heidi J. Sorvino, Esq., the Chapter 11 Trustee for the bankruptcy estate of 60 91st Street Corp., a New York corporation ("**60 91st Street Corp.**") (in her capacity as such trustee, the "**Trustee**") with an address at 7 Times Square, Suite 2900, New York, NY 10024

party of the first part, and

Pinetree Group, Inc., a New York Corporation, with an address at 548 West 28th Street, Suite 645, New York, New York 10001

party of the second part:

**WITNESSETH**, on February 4, 2020, 60 91st Street Corp. filed a voluntary petition under Chapter 11 of the United States Code, 11 U.S.C. §101 *et seq.*, in the United States Bankruptcy Court for the Eastern District of New York (the "**Bankruptcy Court**"), Case No. 20-10338 (SCC)(the "**Bankruptcy Case**");

**WITNESSETH**, on April 30, 2020, the Bankruptcy Court entered the Order Approving the Appointment of the Chapter 11 Trustee [Bankruptcy Case ECF No. 28], pursuant to which the Trustee was appointed as the Chapter 11 Trustee for 60 91st Street Corp.'s bankruptcy estate;

**WITNESSETH**, by the [Insert Sale Approval Order], attached hereto as **Exhibit A** and entered by the Bankruptcy Court in the Bankruptcy Case on [_____], the Bankruptcy Court authorized and empowered the Trustee to execute and deliver this indenture to the party of the second part;

**WITNESSETH**, that the said party of the first part, in consideration of [_____/100 DOLLARS ($_____)], and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever:

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of New York, County of New York, State of New York, as more particularly described on **Exhibit B** attached hereto (the "**Premises**");

**BEING** and intended to be the same premises conveyed to 60 91st Street Corp. by (i) that certain Deed from Anne Sowell dated September 26, 1994 and recorded October 13, 1994 in Reel 2145 Page 2249, and (ii) that certain Deed from Yvonne Sowell a/k/a Yvonne Mortimer "as sole heir-at-law of" Arthur Sowell dated February 18, 2011 and recorded October 7, 2011 as CRFN 2011000355788;

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described Premises to the center lines thereof;

**TOGETHER** with the appurtenances and all the estate and rights of the party of the first part in and to said Premises;

**UNDER AND SUBJECT TO,** nevertheless, the Permitted Exceptions (as defined in the Purchase and Sale Agreement dated _____, 2020 between the party of the first part and the party of the second part);

**TO HAVE AND TO HOLD** the Premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever; and

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, the party of the first part has duly executed this deed the day and year first above written.

<div style="margin-left:50%">

Heidi J. Sorvino, Esq. as the duly appointed Chapter 11 Trustee for the bankruptcy estate of 60 91st Street Corp., a New York corporation


By: _____
Name:  Heidi J. Sorvino, Esq.
Title:   Chapter 11 Trustee

</div>

STATE OF NEW YORK     )
                         ) ss:
COUNTY OF _____    )

On the ___ day of _____ in the year 2020, before me, the undersigned, personally appeared Heidi J. Sorvino, Esq., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the written instrument and acknowledged to me that she executed the same in her capacity as the duly appointed Chapter 11 Trustee for the bankruptcy estate of 60 91st Street Corp., a New York corporation, and that by her signature on the foregoing instrument, as the duly appointed Chapter 11 Trustee for the bankruptcy estate of 60 91st Street Corp., a New York corporation, upon behalf of which such individual acted, executed the foregoing instrument.

_____
(signature and office of person taking acknowledgment)

26264572v.3

## EXHIBIT A

[Bankruptcy Court Order attached]

**<u>EXHIBIT B</u>**

All that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, Cite and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly line of West Ninety-First Street opposite the center of a party wall which point is distant two hundred and forty-one feet easterly form the corner formed by the intersection of the southerly line of Ninety-First Street with the easterly line of Columbus (formerly Ninth) Avenue;

RUNNING THENCE southerly parallel with Columbus (formerly Ninth) Avenue and partly through said party wall, one hundred feet, eight and one-half inches to the center line of the block between West Ninetieth and West Ninety-First Streets;

THENCE easterly along said center line of the block; twenty feet to the point opposite the center of another party wall;

THENCE northerly parallel with Columbus (formerly Ninth) Avenue and partly through the said last mentioned party wall, one hundred feet, eight and one-half inches to the southerly line of West Ninety-First Street;

THENCE westerly along the southerly side of West Ninety-First Street, twenty feet to the point or place of BEGINNING.

26264572v.3

# SCHEDULE 1

## PERMITTED EXCEPTIONS

Reference is made to that certain Title Commitment #RANY-40759 prepared by Riverside Abstract, LLC and effective as of July 28, 2020, and the following enumerated items:

1. Exceptions to Schedule B, Part II, items 2, 4 through 7, and 11 through 35.

2. The rights and interests, if any, of Kim Mortimer and Paulette Brown and any other persons or entities in possession of the Property, not shown by the public record.

3. Environmental Control Board violations

4. Building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations.

5. Any state of facts that a current, accurate survey or visual inspection of the Real Property would disclose, provided same do not render title uninsurable at standard rates.

6. Any encroachment, encumbrance, violation, variation or adverse circumstances affecting the title that would be disclosed by an accurate and complete land survey of the land or survey exception set forth in the policy. In the absence of a survey, the title company will not certify as to the location or dimensions of the Property on all sides, and will except any state of facts an accurate survey may show.

7. All rights and easements for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Real Property.

8. Any variations between a tax diagram or a tax map and the record description, provided same does not render title uninsurable at standard rates.

9. Rights of the public and adjoining owners in highways, streets, roads and lanes crossing the Real Property existing as of the date hereof, provided that the Title Company shall insure (at no additional cost to Purchaser) that no third parties have any claims for adverse possession or easements by prescription by virtue of the use of such highways, streets, roads and lanes crossing the Real Property.

10. Real property taxes, water rates and charges, sewer taxes and rents, and similar items with respect to the Real Property, not yet due and payable and subject to apportionment as provided herein, which may include charges for use prior to the date of the policy.

11. Taxes or special assessments which are not shown as existing liens by the public records.

12. Assessments or installments thereof arising after the date of Closing, whether or not a lien as of Closing, which are due and payable on or after Closing.

13. Liens for municipal improvements assessed after the Closing Date.

14. Oil, gas or other mineral interests and all rights incident thereto now or previously conveyed, transferred, leased, excepted or reserved pursuant to instruments or documents filed of record against the Real Property.

15. Easements, or claims of easements, not shown by the public records.

26202440v.6