UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| 60 91st Street Corp., | Case No. 20-10338 (SCC) |
| Debtor. | |

**DEBTORS SOLE SHAREHOLDER'S NOTICE OF
SALE OBJECTION**

I, Kim Mortimer, hereby declare:

1. I am debtor's sole shareholder in the above captioned case.

2. I submit this Objection to the Sale of the Debtor's assets that occurred on December 9th 2020.

3. I am requesting the sales and final closing be rescinded due to the Chapter 11 Trustee's complaint against the lender and secured creditor 2386 Hempstead Inc. for 11 counts of Fraud against the Debtor. (See Index 20-0132 Dkt. 1).

4. I am requesting the sales and final closing be rescinded due to the fact that a final determination on Appeal has not been made by Hon. Schonfield in the District Court of Appeals (under Index 20-4032).

5. Although the Chapter 11 Trustee purports that to further delay the December 9th 2020 auction would not be advantageous to the Debtors because of loss revenue from the vacated units.  Please note that rental income has decreased because tenants have moved out and no attempt has been made to refill the units with qualified tenants.

6. If the Debtor was allowed to rent the vacant units to qualified tenants, the income generated from the property would easily cover the expenses of operating the property.

7. Additionally, a payment plan with the creditors can easily be structured in lieu of the circumstances. (i.e

8. I have collectively referred to the secured lender and 2386 Hempstead Inc. collectively as the Defendants my declaration, but as will be evidenced also includes many other co-conspirators.

9. I have complete knowledge of the facts of this case and submit this Complaint and Affidavit in support of the Chapter 11 Trustees complaint against the secured creditor and above listed Defendants for violations of Title 18, United States Code, §1343 §§ 1028A, 1349, and 2.

10. Defendants violated several sections of the New York Statutory Business Practices Law particularly § 349 - specifically Debtor's sole shareholder's right to Fair Business Trade Practices.

11. Defendants violated NYC Consumer Protection Law Section § 20-700 against the Debtor's sole shareholder.

12. Defendants engaged in a "Insurance Fraud for Profit" scheme which financially injured the Debtor's sole shareholder by defrauding her of at least five hundred thousand ($500,000) dollars.

13. Defendants, in perpetrating this scheme also steered potential renters away from the debtor.

## OVERVIEW OF THE INSURANCE FRAUD FOR PROFIT SCHEME BY DEFENDANTS

14. In brief this complaint is about unfair business practices committed via an "Insurance Fraud for Profit" Scheme.

15. This "Insurance Fraud for Profit scheme was committed by real estate industry insiders either collectively or individually, who used their specialized knowledge and authority to misuse the mortgage lending process and the judicial system: to commit, facilitate and

defraud the Debtor's sole shareholder of no less than five-hundred-thousand dollars ($500,000).

16. This complicated scheme involved the collusion by industry insiders, (the Defendants), which included bank officers, private lenders, appraisers, title insurance agencies, mortgage services, mortgage brokers, attorneys, loan originators, referees, mortgage closers,

17. From 2015 up to and including 2016, in the Southern District of New York and elsewhere, Defendants, willfully and knowingly, devised and intended to devise a scheme and artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses.

18. Defendants made representations, and promises to the debtor and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television, communication in interstate and foreign commerce, writings, signs, signals pictures and sounds for the purpose of executing such scheme and artifice, to with Defendants through the use of interstate emails, amongst other means made materially false and deceptive representations to the Debtor's sole shareholder.

19. Debtor's sole shareholder used the materially false and deceptive representations of the Defendants to guarantee a commercial mortgage of her property.

20. These false and deceptive actions included, but are not limited to, self-enrichment, identity fraud, abuse of power, false and inaccurate closing documents, false  accounting conflicts of interests, baiting and switching closing documents, undisclosed collusive relationships, undisclosed dual agency relationships, and were all conducted to gain control of Debtor's sole shareholder's property to ultimately short-sell it either via foreclosure and sale and/or bankruptcy proceedings.

21. In the Southern District of New York and elsewhere, the Defendants, and others known and unknown, knowingly and willfully did combine, confederate and agreed together and with each other to commit an offense against the Debtor's sole shareholder, to wit, to violate Title 18, United States Code, section 1343.

22. It was a part and an object of the conspiracy that the Defendants, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, unlawful actions, representations, and promises, and the attempts to do so would and did transmit and cause to be transmitted by means of writings, wire, radio, wire, television, communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for purpose of executing such scheme and artifice in violation of Title 18, United States Code, §1343.

23. From at least in or about 2015, and up to and including on or about 2019, in the Southern District of New York and elsewhere, Defendants, known and unknown, knowingly and willfully did combine, conspire, confederate and agree together and with each other to commit an offense against the Debtor's sole shareholder, to wit, to violate Title 18, United States Code, Section 1343.

## APPLICABLE LAW
## FRAUDULENT INDUCEMENT

24. "Fraudulent inducement may be based on oral statements.  See, Danann Realty Corp. v. Harris, 5 NY2d 317, 320 [1959] ("Where the complaint states a cause of action for fraud, the parole evidence rule is not a bar to showing the fraud either in the inducement or in the execution despite an omnibus statement that the written instrument embodies the whole agreement, or that no representation have been made.")."

# GENERAL BUSINESS LAW § 349

25. "The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made another usually by way of false and misleading advertising." Genesco Entm't v. Koch, 593 F. Supp. 743 (S.D.N.Y 1984). A Debtor's sole shareholder alleging a violation of GBL § 349 must prove it was misleading in a material way; and the Debtor's sole shareholder suffered injury as a result of the deceptive act. Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25 (1995). "Whether a representation or an omission, the deceptive practice must be 'likely to mislead a reasonable person acting reasonably under the circumstances." Stutman v. Chemical Bank, 95 N.Y.2d 24, 29 (2000). Courts consider whether an act is deceptive objectively. Boule v. Hutton, 328 F.3d 84, 94 (2d Cir. 2003). Notably, the deceptive practice does not have to rise to "the level of common-law fraud to be actionable under section 349." Id., citing Gaidon v. Guardian Life Ins. Co., 94 N.Y.2d 330, 343 (1999). In addition, a Debtor's sole shareholder must prove "actual" injury to recover under the statute, though not necessarily pecuniary harm. Stuntman, 95 N.Y.2d at 29; Oswego Laborers', 85 N.Y.2d at 26. And, the Debtor's sole shareholder must prove the deceptive act caused the injury. Id.; Oswego Laborers', 85 N.Y.2d at 26.

# NEW YORK CITY'S CONSUMER PROTECTION LAW

26. Under § 20-700 no person shall engage in any deceptive or unconscionable trade practice in the sale, lease, rental or loan or in the offering for sale, lease, rental, or loan of any consumer goods or services, or in the collection of consumer debts. This includes any deceptive trade practice. Any false, falsely disparaging, or misleading oral or written statement, visual description or other representation of any kind made in connection with the sale, lease, rental or loan or in connection with the offering for sale, lease, rental, or

loan of consumer goods or services, or in the extension of consumer credit or in the collection of consumer debts, which has the capacity, tendency or effect of deceiving or misleading consumers. Deceptive trade practices include but are not limited to: (1) representations that goods or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; the supplier has a sponsorship, approval, status, affiliation, or connection that he or she does not have; goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, or secondhand; or, goods or services are of a particular standard, quality, grade, style or model, if they are of another; (2) the use, in any oral or written representation, of exaggeration, innuendo or ambiguity as to a material fact or failure to state a material fact if such use deceives or tends to deceive; (3) disparaging the goods, services, or business of another by false or misleading representations of material facts.

## PARTIES

27. At all times relevant, unless otherwise indicated Kim Mortimer is a resident of the State of New York and is the sole shareholder and President of the debtor 60 91ST Street Corporation.

28. sole shareholder Mortimer owns 100% of the shares in 6091st Street Corporation.

29. At all times relevant Scott Grodsky ("Defendant Grodsky") was a resident of Long Island, New York and was the President of 2386 Hempstead Inc. and Empire Solutions Inc.

30. Upon information and belief Defendant Grodsky is also Defendant William "Van" Horneff. (See Exhibit 1 closing disbursement statement stating mortgage is the same lender).

31. At all times relevant Defendant Grodsky was and is President of 2386 Hempstead Inc and Empire Solutions with principal addresses being at 2386 Hempstead Turnpike East Meadow, New York 11554 and 45 Glen Cove Road Greenvale New York 11548.

32. At all times relevant hereto, Defendant Grodsky committed the fraud for profit scheme against Debtor's sole shareholder.

33. At all times relevant 2386 Hempstead Inc. was believed to be a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity)

34. 2386 WAS NOT IN REGISTERED AS A CORPORATION IN ANY DATABASE IN 2015.

35. At all times relevant hereto, Defendant 2386 Hempstead Inc. **was not authorized to** conduct business in New York in 2014 or 2015, but was conducting the business of lending money, in the State of New York, maintaining offices within the State of New York, at 2386 Hempstead Turnpike East Meadow, New York 11554 and 45 Glen Cove Road Greenvale New York 11548.

36. At all times relevant hereto, Defendant 2386 Hempstead Inc. duly existed as a "hard-money private" lender for the purposes of lending money to private individuals whose property is financially distressed and in need of a loan.

37. At all times relevant hereto, Defendant 2386 Hempstead Inc committed the "Fraud for Profit scheme committed against Debtor's sole shareholder.

31. At all times relevant hereto, Defendant Moberg and Kocoris LLC was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, for example at 150 Broadhollow Road Ste 320 Melville, New York 11747.

32. At all times relevant hereto, Defendant Kocoris duly existed as a Counsel to Defendants Grodsky, Windfield, 2386 Hempstead Inc. and ASAP Consulting for the purposes of providing legal counsel and services organized and existing under and by virtue of the laws of the State of New York.

33. At all times relevant James Kocoris Esq. ("Defendant Kocoris"), of Moberg and Kocoris LLC, was a Partner and Principal of Moberg and Kocoris LLC.

34. Defendant Kocoris was a co-conspirator in the "Fraud for Profit" lending scheme committed against Debtor's sole shareholder.

35. At all times relevant Moberg and Kocoris LLC, was a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

36. At all times relevant Moberg and Kocoris LLC was a co-conspirator in the Fraud for Profit lending scheme committed against Debtor's sole shareholder.

37. At all times relevant Defendant General Abstract & Settlement Services was a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

38. At all times relevant hereto, Defendant General Abstract & Settlement Services was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices at 150 Broadhollow Road Ste 320 Melville, New York 11747.

39. At all times relevant hereto, Defendant General Abstract & Settlement Services duly existed as an abstract and settlement company for the purposes of providing property abstract and settlement services organized and existing under and by virtue of the laws of the State of New York.

40. At all times relevant hereto, Defendant General Abstract & Settlement Services was a co-conspirator in this "Fraud for Profit" Scheme committed against Debtor's sole shareholder.

41. At all times relevant Jay Waldhauser Esq. ("Defendant Waldhauser"), was a partner and principal of Nisar & Waldhauser.

42. At all times relevant Nisar & Waldhauser P.C., was and is a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

43. At all times relevant hereto, Defendant Waldhauser was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, at 55 Old Country Road, Hicksville, New York 11801.

44. At all times relevant hereto, Defendant Waldhauser duly acted as Debtor's sole shareholder's counsel in 2015 for the purposes of reviewing closing documents in 2015 and organized and existing under and by virtue of the laws of the State of New York.

45. At all times relevant to this information, Defendant Waldhauser Esq. was a co-conspirator in the "Fraud for Profit" lending scheme committed against the Debtor's sole shareholder.

46. At all times relevant hereto, Defendant Robert Windfield, ("Defendant Windfield") was and is the owner and Principal of ASAP Consulting Inc and partner to Defendant Grodsky, and Principal of Defendant 2386 Hempstead Inc.

47. At all times relevant Defendant Windfield, was a co-conspirator in the Fraud for Profit lending scheme committed against the Debtor's sole shareholder.

48. At all times relevant ASAP Consulting Inc. ("Defendant ASAP") was a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

49. At all times relevant hereto, Defendant ASAP was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, located at 72 Anderson Ave North Babylon, New York 11703.

50. At all times relevant hereto, Defendant ASAP duly existed as a Broker and Hard-Money Lender for the purposes of finding lenders and lending money duly organized and existing under and by virtue of the laws of the State of New York.

51. At all times relevant Defendant ASAP Consulting was a co-conspirator in the Fraud for Profit lending scheme committed against Debtor's sole shareholder.

52. At all times relevant Anatasia Koulouris (Defendant Koulouris) was a Principal of ASAP consulting maintaining a residence and office within the State of New York, located at 72 Anderson Ave North Babylon, New York 11703.

53. At all times relevant Defendant Koulouris was a co-conspirator in the Fraud for Profit lending scheme committed against Debtor's sole shareholder.

54. Defendant Koulouris was also an employee of Defendant Absolute Home Mortgage Loans Corporation ("Defendant Absolute Home Mortgage Corporation Loans").

55. At all times relevant hereto, Defendant Absolute Home Mortgage Corporation, was authorized to do business, and was in fact doing business, in the State of New Jersey maintaining offices within the State of New Jersey at 330 Passaic Ave, Suite 204 Fairfield, NJ 07004.

56. At all times relevant hereto, Defendant Absolute Home Mortgage Corporation, duly existed as a full-scale mortgage company doing business with HUD and FHA lending money to borrowers to purchase and refinance homes and servicing mortgages.

57. At all times relevant Defendant Absolute Home Mortgage Corporation Loans was co-conspirator in the Fraud for Profit lending scheme committed against Debtor's sole shareholder.

58. At all times relevant hereto, Defendant Absolute Home Mortgage Corporation, was authorized to do business, and was in fact doing business, in the State of New Jersey,

maintaining offices within the State of New Jersey, with a principal office at 330 Passaic Ave, Suite 204 Fairfield, NJ 07004.

59. At all times relevant Defendant Absolute Home Mortgage Corporation Loans duly existed as a full-service mortgage broker and hard-money Lending, servicing and originating loans duly organized and existing pursuant to, and by virtue of, the laws of the State of New Jersey, and was co-conspirator in the Fraud for Profit lending scheme committed against Debtor's sole shareholder.

60. At all times relevant Kala Herghelegiu (Defendant Herghelegiu) was a Principal of Absolute Home Mortgage Corporation Loans.  Absolute Home Mortgage Corporation Loans was the underwriter of the loans in 2015 and 2016

61. At all times relevant Defendant Kala Herghelegiu was co-conspirator in the Fraud for Profit lending scheme committed against Debtor's sole shareholder.

62. At all times relevant Defendant Intercoastal Abstract Company, was a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

63. At all times relevant hereto, Defendant Intercoastal Abstract Company was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, at 31 Stewart Street Floral Park, New York 11001.

64. At all times relevant hereto, Defendant Intercoastal Abstract Company, was a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

65. At all times relevant Defendant Intercoastal Abstract Company was co-conspirator in the Fraud for Profit lending scheme committed against Debtor's sole shareholder.

66. At all times relevant hereto, Defendant Intracoastal Abstract Company Inc. was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, at 31 Stewart Street Floral Park, New York 11001.

67. At all times relevant hereto, Defendant Intracoastal Abstract Company Inc. duly existed and at all times relevant hereto, was a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

68. At all times relevant Defendant Intracoastal Abstract Company Inc. was a co-conspirator in the Fraud for Profit lending scheme committed against Debtor's sole shareholder.

69. At all times relevant Defendant Tri Costal Abstract was believed to be a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York with offices at 31 Stewart Avenue Floral Park, NY 11001 was in fact doing business, in the State of New York, maintaining offices within the State of New York, at 31 Stewart Street Floral Park, New York 11001.

70. At all times relevant hereto, Defendant Tri Costal Abstract duly existed as an abstract and title company.

71. At all times relevant Defendant Tri Costal Abstract was a co-conspirator in the Fraud for Profit lending scheme committed against the Debtor's sole shareholder.

72. At all times relevant Defendant Bill Wilson aka William E Wilson, upon information and belief was and is President, employee, affiliate or employee of Tri Costal Abstract.

73. At all times relevant Defendant Bill Wilson aka William E Wilson, was the Title closer and also Public Notary for the State of New York in 2015.

74. At all times relevant Defendant Bill Wilson aka William E Wilson, Public Notary qualified in the Suffolk County and acted as the 2014 Title Closer.

75. At all times relevant Defendant Wilson aka William E. Wilson, was and is a notary public registered under the State of New York qualified in Suffolk County.

76. At all times relevant Defendant Bill Wilson aka William E. Wilson was a co-conspirator in the Fraud for Profit lending scheme committed against Debtor's sole shareholder.

77. At all times relevant Aliya J. Nelson ("Defendant Nelson"), was and is the Managing Partner of Aliya J. Nelson, P.C.

78. At all times relevant Aliya Nelson P.C.("Defendant Nelson PC") was and is a domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York.

79. At all times relevant hereto, Defendant Nelson was authorized to do business, and was in fact doing business, in the State of New York, maintaining an office at 315 Madison Avenue Ste. 901 New York New York 10017 within the State of New York.

80. At all times relevant hereto, Defendant Nelson duly existed as the Debtor's sole shareholder's legal counsel in 2016 for the purposes of advising Debtor's sole shareholder on the 2016 refinance with Defendants Grodsky, 2386 Hempstead Inc, and Windfield.

81. At all times relevant Defendant Nelson was a co-conspirator in the Fraud for Profit lending scheme committed against Debtor's sole shareholder. in 2016.

82. At all times relevant Maria Terasco ("Defendant Terasco"), was the Notary Public who represented Defendant Grosky's interests in the 2016 closing.

83. At all times relevant Defendant Terasco, was and is a notary public registered under the State of New York qualified in Suffolk County #01TA6073704 whose commission expired on April 29th 2018.

84. At all times relevant Defendant Terasco was a co-conspirator in the Fraud for Profit lending scheme committed against Debtor's sole shareholder. in 2016.

85. At all times relevant Zeichner Ellman & Krause LLP (" Defendants Zeichner Ellman & Kraus") was a large domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York specializing in providing legal counsel to real estate professionals.

86. At all times relevant hereto, Defendants Zeichner Ellman & Krause was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, for example at 11211 Avenue of the Americas New York, New York 10022.

87. At all times relevant to this information Defendants Zeichner Ellman & Kraus LLP were co-conspirators in the Fraud for Profit lending scheme against Debtor's sole shareholder.

88. Defendant William "Van" Horneff, Defendant Elizabeth Horneff, Defendant John Horneff, (collectively Defendants Horneffs), and is also charged herein purported to be a business with an interest in private hard-money lending to distressed borrowers.

89. At all times relevant hereto, Mark W. Schlussel Esq. ("Defendant Schlussel") is a managing partner, owner and principle of Defendant Zeichner Ellman & Krause LLP.

90. At all times relevant hereto, Defendants Schlussel Esq. provided legal Counsel to Sedgwick Mortimer and Defendants Horneffs.

91. At all times relevant to this information Defendants Zeichner Ellman & Kraus LLP were co-conspirators in the Fraud for Profit lending scheme against Debtor's sole shareholder.

92. At all times relevant hereto, William Horneff, Elizabeth Horneff and John Horneff ("Defendants Horneffs') were private hard money lenders to the Debtor's sole shareholder from 2011 to 2014.

93. Defendant Horneffs were doing business, in the State of New York, but maintaining offices within the State of New Jersey at 1 Eckart Farm Road Saddle River New Jersey.

94. At all times relevant, Defendant Horneffs were co-conspirators in the Fraud for Profit lending scheme committed against Debtor's sole shareholder in 2014.

95. At all times relevant Wolinsky Law Group LLP (" Defendants Wolinsky Law Group PC") was a small domestic corporation, limited liability company, not-for-profit corporation, domestic partnership, proprietorship (or other domestic business entity), organized and existing pursuant to, and by virtue of, the laws of the State of New York specializing in providing legal counsel to real estate professionals and maintaining offices within the State of New York at 160-02 Remington Boulevard Ronkonkoma, New York 11779 (631) 588 2900.

96. At all times relevant, Defendant Wolinsky Law Group LLP were co-conspirators in the Fraud for Profit lending scheme committed against Debtor's sole shareholder in 2014.

97. At all times relevant hereto, Alan M Wolinsky Esq. ("Defendant Wolinsky") was and is Partner of Wolinsky Law Group P.C. and Counsel to Defendants Grodsky and 2386 Hempstead in 2017.

98. At all times relevant to this information Defendants Wolinsky was a co-conspirator in the Fraud for Profit lending scheme against Debtor's sole shareholder.

99. At all times relevant hereto, Defendants Wolinsky Law Group P.C. was authorized to do business, and was in fact doing business, in the State of New York, maintaining offices within the State of New York, at 160-02 Remington Boulevard Ronkonkoma, New York 11779.

100. At all times relevant to this information Defendants Wolinsky Law Group P.C. were co-conspirators in the Fraud for Profit lending scheme against Debtor's sole shareholder.

### ZEICHNER ELLMAN & KRAUSE LLP AND LENDERS
### DEFENDANTS HORNEFFS
### (Unjust Enrichment)

101. The Debtor's sole shareholder was the guarantor of a 2011 mortgage she placed on the property.

102. The mortgaged premises, 60 West 91 Street, New York, New York (the "Premises") is owned by "60 91st Street Corporation", a New York State Corporation with its principal place of business at 60 West 91st Street New York 10024.

103. The mortgage premises was and is the Debtor's sole shareholder's private family home for over 75 years.

106. Defendants Horneff were private hard money lenders who provided the mortgage in 2011 for four-hundred-thousand ($400,000) dollars.

107. Debtor's sole shareholder made payments on this loan from 2011 to 2014.

108. Debtor's sole shareholder has never met Defendants Horneffs.

109. Upon information and belief Defendant William Horneff and Defendant Grodsky and 2386 Hempstead Inc are the same lenders. (See Exhibit 1: Title Insurance Closing Invoice).

110. Notably, this was never disclosed to the Debtor's sole shareholder. Nor did the Debtor's sole shareholder ever agree to use the same lender in the 2014 refinancing.

111. In 2014 Debtor's sole shareholder's principal's brother, Sedgwick Mortimer sought legal counsel from Zeichner Ellman & Krause LLP to discuss a real estate matter with respect to his family's distressed property. (See Exhibit 2 Letter from Zeichner Ellman and Kraus to Debtor's sole shareholder's brother).

112. At the time, Debtor's sole shareholder's brother disclosed "private privileged and confidential" information to Defendant Schlussel regarding Debtor's sole shareholder's financially "distressed" property.

113. On October 10th, 2014, Debtor's sole shareholder's brother Sedgwick Mortimer also discussed the matters with the New York District Attorney and the New York's Special Prosecutors' Bureau.

114. Defendant Schlussel Esq. accepted the letter of engagement pursuant to Part 1215 to Title 22 of the Official Compilations of Codes, Rules and Regulations of the State of New York on June 6th, 2014 (See 2014 Exhibit 2 Zeichner Ellman and Kraus Letter of Engagement).

115. Defendant Schlussel then used the "private privilege and confidential" information to enrich himself via his firm by disclosing the information Debtor's sole shareholder's adversary(ies) Defendant Horneffs.

116. Neither Debtor's sole shareholder's principle nor her brother sanctioned the release of the "private privileged and confidential" information to a third party.

117. Debtor's sole shareholder became aware of the collusive endeavor between Defendants Schlussel and Horneffs and defaulted on mortgage payments to Defendants Horneffs.  (See Exhibit 3 default notice from Defendant Zeichner Ellman and Kraus).

118. In 2014, Defendant Horneffs initiated a separate legal proceeding against Debtor's sole shareholder (See Exhibit 3 default notice from Defendant Zeichner Ellman and Kraus), and used Defendant Zeichner Ellman and Kraus LLP to represent him.

119. Notably Defendant Schlussel used different stationary, which hid his name and affiliation with the firm. (See Exhibit 2: Defendants Zeichner Ellman and Kraus's Letter of Engagement by Defendant Schlussel).

120. Zeichner Ellman and Kraus LLP should have recused itself from representing the Defendant Horneffs, because in so doing, violated "attorney client" privilege.

121. Debtor's sole shareholder attempted to expose the collusive relationship in the Supreme Court but did not have the necessary proof.

122. Since Debtor's sole shareholder was unsuccessful, in the proceedings, Debtor's sole shareholder was liable for Zeichner Ellman & Krause's Legal Fees for sixty-eight thousand four hundred one dollars and four cents ($68,401.04)   See Exhibit 4 Schedule A 2015 closing statement created by Ana Park of Defendants Zeichner Ellman and Kraus).

123. Defendant Schlussel had superior knowledge of essential facts about Debtor's sole shareholder's financially "distressed" premises and used the information to enrich himself and/or his firm by disclosing the information to the Defendants Horneffs.

124. Defendant Schlussel used the information given to him from Debtor's sole shareholder's principal's brother Sedgwick Mortimer to financially benefit from it.

125. Additionally, Zeichner Ellman & Krause LLP calculated a default interest cost at

126. 17% when in fact, according to the original mortgage documents, should have been 16%.

127. Notably, neither Debtor's sole shareholder, nor her brother, have met the Horneffs.

128. Upon information and belief the Defendants Horneffs were involved in this "Fraud for Profit" scheme.

129. Debtor's sole shareholder believes the action by Defendant Schlussel was unconscionable, predatory, and onerous in nature.

130. The actions of Defendants Zeichner Ellman and Kraus, because she was forced to pay for the legal fees of Defendants Zeichner Ellman and Kraus.

131. Debtor's sole shareholder was financially harmed by the actions of Defendants Zeichner Ellman and Kraus, because she was forced to refinance her property, thus further encumbering her property.

132. The initial four-hundred-thousand dollars ($400,000), loan ballooned to one-million four hundred thousand dollars ($1,400,000).

## 2015 REFINANCE

133. On or about 2015, Debtor's sole shareholder Mortimer responded to an unsolicited mail advert sent to her

by Thomas Sidford of Sidford Funding. (See Exhibit 5 letter from Sidford)

134. Mr. Sidford told Debtor's sole shareholder that he had seen her property being listed on the "NYC lien sale auction" and offered to introduce her to private lenders who would be willing to offer funding.

135. Mr. Sidford introduced Debtor's sole shareholder Mortimer to Defendant Winfield as the Lender.  (See Exhibit 8: Emails introducing Defendant Windfield as Lender).

136. Defendant Winfield made materially false representation to Debtor's sole shareholder that he was a broker who had formerly worked on the trading floor as a trader, and had since turned commercial lender with his partner, colleague and associate, Defendant Grodsky.

137. Defendant Windfield purported that he and his partner Defendant Grodsky, would be willing to lend one million four hundred ($1,400,000) dollars, if Debtor's sole shareholder would guarantee the loan.

138. Defendant Windfield introduced Debtor's sole shareholder to his partner Defendant Grodsky.

139. Debtor's sole shareholder agreed to guarantee the debt and elected to a cash out payment of $142K. $42,000 of which Debtor's sole shareholder would use to pay the 12 months of interest up front.

140. Debtor's sole shareholder also asked Defendant Windfield and Grodsky to provide her with an accounting of the fees and charges etc. to review, prior to the actual closing.

141. Defendant Windfield provided Debtor's sole shareholder with a Letter of Intent ("LOI/Term-Sheet" showing anticipated fees and charges for the 2015 closing.

142. Defendant Windfield asked Debtor's sole shareholder to pay $2000 for a licensed building inspection fee.

143. Notably, Defendant Windfield conducted the building inspection himself.

144. Defendants Windflied is not a licensed building inspector.

145. Defendants Windfield and Grodsky asked if Debtor's sole shareholder was interested in reducing the monthly interest payments by half.

146. Defendants Windfield and Grodsky purported that they were willing to decrease the monthly payment to $3500 per month by taking a portion of the original interest payments and adding that spread to the back end of the loan principle which would be paid at the maturity of the loan and when the loan was transferred to another lender.

147. Debtor's sole shareholder agreed and asked for a complete accounting showing the anticipated fees, charges and costs.

148. Defendants Winfield and Grodsky gave Debtor's sole shareholder several versions of the closing accounting numbers, none of which made sense or could be reconciled.

149. The accounting was complicated to obfuscate the scheme.

150. Debtor's sole shareholder was never given the documents which accurately detailed the charges, fees, or costs of the loan.

151. Defendants Grodsky and Winfield offered to provide financing for $1.4M at a discounted rate, but then failed to disclose the rate that would ultimately be charged.

152. Defendants Grodsky and Winfield also took an additional $500K in funds from the Debtor's sole shareholder cloaked as fees, costs charges and unreleased escrow.

153. Defendants Grodsky and Winfield told Debtor's sole shareholder that she would be paying one rate but ultimately, paid a completely new and different rate.

154. Debtor's sole shareholder never agreed to this new and different rate.

155. Defendants Grodsky and Winfield, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations, and promises and attempting to do so, did transmit and cause to be transmitted by means of writing, signs, radio, and television communication in

interstate foreign commerce, writings signs, signal, pictures and sounds for the purpose of executing such schemes and artifice, to wit and defraud Debtor's sole shareholder.

156. Defendants Grodsky and Windfield made materially false representations to Debtor's sole shareholder in order to induce Debtor's sole shareholder into entering into and guaranteeing a mortgage that they alleged was more affordable – but was not.

157. In 2015 Debtor's sole shareholder was provided with a Letter of Intent ("LOI/ term-sheet") which listed the terms and conditions of the anticipated loan. (See Exhibit 7: LOI/Term sheet),

158. Debtor's sole shareholder returned the terms-sheet with comments and questions relating to the loan, lender, points and fees.

159. Many questions were left unanswered by Defendants Grodsky and Winfield

160. Defendants Grodsky and Windfield fielded Debtor's sole shareholder questions to Defendant Koulouris.

161. Defendant Koulouris introduced herself as Defendant Winfield's assistant.

162. It was unclear by the documents what Defendant Koulouris role was in the refinancing. negotiations.

163. Defendant Kouluoris initially told Debtor's sole shareholder that she was helping Defendant Windfield and Grodsky and they were both working for Absolute Home Mortgage Corporation Loans as brokers.

164. However, according to the NYS Department of Incorporation website, Defendant Koulouris was employed by Defendant Absolute Home Mortgage Corporation Loans.

165. Defendant Kolouris was also listed as a Principal for ASAP Consulting.

166. However, it was later evidenced via Defendant Koulouris' email correspondence that she was employed by Absolute Home Mortgage Corporation as a loan Originator.  (See Exhibit 8 email showing Anatasia's Absolute Home Mortgage Corporation email address).

167. Realizing the inconsistencies and discrepancies, Debtor's sole shareholder conducted a search of

Absolute Home Mortgage Corporation, 2386 Hempstead Inc., ASAP Consulting, Intra Coastal Abstract, Inter Costal Abstract, General Abstract Title on the New York State Department of States Division of Incorporations Website.

168. Notably, in 2014, 2386 Hempstead Inc. was not listed on the New York State Division of Incorporation Corporate Database. Nor was Inter, Absolute, General (See Exhibits 10: Department of State Records Database).

169. Defendant Koulouris was licensed with the New York State Department of Banking under Absolute Home Mortgage Corporation Loans in 2014. (See Exhibit 11: Defendant Koulouris listed as Absolute Home Mortgage Loan Employee).

170. Debtor's sole shareholder contacted Absolute Home Mortgage Corporation to verify the employment of Defendants Koulouris and Winfield.

171. Absolute Home Mortgage Corporation Loan's lack of transparency was very disturbing.

172. Debtor's sole shareholder eventually spoke to Laura Goetz Absolute Home Mortgage Corporation Loan's alleged Principals.

173. Lauren Goetz told Debtor's sole shareholder that although Absolute Home Mortgage Corporation knew Defendant Winfield, he was not (1) one of their licensed brokers nor (2) did he work for Absolute Home Mortgage Corporation Loans.

174. Lauren Goetz told Debtor's sole shareholder that Defendant Koulouris was currently an employee of Absolute Home Mortgage Corporation Loans.

175. Ms. Goetz told Debtor's sole shareholder that she was allegedly unaware of any loans being underwritten with respect to the premises located at 60 West 91st Street New York City New York 10024.

176. This information was contrary to what Defendants Winfield, Grodsky and Kouloris told Debtor's sole shareholder. It was later evidenced that Kala Herghelegiu of Absolute Home Mortgage Corporation Loans was also a co-conspirator but this was never disclosed.

177. Defendant Windfield now told Debtor's sole shareholder that he was (1) "in the process of getting his real estate broker's license" (2) he did not work for Absolute Home Mortgage Corporation Loans (3) Defendant Koulouris was only his assistant.

178. Defendant Winfield told Debtor's sole shareholder that Defendant Grodsky's Lending Team included: Defendant Grodsky, Defendant 2386 Hempstead Inc., Defendant Kocoris, Defendant Moberg & Kocoris, a.k.a. and d.b.a. General Abstract Services, Defendant Winfield Defendant Koulouris Defendant ASAP Consulting, Defendant Donna Schofer of Intra Coastal Abstract, Defendant Intra Coastal Abstract.

179. Defendants did not disclose the identity of William E. Wilson to the Debtor's sole shareholder until the day of the 2015 closing.

180. Defendant William E. Wilson introduced himself to Debtor's sole shareholder as Title Closer and Public Notary who was certified in Nassau County New York under the registration number: 01WI6023601. (See Exhibit 14: Undertaking Statement showing Defendant Wilson's notary registration number).

181. Defendants never disclosed to Debtor's sole shareholder that he was an employee, owner, or affiliate of Inter Costal Abstract or its role in the refinancing.

182. Debtor's sole shareholder only circuitously found out that Inter Costal Abstract was the "shell" escrow company in the 2015 refinance.

183. Notably this almost one year later.

184. At the Debtor's sole shareholder request, the DHCR's Legal Assistant II Gloria Graham, sent a copy of the correspondence to Mr. William E Wilson. (See Exhibit 12 DHCR's August 21st 2015 letter to William Wilson of Tri Costal Abstract).

185. Notably, the Defendants never told Debtor's sole shareholder that moneys due her had been returned.

186. Defendants attempted to actively conceal this from the Debtor's sole shareholder by not communicating to her that money were now available and due her.

187. It should be noted that the individual who had identified himself to the Debtor's sole shareholder as Defendant Grodsky; and had endorsed the closing documents in 2014 was not Scott Grodsky.

188. Nor was he the individual who came to the Debtor's sole shareholder's premises on May 11th and 12th 2020 with the appointed Chapter 11 Bankruptcy Trustee.

189. This was a totally different man whom the Debtor's sole shareholder had never met or seen before.

190. This was identity fraud.

191. Defendants Windfield, Grodsky, Nelson, Horneffs and Waldhauser are liable for fraud because they had particular knowledge that the man who came to the 2015 and 2016 closing to effectuate the closing documents and represented to be the Lender Defendant Grodsky, was not the Lender or Principle of 2386 Hempstead Inc.

192. Defendants actively concealed these issues from Debtor's sole shareholder.

193. Defendants are liable for fraud because they had particular knowledge that (1) Defendant William Horneff, was actually the same Lender Defendant Grodsky as represented on the Title Insurance Closing Invoice # ORT-021451NY. (See Exhibit 1); and (2) commingled and withheld funds that were due to the Debtor's sole shareholder.

194. In the end a $400,000 amount ballooned into one-million-four-hundred-thousand (1,400.000) dollars and Debtor's sole shareholder was defrauded of no less than five-hundred-thousand dollars ($500,000).

195. Late 2015 Debtor's sole shareholder guaranteed the mortgage of one million four hundred thousand dollars ($1,400,000).

196. Debtor's sole shareholder hired Mahir Nisar Esq. of Waldhauser and Nisar, LLP to represent her; Mr. Nisar agreed to take on the instruction for $5000.

197. For reasons unknown, and without explanation, his partner Defendant Waldhauser Esq. took over the instruction instead and charged an additional $3000.

198. The initial due diligence leading up to the closing, insofar as the fees, charges and costs, was again obfuscated by inaccurate accounting.

199. There were items that allegedly clouded title and needed to be paid, to ensure the title would be free and clear to refinance.

200. There were several versions of the "Title Insurance Closing Invoice", "Statement of Mortgage Closings", and final disbursement accounting numbers, fees etc. (See Exhibits 15 - 18).

201. The original loan amount of four hundred thousand dollars ($400,000) ballooned into one million four hundred thousand dollars. ($1,400,000).

202. The Title Insurance and Closing Invoice etc. varied from one to the next, showing inaccurate closing totals (See Exhibit 15-18) and were impossible to reconcile.

203. Debtor's sole shareholder did not receive $142K cash out at the closing which Defendant Grosky and Winfield agreed to.

204. Intracoastal Abstract Inc. had received $133,108.20, (See Exhibit 18: Copy of draft to Intracoastal Abstract).

205. This was twice the face value of the initial judgements which clouded the title.

206. Another disturbing item was a October 15th 2015 letter sent by Defendant Donna Schofer of Intracoastal Abstract sent to Debtor's sole shareholder's attorney Defendant Waldhauser.

207. In that letter Defendant Schofer stated that her escrow department had only received and escrowed $6925.62 at the 2015 closing. (See Exhibit 19: Letter from Donna Schofer.

208. However, according to the Statement of mortgage closing (See Exhibit 17: Intra Coastal Abstract had received $133,108.20).

209. Debtor's sole shareholder notified Defendant Waldhauser of the inaccurate accounting on various other documents.

210. Specifically, Debtor's sole shareholder did not receive one-hundred and forty-two thousand dollars ($142,000) cash-out as per the agreement.

211. Defendants were paid the following:

a Moberg & Kocoris $6500 (See Exhibit 21: Copy check);

b Intra Coastal Abstract received $113,108.20, (See Exhibit 21: copy of check).

c Defendant Horneffs.

d Defendant Bill Wilson $500 (See Exhibit 23: copy bank draft

e Zeichner Ellman & Krause LLP (See Exhibit 4: Closing document of Zeichner Ellman Kraus: Copy check);

f ASAP Consulting $28,000 (See Exhibit 25: copy check)

g an additional $685.33 to Intra Coastal Abstract (See Exhibit 25: Copy check).

165. Debtor's sole shareholders reliance on the Defendants misrepresentations that she would receive a cash out payment of $142,000 was one of the reasons why Debtor's sole shareholder obtained and guaranteed the loan.

166. When Debtor's sole shareholder questioned why Defendant Intra Coastal Abstract had received $113,108.20, Debtor's sole shareholder was told that it was "standard procedure" for an escrow company to take twice the face value of funds to cover any judgements which "clouded title".

167. Debtor's sole shareholder told Defendant Waldhauser that she was entitled to receive more funds.

168. Defendant Waldhauser told Debtor's sole shareholder he could do nothing and directed Debtor's sole shareholder to contact the Defendant Intra Coastal Abstract directly.

169. Defendant Schofer told Debtor's sole shareholder that Defendant Intra Coastal Abstract they had nothing to do with the escrowed funds, and that she should contact the "lender's" attorney, Defendant Kocoris.

170. Debtor's sole shareholder called, sent emails and multiple letters requesting that the remaining balance be released to her.

171. Debtor's sole shareholder also requested an audit of the closing numbers, (See Exhibits 27: Letters to James Kocoris Esq.).

172. Debtor's sole shareholder contacted DHCR's Legal Assistant, Gloria Graham.

173. Ms. Graham told Debtor's sole shareholder that not only had the outstanding judgments from her agency been satisfied, but also the Department had also received $11,000 of over payment which was returned.

174. Debtor's sole shareholder asked Ms. Graham to forward a copy of the cancelled check and letter which was sent to Tri Costal Abstract.

175. A check was never forwarded to the Debtor's sole shareholder despite closing one year earlier.

176. The check and correspondence was returned to Defendant William Wilson of Inter Costal Abstract. (See Exhibit 12: copy of check from DHCR and correspondence).

177. It was never disclosed to Debtor's sole shareholder who Defendant William Wilson was, his relationship or to the closing was.

178. It was never disclosed to Debtor's sole shareholder what Defendant Inter Costal Abstract was or its role or involvement in the 2015 closing.

179. Indeed, up to this point Debtor's sole shareholder had never heard of Tri Costal Abstract Company.

180. Upon information and belief Defendant Tri Costal Abstract was attempting to conceal its involvement in the loan as was Defendant Absolute Home Mortgage Corporation Loans.

181. Defendant Tri Costal Abstract company was being used as a quasi-registered "shell" escrow company.

182. Debtor's sole shareholder understood the abstract company to be Intra Coastal Abstract Co. not Inter Costal Abstract. Notably, Tri Costal Abstract and Inter Costal Abstract, operate from the same location: 31 Stewart Street, Floral Park, New York 11001.

183. Inter Costal Abstract Company failed to disclose its position as the escrow agent to the Debtor's sole shareholder.

184. Please note that the cancelled check originated from Moberg and Kocoris

185. The returned check was then added to the alleged escrowed funds that was sent from Inter Costal Abstract and NOT Intra Coastal Abstract for $15,755.00 (see Exhibit 29: Letter).

186. Debtor's sole shareholder believed a credit balance was due to her of approximately $142,000.

187. In an effort to reconcile the accounting discrepancies Debtor's sole shareholder asked Defendant Grodsky, Winfiend, Kocoris and Waldhauser etc. to reimburse the funds.

188. None of the Defendants have responded to date.


**2016 REFINANCE**

189. In 2016 Defendant Grodsky once again used Defendant Korcoris Esq. Defendant General Abstract Services.

190. Notably, Defendants Moberg & Kocoris and d.b.a General Abstract Services located and operated out of the same offices 150 Broadhollow Road Ste. 320 Melville, New York 11747. (See Exhibit 6: Brochure General Abstract).

191. In 2016 Defendant Waldhauser Esq. was replaced by Aliya J. Nelson Esq. ("Defendant Nelson") as Debtor's sole shareholder's new counsel.

192. Before accepting the instruction, Defendant Nelson stated that her husband, Harvey Newkirk Esq. was charged, convicted and imprisoned for wire fraud. Charges she believed were allegedly false. (Index:15-cr-1073 See Exhibit 55: Complaint and Order U.S. -vs- Newkirk).

193. Debtor's sole shareholder appreciated Defendant Nelson's candor regarding her husband's plight.

194. Debtor's sole shareholder did not believe Defendant Nelson's ability to represent her would be compromised by her husband's misfortune.

195. Debtor's sole shareholder hired Defendant Nelson because she had been recommended to the Debtor's sole shareholder by another attorney.

196. As it will be later evidenced in this complaint, Defendants were all co-conspirators in the Fraud for Profit scheme against Debtor's sole shareholder.

197. Debtor's sole shareholder told Defendants Winfield, Grodsky, Kocoris and Nelson that she had not been given the full amount of her cash advance in 2015

198. Debtor's sole shareholder specifically asked Defendant Grodsky to instruct his attorney Defendant Kocoris to release the remaining funds due her immediately. (See Exhibit 56 request to release funds).

199. Defendant Grodsky initially told Debtor's sole shareholder that he was allegedly unaware of any funds being held in escrow for Debtor's sole shareholder. However, Defendant Grodsky told Debtor's sole shareholder that she should contact her counsel Defendant Nelson. (See Exhibit 57 Defendant Grodsky letter to Debtor's sole shareholder).

200. Debtor's sole shareholder contacted Defendant Nelson and asked that she release the funds.

201. Defendant Nelson denied that she was in receipt of any escrowed funds.

202. Defendant Windfield and Grodsky provided Debtor's sole shareholder with a term-sheet for the new loan. (See Exhibit 58: 2016 Term Sheet).

203. Debtor's sole shareholder then returned the documents with her comments, questions and mark-up; as she had done for the 2015 loan.

204. On about June 2015, approximately four (4) months before closing of the second refinance, Debtor's sole shareholder asked Defendants Nelson Winfield and Grodsky and Kocoris, for a full breakdown of charges, fees and full closing costs.

205. After 6 months, Debtor's sole shareholder had still not received anticipated closing numbers from Defendants.

206. Debtor's sole shareholder then asked Defendants Nelson Winfield Grodsky and Kocoris for an accurate accounting ALL of the closing numbers including the additional lenders fee for potentially discounting any deferred interest payments.

207. Debtor's sole shareholder received only a partial accounting of the fees and charges and closing costs to review.

206. Most of the accounting items were questionable. Specifically, an additional charge for $15,000 for a title report and title insurance policy, (9.99%) 10 points to refinance, $200,000 in fees.  However, there were additional concerning charges and fees.

207. Debtor's sole shareholder thought this was an exorbitant amount considering she had paid fifteen thousand dollars ($15,000) and refinanced twelve months prior.

208. Defendants never told Debtor's sole shareholder that the loan documents would be changing.

209. Defendants never communicated to Debtor's sole shareholder that there would be new CEMA documents or the new anticipated closing costs.

210. Debtor's sole shareholder never agreed to these new anticipated closing costs.

211. Notably, Debtor's sole shareholder was never given a copy of Title Insurance Policy, which upon information and belief was held by Defendants Grodsky and 2386 Hempstead Inc.

212. Defendant Grodsky selected the Title Insurance Policy and its details.

213. Debtor's sole shareholder did not have any input into the type of policy which ultimately was retained by Defendant Grodsky.

214. It would be interesting to note what the kind of insurance was taken out by Defendant Grodsky especially if he was insured against the non-payment of real estate or property taxes.

215. When Debtor's sole shareholder questioned the anticipated charges, fees and missing documents with  Defendants, Grodsky, Windfield, Kocoris and Nelson, Defendant Winfield stated the charges and fees were so-high because the extension was being treated as a "new loan" and not as an "extension" due to the additional cash out.

216. Debtor's sole shareholder never agreed to this.

217. Unsatisfied with the answer, Debtor's sole shareholder requested Defendants, Grodsky, Windfield, Kocoris and Nelson put their statements in writing.

218. Defendants, Grodsky, Windfield, Kocoris and Nelson never provided Debtor's sole shareholder with any statements reflecting the same.

219. Defendant Windfield, Defendant Nelson Grodsky, and Defendant Kocoris' reluctance to provide Debtor's sole shareholder with the statement, an accurate reconcilable accounting of the fees, charges, costs and disbursement numbers prompted Debtor's sole shareholder to reevaluate all of the closing documents, fees charges etc.

220. The Debtor's sole shareholder continued to request an accounting of the closing numbers from Defendants Nelson, Kocoris, Winfield and Grodsky.

221. Defendants Nelson, Kocoris, Winfield and Grodsky willfully deflected the Debtor's sole shareholder's concerns and continued to place blame on each other for not providing the necessary closing documents and closing accounting numbers to the Debtor's sole shareholder.

222. Defendants Nelson, Windfield, Kocoris and Grodsky are liable for fraud because they had particular knowledge that closing disbursement numbers being presented to the Debtor's sole shareholder were not accurate or what Debtor's sole shareholder agreed upon.

223. Defendants Nelson, Windfield, Kocoris and Grodsky because they actively concealed this issue from Debtor's sole shareholders in order to defraud her of money.

224. Defendants are liable for fraud because they had particular knowledge that the closing disbursement costs, fees and charges that were being presented was not what the Debtor's sole shareholder had agreed to.

225. Debtor's sole shareholder relied on Defendant Nelson, Winfield, Kocoris and Grodsky promise to provide them prior to the closing. They did not.

226. Debtor's sole shareholder was injured by this because she further encumbered herself and the premises with additional financial obligations.

227. Debtor's sole shareholder demanded ALL escrowed funds to be released immediately. (See Exhibit 33:

228. Letters requesting release of escrow money to Defendants Grodsky, Nelson and Kocoris).

229. One day before the closing, Defendant Nelson told Debtor's sole shareholder that the closing numbers had finally been calculated.

230. Defendant Windfield promised Debtor's sole shareholder to bring the new closing numbers to the table.

231. Defendant Nelson arrived several hours early to the closing to review the final numbers.

232. Instead Debtor's sole shareholder and Defendant Nelson were told that the disbursement numbers had still not been finalized.

233. Instead, Defendant Kocoris Esq. presented a completely new set of documents for her to sign. Specifically, CEMA.

234. Debtor's sole shareholder had never seen the new CEMA documents before her.

235. Furthermore, and upon further discovery, the Terms and Conditions that Debtor's sole shareholder agreed to guaranteed in 2015 were not included in the new 2016 documents.

236. Debtor's sole shareholder was now being presented with amended unverified closing documents.

237. What is notable is Defendant Nelson was allegedly not aware that the documents had been changed from the original terms and conditions Debtor's sole shareholder had agreed to in 2014.

238. Defendant Nelson had been hired to review the same.

239. As per the Debtor's sole shareholder's hand-written comments on the term sheet, Debtor's sole shareholder had specifically stated that the contents therein remain the same. (See Exhibit 36 LOI and handwritten comments).

240. Debtor's sole shareholder was injured by this because the new closing documents terms and conditions were very egregious in nature. Specifically, there was a section that read "the borrower had been given three hundred thousand dollars ($300,000) in cash as an advancement..." (that day.). (See Exhibit 37 first page of the new document with Defendant Nelson's handwritten changes).

241. This is false.

242. Debtor's sole shareholder was not been given three hundred thousand dollars in cash at the closing or at any other time!

243. Never-the-less, Defendant Kocoris insisted that Debtor's sole shareholder sign and guarantee the document.

244. Defendant Kocoris told Debtor's sole shareholder that it was normal business protocol to request this amount in an extension.

245. Debtor's sole shareholder refused.

246. There were other irregularities:

a. Misclassification of the property.

b. The new documents listed the property as "investment non-owner occupied" property", when in fact the property had been the Debtor's sole shareholder's family primary home for over seventy-five (75) years.

247. The closing stalled for three hours due to the Debtor's sole shareholder refusal to sign the new and unauthorized closing documents.

248. In order to move the closing forward, Defendant Nelson promised to provide an affidavit to the Debtor's sole shareholder substantiating what transpired at 2015 closing and confirm that the Debtor's sole shareholder had not in fact received three hundred thousand dollars ($300,000) in cash at the closing. Nor would she be liable for any tax consequences as a result.

249. Defendant Nelson has to date not given Debtor's sole shareholder the promised affidavit of the same.

250. Defendant Nelson willfully misled Debtor's sole shareholder and moreover, did not use jurisprudence at the closing, nor did she fulfill her fiduciary obligations relating to Debtor's sole shareholder's affairs.

251. Defendants Nelson , Kocoris, Grodsky and Winfield,are liable for fraud because they had particular knowledge that the closing 2016 CEMA was not the same as the 2015 closing documents, and did not include the terms and conditions agreed upon by the Debtor's sole shareholder.

252. Debtor's sole shareholder relied on Defendant Nelson, Winfield, Kocoris and Grodsky promise to provide the same closing documents as was memorialized in 2015.

253. They did not.

254. Debtor's sole shareholder was injured by this because she further encumbered herself and the premises with additional financial obligations.

255. Debtor's sole shareholder permitted Defendant Kocoris Esq. to escrow an additional $10,000.

256. The was used to pay for the annual insurance premium of $6884.11. (See Exhibit 37: escrow check to pay off the annual insurance premium of $6884.11. (See Exhibit 38: Escrow agreement).

257. This was done with the understanding that the credit balance would be immediately released to Debtor's sole shareholder following payment.

258. The insurance premium was paid immediately. However, Debtor's sole shareholder has yet to be reimbursed the difference of $3115.89.

259. In 2016 Defendant Grodsky and Windfield asked Debtor's sole shareholder if she wanted to extend and guarantee the loan for a third year.

260. Debtor's sole shareholder refused.

261. Debtor's sole shareholder in an effort to expose the fraud that she had been a victim of she filed complaints with the following local, State and Federal agencies:

a. Department of Financial Services Online Complaint Platform- June 30th 2017 (See Exhibit 40)

b. Attorney Grievance Committee Docket 2017.1226 - (See Exhibit 41)

c. New York State Department of Financial Services Case Number BKM-2017-1211039 - (See Exhibit 42)

d. State of New York Grievance Committee for the Tenth Judicial District December 5th 2017 – (See Exhibit 43)

e. Federal Trade Commission – (See Exhibit 44)

f. Office of the District Attorney Nassau County Complaint 991653-17 December 27th 2017 - (See Exhibit 45)

g. Nassau County Bar Association - December 14th 2017 (See Exhibit 46)

h. Attorney General Bureau of Consumer Frauds and Protections. December 13th 2017 –(See Exhibit 47)

i. The Lawyer's Fund for Client Protection - December 19th 2017 -

262. On or about 2017 Defendants Grodsky and 2386 Hempstead Inc. initiated a foreclosure action against the Debtor's sole shareholder's Company 6091 Street Corporation.

263. Debtor's sole shareholder who was the Guarantor of the loan was bit served as required by law pursuant to CPLR 3212(b).

264. Debtor's sole shareholder did not receive the notice, summons or the complaint because the notice had been properly delivered by the USPS.

265. It wasn't until one and one half (1½) years later, that the Debtor's sole shareholder received a notice of default judgement against the Debtor's sole shareholder's Corporate entity. 6091st Street Corporation.

266. On or about June 2019 Debtor's sole shareholder hired Stewart Shaw Esq. to vacate the default judgement and file an answer.

267. Stewart Shaw Esq. had indeed discovered that that Defendants Grodsky and Windfield

268. Hempstead Inc. and it's co-conspirators had inter alia indeed committed fraud.


**FORECLOSURE ACTION BACKGROUND**

*Please note that paragraphs 269 though ¶ 323 were written by Debtor's sole shareholder's attorney Daniel LoPresti of Shaw and Binder.*

269. The Debtor's sole shareholder first encountered someone who was alleging to be Defendant Grodsky as the Lender, when she guaranteed the Promissory Note and mortgage for one million four hundred thousand dollars ($1,400,000).

270. The note and mortgage were for a one-year term, with interest only payments.

271. The Debtor's sole shareholder paid the interest when it was due. Defendant Grodsky then offered to extend the note for another year.

272. But Debtor's sole shareholder refused Defendant's Grodsky's offer to extend.

273. As the 2015 loan neared maturity Debtor's sole shareholder contacted various other lenders and discussed alternative financing.

274. On or about August 13, 2016, Defendant Grodsky provided Guarantor / Borrower with a written Letter of Intent ("LOI") offering to extend the loan by one year at 3% interest only, with eight points and a 2% "Broker Fee" to be paid to Lender and stating, in pertinent part:

1. Lender agrees to lend and (sic) additional $100,000 to 60 91 Street Corporations and extend the loan an additional year.

2. The monthly interest only payment of $3,500.00 will remain the same. And all additional monies and costs associated with the extension will be deferred and added to the final payoff of the loan.

3. At the time the loan is paid in full the payoff will include the additional $100,000, deferred interest on the additional funds, lender and broker fees associated with the extension, all closing costs including but not limited NY mortgage tax based on the additional $100,000, title searches, lender legal fees for the preparation of revised Mortgage documents and interest on the above referenced deferred charges. (Emphasis added)

275. After speaking to Lender, the LOI was amended to provide for a broker's fee of 1% of the original loan amount, or $14,000. The terms of the note and mortgage were to be the same as those in the 2015 loan documents (note and mortgage). A copy of the marked up LOI is annexed as Exhibit 34: This writing was Debtor's sole shareholder's counteroffer, which Lender accepted in 2015. These terms were discussed with the purported broker (one Defendant Winfield "Winfield" or "Lender's broker") the Debtor's sole shareholder's agent, and Lender's team, including Defendants Grodsky", Nelson, and Kocoris.

276. Debtor's sole shareholder say "purported" broker because Debtor's sole shareholder has since realized Defendant's actual status and capacity was deceptive. As will be explained elsewhere, Defendant Winfield was actually a highly conflicted "dual agent" who wore two other hats: One as Debtor's sole shareholder's and Borrower's broker "Borrower's broker" as well as a partner or principal of the 2386 Hempstead Inc" and Lender.

277. This morass was inherent with conflict. Such "unclean hands" and breach of fiduciary duty to me should be imputed to the Lender-Defendants.

278. As Lender's broker, it has now become apparent that Winfield's job was to obtain the highest interest rate and most onerous terms in favor of the Lender to further the Lender's interest, and not Debtor's sole shareholders.

279. On the other hand, it has now become also apparent that the Borrower's broker, as such, should have had the opposite goals, so as to discharge his fiduciary obligation to the Debtor's sole shareholder, to obtain, for example, the lowest interest rate upon terms most favorable to me, which could necessarily diminish the protection of the lien of the Lender's mortgage sought to be achieved by Debtor's sole shareholder.

280. Defendant Winfield never disclosed, let alone explained, to Debtor's sole shareholder, this inherent conflict.

281. Debtor's sole shareholder requests on this application that equity intervene and protect her.

282. Defendants Windfield and Grodsky, further agreed that they would defer payment of all closing costs, the additional $100,000 and interest thereon and would add it to the payoff at the time the loan is paid in full (at maturity, when the loan transferred to another lender, not at the closing).

283. Once the LOI was negotiated, Debtor's sole shareholder was satisfied with the terms and ceased looking for alternative financing which was then available in the market.

284. Debtor's sole shareholder and Borrower did this in reliance on the terms negotiated in the Letter of Intent ("LOI"). The LOI specifically provided that the terms of the 2016 loan would be substantially the same as the terms of the 2015 loan.

285. Prior to the closing Debtor's sole shareholder repeatedly asked Defendant Grodsky and Windfield to provide her with a list of closing costs and to explain to her what would happen at the closing.

286. Lender(s) never provided Debtor's sole shareholder with an explanation. Rather, at the closing Debtor's sole shareholder was confronted with documents that she was told I had to sign or the loan would not be given; this was an ultimatum. Among other things, Debtor's sole shareholder was forced to sign a note and mortgage that stated that she was borrowing an additional $300,000 and a new note and mortgage for $1,700,000. This amount was never discussed with Debtor's sole shareholder and this amount was not funded by Lender.

287. In the end, Debtor's sole shareholder was defrauded of approximately $500K. was from 2014 – 2016.

288. At the closing, on October 3, 2016, for the first time Debtor's sole shareholder was presented with a

Consolidation, Extension and modification Agreement ("CEMA"), a note and mortgage for $300,000 (the "$300,000 mortgage") and a consolidated note and mortgage for $1,700,000."

289. Notably, Debtor's sole shareholder did not agree to the loan amount being increased to $1,700,000 and did not receive the proceeds of the $300,000 loan.

290. Specifically, Debtor's sole shareholder only received a check for only $87,729.87.

291. Defendants Winfield and Grodsky ("Lender"), paid itself and others monies from the proceeds of loan that they were not entitled to and which Debtor's sole shareholder did not authorize.

292. More the Lender unilaterally, without Debtor's sole shareholders' consent or authorization, took 9.99 points, an excess of approximately $34,000.

293. The Lender also paid itself the broker's fee, and a building inspection fee of $2000, misrepresenting to Debtor's sole shareholder that the fee was for a broker, and a licensed inspector, when, in fact, it was paid to itself.

294. Indeed, Defendant Winfield, the alleged broker, told Debtor's sole shareholder hem was partners with Defendant Grodsky, of 2386 Hempstead Inc.

295. This was a collusive endeavor.

296. Defendant Lenders and co-conspirators never provided Debtor's sole shareholder with a copy of the Title Insurance Policy and took over $150,000 in escrowed funds, and never returned any of the escrow funds to the Debtor's sole shareholder.

297. Defendant Lenders and co-conspirators never provided accurate accounting to the Debtor's sole shareholder showing where funds went.

298. This is a violation of the law.

299. Finally, Debtor's sole shareholder never received fully executed copies of the loan documents at or after the closing.

300. Although Debtor's sole shareholder was represented by counsel at the closing, neither Defendant Grodsky and/or his Co-conspirators could explain to Debtor's sole shareholder where the moneys went.

301. Defendant Grodsky and/or his Co-Conspirators agreed to defer payment of the $100,000 and the closing costs (i.e., at the maturity of the loan).

302. Debtor's sole shareholder was also told she had no choice but to sign the papers or the mortgage would not be extended.

303. Debtor's sole shareholder was not given a full and fair opportunity to read the documents as she had not been given a copy of the documents to review despite requesting them.

304. Debtor's sole shareholder was placed under emotional distress and economic duress.

305. Debtor's sole shareholder was coerced and deprived of time to consider and then effectuate, as a professional matter, other alternatives which were apparent in the market.

306. Debtor's sole shareholder now knows that the documents do not reflect Defendant Grodsky and his co-conspirators representation to me.

307. More specifically, rather than merely deferring payment of closing costs and the additional funds and adding them to the payoff, i.e. later down the road at maturity. Lender had Debtor's sole shareholder sign a new note and mortgage for $300,000 at the closing and forced the Debtor's sole shareholder to Borrower to borrow $1,700,000 rather than the $1,400,000 amount that was promised.

308. This was to Debtor's sole shareholder's detriment because it further encumbered the property, and because Debtor's sole shareholder did not receive $300,000 (other than the less than $88,000 paid to Debtor's sole shareholder).

309. Defendants and his co-conspirators misrepresented the essential terms of the loan and the actual accounting of charges, points fees and cost of the loans.  Moreover, lender/secured creditor (2386 Hempstead Ince) has not provided any proof that retroactive taxes have been paid. According to the NYC Department of Finance, they have not been paid for that period.

310. The closing documents did not state what was promised, thereby denying Debtor's sole shareholder of her statutory right to fair and honest business practices.

311. Defendants Grodsky, Windfield and  his co-conspirators also misrepresented the closing costs, seeking entitlement to a broker fee when, in fact, there was no "broker".

312. Documents from the closing, which my new attorneys only recently received from my former closing attorney Defendant Nelson. (Exhibit 37:), show that both the points and the broker fee went directly to the Lender.

313. A Lender whom was not at the 2016 closing or whom Debtor's sole shareholder has never met.

314. Thus, the actual deal was "masked" until the day of the closing to deprive the Debtor's sole shareholder of right in fair business practices.

315. Indeed, there was no meeting of the minds, hence no contractual relationship. Making the 2016 loan even more onerous was the inclusion of a default interest rate of nearly 25%. This loan was made in bad faith with an intent to deprive Debtor's sole shareholder of her rights of fair business practices under GBL § 349 and NYC Consumer Protection Law Under § 20-700.

316. The Lender also falsely states that Debtor's sole shareholder would receive a check for $97,729.87.

317. This is also false.

318. Debtor's sole shareholder did not receive a check for $97,729.97.

319. Of course, the LOI provided that Borrower would receive $100,000 an additional 2.99% of the loan proceeds, monies that should have gone to Borrower.

320. Such incestuous Lender-broker-Borrower relationships, in view of the conflicts of the dual agency, should not be countenanced by the Court.

321. Since the documents that Debtor's sole shareholder executed do not reflect what Debtor's sole shareholder agreed to, nor are they the same documents that Debtor's sole shareholder guaranteed and signed in 2014, the mortgage should not have been enforced against Borrower or the Debtor's sole shareholder because it violated Debtor's sole shareholder Civil, Constitutional and Statutory Rights under the law.

322. Rather, the Mortgage and/or the Note should be eviscerated and/or at the very least recalculated to exclude the default interest rate charged to the Principle amount at $25%.

323. Additionally there was no referee hearing: the referee's computations computed on default by Defendant Kleinberger and without a hearing were false and inaccurate.

324. No client testimony or affidavit was provided to the Defendant (Referee).

325. The Defendant Referee's findings were not based on personal knowledge, but hearsay, and therefore should not have been confirmed.

326. Defendants actions are relevant and is indicative of their misrepresentation and lack of good faith.

327. By December 18th 2018 Debtor's sole shareholder's company 60 91st Street Corporation ("borrower") was now in default and a judgement entered.

328. Initially, case was adjudicated to Honorable Mc Manon, but then reassigned to Judge Bluth in Supreme Court New York County under index 850274/2017.

329. Debtor's sole shareholder hired Shaw and Binder to represent the borrower to vacate the default judgement and file an answer.

330. Shaw and Binder found inter alia that the 2014, 2015 and 2016 mortgage and refinancing were fraudulent.

331. Debtor's sole shareholder Counsel established;

a. "Debtor's sole shareholder claims of fraud were accurate and satisfied each element of the cause of action."

b. "Defendants misrepresentation and lack of good faith with respect to the mortgage and note were clear."

c. "Attorney fees presented by the Lenders attorney in the foreclosure and sale, were not supported by invoices or any documentary evidence."

d. "Lack of a valid referee hearing"

e. "Referee reports and fee computations that were computed on default and without a hearing were inaccurate and unsubstantiated".

f. "That Defendants Windfield, Grodsky used a usurious rate which had been cloaked as fees, charges, points and unreleased escrowed funds."

332. Despite the superfluous amount of evidence, Judge Bluth ruled against the Debtor's sole shareholders request to vacate the default judgement and be heard.

333. Judge Bluth also allowed Debtor's sole shareholder's Counsel to withdraw as Counsel.

334. Unfortunately, Debtor's sole shareholder could not secure new counsel in time, nor had she the financial resources at that time, to continue the case.

335. Judge Bluth ordered the foreclosure and sale of the property on November 21st 2019 for sale of property on February 5th 2020.

336. Debtor's sole shareholder/Borrower did not have a full and fair opportunity to litigate the issue in State Court.

337. Debtor's sole shareholder/Borrower was denied of her Right of trial by jury.

338. Defendants violated Debtor's sole shareholders' statutory and constitutional substantive and procedural due process rights to fair trial.

339. A Notice of Appeal was filed, but not perfected with the Appeals Court First Department in New York on or about February 2020.  (See Exhibit 49: Notice of Appeal).


**PRAYER FOR RELIEF WHEREFORE,**  the Debtor's sole shareholder respectfully seeks (1) an injunction of the sale, closing, marketing or showing of the debtors property, unless it is to re-let (rent) the units so an income can be generated (2) the debtor be allowed to rent the units to generate an operating income to payoff the existing unsecured creditors (3) the instant case not be dismissed or converted to Chapter 7, but that the lender/secured creditor and co-conspirators to be prosecuted to the full extent of the law for their roles in defrauding the Debtor (3) a plan be established to pay-off the existing unsecured creditors (4) a stay on any and all evictions proceedings of Debtor's sole shareholder and family from the unit until located at 60 West 91st Street Apartment A NYC NY 10024.

Dated: New York, New York
December 12, 2020

Respectfully submitted,

/k/_____
Kim Mortimer
60 West 91st Street
New York, New York
10024
(646) 684-5774
Kimmortimer5@gmail.com

Via ECF

To:
**Brian S. Masumoto**
Office of the United States Trustee
201 Varick Street Room 1006
New York, New York 10014
(212) 510-0500
Fax: (212) 668-2255
Email: nysbnotice@gmail.com

**James Christopher Vandermark**
WHITE AND WILLIAMS LLP
7 Times Square
Suite 2900
New York, NY 10036
(212) 244-9500
Fax: (212) 244-6200
Email: vandermarkj@whiteandwilliams.com

**Heidi Sorvino**
WHITE AND WILLIAMS LLP
7 Times Square
Suite 2900
New York, NY 10036
(212) 244-9500
Fax: (212) 244-6200
Email: vsorvinoh@whiteandwilliams.com

**Kent Gross Esq.**
300 East 33rd Street Ste 18B
New York, New York 10168

1 Grand Central Place, Suite 2515
New York, NY 10165
New York County
Phone: (646) 506-8662
Email:[quoguelaw@msn.com](mailto:quoguelaw@msn.com)

**United States Trustee**
Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street Room 1006
New York, New York 10014